# Exhibit A

(TO PLAINTIFF'S ATTORNEY:   PLEASE CIRCLE TYPE OF ACTION INVOLVED:
TORT - MOTOR VEHICLE TORT - CONTRACT -
EQUITABLE RELIEF - OTHER)

## COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.                                            SUPERIOR COURT
                                                        CIVIL ACTION

                                                        NO.   17   1478

_Shaun R. Levesque_____, _Plaintiff(s)_

v.

_Schroder Investment Management_ _Defendant(s)_
_North America Inc. et al._

### SUMMONS

To the above-named Defendant:

        You are hereby summoned and required to serve upon _Martha J. Zackin_
plaintiff's attorney, whose address is _Bello Welsh LLP, 125 Summer St, Suite 1200,_
an answer to the complaint which is herewith served upon you, within 20 days after service of this _Boston, M_
summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken _02110_
against you for the relief demanded in the complaint. You are also required to file your answer to the
complaint in the office of the Clerk of this court at Dedham either before service upon the plaintiff's
attorney or within a reasonable time thereafter.

        Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim
which you may have against the plaintiff which arises out of the transaction or occurrence that is the
subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other
action.

WITNESS,  JUDITH FABRICANT, Esquire      , at _____ the _11th_
day of _November_____, in the year of our Lord two thousand and _17_

                                                        _____ _Clerk._

NOTES:
1.  This summons is issued pursuant to Rules 4 of the Massachusetts Rules of Civil Procedure.
2.  When more than one defendant is involved, the names of all such defendants should appear in the caption.
    If a separate summons is used for each such defendant, each should be addressed to the particular defendant.

F-33

## PROOF OF SERVICE OF PROCESS

I hereby certify and return that on ........................................, 20      , I served a copy of the within summons, together with a copy of the complaint in this action, upon the within-named defendant, in the following manner (See Mass. R. Civ. P. 4 (d) (1-5):

.....................................................................................................................................................

.....................................................................................................................................................

.....................................................................................................................................................

Dated:                      , 20        .....................................................................................................

**N.B.   TO PROCESS SERVER:-**
**PLEASE PLACE DATE YOU MAKE SERVICE ON DEFENDANT IN**
**THIS BOX ON THE ORIGINAL AND ON COPY SERVED ON**
**DEFENDANT.**

|  |
| --- |
| , 20      . |

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.                     SUPERIOR COURT
                                 CIVIL ACTION

NO.1782CV01478

Shaun R. Levesque.., Plaintiff

v.

Schroder Investment... Defendant
Management North America Inc
SUMMONS   et al .

(Mass. R. Civ. P.4)

(TO PLAINTIFF'S ATTORNEY:   PLEASE CIRCLE TYPE OF ACTION INVOLVED:
TORT - MOTOR VEHICLE TORT - CONTRACT -
EQUITABLE RELIEF - OTHER)

## COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.                                    SUPERIOR COURT
CIVIL ACTION

NO.   17   1478

_Shaun R Levesque_ , *Plaintiff(s)*

v.

_Karl Dasher et al._ , *Defendant(s)*

### SUMMONS

To the above-named Defendant:

You are hereby summoned and required to serve upon _Martha J. Zackin_, plaintiff's attorney, whose address is _Bello Welsh LLP, 125 Summer St, Suite 120, Boston, MA 02111_ an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this court at Dedham either before service upon the plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

WITNESS,   JUDITH FABRICANT, Esquire   , at ............................... the _11th_ day of _November_ ..............., in the year of our Lord two thousand and _17_

_Walter C. Dimilly_ Clerk.

NOTES:
1. This summons is issued pursuant to Rules 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all such defendants should appear in the caption. If a separate summons is used for each such defendant, each should be addressed to the particular defendant.

F-33

## PROOF OF SERVICE OF PROCESS

I hereby certify and return that on ........................................., 20      , I served a copy of the within summons, together with a copy of the complaint in this action, upon the within-named defendant, in the following manner (See Mass. R. Civ. P. 4 (d) (1-5):

............................................................................................................................................................

............................................................................................................................................................

............................................................................................................................................................

Dated: _____ , 20 _____ ...............................................................................

**N. B.   TO PROCESS SERVER:-**
**PLEASE PLACE DATE YOU MAKE SERVICE ON DEFENDANT IN**
**THIS BOX ON THE ORIGINAL AND ON COPY SERVED ON**
**DEFENDANT.**

| , 20      . |
| --- |

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.                SUPERIOR COURT
                            CIVIL ACTION

                            NO. 1782 CV01478

                            *Shawn R. Leveaque....., Plaintiff*

                            v.

                            *Karl Dasher et al..., Defendant*

                            **SUMMONS**

                            **(Mass. R. Civ. P.4)**

| CIVIL TRACKING ORDER (STANDING ORDER 1-88) | DOCKET NUMBER 1782CV01478 | Trial Court of Massachusetts The Superior Court |
|---|---|---|
| CASE NAME: Shaun R Levesque vs. Schroder Investment Management North America Inc et al | | Walter F. Timilty, Clerk of Courts |
| TO: Martha J Zackin, Esq. Bello Welsh LLP 125 Summer St Suite 1200 Boston, MA 02110 | | COURT NAME & ADDRESS Norfolk County Superior Court 650 High Street Dedham, MA 02026 |

### TRACKING ORDER - F - Fast Track

You are hereby notified that this case is on the track referenced above as per Superior Court Standing Order 1-88. The order requires that the various stages of litigation described below must be completed not later than the deadlines indicated.

#### STAGES OF LITIGATION                          DEADLINE

| | SERVED BY | FILED BY | HEARD BY |
|---|---|---|---|
| Service of process made and return filed with the Court | | 02/20/2018 | |
| Response to the complaint filed (also see MRCP 12) | | 03/21/2018 | |
| All motions under MRCP 12, 19, and 20 | 03/21/2018 | 04/20/2018 | 05/21/2018 |
| All motions under MRCP 15 | 03/21/2018 | 04/20/2018 | 05/21/2018 |
| All discovery requests and depositions served and non-expert despositions completed | 09/17/2018 | | |
| All motions under MRCP 56 | 10/17/2018 | 11/16/2018 | |
| Final pre-trial conference held and/or firm trial date set | | | 03/18/2019 |
| Case shall be resolved and judgment shall issue by | | | 11/21/2019 |

The final pre-trial deadline is **not the scheduled date of the conference.** You will be notified of that date at a later time. Counsel for plaintiff must serve this tracking order on defendant before the deadline for filing return of service. This case is assigned to

| DATE ISSUED 11/21/2017 | ASSISTANT CLERK | PHONE |
|---|---|---|

| CIVIL ACTION COVER SHEET | DOCKET NUMBER | Trial Court of Massachusetts The Superior Court |
|---|---|---|

| | | COUNTY |
|---|---|---|
| PLAINTIFF(S): | Shaun R. Levesque | Norfolk |
| ADDRESS: | 60 Oak Point | |
| Wrentham, MA 02093 | | DEFENDANT(S): Schroder Investment Management North America Inc. and |
| | | Karl Dasher |
| ATTORNEY: | John F. Welsh and Martha J. Zackin | |
| ADDRESS: | Bello Welsh LLP | ADDRESS: 7 Bryant Park |
| 125 Summer Street, Suite 1200 | | New York, NY 10018 |
| Boston, MA 02110 | | |
| BBO: | Welsh 522640 / Zackin 555733 | |

## TYPE OF ACTION AND TRACK DESIGNATION (see reverse side)

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| A04 | Employment Contract | F | ☒ YES   ☐ NO |

*If "Other" please describe:

## STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

### TORT CLAIMS
(attach additional sheets as necessary)

A. Documented medical expenses to date:
    1. Total hospital expenses ................................................................................ $ _____
    2. Total doctor expenses ................................................................................ $ _____
    3. Total chiropractic expenses ................................................................................ $ _____
    4. Total physical therapy expenses ................................................................................ $ _____
    5. Total other expenses (describe below) ................................................................................ $ _____
        Subtotal (A): $ _____
B. Documented lost wages and compensation to date ................................................................................ $ _____
C. Documented property damages to dated ................................................................................ $ _____
D. Reasonably anticipated future medical and hospital expenses ................................................................................ $ _____
E. Reasonably anticipated lost wages ................................................................................ $ _____
F. Other documented items of damages (describe below) ................................................................................ $ _____

G. Briefly describe plaintiff's injury, including the nature and extent of injury:

        TOTAL (A-F):$ _____

### CONTRACT CLAIMS
(attach additional sheets as necessary)

Provide a detailed description of claims(s):
Refusal and failure to pay commissions due and owing to Plaintiff in violation of employment contract and the     TOTAL: $  over $3.8MM

MA Wage Act.

Signature of Attorney/Pro Se Plaintiff: X _____    Date: Nov 20, 2017

RELATED ACTIONS: Please provide the case number, case name, and county of any related actions pending in the Superior Court.

## CERTIFICATION PURSUANT TO SJC RULE 1:18

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

Signature of Attorney of Record: X _____    Date: Nov 20, 2017

## CIVIL ACTION COVER SHEET INSTRUCTIONS
## SELECT CATEGORY THAT BEST DESCRIBES YOUR CASE

### AC Actions Involving the State/Municipality *

AA1 Contract Action Involving Commonwealth,
Municipality, MBTA, etc. (A)
AB1 Tortious Action Involving Commonwealth,
Municipality, MBTA, etc. (A)
AC1 Real Property Action Involving
Commonwealth, Municipality, MBTA etc. (A)
AD1 Equity Action Involving Commonwealth,
Municipality, MBTA, etc. (A)
AE1 Administrative Action Involving
Commonwealth, Municipality, MBTA,etc. (A)

### CN Contract/Business Cases

| | |
|---|---|
| A01 Services, Labor, and Materials | (F) |
| A02 Goods Sold and Delivered | (F) |
| A03 Commercial Paper | (F) |
| A04 Employment Contract | (F) |
| A06 Insurance Contract | (F) |
| A08 Sale or Lease of Real Estate | (F) |
| A12 Construction Dispute | (A) |
| A14 Interpleader | (F) |
| BA1 Governance, Conduct, Internal | |
|    Affairs of Entities | (A) |
| BA3 Liability of Shareholders, Directors, | |
|    Officers, Partners, etc. | (A) |
| BB1 Shareholder Derivative | (A) |
| BB2 Securities Transactions | (A) |
| BC1 Mergers, Consolidations, Sales of | |
|    Assets, Issuance of Debt, Equity, etc. | (A) |
| BD1 Intellectual Property | (A) |
| BD2 Proprietary Information or Trade | |
|    Secrets | (A) |
| BG1 Financial Institutions/Funds | (A) |
| BH1 Violation of Antitrust or Trade | |
|    Regulation Laws | (A) |
| A99 Other Contract/Business Action - Specify | (F) |

\* Choose this case type if ANY party is the
Commonwealth, a municipality, the MBTA, or any
other governmental entity UNLESS your case is a
case type listed under Administrative Civil Actions
(AA).

† Choose this case type if ANY party is an
incarcerated party, UNLESS your case is a case
type listed under Administrative Civil Actions (AA)
or is a Prisoner Habeas Corpus case (E97).

### ER Equitable Remedies

| | |
|---|---|
| D01 Specific Performance of a Contract | (A) |
| D02 Reach and Apply | (F) |
| D03 Injunction | (F) |
| D04 Reform/ Cancel Instrument | (F) |
| D05 Equitable Replevin | (F) |
| D06 Contribution or Indemnification | (F) |
| D07 Imposition of a Trust | (A) |
| D08 Minority Shareholder's Suit | (A) |
| D09 Interference in Contractual Relationship | (F) |
| D10 Accounting | (A) |
| D11 Enforcement of Restrictive Covenant | (F) |
| D12 Dissolution of a Partnership | (F) |
| D13 Declaratory Judgment, G.L. c.231A | (A) |
| D14 Dissolution of a Corporation | (F) |
| D99 Other Equity Action | (F) |

### PA Civil Actions Involving Incarcerated Party †

| | |
|---|---|
| PA1 Contract Action Involving an | |
|    Incarcerated Party | (A) |
| PB1 Tortious Action Involving an | |
|    Incarcerated Party | (A) |
| PC1 Real Property Action Involving an | |
|    Incarcerated Party | (F) |
| PD1 Equity Action Involving an | |
|    Incarcerated Party | (F) |
| PE1 Administrative Action Involving an | |
|    Incarcerated Party | (F) |

### TR Torts

| | |
|---|---|
| B03 Motor Vehicle Negligence - Personal | |
|    Injury/Property Damage | (F) |
| B04 Other Negligence - Personal | |
|    Injury/Property Damage | (F) |
| B05 Products Liability | (A) |
| B06 Malpractice - Medical / Wrongful Death | (A) |
| B07 Malpractice - Other | (A) |
| B08 Wrongful Death, G.L. c.229 §2A | (A) |
| B15 Defamation | (A) |
| B19 Asbestos | (A) |
| B20 Personal Injury - Slip & Fall | (F) |
| B21 Environmental | (F) |
| B22 Employment Discrimination | (F) |
| BE1 Fraud, Business Torts, etc. | (A) |
| B99 Other Tortious Action | (F) |

### RP Real Property

| | |
|---|---|
| C01 Land Taking | (F) |
| C02 Zoning Appeal, G.L. c. 40A | (F) |
| C03 Dispute Concerning Title | (F) |
| C04 Foreclosure of a Mortgage | (X) |
| C05 Condominium Lien & Charges | (X) |
| C99 Other Real Property Action | (F) |

### MC Miscellaneous Civil Actions

| | |
|---|---|
| E18 Foreign Discovery Proceeding | (X) |
| E97 Prisoner Habeas Corpus | (X) |
| E22 Lottery Assignment, G.L. c. 10 §28 | (X) |

### AB Abuse/Harassment Prevention

| | |
|---|---|
| E15 Abuse Prevention Petition, G.L. c. 209A | (X) |
| E21 Protection from Harassment, G.L. c. 258E | (X) |

### AA Administrative Civil Actions

| | |
|---|---|
| E02 Appeal from Administrative Agency, | |
|    G.L. c. 30A | (X) |
| E03 Certiorari Action, G.L. c.249 §4 | (X) |
| E05 Confirmation of Arbitration Awards | (X) |
| E06 Mass Antitrust Act, G. L. c. 93 §9 | (A) |
| E07 Mass Antitrust Act, G. L. c. 93 §8 | (X) |
| E08 Appointment of a Receiver | (X) |
| E09 Construction Surety Bond, G.L. c. 149 | |
|    §§29, 29A | (A) |
| E10 Summary Process Appeal | (X) |
| E11 Worker's Compensation | (X) |
| E16 Auto Surcharge Appeal | (X) |
| E17 Civil Rights Act, G.L. c.12 §11H | (A) |
| E24 Appeal from District Court | |
|    Commitment, G.L. c.123 §9(b) | (X) |
| E25 Pleural Registry (Asbestos cases) | |
| E94 Forfeiture, G.L. c265 §56 | (X) |
| E95 Forfeiture, G.L. c.94C §47 | (F) |
| E99 Other Administrative Action | (X) |
| Z01 Medical Malpractice - Tribunal only, | |
|    G.L. c. 231 §60B | (F) |
| Z02 Appeal Bond Denial | (X) |

### SO Sex Offender Review

| | |
|---|---|
| E12 SDP Commitment, G.L. c. 123A §12 | (X) |
| E14 SDP Petition, G.L. c. 123A §9(b) | (X) |

### RC Restricted Civil Actions

| | |
|---|---|
| E19 Sex Offender Registry, G.L. c.6 §178M | (X) |
| E27 Minor Seeking Consent, G.L. c.112 §12S | (X) |

TRANSFER YOUR SELECTION TO THE FACE SHEET

EXAMPLE:

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| B03 | Motor Vehicle Negligence-Personal Injury | F | ☒ YES    ☐ NO |

### STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A

DUTY OF THE PLAINTIFF - The plaintiff shall set forth, on the face of the civil action cover sheet (or attach additional sheets as necessary), a statement specifying the facts on which the plaintiff relies to determine money damages. A copy of such civil action cover sheet, including the statement as to the damages, shall be served with the complaint. A clerk-magistrate shall not accept for filing a complaint, except as otherwise provided by law, unless it is accompanied by such a statement signed by the attorney or pro se party.

DUTY OF THE DEFENDANT - If the defendant believes that the statement of damages filed by the plaintiff is inadequate, the defendant may file with his/her answer a statement specifying the potential damages which may result if the plaintiff prevails.

**A CIVIL COVER SHEET MUST BE FILED WITH EACH COMPLAINT.**
**FAILURE TO COMPLETE THIS COVER SHEET THOROUGHLY AND ACCURATELY**
**MAY RESULT IN DISMISSAL OF THIS ACTION.**

COMMONWEALTH OF MASSACHUSETTS

NORFOLK s.s.                                          SUPERIOR COURT

| | |
|---|---|
| SHAUN R. LEVESQUE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. _____ |
| v. ) | |
| ) | |
| SCHRODER INVESTMENT MANAGEMENT ) | |
| NORTH AMERICA INC., and KARL DASHER, ) | |
| ) | |
| Defendants. ) | |

## NOTICE OF APPEARANCE

Please take note that the undersigned, Martha J. Zackin, hereby enters her appearance as counsel to Plaintiff Shaun R. Levesque, in the above-captioned matter.

Respectfully submitted,

**SHAUN R. LEVESQUE**

By his attorneys,

John F. Welsh, BBO#522640
Martha J. Zackin, BBO#555733
BELLO WELSH LLP
125 Summer Street, Suite 1200
Boston, Massachusetts 02110
Tel: (617) 247-4100
Fax: (617) 247-4125
jwelsh@bellowelsh.com
mzackin@bellowelsh.com

Dated: November __, 2017

COMMONWEALTH OF MASSACHUSETTS

NORFOLK s.s.                                                SUPERIOR COURT

|  |  |  |
|---|---|---|
| SHAUN R. LEVESQUE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. _____ |
| v. | ) | |
| | ) | |
| SCHRODER INVESTMENT MANAGEMENT | ) | |
| NORTH AMERICA INC., and KARL DASHER, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## **NOTICE OF APPEARANCE**

Please take note that the undersigned, John F. Welsh, hereby enters his appearance as

counsel to Plaintiff Shaun R. Levesque, in the above-captioned matter.

Respectfully submitted,

**SHAUN R. LEVESQUE**

By his attorneys,

John F. Welsh, BBO#522640
Martha J. Zackin, BBO#555733
BELLO WELSH LLP
125 Summer Street, Suite 1200
Boston, Massachusetts 02110
Tel: (617) 247-4100
Fax: (617) 247-4125
jwelsh@bellowelsh.com
mzackin@bellowelsh.com

Dated: November __, 2017

COMMONWEALTH OF MASSACHUSETTS

NORFOLK s.s.                                                SUPERIOR COURT

|   |   |
|---|---|
| SHAUN R. LEVESQUE, | ) |
|  | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| SCHRODER INVESTMENT MANAGEMENT | ) |
| NORTH AMERICA INC., and KARL DASHER, | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

Civil Action No. _____

### PLAINTIFF'S MOTION TO APPOINT SPECIAL PROCESS SERVER

Pursuant to Mass. R. Civ. P. 4(c), Plaintiff Shaun R. Levesque hereby moves this

Honorable Court to appoint the following entities (or its employees or agents) as special process

server to serve the Summons, Complaint and such other process as may be necessary to serve in

the above-captioned matter:

> Ricardo Delpratt/Redouane Belkhabbaz
> Metro Attorney Service Inc.
> 305 Broadway, 9th Floor
> New York, New York 10007

This request is made to effect speedy service of process and to save time and expense. The

undersigned swears that, to the best of his knowledge and belief, the person to be appointed is 18

years of age or older, is experienced in the service of process and is not a party to this action.

1

Respectfully submitted,

SHAUN R. LEVESQUE,

By his attorneys,

John F. Welsh, BBO#
Martha J. Zackin, BBO #555733
Bello Welsh LLP
125 Summer Street, Suite 1200
Boston, Massachusetts 02110
Tel: (617) 247-4100
Fax: (617) 247-4125
mzackin@bellowelsh.com
jwelsh@bellowelsh.com

DATED: November___, 2017

2



125 Summer Street    Main: 617.247.4100
Suite 1200    Fax: 617.247.4125
Boston, MA 02110    bellowelsh.com

**Martha J. Zackin, Esq.**

Direct: 617.963.1062
mzackin@bellowelsh.com

November 20, 2017

**BY HAND DELIVERY**

Civil Clerk's Office
Norfolk County Superior Court
650 High Street
Dedham, MA 02026

    Re:   **Shaun R. Levesque v. Schroder Investment Management North America Inc.
and Karl Dasher**
           **Norfolk County Superior Court Civil Action No.** _____

Dear Sir or Madam:

    Enclosed for filing in the above-captioned matter please find the following:

1)    Complaint;

2)    Civil Cover Sheet;

3)    Motion to Appoint Special Process Server;

4)    Notice of Appearance of John F. Welsh;

5)    Notice of Appearance of Martha J. Zackin;

6)    Check in the amount of $285, which constitutes payment of the filing fee and
summonses.

    Kindly date stamp the enclosed copy of this letter and return it, **along with the summons
and the allowed motion to appoint special process server** in the enclosed self-addressed
envelope. Thank you for your attention to this matter.

                   Very truly yours,

                   Martha J. Zackin

Enclosures

COMMONWEALTH OF MASSACHUSETTS

NORFOLK s.s.                                              SUPERIOR COURT

| | |
|---|---|
| SHAUN R. LEVESQUE,                     ) | |
|                                                    ) | |
|     Plaintiff,                                 ) | Civil Action No. _____ |
|                                                    ) | |
| v.                                                ) | |
|                                                    ) | |
| SCHRODER INVESTMENT MANAGEMENT  ) | |
| NORTH AMERICA INC., and KARL DASHER, ) | |
|                                                    ) | |
|     Defendants.                             ) | |

## COMPLAINT

By this Complaint, Plaintiff Shaun R. Levesque seeks damages against his former employer, Schroder Investment Management North America, Inc. ("SIMNA") and his former manager, Karl Dasher, for breach of contract; violation of the Massachusetts Wage Act, Mass. Gen. L. ch. 149, §148; retaliation in violation of the Massachusetts Wage Act; promissory estoppel; and *quantum meruit*.

As set forth more fully below, Mr. Levesque was employed by SIMNA for more than nine years, selling investment services and products to institutional investors. Mr. Levesque earned, and was entitled to be paid, compensation in accordance with certain contractual agreements and promises. Notwithstanding these contractual agreements, Defendants have refused and failed to pay commissions due and owing to Mr. Levesque, in violation of these contracts and the Massachusetts Wage Act.

## PARTIES, JURISDICTION AND VENUE

1.    Plaintiff Shaun Levesque is an individual resident of Wrentham, Massachusetts. Plaintiff Levesque was employed by Defendant Schroder Investment Management North America Inc. ("SIMNA") from June 2, 2008 through his termination on September 22, 2017.

2.    Defendant SIMNA is a corporation organized and existing under the laws of Delaware and registered to do business in Massachusetts. SIMNA's principal place of business is located at 7 Bryant Park, New York, New York, 10018.

3.    Defendant Karl Dasher ("Dasher") is an individual who, on information and belief, has homes in New York, New York and Atlanta, Georgia, and who works in New York. Since approximately 2013, Dasher has been employed as the Chief Executive Officer of SIMNA, Co-Head of Fixed Income, and has served as a member of the Group Management Committee.

4.    This Court has subject matter jurisdiction over the Defendants pursuant to Mass. Gen. L. ch. 212, §3, because this is a civil action seeking relief in excess of $25,000 in damages.

5.    This Court has personal jurisdiction over the Defendants pursuant to Mass. Gen. L. ch. 223A, §3 because the contract at issue was executed and delivered in the Commonwealth of Massachusetts, the Defendants' actions caused harm to Plaintiff Levesque in the Commonwealth of Massachusetts, and each transacts business in the Commonwealth of Massachusetts.

6.    Venue in this Court is proper pursuant to Mass. Gen. L. ch. 223, §1, because Plaintiff Levesque resides in Wrentham, Norfolk County, Massachusetts.

**FACTS**

7.      Schroders plc is a private limited company, with a principal place of business at 31 Gresham Street, London, England, EC2V 7QA.  On information and believe, Schroders plc is organized and existing under the laws of England and Wales.

8.      Schroder plc, together with its subsidiary undertakings, form the Schroders plc Group (the "Group"). See Schroders Annual Report and Accounts 2016, attached hereto as Exhibit A.   The Group is managed as a whole. See Schroder Investment Management Limited Annual Report and Accounts 2016, at 4, attached hereto as Exhibit B.

9.      As set forth in the Financial Report, incorporated by reference into Schroders Annual Report and Accounts 2016, the Group has three business segments: Asset Management, Wealth Management and the Group segment. Asset Management principally comprises investment management including advisory services, equity products, fixed income securities, multi-asset investments, real estate and other alternative asset classes such as commodities. SIMNA is part of the Asset Management business segment.

10.      The Group segment principally comprises the Group's investment capital and treasury management activities, business strategy and corporate development activities and the management costs associated with governance and corporate management.

11.      The Group is managed by a committee, comprised of the Group Chief Executive, the Group's Chief Financial Officer, Global Head of Human Resources, Global Head of Strategy, Global General Counsel, and the Chief Executive Officers and Heads of various divisions within each segment.

12.      SIMNA is part of the Asset Management Segment of the Group.

13.     Mr. Levesque was hired by the Group to work within SIMNA as Institutional

Sales Director, U.S. East Coast ("Sales Director"), reporting to the Head of U.S. Institutional

Distribution. His offer letter dated April 18, 2008 ("Offer Letter"), was signed by Jamie

Dorrien-Smith, Chief Executive Officer of SIMNA. A copy of the Offer Letter is attached as

Exhibit C.

14.     In the investment management context, Institutional sales refer to the sale of

investment products and services to institutions, rather than to individual investors. In other

words, in this context an institution is a client or potential client that maintains and manages

pension or other types of investment funds for multiple persons or business entities. By way of

example, the California Public Employees Retirement System ("CalPERS") is an agency within

the California executive branch that manages retirement and health benefits for more than 1.6

million California public employees, retirees, and their families, would be an "institution."

15.     On information and belief, at the time he offered Mr. Levesque a position as Sales

Director for SIIMNA, Mr. Dorrien-Smith was a member of Member of the Group Management

Committee; the Asset Management and Global Distribution Executive Committees.

16.     As Sales Director, Mr. Levesque was entitled to compensation as set forth in the

Offer Letter. Specifically, Mr. Levesque was then entitled to a base salary of $225,000 per year.

In addition, he was eligible to earn Incentive Compensation based on Management Fee Revenues

(as defined in the applicable Incentive Compensation Plan). Mr. Levesque's Incentive

Compensation was guaranteed to be at least $550,000 for the first twelve months of his

employment.

17.     The Incentive Compensation for which Mr. Levesque was eligible was comprised

of a quantitative component and a qualitative component. The quantitative component equaled a

-4-

percentage of Management Fee Revenues accrued on any New Account (as defined in the Incentive Compensation Plan) over a three-year period. The qualitative component of Mr. Levesque's Incentive Compensation, which was also calculated as a percentage of Management Fee Revenues accrued on any New Account, was paid over a three-year period based on his achievement of individual goals in the base year.

18.     Quantitative Incentive Compensation was earned when revenues were generated on accounts. Qualitative Incentive Compensation was earned at the end of each fiscal year, when it was determined whether a participant met his or her stated goals in that year. Although the amount paid was somewhat discretionary, it was based on a percentage of Management Fee Revenues accrued on a participant's sales production.

19.     Schroders' reserved the right to defer up to 50% of the qualitative component of Mr. Levesque's earned Incentive Compensation, subject to the rules of a referenced Equity Compensation Plan.

20.     Mr. Levesque was paid a total of $875,000 in salary, quantitative incentive compensation (i.e., commissions), and qualitative bonus during calendar year 2008.

21.     In mid-2009, Mr. Dorrien-Smith promoted Mr. Levesque to Head of Institutional Sales ("Sales Manager"). Together, they agreed that Mr. Levesque's management responsibilities would take approximately 25% of his time, meaning that he would have less time to make sales and to earn the Incentive Compensation that comprised the majority of his total compensation. Accordingly, based on a targeted $1,000,000 in base earnings comprised of base salary and quantitative incentive bonus (commissions), Mr. Dorrien-Smith suggested paying Mr. Levesque a management bonus of $250,000, more if the team Mr. Levesque managed exceeded its goals.

-5-

22.    The management bonus referenced in paragraph 21, which ranged from $100,000 to $350,000 per year, was paid to Mr. Levesque for the years 2009, 2010, 2011, and 2012, in or about February of the year following the year relative in which it was earned.

23.    According to Mr. Dorrien-Smith, a memorandum memorializing the compensation arrangement described in paragraph 21 had been placed in Mr. Levesque's personnel file.

24.    In 2011, the Group implemented a new Equity Compensation Plan ("ECP"), which applied to SIMNA. Under the ECP, participating employees were given either a Share Award (an amount of shares in Schroders plc) and/or a Fund Award (units in a range of the Group's investment products), equal to the value of their earned, deferred Incentive Compensation. A copy of the ECP, which superseded an earlier version of it, is attached as Exhibit D.

25.    In 2013, SIMNA implemented a new Incentive Compensation Plan applicable to Institutional Sales.

26.    On information and belief, the 2013 Incentive Compensation Plan (the "2013 Plan") was similar to the Incentive Compensation Plan in effect from the start of Mr. Levesque's employment through the effective date of the 2013 Plan. One of the two primary differences between the two Plans was that both the quantitative component of incentive compensation was itself divided into two components –individual Quantitative Incentive Compensation and team Quantitative Incentive Compensation. As with the earlier plan, the dollar value of both the quantitative and qualitative components of available incentive compensation was calculated based on Management Fee Revenue generated on sales production.

27.     The second primary difference between the superseded incentive compensation plan and the 2013 Plan was that after 2013, the team Quantitative Incentive Compensation was subject to deferral into the ECP, along with the Qualitative Incentive Compensation.

28.     As with the earlier Incentive Compensation Plan, quantitative Incentive Compensation was earned when revenues were generated on accounts. Qualitative Incentive Compensation was earned at the end of each fiscal year, when it was determined whether a participant met his or her stated goals in that year.

29.     Mr. Levesque earned between approximately $1,160,000 and $1,412,500 each year in the years between 2010 and 2014.

30.     Between 2010 and 2013, in what became a recurring conversation, Mr. Dorrien-Smith and Massimo Tosato, Vice-Chairman of Schroders plc, repeatedly questioned Mr. Levesque about his retirement plans. Repeatedly, Mr. Levesque refused to discuss either his age or his retirement plans.

31.     In mid-2013, Mr. Dorrien-Smith retired. He was replaced as CEO of SIMNA by Defendant Karl Dasher, who also held the title of Co-Head of Fixed Income assets. Defendant Dasher continued to serve on the Group Management Committee, to which he had been appointed in about 2010.

32.     In about February 2014, Mr. Levesque and Defendant Dasher had a discussion about Mr. Levesque's management bonus. During that conversation, Mr. Dasher noted that Mr. Levesque earned approximately $1.4 million in 2013, which amount was based entirely on Mr. Levesque's base salary and his earned quantitative bonus (commissions). Accordingly, Mr. Dasher told Mr. Levesque that he thought Mr. Levesque's compensation was "excellent" for

someone in his position and, therefore, he would not be getting a management bonus relative to his 2013 performance.

33.     Mr. Dasher assured Mr. Levesque that, going forward, if Mr. Levesque earned less in commissions than he earned in 2013, he would make up the difference so that he received a total compensation package equal to $1.4 million.

34.     Shortly thereafter, in 2014, Defendant Dasher hired Marc Mayer as head of Institutional Investments. Mr. Levesque began reporting to Mr. Mayer, instead of Mr. Dasher.

35.     In a telephone call in about the summer of 2014, Mr. Mayer informed Mr. Levesque that he no longer needed an Institutional Sales Manager because he instead wanted the salespeople to report directly to him.

36.     Immediately thereafter, Mr. Levesque and Mr. Dasher spoke by telephone. During that call, Mr. Dasher reiterated his promise to keep Mr. Levesque's total compensation at no less than $1.4 million. During that call, Mr. Dasher told Mr. Levesque that he only expected Mr. Levesque to remain employed for another approximately three years before retiring. At that time, Mr. Levesque was 56 years old.

37.     Shortly thereafter, in about September 2014, Mr. Mayer called Mr. Levesque. During that telephone call, Mr. Mayer acknowledged the promise Defendant Dasher had made to Mr. Levesque, that Mr. Levesque would continue to receive at least $1.4 million dollars in earnings.

38.     Relieved that both Defendant Dasher and Mr. Mayer were in agreement that Mr. Levesque's compensation would remain at no less than $1.4 million, Mr. Levesque asked that the agreement be memorialized, in case there were further management changes.

-8-

39.     Mr. Mayer declined to put the agreement in writing, saying that both he and Defendant Dasher were "serious guys."  Mr. Mayer also stated Schroders "did not put such things in writing."

40.     Mr. Levesque earned less than $1.4 million in base salary and quantitative incentive compensation for 2013.

41.     Notwithstanding the promises made by both Defendant Dasher, and confirmed by Mr. Mayer, Mr. Levesque was not paid a qualitative bonus in an amount that brought his total compensation to $1.4 million dollars, which bonus should have been paid in February or March 2014.  Mr. Levesque was paid approximately $1,100,000 relative to 2013.  Mr. Levesque was not paid a bonus of approximately $300,000 in February or March 2014, to bring his total earnings relative to 2013 up to $1,400,000.

42.     Mr. Levesque continued his employment as Sales Director.  He was the top-producing Sales person for 2015, and was the first or second highest grossing salesperson for every year he worked for the Group.

43.     In about March 2015, Mr. Mayer spoke with Mr. Levesque about the Emerging Market Equities Product section of the Asset Management segment of the Group.  Specifically, Mr. Mayer described the difficulties the then-Manager of the Emerging Product section was having accomplishing his goals and objectives.  Mr. Levesque remarked that he would be interested in the position, but not for two or three more years.

44.     In or about spring 2015, Mr. Mayer contacted Allan Conway, the Head of Emerging Markets, to discuss the possibility of Mr. Levesque transferring into the position of Manager of Emerging Products.  Mr. Mayer made this contact without Mr. Levesque's knowledge.

45.     Mr. Levesque and Mr. Conway discussed the position over lunch in London, during the summer of 2015.  They agreed that Mr. Levesque would start as Manager of Emerging Products in early 2016.  They also agreed that Mr. Levesque targeted compensation would be between $750,000 and $1 million, and that Mr. Levesque and Mr. Mayer would come to an agreement about the Sales Director quantitative bonus (commissions) he would be due on already-made Institutional sales for the full three-year commission cycle.  Finally, they agreed that Mr. Levesque would report to Alan Ayers, Head of Client Portfolio Management, Emerging Equities.

46.     During the London meeting described above, Mr. Levesque expressed to Mr. Conway his intent to continue working for at least five more years, if not longer.

47.     Mr. Levesque became Client Portfolio Manager for Emerging Products on February 1, 2016.

48.     After much negotiation and back-and-forth, the terms of Mr. Levesque's compensation were memorialized.   By an internal memorandum dated June 29, 2016 ("2016 Agreement"), Mr. Levesque would be compensated as follows:

49.     Base salary, at his then-current level ($275,000);

50.     Continued sales-related pay ("SRP") for three years, at specified levels, for named accounts that were in process at the time Mr. Levesque transferred;

51.     Continued SRP at specific, agreed upon rates applicable to both the quantitative and qualitative components of his incentive compensation for the full three-year cycle, relative both to business sold prior to Mr. Levesque's transfer (institutional sales), as well as business sold relative to Emerging Product clients; and

-10-

52.    Eligible to be considered for a qualitative bonus based on his work with the Emerging Equity product team.

53.    A copy of the 2016 Agreement is attached hereto as Exhibit E.

54.    In accordance with the terms of the 2016 Agreement, the earned compensation referenced in paragraph 49 was subject to deferral into the ECP.

55.    Mr. Conway retired in August 2016.  He was replaced by Tom Wilson, who became Head of the Emerging Markets Equity Group.  Mr. Ayers, to whom Mr. Levesque reported, reported to Mr. Wilson.

56.    In early 2016, Mr. Levesque and Mr. Wilson traveled across the country, so that Mr. Levesque could introduce Mr. Wilson to his North American clients.  In the course of these travels, in March 2016, a conversation took place at Los Angeles International airport wherein Mr. Wilson (who was then approximately 38 years of age), asked Mr. Levesque whether he was tired of traveling so much at his age (which was then 59), and how much longer did he think he could work.

57.    During a conversation between Mr. Dasher and Mr. Levesque just prior to the Group's holiday party in December 2016, Mr. Dasher confided in Mr. Levesque that racially disparaging comments he had made about Hispanics had been used against him during negotiations between the Group and an attorney for an employee who had been pushed out.  Mr. Levesque attempted to coach Mr. Dasher, to help protect him and the Group.

58.    In early February, 2017, Mr. Levesque was told that Mr. Dasher would speak to him about his 2016 Incentive Compensation.

59.    On or about February 10, 2017, Mr. Levesque met with Mr. Dasher.  During that meeting, which took place in Atlanta where Mr. Dasher now lives, Mr. Dasher disclaimed the

terms of the 2016 Agreement (Exhibit E). Instead, Mr. Dasher told Mr. Levesque that, despite

the existence of the 2016 Agreement, it was his belief that the promised bonus relative to Mr.

Levesque's work for in Emerging Markets Client Portfolio Management was intended to be in

lieu of his quantitative bonus (commissions) earned relative to his previously-made Institutional

Sales.

60.     In that conversation, Mr. Dasher also told Mr. Levesque that he was fortunate to

be paid as much as he was because, he erroneously stated, the "going rate" for the job held by

Mr. Levesque was between $400,000 and $600,000. When Mr. Levesque responded that he

never would have left a position in sales where he earned in excess of $1,000,000 per year for a

position earning significantly less than that per year. Mr. Dasher responded to Mr. Levesque,

saying he should not complain because he had earned a lot of money over the years.

61.     Mr. Levesque was paid a total of $950,000 for 2016. This amount included his

base salary and the sales-related pay ("SRP"), calculated in accordance with the 2016

Agreement.

62.     Had Mr. Levesque been paid the quantitative Incentive Compensation earned

relative to Institutional sales for all of 2016, as promised, he would have been paid an additional

amount of approximately $367,000 in 2017 relative to work performed in 2016. In addition, had

Mr. Levesque not been terminated in retaliation for submitting a complaint about his

compensation, in 2018 he would likely have earned an additional amount of quantitative

Incentive Compensation relative to these sales, in an amount of approximately $732,000.

63.     Had Mr. Levesque been paid the qualitative bonus earned relative to his 2016

performance, calculated as a percentage of management fee revenues accrued on sales made by

Mr. Levesque, he would have been paid an additional amount of approximately $500,000.

64.     Thereafter, Mr. Levesque had a discussion with Mr. Ayers and Mr. Wilson. Mr. Wilson, who ran the Emerging Equity group, told Mr. Levesque not to complain because "he did bloody well." Inexplicably, Mr. Wilson also told Mr. Levesque that he should be grateful he was paid in United States dollars, a strong currency.

65.     Subsequently, Mr. Levesque spoke to Mr. Ayres, his direct manager. Mr. Ayres told Mr. Levesque that he should "leave it alone."

66.     Thereafter, Mr. Levesque contacted Louise Hosking, the Chief of Staff for the Asset Management segment of the Group. As Chief of Staff, Ms. Hoskings is responsible for managing personnel issues within the Asset Management segment. Mr. Levesque explained to Ms. Hoskings that Mr. Dasher was refusing to pay him compensation legally owed to him under the terms of his agreements with the Group. Because Mr. Levesque was concerned (rightfully) about retaliation, he asked for Whistleblower status under the Group Whistleblowing Policy. A copy of the Whistleblowing Policy is attached hereto as Exhibit F.

67.     Mr. Levesque also contacted Emma Holden, head of Human Resources for the Group. As such, Ms. Holden is responsible for all personnel issues across the Group. After multiple attempts, Mr. Levesque finally managed to arrange a telephone conversation with Ms. Holden. During that conversation, Mr. Levesque protested the breach of his compensation agreement and the Group's failure to pay him the compensation as promised, both verbally and in writing. Mr. Levesque reiterated his request for Whistleblower status, along with his concern about retaliation. Ms. Holden rejected this out of hand, saying that this was simply a pay dispute between an employee and his manager. Ms. Holden refused to engage further, and directed Mr. Levesque to speak with Mr. Dasher.

68.     On September 8, 2017, Mr. Levesque met with Chris Lue, head of Human Resources for the Group in the United States.  Also present were Alan Ayres and Tom Wilson, who had flown to the United States from London for the meeting.

69.     During the meeting on September 8, Mr. Levesque was told that his position was being "upgraded" and moved to London.  Mr. Levesque, who is a British national, was not offered the position.

70.     At the end of the meeting on September 8, after Mr. Ayres and Mr. Wilson had left, Mr. Lue told Mr. Levesque that he should "take the weekend" and think about how he wanted to "manage the narrative."  Mr. Lue suggested that Mr. Levesque might decide to return to the office on Monday and tell co-workers – falsely – that he intended to retire.

71.     Mr. Levesque, who is 60 years of age, has no interest in retiring in the near-or mid-future.

<div align="center">

**COUNT I**
**Breach of Contract**
**(against SIMNA)**

</div>

72.     Mr. Levesque restates and incorporates by reference the allegations set forth above as though fully set forth herein.

73.     Mr. Levesque had an agreement pursuant to which Mr. Levesque performed services for SIMNA, in exchange for payments made in accordance with the 2013 Incentive Compensation Plan and the 2016 Agreement.

74.     Such agreements constituted valid and binding contracts between the parties.

75.     Mr. Levesque performed all of his obligations pursuant to the contracts between the parties.

76.     SIMNA's obligation to pay Mr. Levesque in accordance with the terms of the 2013 Incentive Compensation Plan and the 2016 Agreement constituted material obligations under the contracts between the parties.

77.     Defendants breached the contracts by failing to pay all compensation owed.

78.     As a result of Defendants' breach of their contractual obligations, Mr. Levesque has sustained damages.

## COUNT II
### Violation of Mass. Gen. L. ch. 149, §148 (Massachusetts Wage Act)
### (against SIMNA)

79.     Mr. Levesque restates and incorporates by reference the allegations set forth above as though fully set forth herein.

80.     Mr. Levesque has exhausted all administrative remedies, submitting his claim to the Attorney General's Wage Claim Unit on October 5, 2017 and receiving a private right to sue letter on October 12, 2017.

81.     SIMNA is an employer under Chapter 149 of the Massachusetts General Laws. Mr. Levesque was an employee of SIMNA for the purposes of the statute.

82.     SIMNA's failure to timely pay Mr. Levesque wages as promised and required is a violation of the Massachusetts Wage Act, Mass. Gen. L. ch. 149 § 148.

83.     Due to SIMNA's actions, Mr. Levesque has suffered damages.

## COUNT III
### Violation of Mass. Gen. L. ch. 149, §148 (Massachusetts Wage Act)
### (against Defendant Dasher)

84.     Mr. Levesque restates and incorporates by reference the allegations set forth above as though fully set forth herein.

85.     Mr. Levesque has exhausted all administrative remedies, submitting his claim to the Attorney General's Wage Claim Unit on October 5, 2017 and receiving a private right to sue letter on October 12, 2017.

86.     Defendant Dasher is an employer under Chapter 149 of the Massachusetts General Laws.  Mr. Levesque was an employee of Defendant Dasher for the purposes of the statute.

87.     Defendant Dasher's failure to timely pay Mr. Levesque wages as promised and required is a violation of the Massachusetts Wage Act, Mass. Gen. L. ch. 149 § 148.

88.     Due to the Defendant Dasher's actions, Mr. Levesque has suffered damages.

## COUNT IV
### Violation of Mass. Gen. L. ch. 149, §148A (Retaliation)
### (against both defendants)

89.     Mr. Levesque restates and incorporates by reference the allegations set forth above as though fully set forth herein.

90.     Mr. Levesque has exhausted all administrative remedies, submitting his claim to the Attorney General's Wage Claim Unit on October 5, 2017 and receiving a private right to sue letter on October 12, 2017.

91.     Mr. Levesque was terminated because he demanded wages that were due and owing to him pursuant to the Massachusetts Payment of Wages statute, in violation of Mass. Gen. L. ch. 149 § 148.

92.     The decision by the Defendants to terminate Mr. Levesque was done in bad faith, with actual malice and in retaliation for Mr. Levesque seeking to enforce his rights to wages under Massachusetts law.

93.     Discharging Mr. Levesque for seeking to enforce his rights under G.L. c. 149, § 148 is a violation of Massachusetts law.

94.     As a result of the Defendants' actions, Mr. Levesque has suffered damages.

## COUNT V

### PROMISSORY ESTOPPEL
### (against SIMNA)

95.     Mr. Levesque restates and incorporates by reference the allegations set forth above as though fully set forth herein.

96.     Representatives of SIMNA and the Group told Mr. Levesque that he would be entitled to earn a bonus relative to his work in Emerging Markets Client Portfolio Management and, in addition, a quantitative bonus (commissions) earned relative to his previously-made Institutional Sales.

97.     Representatives of SIMNA and the Group made this representation knowing that Mr. Levesque would not accept a transfer into a position at significantly lower compensation.

98.     In reasonable reliance on the promises made, Mr. Levesque accepted a transfer from his position as a top-producing Sales Director into a position within the Emerging Market Equities product group.

99.     As a result of the SIMNA's actions, Mr. Levesque has suffered damages.

### COUNT VI
### QUANTUM MERUIT
### (against SIMNA)

100.    Mr. Levesque restates and incorporates by reference the allegations set forth above as though fully set forth herein.

101.    Mr. Levesque acted in good faith in providing services for SIMNA with the expectation of being properly paid for his services.

102.    SIMNA acted in bad faith and refused to compensate Mr. Levesque for all of the work he performed.

103.    As a result of SIMNA's actions, Mr. Levesque has suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Shaun R. Levesque respectfully requests that this Court:

1.    Enter judgment in Mr. Levesque's favor on all counts of this Complaint;

2.    Award Mr. Levesque all contractual damages to which he is entitled;

3.    Award Mr. Levesque treble damages, attorneys' fees and costs under the Massachusetts Wage Act, Mass. Gen. L. ch. 149, § 148;

4.    Award Mr. Levesque front pay;

5.    Order any other such relief as this Court deems fair and just.

## DEMAND FOR JURY TRIAL

Plaintiff Shaun R. Levesque hereby demands a trial by jury on all Counts that are so triable.

Respectfully submitted,
SHAUN R. LEVESQUE,

By his attorneys,

John F. Welsh, BBO#
Martha J. Zackin, BBO #555733
Bello Welsh LLP
125 Summer Street, Suite 1200
Boston, Massachusetts 02110
Tel: (617) 247-4100
Fax: (617) 247-4125
mzackin@bellowelsh.com
jwelsh@bellowelsh.com

DATED: November ___, 2017

-18-

# Exhibit A



# Our perspective
# on a changing world

At Schroders, we put our clients at the centre of everything we do.

In a fast moving, data-driven world, our lens captures intelligence. It brings together powerful insights which drive the design of our investments, with the aim of delivering long-term value for individuals, businesses and future generations.




At Schroders, we focus on helping our clients achieve their financial goals and build future prosperity.

As a global asset and wealth manager, Schroders delivers a broad range of investments designed to meet the diverse needs of institutions, intermediaries and high net worth individuals.

For over 200 years we have built principled partnerships with our clients, putting them at the centre of everything we do. They trust us to deliver sustainable returns through times of economic prosperity and of uncertainty.

We are a global business, managed locally. Our international presence supports us in understanding the needs of our clients and delivering them the right expertise from across the business.

As an active investment manager we believe that we have an important role to play in driving better outcomes for our clients and society as a whole. We bring together people and data to identify the trends that will shape the prosperity of individuals, businesses and future generations.



# Contents

## Strategic report

The Company's Strategic Report is set out from pages 4 to 43 and on pages 102, 104 and 106.

### Overview
| | |
|---|---|
| Schroders at a glance | 4 |
| Chairman's statement | 6 |

### Strategy and business review
| | |
|---|---|
| Group Chief Executive's statement | 10 |
| Market trends | 12 |
| Strategy | 14 |
| Key performance indicators | 16 |
| Business and financial review | 18 |
| Business model | 24 |
| Our people | 30 |
| Our impact | 32 |
| Key risks and mitigations | 36 |

### Governance
| | |
|---|---|
| Board of Directors and Company Secretary | 45 |
| Group Management Committee | 48 |
| Corporate governance report | 50 |
| Directors' report | 65 |
| Remuneration report | 68 |
| Statement of Directors' responsibilities | 97 |

### Financial report
| | |
|---|---|
| Consolidated financial statements | 101 |
| Notes to the accounts | 108 |
| Schroders plc financial statements | 153 |
| Independent auditors' report | 164 |

### Shareholder information
| | |
|---|---|
| Shareholder information | 172 |
| Five year consolidated financial summary | 173 |
| Glossary | 174 |



You can find more information about Schroders on our website
**www.schroders.com/ir**

Overview

# Schroders at a glance

## We have a diversified business across client channels, asset classes and regions.

Assets under management and administration*[1]

# £397.1bn

(2015: £313.5 billion)

Assets under management*

# £386.0bn

(2015: £313.5 billion)



### Clients
We manage assets on behalf of institutional clients and retail investors, financial institutions and high net worth individuals from around the world. No single client accounts for more than 2% of revenues.

- Institutional
- Intermediary
- Wealth Management



### Assets
We invest in a broad range of asset classes across equities, fixed income, multi-asset, alternatives and real estate, as well as Wealth Management. In addition to institutional segregated mandates, we manage more than 610 funds domiciled in 19 countries.

- Equities
- Multi-asset
- Fixed income
- Emerging Market Debt, Commodities and Real Estate
- Wealth Management



### Geography
We operate from 41 offices in 27 countries, managing local and international investment strategies and solutions on behalf of local and international clients.

- UK
- Asia Pacific
- Europe, Middle East and Africa
- Americas

*The above charts show the breakdown of assets under management and administration.*

\* See glossary.
[1] The investment in Benchmark Capital brought £11.1 billion of assets under administration.

## We have a strong financial position

At 31 December 2016, shareholders' equity was £3.2 billion. Maintaining a strong financial position enables us to take a long-term view of growth opportunities. We have no debt and hold capital significantly in excess of regulatory requirements.

**Profit before tax and exceptional items\***
# £644.7m
(2015: £609.7 million)

**Profit before tax**
# £618.1m
(2015: £589.0 million)

**Basic earnings per share\* before exceptional items**
# 186.3p
(2015: 176.9 pence)

Award highlights of 2016

funds europe awards 2016 Winner

European Marketing Campaign of the Year for IncomeIQ and European Digital Brand of the Year, *Funds Europe Awards* 2016 winner

GLOBAL INVESTOR ISF

Asset Manager of the Year 2016, *Global Investor ISF Awards*

INVESTMENT

Digital Marketing Campaign, winner – *Investment Week*, Investment Marketing and Innovation Awards 2016

## Our people

We have more than 4,100 employees who are essential to our success. They are based around the world, close to our clients and to the markets in which we invest.



8%
**Americas**

55%
**UK**

17%
**Europe, Middle East and Africa**

20%
**Asia Pacific**

**Employees by length of service**



| | |
|---|---|
| 0-5 years | 42% |
| 1-5 years | 13% |
| 6-10 years | 24% |
| 10+ years | 21% |

**94**%
of employees are proud to be associated with Schroders (2015: 93%)

**92**%
employee satisfaction (2015: 89%)

## Our values

We strive for

**Excellence**
We want to excel at what we do. We continually strive for better.

We work with

**Innovation**
We challenge how things are done and anticipate future opportunities.

**Teamwork**
We work as one team for our clients. We value the contribution of individuals and encourage healthy debate.

We have

**Passion**
We demonstrate enthusiasm for what we do through the dedication and energy we bring to servicing our clients.

**Integrity**
We build strong relationships based on trust and confidentiality.

**Total dividend per share\***

**93**p
(2015: 87 pence)

**Investment capital\***

**£1.1**bn
(2015: £942 million)

**Shareholders' equity**

**£3.2**bn
(2015: £2.8bn)

**Engagements on ESG issues**

**761**
(2015: 495)

ⓘ For more information on our approach to environmental, social and governance issues see page 34.



2016 WINNER

Private Bank of the Year, *Citywealth* 2016 Magic Circle Awards



Finalist, Britain's Most Admired Companies 2016/17 *Management Today*

Overview

# Chairman's statement



Michael Dobson
Chairman

### Results
2016 was a year of major change with the UK voting to leave the European Union and the Presidential election in the US. This led to some sharp adjustments in equity markets and currencies but, overall, financial markets were resilient and offered positive returns for investors in 2016.

Schroders again delivered record results, benefiting from our diversified business model and, in particular, the strength of our international franchise as sterling weakened. Profit before tax and exceptional items increased by 6% to £644.7 million and assets under management and administration ended the year up 27% at £397.1 billion (2015: £313.5 billion).

### Dividend
Our policy is to increase dividends progressively in line with the trend in profitability and to target a 45 – 50% pay out ratio. The Board will recommend to shareholders at the Annual General Meeting a final dividend of 64 pence per share (2015: 58 pence). The final dividend will be paid on 4 May 2017 to shareholders on the register at 31 March 2017. The full year dividend of 93 pence per share represents an increase of 7%.

### Our role as asset managers
As one of the largest investment firms in Europe, Schroders plays an important role in helping a broad range of investors meet their financial goals as they provide for retirement, seek to offset future liabilities or build pools of capital to fund the investment needs of the future. We also play an important role in actively channelling capital to companies to support them in investing for growth. High standards of governance and corporate and social responsibility matter to us and we believe they are likely to lead to outperformance in the long term.

In line with the asset management industry as a whole, Schroders faces a number of challenges but we are well placed to continue to grow the business in the long term. Fees have been reducing for several years and will likely decline further as investors continue to focus on costs in a low return world. This is also driven in part by the shift into passive investment strategies. However, Schroders has the scale to weather declining fee margins and we remain committed to active investment management which we believe

can generate significant incremental value for clients over the long term by compounding returns in excess of what can be achieved by matching a benchmark index.

The regulatory focus on asset management continues to intensify and the Financial Conduct Authority issued its interim report on its Asset Management Market Study in November. We support the regulator's objective of greater transparency around costs and investment outcomes to assist investors in making the choices that best meet their needs. The regulatory focus may also lead to higher capital requirements for asset managers but we are well positioned with £1.1 billion of investment capital over and above operating requirements.

It is too early to predict the precise impact of Brexit on UK asset managers but, given the scope of our European based business with operations on the ground in eleven European centres including our £90 billion Luxembourg fund range, we are confident that we will be able to adapt to the new landscape.

### The Board
We made a number of important changes to the composition and working of the Board in 2016. In April, Peter Harrison succeeded me as Chief Executive. This was the culmination of a succession plan designed to ensure stability and continuity as well as continued long term growth and expansion.

Andrew Beeson stepped down from the Board in April after 11 years, including four years as Chairman. On behalf of the Board I would like to thank Andrew for his contribution to Schroders over more than a decade.

Massimo Tosato, Executive Vice Chairman and Head of Distribution, retired as a Director and left the Company at the end of 2016. Massimo joined Schroders in 1995 and was the architect of our institutional and intermediary distribution capability, widely recognised as one of our key competitive advantages. I would like to thank Massimo for 15 years of partnership and for his important role in our success over recent years.

Ashley Almanza left the Board in May since his commitments as Chief Executive of G4S prevented him from continuing as a Director. I would like to thank him for his support and advice during five years on the Board and



# Schroders again delivered record results, benefiting from our diversified business model.

for his work as Chairman of the Audit and Risk Committee. Rhian Davies succeeded Ashley as Chairman of this committee and led the process for selecting Ernst & Young as our proposed new auditors for 2018.

I was appointed Chairman in succession to Andrew Beeson in April. At that time I said we would appoint two additional independent non-executive Directors to the Board by the end of 2016. After a thorough review of the attributes we were looking for in these two candidates and an extensive search, we were delighted to announce that Ian King, Chief Executive of BAE, and Rakhi Goss-Custard, formerly an executive at Amazon, were appointed to the Board effective 1 January 2017.

After more than 20 years with the Company as an executive, Philip Mallinckrodt, Group Head of Private Assets and Wealth Management, relinquished his executive responsibilities on 1 March 2017. As a member of the principal shareholder group, he continues on the Board as a non-executive Director. Philip has made a major contribution to Schroders' success, particularly in the last eight years as an executive Director. I am delighted that he will serve as a non-executive Director and I look forward to continuing to work with him in this new capacity.

We continue to hold five scheduled Board meetings a year but we have extended the duration of the meetings to allow for a fuller discussion. In May we hold a two day strategy meeting and every eighteen months we travel to one or more of our overseas offices. The focus of the Board in 2016 was concentrated on strategic challenges and opportunities and we intend to maintain that focus in future.

**Diversity**
In 2016 we signed the Women in Finance Charter and we have committed to meet the target of women filling at least 33% of senior management positions by 2019. At Board level we have also increased the level of female representation and our aim is to achieve the new target of 33% by 2020 as set out in the Hampton-Alexander report. We also support the recommendations contained in the Parker report on the ethnic diversity of Boards.

**Our people**
The success of our business derives from our values, our diversified business model, our financial strength and, above all, the extraordinary depth of talent we have at Schroders across the world. I would like to place on record the Board's recognition of their contribution in 2016.

**Michael Dobson**
Chairman

**Profit before tax and exceptional items**

£**644.7**m

(2015: £609.7 million)

**Total dividend per share**

Pence per share

| | |
|---|---|
| | 43 |
| | 58 |
| | 78 |
| | 87 |
| 2016 | 93 |

# Strategy and business review

Group Chief Executive's statement 10
Market trends 12
Strategy 14
Key performance indicators 16
Business and financial review 18
Business model 24
Our people 30
Our impact 32
Key risks and mitigations 36





### Intermediary investors

We manage over
£120 billion of assets
on behalf of financial
advisers, discretionary
managers, private
wealth managers
and online platforms.

# Group Chief Executive's statement



Peter Harrison
Group Chief Executive

It is a privilege to have taken over responsibility as Group Chief Executive in April, having first joined Schroders as a graduate trainee and having spent my whole career in the asset management industry. I am grateful to both the Board and the senior management team in supporting a very smooth transition.

Schroders had a good year in 2016, despite the headwinds the industry is facing. Profit before tax and exceptional items increased by 6% to £644.7 million and net operating revenue* grew 7% to £1,712.8 million. Assets under management and administration reached a record level of £397.1 billion, up from £313.5 billion.

Subdued market returns, low interest rates and volatile markets are difficult for our clients to navigate and delivering good outcomes for them is our key priority. Investment performance* continued to be strong in 2016 with 74% of assets outperforming their benchmark or peer group over a three-year period. Over one year, 75% of assets outperformed and over five years, the figure was 85%. We strongly believe that active asset management adds real value to our clients' portfolios and I am proud that we have managed this.

I have taken on this role at an interesting time. Aside from the remarkable developments in the political environments of both the UK and US, the asset management industry is changing rapidly. Asset flows into active managers, like Schroders, were negative for the first time in eight years in 2016. Despite this, we achieved positive net inflows of £1.1 billion. The rapid growth of passive products and the continued derisking of pension funds will likely continue as will the widespread pressure on industry pricing. Regulation of the industry remains intense, while technological change offers the possibility of new opportunities and significant productivity improvements.

My priority has been to develop our strategy to meet these challenges. We will continue to develop our business by both evolving our structure and investing in a clear range of growth initiatives.

I am fortunate to have inherited a diverse and talented group of employees across the world.

In a recent employee survey, 94% of employees globally said that they were proud to be associated with Schroders, more information on which can found on page 30.

**Changing client demand**
As our clients find it increasingly difficult to meet their financial objectives in a low return environment, we have seen a persistent shift in product demand.

We see the opportunity to offer enhanced value for money and more tailored solutions. We have adapted our business model to create a distinct Product division. This will help us to remain at the cutting edge of product innovation, development and management. We have provided more information on page 27.

We have also created a stand-alone Solutions business. This business is asset class agnostic and solely focused on building solutions to meet our clients' changing investment goals.

**Technology**
The use of technology has disrupted many industries, including within financial services, and I strongly believe that it can transform many aspects of asset management.

We believe there are significant opportunities to enhance how we analyse investment data and to provide better services for our clients. For Schroders to be at the leading edge of these changes, we have been investing in technology throughout the firm.

We have continued to grow our Data Insights team with more people from data science backgrounds embedded amongst our investment teams. We have also been constructing a best-in-class technology platform, most notably through the ongoing implementation of a new front office investment management system. We also made a strategic investment in Benchmark Capital, a technology-led high quality adviser support business in the UK. This relationship has the potential to significantly enhance the service we provide to UK Intermediary and Wealth Management clients.

* See glossary.

Group Chief Executive's statement
Market trends
Strategy

Key performance indicators
Business and financial review
Business model

Our people
Our impact
Key risks and mitigations



## Schroders had a good year in 2016, despite the headwinds the industry is facing.

### Geographic diversification

We are a globally diverse business, with 41 offices across 27 countries. Whilst we see opportunities across all the regions in which we operate, we see good opportunities in North America. It accounts for almost half of the world's investible assets and there is significant scope for us to grow the £49 billion of assets we manage on behalf of our clients in the region.

In October, we established a strategic relationship with Hartford Funds to further develop our mutual fund presence in the US. Through this relationship, we have greatly increased our scope and reach in the US intermediary markets and we are already seeing the benefits through new business flows.

In the North American pensions market, we believe there is a significant opportunity as pension schemes in the US and Canada embark upon the same derisking journey that we have seen in the UK. With our long and successful track record of providing investment solutions for schemes in our home market, we are well placed to grow our business in other regions.

We have expanded our investment expertise with the acquisition of an asset-backed securities team based in New York. They have come with a strong track record and we are already seeing positive client momentum.

### Private assets

In the current environment of sustained low interest rates, many of our clients are looking to invest beyond public markets. Private markets can, in some cases, offer higher returns than traditional asset classes. It is an area where we have been building our business and expanding our investment capabilities.

We have a long-established Real Estate business with investment centres in 10 locations, managing £11 billion of assets for our clients. In 2016, we increased our stake in Secquaero, a Swiss-based insurance-linked securities business, whose assets have now grown to £1.6 billion. Our Infrastructure Finance capability, which we established in late 2015, has seen strong growth this year and now manages assets of over £700 million on behalf of our clients.

In 2016, we entered the direct lending market as we took a stake in NEOS Finance Group. NEOS is a direct lending firm based in the Netherlands that provides institutional investors with access to an alternative debt financing platform for Dutch small and medium-sized enterprises.

### 2017 outlook

In my first year as Group Chief Executive, the external environment has been dominated by market uncertainty and industry challenges. Although these look set to continue as we go into 2017, I believe Schroders is well placed to take advantage of these challenges.

As I travelled between many of our global offices this year, I have been struck by the depth of talent and the strength of the culture that we have in place across all the regions in which we operate. Protecting the integrity of this culture, which puts our clients at the centre of everything we do, is critical to our ongoing success. In order to do this, retaining and developing our people is a key priority and there is more information on this on page 30.

Throughout 2016, there has been much focus within Schroders on developing our collaboration across the firm and on broadening our diversity of thought. This has been evident not just at senior management level, where we have increased the scope and membership of the Group Management Committee (GMC) (see page 48), but throughout all functions of the Group.

With the support of the Board, we have made a number of decisions this year to strategically develop our business, including the acquisition of C. Hoare & Co.'s wealth management business in February 2017. We have a highly diversified business model, a strong financial position and we have demonstrated the willingness to invest in the future growth of the business.

We see interesting long-term opportunities across the world, both organically in our core business and inorganically in new opportunities, and I look forward to leading Schroders' continued growth.

**Peter Harrison**
Group Chief Executive

### Assets under management outperforming over three years*

# 74%

(2015: 72%)

### Basic earnings per share

pence per share

| | |
|---|---|
| 2012 | 104.7 |
| 2013 | 140.9 |
| 2014 | 166.8 |
| 2015 | 176.9 |
| 2016 | 186.3 |

* Before exceptional items.

**Strategic report**
Strategy and business review

# Market trends

A number of key themes are driving change in the asset management industry.

## Investment environment

In recent years the global macro environment has been dominated by limited global growth and an expectation that interest rates will be kept lower for longer. Political upheaval and populist movements are driving uncertainty across the globe, along with fears over the limitations of monetary and fiscal policies implemented by central banks.

Although equity markets were strong at the end of 2016, investors are feeling the effects of a lower return world and we are seeing shifts in product demand. Increasingly, our clients are looking for solutions with specific outcomes to meet their investment objectives, rather than the component building blocks of a wider portfolio. To ensure we are at the forefront of meeting evolving client needs we have increased our operational focus on the products we provide, more information on which can be found on page 27.

The search for higher returns has also driven a shift in asset allocation and product demand. As asset classes have become more correlated and offered lower returns, clients' fee sensitivity has increased and many have allocated towards passive investments. We have seen sustained increased demand for income products and we have evolved our franchise across equity, fixed income and multi-asset products to address this. We have also seen reduced client demand for traditional asset classes and greater interest in higher returning areas, such as private assets.

Above all else, the current macro environment means a greater focus on value for money, and the onus is upon us to demonstrate that we are consistently delivering for all of our clients.

## Demographics

Over recent decades, we have seen enormous shifts in demographics globally. People are living longer and many developed countries are facing ageing populations, with significant implications for retirement planning. As governments find it increasingly challenging to provide financial security, the responsibility for savings has shifted to the individual. Pension schemes are obliged to look for new and more efficient ways to match liabilities as longevity increases.

This year we have developed a stand alone, asset class agnostic, Solutions business dedicated to providing our clients with the investment solutions to help them achieve their changing financial objectives. We have a long-established and growing liability driven investment* capability in addition to a number of strategies which provide innovative investment products during the accumulation phase.

Nowhere has seen greater effects of demographic changes than Asia Pacific. A burgeoning middle class and second-generation wealth accumulation will likely alter our clients' approach to investing. With over £96 billion of assets under management (AUM) from clients in Asia Pacific and with a local presence established in many financial centres for over 40 years, we are well placed to continue to build our clients' future prosperity.






\* See glossary.

Group Chief Executive's statement
Market trends
Strategy

Key performance indicators
Business and financial review
Business model

Our people
Our impact
Key risks and mitigations



**Our clients' investment needs are changing as the global landscape evolves.**

## Technology

Many industries across the globe have been transformed by improvements in technology and asset management will be no exception. Increasingly sophisticated technology is changing every aspect of asset management, from how we interact with our clients, to how we conduct research, execute trades and manage risks.

We aim to be at the forefront of these changes and will continue to make significant investments in technology throughout our business.

Within Investment, our Data Insights team has developed well. Using the latest in data science technology to interpret new and non-traditional data sets, the team provides fresh and diverse insights which complement the skills of our fund managers and analysts. We have also widened the application of technology across the business to improve efficiency and change how we work on a day-to-day basis. A significant upgrade to our front office technology systems will drive further efficiencies through increased end-to-end processing across the globe. We have also changed our approach to technology projects so that innovations are implemented much sooner across the business, improving productivity and efficiency.

Technology is also changing how we interact with our clients across all distribution channels. In 2016, we made a strategic investment in Benchmark Capital, a UK-based technology-led, high quality adviser support business.

## Regulation

Financial services, including asset management, have come under increased scrutiny from regulators around the world and the business models of many firms have been forced to evolve. In the UK, we have seen the publication of the FCA's interim report on its asset management market study, which is looking at ways to improve client outcomes across the entire industry.

At Schroders, we welcome regulation that increases transparency, improves trust and promotes better outcomes for clients. As an active investment manager, we believe that we have an important role to play in driving better outcomes for our clients and society as a whole. We believe that we have the responsibility to demonstrate that we provide value for money for our clients and act with integrity as good stewards of capital. Focusing on the sustainability of investments and applying influence as active shareholders adds significant value to our clients' portfolios. We have a team dedicated to environmental, social and governance issues. More information can be found on page 34.

Whilst increased regulation can bring challenges and increase operational complexity, it also provides opportunity. As banks' activities have declined, particularly in credit and more illiquid fixed income, asset managers can expand their operations. We have expanded our investment capabilities in these areas this year, acquiring a new securitised credit team based in New York, and have taken an associate interest in NEOS Finance Group, a Dutch direct-lending business.





**Strategic report**
Strategy and business review

# Strategy

**Our objectives are aligned with those of our clients – to help them achieve their financial goals and build future prosperity.**

| Our objectives: | Delivering consistent investment outperformance | Building partnerships with our clients and designing purposeful products |
|---|---|---|
| Measurable by: | Targeting at least 60% of AUM to outperform benchmark or peer group over rolling three-year periods. | Levels of gross and net flows. |
| Benefits: | Consistent outperformance increases value for our clients and is a driver of growth in new business. | Forming closer partnerships with our clients will allow us to better understand their financial goals and construct a solution to meet them. This will lead to improved client longevity and increased new business opportunities. |
| Risks: | Performance can fall short of targets. | Products that do not meet their objectives can put client relationships at risk. |

**Key risks**
We have identified the key risks associated with each of our strategic objectives, shown here as a numbered circle ❶. Details on each and our approach to risk management can be found on page 36.

**Key Performance Indicators (KPIs)**
A number of the results are also KPIs, which we use to measure our performance. These can be found on pages 16 and 17 and are indicated by a numbered circle ❶.

| | ❽ ❾ ❿ ⓫ ⓬ | ❶ ❷ ❸ ❹ ❺ |
|---|---|---|
| Results: | **74%** The percentage of AUM that outperformed over three years to 31 December 2016 (2015: 72%) | **£80.8**bn Gross flows (2015: £84.1bn)   **£1.1**bn Net inflows (2015: £13.0bn) |
| | ❶ | ❷ |

| Our expectations for 2017: | The investment environment was relatively challenging in 2016 with macro uncertainty driving volatility in markets and currencies and a high level of asset class correlation. Volatility could impact short term performance figures in 2017.

Over 12 months to 31 December 2016, 75% of assets outperformed benchmark or peer group (2015: 53%). Long-term performance is strong with 85% of assets outperforming over five years (2015: 76%). | In 2017, gross and net flows may be impacted by market uncertainty. Volatility can weigh upon client sentiment, particularly in the intermediary markets.

However, with a broad product range and highly diversified business model, we are well placed to continue to grow our business. |

\* See glossary.

Group Chief Executive's statement
Market trends
Strategy

Key performance indicators
Business and financial review
Business model

Our people
Our impact
Key risks and mitigations

### Ensuring operational efficiency

### Developing and retaining a deep pool of talent

### Maintaining a strong capital base to invest in future growth opportunities

Targeting a total cost ratio' of 65% and total compensation ratio' of between 45% and 49% depending on market conditions.

Developing our employees and retaining our highly rated people.

A strong capital base allows for investment in both organic growth and acquisition opportunities. Seed capital deployed supports the development of new investment strategies.

Greater operational efficiency and higher productivity will lead to generating higher levels of profit after tax, enabling increased dividends and continued organic investment in our business.

Developing and retaining our people is key to organisational stability and the long-term effective delivery of our business model.

Building shareholder value over the long term.

In weaker markets, the ratios may be higher than our long-term targets.

Our people are frequently targeted by competitors seeking to build their business.

In the short term, particularly during periods of market weakness, profitability can be adversely affected.

## **64**% 
Total cost ratio
(2015: 63%)

## **44**%
Total compensation ratio
(2015: 44%)

## **95**%
Percentage of highly rated employees retained
(2015: 94%)

## **94**%
Percentage of employees proud to be associated with Schroders
(2015: 93%)

## £**1.1**bn
Investment capital
(2015: £942m)

## £**325**m
Seed capital
(2015: £229m)

**5**

**6**

We are targeting a total compensation ratio towards the lower end of our target range in 2017.

We actively seek to retain and develop our highly rated employees, more information on which is on page 30.

Retention rates have remained high in recent years but could be negatively affected if competitors recruit more actively.

As clients' changing needs require innovative products, seed capital could increase in 2017.

Volatile markets could lead to short-term losses on investment capital, although we remain well positioned for the long term.

**Strategic report**
Strategy and business review

# Key performance indicators

We use a number of key performance indicators to measure our performance.

| | How we performed: | Long-term performance: |
|---|---|---|

## 1. Investment performance

We target at least 60% of AUM to outperform benchmark or peer group over rolling three-year periods.

Three-year investment performance was strong in 2016 and has been above our target for the last five years.

Five-year investment outperformance was 85%.

%

2012     71
2013     68
2014     78
2015     72
2016     74

## 2. Net new business*

We seek to generate positive net new business in Institutional, Intermediary and Wealth Management.

We generated net new business of £1.1 billion in 2016. Institutional generated strong net inflows of £4.3 billion. Market uncertainty impacted client demand in Intermediary and we saw net redemptions of £2.9 billion. There were net outflows of £0.3 billion in Wealth Management.

£bn

2012     9.4
2013     7.9
2014     24.8
2015     13.0
2016     1.1

## 3. Assets under management and administration*[†]
(at 31 December 2016)

An important influence on AUMA is the level of markets, but we aim to grow AUMA over time in excess of market growth, through positive investment performance and net new business. Currency movements may also impact asset levels.

AUMA increased by 27% in 2016 to £397.1 billion, driven by net new business, positive investment returns, the weakening of sterling and acquisitions.

£bn

2012     212.0
2013     262.9
2014     300.0
2015     313.5
2016     397.1

## 4. Net operating revenue margins*
(excluding performance fees)

As a key driver of revenue, we focus on net operating revenue margins by product and by channel, which are calculated based on AUM. As Institutional, Multi-asset and Fixed Income have grown, net operating revenue margins have declined but we benefit from the greater diversity of our business.

In 2016, net operating revenue margins declined to 48 basis points*, in line with our expectations.

In the future, net operating revenue margins may continue to decline, reflecting changes to the business mix and pressure on fees.

basis points

2012     54
2013     53
2014     53
2015     51
2016     48

---

* See glossary.
[†] Following the acquisition of Benchmark Capital, this KPI was amended to include assets under administration in addition to assets under management.

Group Chief Executive's statement
Market trends
Strategy

Key performance Indicators
Business and financial review
Business model

Our people
Our Impact
Key risks and mitigations

| | How we performed: | Long-term performance: |
|---|---|---|

## 5. Total cost ratio*

We target a 65% total cost ratio, recognising that in weaker markets the ratio may be higher than our long-term target.

In 2016, this ratio at 64% was better than our target.

%
2012  69
2013  64
2014  64
2015  63
2016  64

† Before exceptional items.

## 6. Total compensation ratio*

By targeting a total compensation ratio over a market cycle we align the interests of employees and shareholders with our financial performance.

We aim for a total compensation ratio of between 45% and 49% depending on market conditions.

In 2016, this ratio at 44% was better than our target range.

%
2012  43
2013  45
2014  44
2015  44
2016  44

† Before exceptional items.

## 7. Basic earnings per share

We aim to grow earnings per share consistently, recognising the potential impact of market volatility on results in the short term.

In 2016, basic earnings per share before exceptional Items increased by 5%.

pence per share
2012  104.7
2013  149.9
2014  166.8
2015  176.9
2016  186.3

† Before exceptional items.

## 8. Dividend per share
(in respect of the year)

Our policy is to increase the dividend progressively, in line with the trend in profitability. We target a dividend payout ratio of 45 to 50%. For more information, see page 104.

The Board is recommending a final dividend of 64.0 pence per share, bringing the total dividend for the year to 93.0 pence per share, an increase of 7%. This represents a payout ratio* of 50%.

pence per share
2012  43
2013  58
2014  78
2015  87
2016  93





# Business and financial review



**Profit before tax and exceptional items increased 6% to £644.7 million.**



**Richard Keers**
Chief Financial Officer





I am pleased to present another year of record results for the Group, with net income*, profit and our new KPI of AUMA all reaching record levels. The referendum on the UK's membership of the European Union led to a devaluation in sterling. As a company which reports in sterling, this has had a significant impact on this year's results, increasing our AUMA and net operating revenues as the majority of money we manage is in currencies other than sterling.

Our cost base also increased as a result of foreign currency movements, although as a net exporter of investment services a significant proportion of our costs arise in sterling. Overall the Group's results have benefited from the sterling devaluation. Our substantial operations in continental Europe mean we are well placed to address the challenges that may arise as the UK government begins the process of removing the UK from the European Union.

The Group's profit before tax and exceptional items increased by 6% in 2016 to £644.7 million. Basic earnings per share before exceptional items were up 5% to 186.3 pence. After exceptional items, profit before tax was up 5% to £618.1 million, resulting in a 4% increase in basic earnings per share to 178.3 pence.

This increase in profits has been driven by the growth in our AUMA as well as the strategic developments we have made in the business. The Group's AUM increased by 23%, primarily due to strong investment returns, including currency movements, but also as a result of business acquisitions and net new business flows.

Our acquisition of Benchmark Capital, which completed in December 2016, introduced a new category of assets under administration (AUA), with £11.1 billion of assets generating revenues linked to the provision of services to Independent Financial Advisers (IFAs). The acquisition also added £3.4 billion of AUM and associated revenues.

Based on these strong results, the Board is recommending a final dividend of 64 pence per share, bringing the total dividend for the year to 93 pence, an increase of 7% from 2015. This is in line with our stated policy to increase the dividend progressively, in line with the trend in profitability, and represents a dividend payout ratio of 50%.

The following commentary provides a more detailed review of our business development and the financial results of the Group in 2016. It is supplemented by further information on the financial position, capital strength and liquidity of the Group which can be found on pages 102, 104 and 106.

**Richard Keers**
Chief Financial Officer

* See glossary.

Group Chief Executive's statement
Market trends
Strategy

Key performance indicators
**Business and financial review**
Business model

Our people
Our impact
Key risks and mitigations

**Assets under management
and administration**

# £397.1bn
(2015: £313.5 billion)



As the asset management industry is undergoing a number of fundamental changes, we have continued to evolve our business to ensure we are well placed to deliver for our clients and to generate continued growth for shareholders. We have seen an orderly and managed succession process for a new Group Chief Executive and welcomed two new independent non-executive Directors to the Board. The composition of our GMC has changed and expanded, ensuring we have the right focus on strategy, technology and people, alongside our core business.

We have adapted our business structure, invested in technological improvements throughout the Group and entered into a number of strategic partnerships.

**Organic developments**

In recognition of the importance of product innovation and the ability to offer complete investment solutions for our clients, we have adapted our business structure this year. We have created a new Product division within Asset Management, distinct from Investment and Distribution, to articulate our value proposition and develop our product strategy. We have also adapted our Solutions function, which had previously been part of Multi-asset. This is now a stand alone, asset class agnostic function, dedicated to working with investment teams across the business to construct solutions for our clients' changing investment objectives. More information is on page 27.

In today's world the pace of technological innovation is accelerating and there are sizable competitive advantages for those who embrace these advances. Our Data Insights team has continued to grow and is embedded within our investment teams, providing analysis and insights derived from non-traditional data sets. We are in the process of implementing a new investment technology platform, which will simplify

end-to-end processes and achieve operational efficiencies in our business across the world. Applying technology effectively in other parts of our business is also a key priority and we are investing now to ensure we continue to provide the highest quality client service and to support continued business growth.

We are also investing in the development of our new headquarters in London, where we will relocate in 2018. The building will bring together our London employees into a single location and will deliver the tools and environment for continued growth and maintaining a positive client experience into the future.

**Strategic partnerships and acquisitions**

We have entered into a number of strategic partnerships this year to expand our investment expertise and to broaden our distribution reach.

Within Wealth Management, we acquired a significant stake in Benchmark Capital, a technology-led, high quality adviser support business based in the UK. Benchmark Capital increased AUM by £3.4 billion at 31 December 2016, as well as bringing AUA of £11.1 billion. More information regarding AUMA acquired through Benchmark Capital is set out on page 20. This business represents an important strategic step in widening our access to the UK advice market and providing a high quality fund platform' for advisers. Benchmark Capital operates as a separate business within our Wealth Management segment.

In North America, a key area of strategic growth, we entered into a relationship with Hartford Funds to manage and distribute a 'Hartford Schroders' branded fund range to intermediary clients in the US. There is strong potential for this partnership to expand to a significant size over the medium term and we have already seen the benefits, with positive net inflows and reduced operating costs.

We also strengthened our investment presence in North America with the acquisition of an asset-backed securities business which completed in September. The business comes with a strong track record and the team has been integrated into our existing New York business, greatly enhancing our capabilities in securitised credit. £3.3 billion of assets were migrated to Schroders' platform and we have already seen positive client momentum, with £1.6 billion of net inflows following completion.

We made selective investments to expand our capabilities in private assets. We entered into a strategic relationship with NEOS Finance Group (NEOS) in April. We acquired a 25% stake in NEOS, which is a specialist Dutch direct lending firm providing institutional investors with access to a debt financing platform for small and medium-sized enterprises. We also increased our stake in Secquaero Advisors AG to 50.1%, which provided us with a controlling interest in this Swiss-based insurance linked and catastrophe bond business.

In October, we announced that we had reached agreement to acquire the wealth management business of C. Hoare & Co., which completed on 17 February 2017 and brought around 1,800 clients representing approximately £2.3 billion of AUM.

# Business and financial review
## continued

**Economic, political and regulatory uncertainty**

2016 has seen a significant shift in the political and economic environment, combined with ongoing regulatory scrutiny. As a Group headquartered in the UK, the most prominent event was the result of the referendum in June, when it was decided that the UK should begin the process of removing itself from the European Union (Brexit). This was later followed by the unexpected outcome of the US presidential election. These and other factors have resulted in significant uncertainty in financial markets, which have impacted upon investor demand and market returns.

One immediate impact of the UK referendum result was a devaluation of sterling. This had a significant effect upon the Group's AUMA and profits, with the majority of client assets denominated in US dollars or dollar-linked and other currencies, all of which appreciated in sterling terms. This also led to an increase in the sterling value of our net operating revenues. Our cost base has a lower weighting towards such currencies, and although it has been impacted, it was to a lesser extent than revenues.

We are well placed to support our clients and to adapt our business to the market environment as it evolves. The Group is also well positioned, from an operational perspective, to deal with many potential outcomes of the Brexit decision. We have a long standing and substantial presence in continental Europe with over 700 people operating across 13 offices and managing over £70 billion of assets on behalf of clients.

⁺ See glossary.

Our existing product range is also suitably positioned to deal with any likely change in marketing restrictions. We have broad and diverse fund ranges domiciled both in the UK and Luxembourg, with limited cross-selling between jurisdictions. We have assessed the possible changes that may be required and will take appropriate actions as the UK government's negotiated position with the EU becomes clearer.

The FCA's interim report on its asset management market study, which was published in November, also has potential implications for the industry and for Schroders. We are contributing actively to the dialogue with the FCA in order that any changes promote a positive outcome for clients.

The outcome of the Brexit negotiations as well as changes in the US market continue to be areas of uncertainty both for investors and for our business. We are well placed to support our clients and to adapt our business to the market environment as it evolves. We expect this uncertainty to be a continuing focus over the next few years.

**Assets under management and administration**

The acquisition of Benchmark Capital, which completed in December 2016, has introduced a new service line to our existing asset management services. Benchmark Capital provides a technology-led regulatory and administrative service to a network of third party IFAs which operate within the regulatory permissions of the Benchmark Capital group. These assets are not managed or advised by

Benchmark Capital and we present them as assets under administration (AUA). We have chosen to update our KPI in respect of client assets to become assets under management and administration, which now incorporates our previous KPI of AUM along with these AUA.

AUMA increased by 27% during the year to £397.1 billion (2015: £313.5 billion), including £11.1 billion of AUA.

**Assets under management**

Assets under management grew by 23% in 2016 from £313.5 billion to £386.0 billion. Investment returns and currency movements increased the value of the assets we manage on behalf of our clients by £64.7 billion, while acquisitions added £6.7 billion and we generated net new business of £1.1 billion.

Along with £11.1 billion of AUA, the acquisition of Benchmark Capital introduced £3.4 billion of AUM. This comprises advisory assets through Benchmark Capital's own IFA business, along with assets managed through the Fusion wealth⁺ platform, which provides investor access and custodian services. This AUM is included within the Wealth Management segment and operates as a separate division focused on IFA clients.

The remaining £3.3 billion of acquired AUM was in respect of the securitised credit business in North America, which completed in September.





Group Chief Executive's statement
Market trends
Strategy

Key performance indicators
Business and financial review
Business model

Our people
Our impact
Key risks and mitigations

Consistent with the trends we have seen over recent years, many clients have continued to derisk their portfolios and are allocating away from growth assets. We have seen strong demand for fixed income products with £4.8 billion of net inflows in 2016, with particular focus on European credit and securitised credit. Fixed income now represents 21% of AUM.

We have also seen client demand for multi-asset solutions. We generated £4.1 billion of net new business, with flows into LDI, risk-controlled growth and income-generating products. We now manage more than £96 billion of assets within multi-asset strategies on behalf of our clients, which is 25% of AUM.

In the current 'risk off' environment, demand for equity products was subdued and we saw net outflows of £6.8 billion. This was relatively widespread across investment teams and regions, although we did see positive net inflows in EAFE, US small cap and emerging market equity strategies. Despite net redemptions, Equities remains the largest part of our business with £154 billion of client assets representing 40% of AUM.

Regionally, net new business was driven by clients in North America and continental Europe, with positive net flows across both channels in each region. North America generated £3.1 billion of net new business and has grown to 13% of AUM.

Asia Pacific saw net outflows of £2.9 billion but this was heavily concentrated in a small number of significant institutional mandates in Australia. In contrast, we have continued to see strong growth in the Japanese business with net new business of £2.4 billion.

The UK generated small net inflows this year, with institutional demand for multi-asset solutions largely offset by Intermediary redemptions.

Across our business, the Institutional channel continued to perform strongly with £4.3 billion of net inflows. These were concentrated in multi-asset and fixed income strategies and from clients based in North America and the UK. Total AUM in Institutional increased by 25%, ending the year at £226.3 billion.

Intermediary saw clients across the world allocating away from equity markets in 2016. Despite positive flows in Fixed income, we saw net outflows of £2.9 billion across the sales channel. Client sentiment in the UK and Asia Pacific has been unsettled for some time and both regions had net redemptions, principally from equity products. Investment returns, currency movements and acquisitions, partially offset by net outflows, grew Intermediary AUM by 19% to £120.1 billion.

Within Wealth Management, 2016 portfolio performance was strong with UK-based clients benefitting from diversification away from sterling-based assets. Total AUM increased 25% to £39.6 billion. However, net flows in early 2016 were impacted by clients' preference for private assets after lacklustre market returns in previous years and also for property in the UK. There were total net redemptions of £0.3 billion.

**Investment performance**
It is only through delivery of consistent investment outperformance for our clients that we can continue to grow. Despite volatile market conditions, our shorter-term performance is strong with 75% of assets outperforming their benchmark or peer group over one year (2015: 53%).

However, the longer-term performance measures are more meaningful for us and these have also improved. Over three years, 74% of assets are outperforming (2015: 72%) and over five years the figure is 85% (2015: 76%).



**Assets under management outperforming over three years**

**74%**
(2015: 72%)

| £bn | AUM | | | | | | |
|---|---|---|---|---|---|---|---|
| | Institutional | Intermediary | Asset Management | Wealth Management | Total | AUA | AUMA |
| 1 January 2016 | 181.0 | 100.9 | 281.9 | 31.6 | 313.5 | | |
| Gross inflows | 33.1 | 43.4 | 76.5 | 4.3 | 80.8 | | |
| Gross outflows | (28.8) | (46.3) | (75.1) | (4.6) | (79.7) | | |
| Net flows | 4.3 | (2.9) | 1.4 | (0.3) | 1.1 | | |
| Acquisitions | 1.9 | 1.4 | 3.3 | 3.4 | 6.7 | | |
| Investment returns* | 40.0 | 20.7 | 60.7 | 4.0 | 64.7 | | |
| Transfers | (0.9) | – | (0.9) | 0.9 | – | | |
| 31 December 2016 | 226.3 | 120.1 | 346.4 | 39.6 | 386.0 | 11.1 | 397.1 |

# Business and financial review
continued

## Financial performance

The table below shows the Group's net operating revenues, net income and profit before tax:

| £m | 2016 | 2015 |
|---|---|---|
| Net operating revenue | 1,712.8 | 1,600.7 |
| Net income[1][2] | 1,793.1 | 1,658.5 |
| Profit before tax[1] | 644.7 | 609.7 |

[1] Excludes exceptional items.
[2] Previously referred to as net revenue.

Higher average AUMA in 2016 compared with 2015 resulted in net income before exceptional items increasing by 8% to £1,793.1 million (2015: £1,658.5 million). Performance fees increased by 13% to £41.2 million (2015: £36.3 million), demonstrating strong investment performance. Along with the increase in net operating revenue, net income also included higher returns on the Group's investment and seed capital portfolios.

Our share of profits from associates and joint ventures was the same as 2015 at £21.5 million.

The Group's operating expenses, excluding exceptional items, were £1,148.4 million (2015: £1,048.8 million), resulting in a total cost ratio of 64%, which is below our KPI target of 65%. The increase in costs from 2015 has been driven mainly by a weaker sterling, with a proportion of our cost incurred in non-sterling denominations, along with investment in headcount growth and in technology.

The Group's profit before tax and exceptional items increased by 6% in 2016 to £644.7 million. Basic earnings per share before exceptional items increased by 5%. After exceptional items, profit before tax increased by 5% to £618.1 million.

The effective tax rate decreased from 20.7% to 20.5% before exceptional items and increased from 20.6% to 20.7% after exceptional items.

## Asset Management

Asset Management generated net income of £1,534.4 million (2015: £1,412.5 million) including performance fees of £38.8 million (2015: £35.7 million). Profit before tax and exceptional items was up 6% to £572.4 million (2015: £540.5 million). Profit before tax and after exceptional items was up 5% to £553.9 million (2015: £528.4 million).

Net income increased by 7% mainly due to higher net operating revenue of £1,489.5 million (2015: £1,393.4 million). Net operating revenue comprises fees based on AUM, including performance fees that are dependent on the performance of particular mandates and funds and transaction-related fees. Net income includes these items as well as gains on financial instruments and other income along with the share of post-tax profits from associates and joint ventures which increased from £12.8 million in 2015 to £16.7 million in 2016.

The increase in net operating revenue was principally due to higher average AUM, resulting in a rise in management fees, and strong investment performance, driving increased performance fees. The growth in management fees was partially offset by a reduction in the net operating revenue margin which, excluding performance fees, fell by 3 bps to 46 bps. The decrease in fee margins was in line with our expectations as the trend towards lower margin multi-asset and fixed income products and greater net inflows from institutional investors continued into 2016.

Other income also increased, predominantly due to foreign exchange gains and higher levels of transactional income earned.

Asset Management operating expenses before exceptional items increased to £962.0 million (2015: £872.0 million). This increase was largely driven by higher compensation costs*. The Group's fixed compensation costs have increased due to the weakening of sterling, which increased the costs of salaries paid outside of the UK, and due to the growth in employee numbers as we continue to invest to support our growth initiatives. Despite these fixed compensation cost increases, we maintained the Group-wide total compensation ratio of 44%. This reflected a reduction in variable compensation costs.

Within non-compensation costs, our technology costs increased, as we position ourselves for future growth, and we also saw an increase in market data costs. Additionally, non-compensation costs were impacted by the weakening of sterling, which increased our overseas cost base.

Exceptional items of £18.5 million mainly relate to the amortisation of acquired intangible assets and costs incurred as part of the development of the strategic relationship with Hartford Funds during 2016.





* See glossary.

Group Chief Executive's statement
Market trends
Strategy

Key performance indicators
Business and financial review
Business model

Our people
Our impact
Key risks and mitigations

## Wealth Management

Wealth Management generated net income of £224.0 million (2015: £207.2 million) including performance fees of £2.4 million (2015: £0.6 million). Profit before tax and exceptional items was up 8% to £66.4 million (2015: £61.3 million). Profit before tax and after exceptional items decreased by 7% to £56.3 million (2015: £60.5 million) due to the release of a provision in 2015 that was no longer required.

Wealth Management net income increased by 8% mainly due to higher net operating revenue which increased by £16.0 million to £223.3 million. Along with performance fees of £2.4 million, management fees increased to £161.5 million (2015: £155.2 million), transactional fees increased to £38.8 million (2015: £36.0 million) and net banking interest income was £20.6 million (2015: £15.5 million).

The change in business mix from net flows and markets reduced the net operating revenue margins but this was offset by increases in transactional income, resulting in the margin remaining unchanged at 65 bps.

Wealth Management operating expenses before exceptional items increased by £11.7 million to £157.6 million (2015: £145.9 million), driven by increased compensation costs from a weaker sterling and higher headcount.

Exceptional costs mainly comprise amortisation of acquired intangible assets in addition to costs incurred in relation to the Benchmark Capital and C. Hoare & Co. acquisitions, which completed on 15 December 2016 and 17 February 2017 respectively.

## Group segment

The Group segment includes returns on investment capital, income from financial investments, including RWC Partners Limited, and net returns from seed capital after hedging. The Group segment net income was £34.7 million (2015: £38.8 million) and profit before tax and exceptional items was £5.9 million (2015: £7.9 million). Profit before tax and after exceptional items was £7.9 million (2015: £0.1 million).

Post-tax profits from associates reduced from £8.7 million in 2015 to £4.8 million due to one-off private equity gains realised last year.

Group costs reduced to £28.8 million (2015: £30.9 million) with the decrease being driven by lower governance and general management costs of the Group.

Exceptional items included the release of deferred compensation costs related to STW that were not required to be paid, partially offset by share-based payments related to the 2013 acquisition of Cazenove Capital which fully vested in the year.

## Dividends

Our policy is to increase the dividend progressively, in line with the trend in profitability, having regard to overall Group strategy, capital requirements, liquidity and profitability. This approach will enable the Group to maintain sufficient capital to meet possible risk scenarios, including the impact of possible periods of economic downturn, and provide surplus to fund future acquisitions. We target a dividend payout ratio of 45 to 50%, determined as the total dividend per share in respect of the year, divided by the Group's pre-exceptional basic earnings per share. More information is set out on page 104.

The Board is recommending a final dividend of 64.0 pence per share, bringing the total dividend for the year to 93.0 pence per share, an increase of 7% from 2015. This represents a payout ratio of 50%.

## 2017 outlook and priorities

Although the asset management industry is undergoing a number of significant changes, we see growth potential across the areas in which we operate.

We will continue to focus on our core business of helping our clients to achieve their financial goals and build their future prosperity. Our focus will remain on organically growing our core business of managing equity, fixed income, multi-asset and alternative solutions.

In addition, we will seek to further diversify our business, both by region and product offering. We have already completed the acquisition of C. Hoare & Co.'s wealth management business in 2017 and we will continue to consider inorganic opportunities that deepen our investment expertise or broaden our distribution reach.

Despite the challenges the industry faces, we remain well placed to capitalise on these opportunities with a highly diversified business model, a strong financial position and the willingness to invest behind our business.

More information on the Group's financial position and liquidity is set out on pages 102, 104 and 106.

**Basic earnings per share**
Before exceptional items

# 186.3p
(2015: 176.9 pence)

**Strategic report**
Strategy and business review

# Business model

## Our business model starts with our clients.

Our continued success is reliant upon achieving our clients' investment objectives.

It is only by demonstrating value for money and meeting their financial goals that we can continue to grow our business.



## The successful delivery of our business model allows us to generate returns for:

### Our clients
Purpose-driven design with exemplary client service.

Strong, consistent outperformance.

### Our shareholders
A progressive dividend policy has seen a 7% increase to 93 pence and a payout ratio of 50%.

### Our people
94% proud to be associated with Schroders.

95% of highly rated employees retained.

See page 30 for more information on our approach to retaining and developing our people.

### Society
Act with integrity as stewards of capital.

Proud to support the communities in which we operate.

See pages 32 to 35 for more on our approach to Corporate Responsibility, environmental, social and governance investing and our tax contribution.

Group Chief Executive's statement
Market trends
Strategy

Key performance indicators
Business and financial review
**Business model**

Our people
Our impact
Key risks and mitigations

# Business structure

**Our structure is designed to ensure that we deliver consistently globally, but with flexible local management.**

In recognition of the importance of product innovation to future growth, we have revised our structure to create an independent Product division within the Asset Management segment.

Developing, managing and retaining our people is essential to the effective delivery of our business model.

## Our purpose
We focus on helping our clients achieve their financial goals and build future prosperity.

### Asset Management
We offer a broad range of products and solutions that meet the demands of institutional and retail investors throughout the economic and market cycle.

We provide client service through offices in 29 locations globally.

#### Investment
Portfolio management, research and dealing functions across a broad range of asset classes.

#### Product
Innovative product development, marketing intelligence and communications.

#### Distribution
Sales and client service for institutions and intermediaries throughout the client life cycle.

### Wealth Management
Our Wealth Management clients include high net worth individuals, family offices*, charities and clients introduced through a network of IFAs.

We offer a complete wealth management service, including wealth planning, portfolio management and banking and treasury services.

### Infrastructure
Infrastructure provides critical support to the business across Technology, Operations, Finance, Risk, Human Resources, Legal, Compliance, Governance, Internal Audit and Tax.

### Group
The Group segment includes the offices of the Chairman, Group Chief Executive and Chief Financial Officer and employees involved in corporate strategy, corporate development and in the management of the Group's investment capital and liquidity.

\* See glossary.

**Strategic report**
Strategy and business review

# Asset Management

Investment

Over 50 teams of investment professionals in 20 locations globally run actively managed investment solutions, designed to build our clients' future prosperity over the long term. Pioneering research insights help us to consistently outperform a benchmark or target agreed with our clients.

By challenging conventional wisdom and interpreting real time data intelligence, we believe that active management can deliver value for money for our clients, generating significant value over the long term by compounding returns in excess of what can be achieved by investing in an index.

## Equities
Equity investment in public markets includes single country, regional and global funds, small and mid-cap funds, growth, value and quantitative strategies, and defensive strategies to reduce market risk.

## Fixed Income
Fixed Income employs fundamental and quantitative approaches and is based on research intensive, globally integrated credit and macro capabilities.

## Multi-asset
Multi-asset combines different asset classes to offer a comprehensive range of customised strategies and pooled products. We specialise in providing a consultative approach for clients.

## Emerging Market Debt, Commodities and Real Estate
Our real estate business manages a range of open and closed end funds. We manage absolute return emerging market debt, commodities and agriculture funds.

£**153.7**bn
(2015: £129.9 billion)

£**82.0**bn
(2015: £60.3 billion)

£**96.2**bn
(2015: £78.0 billion)

£**14.5**bn
(2015: £13.7 billion)



- Asia Pacific
- Quantitative equities
- Global
- Emerging markets
- UK
- Europe
- Japan
- US
- Australia
- Other



- US
- Europe
- Global
- Asia Pacific
- UK
- Securitised Credit
- Australia
- Convertibles
- Insurance linked
- Emerging Market Bonds
- Infrastructure finance



- Risk-controlled growth
- LDI
- UK traditional balanced
- Income
- Inflation protection
- Risk mitigation
- GAIA*
- Wealth preservation



- Real estate
- Emerging market debt
- Agriculture and commodities
- Private equity

* See glossary.

Group Chief Executive's statement        Key performance indicators        Our people
Market trends                            Business and financial review      Our impact
Strategy                                 **Business model**                 Key risks and mitigations

# Asset Management

## Product

**Countries**

# 19

operate fund ranges

**More than**

# 610

funds

This year, we have created a new Product division. It has brought together over 400 people globally from existing teams within Investment, Distribution and Infrastructure to define our value proposition and integrate purposeful design to our developing product strategy.

The division specialises in product strategy, product development, portfolio solutions, product management, marketing and product operations.

Our clients need sustainable investment returns, which are flexible enough to adapt to industry and market changes. Our investment products and strategies are designed to help our clients achieve their desired outcomes. Our products are robust, fit for purpose and built to stand the test of time. We achieve this through close collaboration with Investment and Distribution to deliver the best of the firm to our clients. We actively manage our product ranges to ensure that we meet our clients' needs throughout the product and client life cycles.

Our market intelligence team's analytical insights on global market trends, changing client demands and competitor research bring us an additional perspective that helps to inform our product strategy and support product development. They work closely with the product development team who manage the product life cycle from generation of ideas through to product launch and finally to product retirement.

The product operations group is focused on ensuring that our processes are efficient and effective, our client reporting is relevant and that we can manage increasing regulatory expectations. Substantial fund services teams based in both the UK and Luxembourg support these activities.

We have also brought together our alternative product capabilities to be managed under one division. This supports our commitment to have clear leadership to drive further development in our alternatives business.

This year, our Solutions team was moved out from within Multi-asset to become an asset class agnostic function working with all investment teams across Schroders. We look to offer our clients expertise from across the whole Group and the Solutions team brings all of these capabilities together.

Providing investment solutions is not new to Schroders. The Solutions team have a 16-year track record covering the spectrum of risk management, advice-led client engagement and asset and liability challenges. We have an asset class agnostic philosophy, the ability to combine capabilities into a fiduciary management solution and an established global footprint across multiple channels and geographies.





**Strategic report**
Strategy and business review

# Asset Management

Distribution

Our Distribution teams consist of over 500 people who are focused on forming principled partnerships with our clients. Close relationships mean that we can better understand their changing financial needs and recommend the solutions to build their future prosperity.

Our reputation has been formed by over two centuries of building stable and prosperous relationships with our clients, recognising the responsibility entrusted to us both by institutions, intermediaries and investors in our funds.



### Institutional clients*
We manage segregated accounts and assets in pooled vehicles for a range of institutional clients including local authorities, corporate pension plans, defined contribution* pension schemes, insurance companies and sovereign wealth funds.

£**226.3**bn
(2015: £181.0 billion)



- UK
- Asia Pacific
- Americas
- Europe

### Intermediary clients*
We manage collective investment vehicles across a wide range of strategies invested in by the clients of a variety of intermediaries including financial advisers, discretionary managers, private wealth managers and online platforms.

£**120.1**bn
(2015: £100.9 billion)



- Europe
- Asia Pacific
- UK
- Americas

* See glossary.

Group Chief Executive's statement
Market trends
Strategy

Key performance indicators
Business and financial review
**Business model**

Our people
Our impact
Key risks and mitigations

# Wealth Management

We provide a full suite of wealth management services, including wealth planning, portfolio management and banking and treasury services. Our clients include high net worth individuals, family offices and, through Benchmark Capital, clients introduced through a network of IFAs. We are also the largest investment manager of charity assets in the UK.

We operate from 15 locations globally. Our largest business is based in the UK and we have significant presences in the Channel Islands and Switzerland, as well as businesses in Frankfurt, Gibraltar, Milan, Madrid, Hong Kong and Singapore. Benchmark Capital operates from various locations in the UK.

Forming strong relationships with our clients to understand their changing needs is at the heart of our client service proposition. Experienced relationship management teams aim to deliver an uncompromising quality of service. Our dedicated portfolio managers and, where appropriate, wealth planning advisers, allow us to develop close relationships and ensure that the investment solutions we provide are well placed to meet our clients' financial goals. We take an active, long-term approach to

portfolio management. We recognise that our clients' investment goals will change over time as their personal and financial circumstances develop and this is reflected in our flexible portfolio construction. Our banking and treasury services enable us to provide a range of deposit-taking and lending services to clients to assist in the overall management of their financial affairs.

Our portfolio managers select best-of-breed products across the whole of the market, with both Schroders and third party strategies subjected to the same level of scrutiny and rigorous selection process. All of our clients benefit from the investment expertise of the whole Group as our portfolio managers have access to our 700 investment professionals.

In December, we made a significant investment in Benchmark Capital, a technology-driven adviser support business based in the UK, which expanded our offering and has the potential to significantly enhance the service we provide to this channel. It also introduced a new category of AUA, with revenues linked to the provision of services to IFAs. Benchmark Capital brought AUA of £11.1 billion, in addition to increasing AUM by £3.4 billion.

**Wealth Management assets under management**

£**39.6**bn

(2015: £31.6 billion)

**Wealth Management assets under administration**

£**11.1**bn

(2015: £nil)

**Wealth Management clients' AUM by portfolio size**



13%
16%
9%
16%
13%
10%
6%
17%

① £ <£1m
② £1m-£5m
③ £5m-£10m
④ £10m-£25m
⑤ £25m-£50m
⑥ £50m-£100m
⑦ £100m-£250m
⑧ >£250m



**Strategic report**
Strategy and business review

# Our people

**Diversity of thought and an inclusive workplace are key to creating a positive environment for our people.**

## Gender diversity in senior management

| 2016 (2015) | Female | Male |
|---|---|---|
| Directors | 2 (2) | 12 (11) |
| Senior managers | 220 (176) | 544 (525) |
| Subsidiary directors | 8 (9) | 34 (26) |
| Total senior management | 228 (185) | 575 (549) |
| All employees | 1,634 (1,530) | 2,386 (2,254) |

## Employee Opinion Survey

**90%**
of employees recommend Schroders as a good place to work
(2015: 90%)

**94%**
of employees proud to be associated with Schroders
(2015: 93%)

**93%**
believe Schroders behaves responsibly towards our clients
(2015: 93%)

**92%**
Employee satisfaction
(2015: 89%)

## Our culture and values

We are proud of our reputation as an employer of choice. We encourage an open, collaborative and meritocratic working environment in which everyone has the opportunity to deliver their best.

Our approach to business is defined in our guiding principles, which we share with all employees and external stakeholders including clients, combined with our values of excellence, innovation, teamwork, passion and integrity. They are a key part of Schroders' culture, define the high standards of behaviour we expect from our people and are embedded in our appraisal process.

## Diversity of thought

Talented people and an ability to understand and embrace different perspectives are crucial to the Group's continued success. Schroders is highly diverse in terms of the nationalities employed in our local offices globally. This is a key strength that provides us with local market knowledge and a deep understanding of our clients' needs. Our Group Chief Executive takes accountability for ensuring that we foster an inclusive culture, which strives for diversity in everything we do, across our global workforce.

As part of this, we were one of the first signatories of the Women in Finance Charter, a pledge towards gender balance across financial services. We are committed to striving for gender equality across our business.

We introduced an initial target of at least 30% female representation in senior management roles and senior management compensation is linked to the achievement of this goal. We made good progress in 2016 and under the leadership of the new Group Chief Executive, we have increased female representation in senior management roles from 25% to 29%, including additional appointments to the GMC, more information on which is on page 48. We have increased our target to at least 33% female representation at senior management level by the end of 2019. More information on gender pay gap and diversity initiatives can be found on page 84.

As we look to recruit from a more diverse talent pool, we have taken a number of key measures. We ensure that our entry level assessment centres are gender balanced. Training is provided to managers on diversity issues and unconscious bias. Internal and external mentoring programmes are provided to encourage diversity. We offer maternity and paternity coaching, shared parental leave and flexible working policies to help ensure that we support employees having children.

A series of employee resource groups have been established this year which represent the diversity of Schroders and are an important part of our approach to diversity and inclusion. They include gender and sexual orientation, multi-cultural, disability and carer groups that are a key feature of our identity as an inclusive

place to work. As part of our commitment to driving diversity across the business, in 2016 we became a member of 'OUTstanding', the professional network for LGBT+* executives.

We are committed to providing equal employment opportunities and avoiding discrimination. Where possible, we monitor the ethnicity, age and gender composition of our existing workforce and those applying for jobs.

Our equal opportunities policy is to give fair consideration to all employment applications, including from disabled people, considering particular aptitudes and abilities. If employees become disabled, employment continues wherever possible, with retraining given if necessary. For the purposes of training, career development and progression, all employees are treated equally as part of our

## Our values

### We strive for
## Excellence
We want to excel at what we do. We continually strive for better.

### We work with
## Innovation
We challenge how things are done and anticipate future opportunities.

## Teamwork
We work as one team for our clients. We value the contribution of individuals and encourage healthy debate.

### We have
## Passion
We demonstrate enthusiasm for what we do through the dedication and energy we bring to servicing our clients.

## Integrity
We build strong relationships based on trust and confidentiality.

\* See glossary.

Group Chief Executive's statement
Market trends
Strategy

Key performance indicators
Business and financial review
Business model

**Our people**
Our impact
Key risks and mitigations

commitment to make Schroders an inclusive place to work for all. More on our approach to diversity and inclusion can be found at www.schroders.com/inclusion.

We are proud to be an accredited London Living Wage employer. All of our London-based employees, including contractors, are paid above the London Living Wage.

**Wellbeing**
Our employee diversity includes a multi-generational workforce and it is vital that our people are provided with the support and opportunities they need to optimise their health and overall wellbeing.

As well as being members of several thought-leadership networks, we provide a comprehensive calendar of wellbeing events for our people across five key areas: mind, workplace, body, financial and work-life balance. There is also extensive resilience and mental health training embedded within our learning and development programmes.

**Engaged and highly-motivated employees**
We have recently completed our firm-wide Employee Opinion Survey. The results demonstrate that our employees are engaged with the firm, understand our values and believe that we have a culture of behaving responsibly towards our clients.

We have invested in our corporate communications this year as we recognise that good communication is key to delivering high levels of engagement. It helps employees to understand and deliver our strategic objectives. We communicate regularly through a variety of channels, including management

briefings, videos, an internal magazine and a social intranet. Annual 'Inside Schroders Live' meetings are held with the Group Chief Executive to discuss the progress made by the Group and future challenges and objectives. Similar events are held across our offices globally.

**Retaining our talented people**
We have a highly engaged, experienced and stable workforce, with 45% of employees having been with the firm six years or more. Overall turnover in 2016 was 9%. We focus on retaining our most talented employees and our retention of high performing employees remains high at 95% (2015: 94%).

Over 20% of our global roles are filled with internally developed talent (30% in the UK) as we provide our employees with the opportunities and fulfilling work experience they need to achieve their potential. We invest heavily in developing their knowledge, skills and capabilities. Employees have access to a range of learning and development programmes in order to maintain and increase technical competence in their roles and align behaviours with our values.

Competitive remuneration is important in delivering this and our approach is explained in the Remuneration report on page 68.

**Employees by length of service**



- 0–3 years — 21%
- 4–5 years — 42%
- 6–10 years — 13%
- 10+ years — 24%

**Age profile of employees**



- Under 30 — 14%
- 31–40 — 18%
- 41–50 — 39%
- 50+ — 29%

**Employees by region**



- UK — 55%
- Asia Pacific — 8%
- Europe — 17%
- Americas — 20%







**Strategic report**
Strategy and business review

# Our impact

## Corporate Responsibility

At Schroders we are aware of our societal responsibilities. We are proud to support the communities in which we operate and encourage our employees to do the same.

Our commitment to Corporate Responsibility (CR) has been refreshed and expanded this year, to ensure that our commitment to act responsibly, support our clients, deliver value to shareholders and make a wider contribution to society is embedded across our business in all that we do. To ensure that societal considerations are addressed at the highest level, responsibility for CR sits with an executive Director.

### 2016 highlights
We have seen significant strategic progress on CR issues in 2016. We appointed a dedicated Head of Corporate Responsibility in recognition of the need to respond to fast-changing social issues and expectations, both internally and externally.

We have established a global CR champion network, ensuring that we have contacts across the world to contribute to designing, spearheading and delivering CR initiatives.

Our inaugural firm-wide Employee Recognition Scheme was launched in 2016, recognising those who have gone further to demonstrate Schroders' values, with the option for winners

to select a charitable donation. We have also launched our three-year Diversity and Inclusion Strategy, focusing firstly on inclusive leadership. Externally, we have delivered numerous high impact and diverse community projects across the globe, such as our Netherlands office supporting Dutch charity 'Alternatives 4 Children', which aims to improve the wellbeing of children, and our New York office supporting the 'Read Alliance' initiative, which provides tutoring for at-risk children. We have also received a 'Long Service Company Award' from the East London Business Alliance in acknowledgement of our 10-year partnership with the 'Mentoring Works' programme.

### Highest ethical standards
We promote high ethical standards and have a strong culture of doing the right thing for our clients, our employees, our shareholders and the Group. If an employee does have any ethical concerns, we have an internal whistleblowing policy, through which they can raise concerns about behaviour or decisions that could indicate potential wrongdoing. A 24-hour hotline is available for employees to report any concerns anonymously, which is publicised widely to employees. Personal securities trading by employees is subject to clearly defined internal policies.

Employees are not permitted to solicit or accept any inducements that are likely to conflict with their duties. We have policies in place and train employees in relation to treating customers fairly, anti-bribery, anti-money laundering, terrorist financing, market integrity, gifts and entertainment and data protection. Due diligence is undertaken before entering any material new client relationship and this is enhanced in high-risk countries or for higher risk entities or individuals.

This year we also published our first Slavery and Human Trafficking statement, to outline the steps we are taking to prevent slavery and human trafficking from taking place in any part of our business or in our supply chains. This can found on our website at www.schroders.com/slavery.

### Investment 2020
Schroders supports Investment 2020, a programme that provides opportunities for school leavers and graduates in asset management. As part of this programme, we recruited across all areas of the business in 2016. More than half of the trainees from our 2015 programme progressed to full time roles within Schroders in 2016, and the majority of those who did not stay at Schroders went on to attend university.

### Charitable giving
In 2016, we donated £1.5 million to charitable causes around the world with an emphasis on supporting our employees through Give As You Earn (GAYE) payroll giving and sponsorship matching. In the UK, 29% of our employees donated to charitable causes through GAYE and the firm's matching donations increased to £839,000 (2015: £763,000), qualifying us for the Platinum award for payroll giving.

In addition to financial donations, we have provided gifts in kind, organised frequent charitable collections and encouraged our employees to share their knowledge, skills and capabilities with charitable organisations. Through our volunteering policy, we offer employees up to 15 hours of paid volunteering leave each year and provide a 'time matching' charitable donation for volunteering that takes place outside of working hours.

### Environmental impact
We are committed to minimising the environmental impact of our operations and to delivering continuous improvements in our environmental performance.

In 2015, we set targets for the first time to purchase electricity from renewable sources. We committed to targeting 60% of our global electricity supply to be from renewable sources by the end of 2016 and for that figure to increase to 75% by the end of 2020. We have successfully achieved the first of these targets, as 69% of our electricity purchased globally in 2016 was from renewable sources.

We use DEFRA's conversion factors each year to calculate our $CO_2e^*$ emissions for all office locations. Our data has been externally verified and further information will be disclosed in our Carbon Disclosure Project submission later in the year, which will undergo a AA1000 assurance review. Our total carbon output in 2016 has reduced by 13%. This is due to both a decline in our global electricity and oil consumption following office moves during the year and a change in guidance from DEFRA on air travel.

For 2015 and 2016 we have used the internationally accepted GHG Protocol Corporate Standard for reporting. Previous years have been restated accordingly, although 2013 does not include $CO_2e$ emissions for employees using their own vehicles for business purposes, as this data was not captured in that year.

\* See glossary.







Group Chief Executive's statement
Market trends
Strategy

Key performance indicators
Business and financial review
Business model

Our people
Our impact
Key risks and mitigations

## $CO_2e$ emissions per employee

tonnes

| | |
|---|---|
| 2016 | 4.4 |
| 2015 | 4.9 |
| 2014 | 5.5 |
| 2013 | 4.4 |

## Total $CO_2$ emissions

tonnes

| 2013 | 7,515 | 659 | 14,696 |
|---|---|---|---|
| 2014 | 9,055 | 659 | 16,943 |
| 2015 | 12,798 | 539 | 19,833 |
| 2016 | 10,899 | 688 | 17,211 |

- Scope 1: Natural gas, oil and company owned vehicles
- Scope 2: Electricity
- Scope 3: Business travel

In 2018, our UK headquarters will relocate to 1 London Wall Place, an inspirational new building in the heart of the City of London. This is an exciting opportunity to bring all of our London-based employees together in one building in a collaborative and modern working environment.

We have given much consideration to building efficiencies and the Intelligent Building Management System being installed will optimise energy conservation, as well as providing trend analysis and advanced analytics. The sustainability objectives we set for the building will cover a variety of topics including energy, materials and water use and we are targeting a BREEAM' rating of 'Excellent'. Our expectation is that this, together with moves to new offices in New York and Singapore, will help us to improve our environmental impact.

## 2017 objectives

Through 2017 we are looking to further develop and expand our CR efforts. We are developing an enhanced strategy for the firm, building on our long history of philanthropy and our ongoing commitment to acting responsibly, supporting both our clients and our people and making a positive wider contribution to society. We will look to create focused attention on a number of specific themes globally to enable concentrated effort and impact. We will also seek to introduce charity and community partnerships that offer sustainable, long-term value.



## Memberships and awards



We received the Payroll Giving Quality Mark Platinum Award.



We are a member of OUTstanding, the professional network for LGBT+ executives and future leaders and their allies.



We signed the Women in Finance Charter in May 2016, a pledge for gender balance across financial services.



We are a member of The Business Disability Forum.



We are an accredited London Living Wage Employer.



We are a member of the City Mental Health Alliance (CMHA).



We received an East London Business Academy Long Service Company Award for our mentoring contributions over 10 years.



We are a member of Working Families, the UK's leading work-life balance organisation.





We are a member of Cityparents – a network for City professionals who have a shared interest in balancing home/family life with a progressive career.



We are included in the FTSE4Good Index series.



We participate in the Carbon Disclosure Project (CDP) climate change program.

We are included in the Dow Jones Sustainability Indices (DJSI).



We are a member of the Heart of the City's alumni programme.



We are a member of the London Benchmarking Group (LBG).



**Strategic report**
Strategy and business review

# Our impact

## Environmental, social and governance

Our world is changing faster than ever. As environmental stresses and social pressures become more acute, the financial importance of effectively managing environmental and social change is rising. High standards of governance and corporate and social responsibility are important to us and we believe they are likely to lead to outperformance in the long term.

As active fund managers, identifying companies that will thrive against this backdrop will help us achieve better outcomes for our clients. This is why we are committed to the integration of environmental, social and governance (ESG) factors into our investment processes across geographies and asset classes.

Schroders has always been at the forefront of responsible investing, being amongst the first institutions to add dedicated ESG resources, in 1998. This team has now grown to 11 and has


Signatory and association member of UN PRI.

been further strengthened by the addition of a Head of Sustainable Research in 2016. Transparency is key in this area. As well as our quarterly and annual Responsible Investment reports, we regularly publish thematic research, all of which is available at www.schroders.com/esg.

We have a long track record of managing exclusion mandates according to clients' ethical criteria, with 9% of Group AUM (over £33 billion) dedicated to this area.

Our strengths are also reflected in the award of an A+ rating for our ESG strategy, the highest achievable, from the United Nations Principles for Responsible Investment (UN PRI*) for each of the last two years. We were also assessed by the Financial Reporting Council (FRC) as a top tier signatory for the UK Stewardship Code*, reflecting our commitment to being actively engaged owners.

In 2016, we engaged with more than 530 companies across the world on ESG issues on 761 occasions. This was a 54% increase in engagements from 2015 and covered topics such as climate change, human rights, bribery and corruption, board structure and remuneration. We also voted on resolutions at 5,168 company meetings.

**Engagements with companies on ESG issues**

| | |
|---|---|
| 2012 | 105 |
| 2013¹ | 109 |
| 2014 | 243 |
| 2015 | 495 |
| 2016 | 761 |

¹ Governance engagements included from 2014 onwards.

**Company resolutions voted on**
%

| | |
|---|---|
| 2012 | 90 |
| 2013 | 96 |
| 2014 | 97 |
| 2015 | 92 |
| 2016 | 92 |

Our commitment to responsible investing has also led to broader engagement with stakeholders. We have partnered with a number of non-governmental organisations, including the Carbon Disclosure Project (CDP) and Action on Sugar, across a wide range of topics including corporate disclosure, implementation of the living wage and nutrition.

### Climate change risk

Climate change is a major investment risk, and one to which we are devoting increasing resources. Our work has four main strands: research on the investment implications, education for clients, engaging for improved corporate disclosure, and working with policy makers on the framework for a transition to a low carbon economy.

Over the past four years we have published thematic reports assessing the impact of climate change across a range of industries from aviation to shipping and coal. In 2016, we wrote about the 'Climate Conundrum: How to assess climate risks in your portfolio' and ran a series of seminars for clients in different geographies.

Climate change is a major engagement topic and we have been assertive in using our votes to promote change, working alongside the 'Aiming for A' investor coalition. We have also responded to calls for evidence on topics directly and indirectly related to climate change by the European Union and the Financial Stability Board.

**Global engagement with companies on ESG issues in 2016**



24% Americas
18% UK
30% Europe, Middle East and Africa
28% Asia Pacific

\* See glossary.

Group Chief Executive's statement
Market trends
Strategy

Key performance indicators
Business and financial review
Business model

Our people
**Our impact**
Key risks and mitigations

# Our impact

## Our tax contribution

Integrity and good conduct are central to our culture. This means we aim to comply with both the spirit and letter of the law and are committed to conducting our tax affairs in an open and transparent way.

We look to comply with all of our tax filing, tax reporting and tax payment obligations globally. We also seek to maintain good relationships with the tax authorities in the key jurisdictions in which we operate. This may take the form of discussing key developments in our business and the potential impact of those developments on the amount of tax we pay. From time to time, our views on the appropriate tax treatment in any given situation may differ from those of the tax authorities, in which case we will work constructively and proactively to achieve an early resolution. We comply with the UK's Code of Practice on Taxation for Banks and are treated as 'low risk' by HMRC*.

We believe it is important that business builds trust within society regarding its role and contribution. With this in mind, we support initiatives to improve international transparency on taxation matters, including OECD' measures on country-by-country reporting and automatic exchange of information.

Our tax strategy, available at www.schroders.com/taxstrategy, sets out our approach to tax matters across the Group. This strategy is reviewed and approved annually by the Audit and Risk Committee.

### Taxes incurred

We incur corporate income tax on the profits arising in each country in which we operate. Corporate tax rates in these territories vary significantly and we apply a consistent global approach to transfer pricing that fairly recognises the economic contribution that our business in each country makes to the Group's overall profit. On average, we pay corporate income tax at a rate of 20.7% (2015: 20.6%). See note 6 to the accounts on page 114 for further information.

In our capacity as an employer, we bear payroll taxes (including social security contributions) on our employees' remuneration.

We also incur value-added tax (VAT) on our expenses. While VAT is generally a tax on the final consumer of services, as a financial services business part of the VAT we incur is not recoverable resulting in a cost for the Group. Other taxes we bear include property taxes and business rates and withholding taxes on payments by clients and within the Group.

The total tax incurred by the Group in 2016 was £225.3 million (2015: £190.1 million).



- ◔ UK taxes incurred £108.7m
- ◔ Europe taxes incurred £52.3m
- ◔ Asia Pacific taxes incurred £51.2m
- ◔ Americas taxes incurred £13.1m

### Taxes collected

In addition to taxes incurred, companies have an important role in collecting and administering taxes on behalf of governments, where the cost of the tax is borne by others.

The largest proportion of the taxes we collect relates to the income tax and social security payments we deduct from our employees' remuneration. Certain types of service the Group provides are subject to VAT and the Group is responsible for the collection of such VAT and for its payment to the tax authorities.

The total tax collected in 2016 was £228.8 million (2015: £240.1 million).



- ◔ UK taxes collected £141.6m
- ◔ Asia Pacific taxes collected £37.6m
- ◔ Americas taxes collected £27.2m
- ◔ Europe taxes collected £23.0m

Further information on the taxes we incur and collect can be found on our website at www.schroders.com/taxtransparency.





**Total global taxes incurred and collected**

# £454.1m
(2015: £430.2 million)

* See glossary.

# Key risks and mitigations

**Integrity and good conduct are central to our culture and approach to risk management.**



The Group is exposed to a variety of risks as a result of its business activities. As such, active and effective risk management is a core competence and we actively monitor the potential impact of current and emerging risks. The Group places significant focus on the integrity and good conduct of employees and the risk management framework is underpinned by a strong ethical culture. This section explains how we control and manage the risks in our business. It outlines key risks, how we mitigate them and our assessment of their potential impact on our business in the context of the current environment.

## Managing risk
The Board is accountable for risk and oversight of the risk management process. It considers the most significant risks facing the Group and also uses quantitative exposure measures, such as stress tests, where appropriate. Non-executive oversight of the risk management process with respect to standards of integrity, risk management and internal control is exercised through the Audit and Risk Committee (see page 58).

It is the responsibility of all employees to uphold the control culture of Schroders and we therefore embed risk management within all areas of the business. Members of the GMC have risk management responsibility for their respective business areas and we expect individual behaviours to mirror the culture and core values of the Group.

The Group Chief Executive and the GMC, as the principal executive committee with responsibility for the monitoring and reporting of risk and controls, regularly review the key risks facing the Group.

The executive oversight of risk is delegated by the Group Chief Executive to the Chief Financial Officer. The Chief Financial Officer has responsibility for the risk and control framework of the Group and independent monitoring and reporting of risks and controls is supported by the Group Head of Risk.

The Chief Financial Officer chairs the Group Risk Committee (GRC). The GRC meets ten times a year and is attended by the heads of the control functions; Group Risk, Compliance, Legal and Internal Audit. Chief Operating Officers from across the business, senior managers from Distribution and Wealth Management and other GMC members regularly attend. The GRC supports the Chief Financial Officer and the GMC in discharging their risk management responsibilities. The GRC reviews and monitors the adequacy and effectiveness of the Group's risk management framework, including relevant policies and limits. It also reviews trends and exceptions in the most significant risk exposures. The GRC and the Wealth Management Audit and Risk Committee (WMARC) receive reports in respect of risk for Wealth Management.

## Lines of defence
The first line of defence against undesirable outcomes is the business operations themselves and respective line managers across Investment, Product, Distribution, Wealth Management and Infrastructure. Business heads take the lead role with respect to identifying potential risks and implementing and maintaining appropriate controls.

Line management is supplemented by the control and oversight functions including: Group Risk, Compliance, Legal and Governance, Finance, Tax and Human Resources which form the second line of defence. This is supplemented by the compliance monitoring programme, which reviews the effective operation of our processes in meeting regulatory requirements.

Group Internal Audit provides retrospective, independent assurance over the operation of controls and forms the third line of defence. The internal audit programme includes reviews of risk management processes and recommendations to improve the control environment; supplemented by external assurance from the Group's auditors.

Schroders also maintains insurance cover with a broad range of policies covering a number of insurable events.

## Lines of defence
Overview



Three lines of defence



| | | |
|---|---|---|
| Group Risk Committee | Group Management Committee | Audit and Risk Committee |

Group Chief Executive's statement          Key performance Indicators          Our people
Market trends                              Business and financial review        Our Impact
Strategy                                   Business model                       Key risks and mitigations

### 2016 developments

We have continued to develop our UK Conduct framework and strengthen our management information and reporting in this key area. We have further enhanced our global oversight of financial crime risk management, our market abuse surveillance tools and a number of our compliance policies in the context of the ever tougher regulatory environment.

The Group Risk operating model has been reviewed and we have strengthened our risk capabilities through the following:

- Recruitment of regional heads of risk in the US, continental Europe and Asia Pacific and particular focus on strengthening our operational risk capability outside the UK
- The development of a Group Risk hub in Hong Kong
- Enhancement of the Group Policy Framework which has been aligned to our material risks and supplemented with policy summaries to increase business awareness and engagement
- Formalisation of our risk appetite statement with supporting measures and metrics.

The Information Security Risk Oversight Committee, Technology Risk Committee and Group Pricing Committee have been added as sub-committees of the GRC. Cyber-crime continues to be at the forefront of Industry concerns so we continue to make progress in this area. The Information Security Risk Oversight Committee has set out its strategic aims for 2017, which include: increasing the level of protection across the business; better agility to detect cyber risks; and improved response and recovery to cyber crisis.

Further developments have also been made to the Risk and Control Assessment (RCA) process to embed this in the business amongst the first line of defence. RCAs are prepared by line management to identify and assess key operational risks at least annually and when significant changes occur. Associated controls are assessed with regard to their design and performance and line management are required to enhance controls where risks exceed appetite.

The ongoing RCA process is integral to our Risk Management Framework. The RCA cycle is detailed in the diagram below.

**Risk Control Assessment process**



### Viability statement

In accordance with the UK Corporate Governance Code, the Directors have carried out a robust assessment of the key risks facing the Group and expect Schroders plc will continue to be viable for the next five years.

This assessment has been made in consideration of the business model, expected future performance, solvency and liquidity. Our prospects have been assessed in line with the strategic business planning and forecasting period which has a five-year horizon.

The Directors review financial forecasts and key risks regularly. Key risks, together with the mitigation of these risks, are detailed in this 'Key risks and mitigations' section. Within this section, we have outlined the strategic risks facing the Group. The Board considers the options available to us to mitigate these risks when executing the Group strategy to ensure our ongoing viability is sustained. The business strategy is outlined on pages 14 and 15.

Stress testing from a capital and liquidity perspective has been performed on the Group's business plan and is integral to the Group's Internal Capital Adequacy Assessment Process (ICAAP) and Internal Liquidity Adequacy Assessment Process (ILAAP). Our stress testing considers a number of scenarios which include a range of factors that would lead to either outflows of our AUM or deterioration in the value of assets as a result of a market downturn. The Group also considers the impact of fee attrition where our margins may be compressed, all of which would negatively impact our revenues.

Our scenarios take into account material operational risk events that may occur, such as compliance failings, regulatory fines or sanctions or technology failures which would impact our operations. We recognise that such events would lead to reputational damage which could result in net outflows of assets, which are also factored into our testing.

Having reviewed the results of the above, we have concluded that we are appropriately capitalised should any of the above scenarios be realised and that our ongoing viability would be sustained.

The Directors' current, reasonable expectation is that Schroders plc will be able to continue in operation, meeting its liabilities as they fall due, over a viability horizon of five years.

**Strategic report**
Strategy and business review

# Key risks and mitigations
continued

**Key threats to our risk profile**
Threats with uncertain impact, probability and timeframe could impact the Group. We continuously monitor internal and external environments to identify new and emerging risks. We then analyse each risk and, if needed, develop and apply mitigation and management plans. The external threats that are currently the focus of attention are largely covered under our key risks including the Strategic risk summary which has been included in 2016. The most material threats to our risk profile in addition to these are:

– the UK's exit from the European Union
– the impact of global terrorism.

We have had a significant presence in the EU outside the UK for many years, including a substantial operation in Luxembourg from where we manage our global fund range which is sold across the continent. Although we continue to review our legal and regulatory structure across continental Europe, Brexit is not expected to have a material impact on our business or the service we provide to our clients and investors.

**Key risks**
We have identified the following as the key risks to Schroders.

**Assessment of key risks**
The key risks outlined on pages 39 to 43 have been assessed in the light of the current environment, as summarised in the diagram below.

This year we have made the following changes to the presentation of our key risks:

– Addition of a Strategic Risk category, recognising the external risks facing the group, comprising Changing Investor requirements, Low Investment return environment, Fee attrition, Regulatory landscape and Business model disruption

– Reputational risk (previously a standalone risk category) has been moved to the Business Risk category
– Removal of the Global Business risk from our Business risks category as we consider an emergence of this risk will be captured in an Operational Risk falling.

The horizontal axis shows the impact of a key risk if it were to materialise. The vertical axis shows the likelihood of this occurring. The scales of each axis are set on a relative basis between each risk and are based on the residual risks. The Group undertakes additional work to address those risks that it considers to be potentially heightened, more costly or in excess of our risk appetite. In some areas we have seen increased levels of risk, which we continue to actively manage.



**Strategic risks**
1. Changing investor requirements
2. Low investment return environment
3. Fee attrition
4. Regulatory landscape
5. Business model disruption

**Business risks**
6. Reputational risk
7. Investment performance risk
8. Product risk
9. Business concentration risk

**Market, credit, liquidity and capital risks**
10. Market risk
11. Credit risk
12. Liquidity risk
13. Risk of insufficient capital

**Operational risks**
14. Conduct and regulatory risk
15. Legal risk
16. Tax risk
17. Process and change risk
18. Fraud risk
19. Technology risk and information security
20. People and employment practices risk
21. Third-party service provider risk

**Key threats to risk profile**
A. Brexit
B. Global Terrorism

* See glossary.

Group Chief Executive's statement | Key performance indicators | Our people
Market trends | Business and financial review | Our impact
Strategy | Business model | Key risks and mitigations

## Strategic risks

The risk of our strategy failing to deliver the expected outcomes, earnings, and profitability can be influenced by internal or external factors that fall into the categories detailed below.

| Key risk | Description | How we manage risk |
|---|---|---|
| 1. Changing investor requirements | Growth in demand for investment solutions that are not currently offered by the Group. This may include passive strategies such as ETFs or certain outcome-oriented products where Schroders does not currently have the investment capability. | We have created a Product function, distinct from Investment and Distribution, to focus on product strategy, innovation, client engagement and managing our diverse product range to face the challenges posed by changing investor requirements and increased regulatory expectations. |
| | Regulated clients de-risking due to the impact of regulatory capital changes, where clients reallocate investments to classes that are not currently offered by the Group or at a lower margin. | We continue to focus on developing our investment capability, expanding into new asset classes and specific areas of expertise. |
| | Movement from defined benefit to defined contribution plans in a number of countries such as the UK, Japan, Korea and Taiwan. | We have enhanced our structured product and LDI product offering for outcome-oriented and de-risking solutions and developed a fiduciary management offering. We seek to ensure our funds are included as part of third party DC offerings. |
| | Consolidation of local authority pensions in the UK, reducing the associated fee pool. | |
| | An increase in demand for liability-driven investment (LDI) solutions, reducing the level of active risk management. | We adapt our business structure and cost base to manage the changing asset allocation requirements of our clients and the impact on our business model. |
| 2. Low investment return environment | A lower investment return environment due to: | Products that see demand in a low interest rate environment are income funds, absolute return funds and multi-asset funds. |
| | – Lower interest rates resulting in a potentially lower income AUM and profits on a constant currency basis<br>– Lower corporate revenue growth globally, impacting equities returns. | We have increased our focus on operational efficiency through automation and the use of technology. |
| | Both risks could impact upon investor demand, which is considered in changing investor requirements above. | |
| 3. Fee attrition | A lower fee environment and the impact on our business model of margin attrition due to: | Where we can offer a competitive advantage, our business is increasing its focus on solutions and outcome-orientated strategies which diversifies our fee income. |
| | – Changes in investor demand, driven by de-risking, a focus on lower fee margin products, or a transfer of AUM into products that are not offered by Schroders<br>– Compressed investment returns leading to tighter fee rates for new and existing institutional mandates<br>– Move towards vertical integration (advice, platform and investment management services) within the industry, increasing competition and pressure on fee revenue as active managers may be disintermediated<br>– Rising costs within the industry driven by changing and increasing regulatory requirements and technological advancement which impact margins. | Diversifying the product offering to address investor needs which supports overall profitability in the long term.<br><br>We have increased our access to private and alternative assets and strategies through acquisitions and strategic relationships (e.g. infrastructure debt and asset-backed securities).<br><br>We have made a strategic investment in Benchmark Capital which provides the opportunity for vertical integration. |
| 4. Regulatory landscape | Regulators are moving their post-crisis focus from the prudential and misconduct issues affecting investment and retail banks to other parts of the financial system including asset managers. | Regulatory and legal change is monitored by the Compliance, Legal and Public Policy teams. We engage with our regulators in relation to potential and planned changes in regulation. |
| | There is an increased regulatory focus on transparency of pricing, fees and other indirect costs borne by clients and the associated operating costs of compliance, reducing net profits, e.g. MIFID II', the potential introduction of minimum levels of fund liquidity and the outcomes of other regulatory reviews, such as the UK FCA's asset management market study. | Our increasingly diverse product offering enables us to meet the changing needs of clients driven by evolving regulation. |
| | Changes to intermediary commission and incentive structures and obligations are changing intermediaries' product selection processes. Regulation of distribution through digital channels and robo-advice may also change. | |
| 5. Business model disruption | The rise of technology solutions from competitors that disrupt our value chain including competition from quantitative investment technologies that have the potential to assimilate more data and make investment decisions, and that may be perceived to realise alpha more efficiently than active managers. | We are driving increased efficiencies and insights through technology, including investment in data science to obtain investment insights from non-traditional data sources and upgrade of front office systems. |
| | Increased investment and asset allocation through robo-advice' services, displacing active management and an increased asset allocation to passive investments. | Digital initiatives are in progress to improve client experience, engagement, and servicing through our web and mobile platforms. |
| | Inability to meet demand for products and solution-based offerings due to our capabilities being inadequate relative to requirements. | We are undertaking significant investment in our technology platform to support scalability, agility in product offerings, and the expanding alternatives business offerings. |
| | Centralisation of providers including swaps and other clearing houses, custodians and transfer agents creates systemic IT based risk with market infrastructure throughout our business chain, coupled with a consolidation of key counterparties that support our business operations. | We monitor the performance of key counterparties on a regular basis, as well as establishing processes for regularly assessing alternatives. |
| | Challenges arising from Brexit resulting from disruption to and uncertainty in respect of current law and regulation. | We are reviewing our operating model to ensure that post-Brexit we can continue to service our clients and investors. |

**Strategic report**
Strategy and business review

# Key risks and mitigations
continued

## Business risks

Business risk can be influenced by both internal and external factors. A risk can materialise due to poor business execution or a failure to respond appropriately to internal or external factors. Business risk can impact our earnings.

| Key risk | Description | How we manage risk |
|---|---|---|
| 6. Reputational risk | The reputation of Schroders is of paramount importance as this can be impacted by any of our key risks.<br><br>Reputational risk impacts Schroders' brand, reliability, and relationships with clients, regulators and shareholders. This may arise from poor conduct or judgements or risk events due to weaknesses in systems or controls.<br><br>Ineffective branding and marketing may impact our ability to grow our business.<br><br>Reputational risk may also arise from inappropriate client relationships or mandates which have adverse implications for the Group. | High standards of conduct and a commitment to regulatory compliance are integral to our culture and values. We consider key reputational risks when initiating changes in strategy or our operating model.<br><br>We have a number of controls and frameworks to address other risks that could affect our reputation including: financial crime, investment risk and client take-on and product development.<br><br>We are currently re-branding to ensure our marketing remains relevant and effective and supports our strategic objectives and product offerings. A key part of the governance process when considering our re-branding was to assess the likely impact on how Schroders is perceived by our clients and investors and the market generally. |
| 7. Investment performance risk | The management of investment performance risk is a core skill of the Group. This is the risk that portfolios will not meet their investment objectives or that there is a failure to deliver consistent and above-average performance. | We have clearly defined investment processes designed to meet investment targets within stated risk parameters.<br><br>The Group's Investment Risk Framework provides review and challenge of investment risks, independent of our fund managers, across all asset classes. Investment monitoring is performed by fund managers and asset class heads on a regular basis, as well as by Pricing and Valuation Committees, Asset Class Risk Committees, the GMC and the relevant legal entity Boards.<br><br>Recognising that products may not outperform all of the time, we offer clients a diversified product set.<br><br>Key to investment performance is our ability to attract and retain talented people (see people and employment practices risk for further information). |
| 8. Product risk | Product risk can arise if our product range is not suitably diversified or does not provide access to strategies sought by investors.<br><br>Product risk also arises from:<br>– product or service viability and the risk that products or services do not meet their objectives<br>– capacity constraints where the size of AUM in a particular asset class or strategy makes it more difficult to trade efficiently in the market.<br><br>Products containing assets outside of public markets may be more difficult to manufacture and maintain, particularly, those requiring longer-term management such as infrastructure or debt. | The Group's new Product function will focus on strategy, innovation and changing investor requirements.<br><br>We conduct quantitative analysis on a product by product basis to confirm that products are performing to the expectation of our clients in accordance with our mandate.<br><br>Risk Dashboards, at product level, are presented for discussion at regular Asset Class Risk Committees. These show key performance and risk metrics and facilitate identification of outlier products for further analysis.<br><br>All new fund proposals are assessed by the Product Development Committee for commercial viability and distribution channels. New investment propositions and strategies are reviewed by the Product Strategy Committee.<br><br>We monitor potential capacity constraints in funds on a regular basis and the Product Development Committee also considers the interests and needs of potential investors in them. |
| 9. Business concentration risk | Business concentration risk arises from concentration in a small number of distribution channels or products or when a small number of clients are concentrated in a specific product. Business concentration risk also arises from insufficient diversification of existing income streams.<br><br>A decline in fees due to changes in investor demands as set out under Strategic Risk where Schroders does not or is not able to respond, resulting in the concentration of business into a smaller grouping of clients.<br><br>While we strive to ensure our business is broadly diversified by region and this mitigates our aggregate risk profile it introduces additional risks in terms of operating cross-border and in multiple environments as a result of business practices, customs and traditions. | The broad range and scale of products, distribution and investment channels that we have established, mitigates our concentration risk and dependency on any single sales channel.<br><br>We aim to avoid client concentrations in any particular market or channel becoming excessive.<br><br>We have further diversification of income streams through the ongoing development of strategic relationships, acquisitions and identifying alternative growth strategies.<br><br>We continue to offer competitive solutions for clients. We consider the scalability of our business and continue to invest in infrastructure. |

Group Chief Executive's statement          Key performance indicators          Our people
Market trends                              Business and financial review         Our impact
Strategy                                   Business model                        Key risks and mitigations

# Market, credit, liquidity and capital risks

We face market, credit, liquidity and capital risks from movements in the financial markets in which we operate, arising from holding investments both as principal and agent. Notes 19 and 20 to the accounts on pages 129 to 135 set out the Group's approach to the management of financial instrument risk, where we act as principal, together with the Group's approach to hedging.

| Key risk | Description | How we manage risk |
|---|---|---|
| 10. Market risk | Market risk arises from market movements, which can cause a fall in the value of principal investments and a decline in the value of AUM.<br><br>Operating capital, fee income and expenses related to the Group's overseas subsidiaries are denominated in a range of currencies and, therefore, subject to exchange rate risk. | Our geographically-diversified, broad product range helps to mitigate market risk in a variety of market conditions and serves to diversify individual market dependencies. The Group's Investment Risk Framework also provides review and challenge of market risks.<br><br>The Group Capital Committee, chaired by the Chief Financial Officer, regularly reviews all principal assets held for investment or seed capital purposes. The Group's seed capital investments are hedged in respect of market risk and currency risk, where practical.<br><br>We use forward foreign exchange contracts to mitigate transactional and investment exposure to currency movements.<br><br>The Wealth Management Executive Committee monitors and manages market risk in the Group's banking businesses, which is principally interest rate risk in the banking book. |
| 11. Credit risk | We face credit risk as a result of counterparty exposure arising from client and principal investment holdings, including derivative exposures. The assets we manage are also exposed to counterparty risk.<br><br>We also face credit risk through Wealth Management lending activities, in addition to client transactional counterparty risk. | We assess counterparty creditworthiness and set limits for both our principal and agency counterparties.<br><br>We seek to diversify our exposure across different counterparties. The creditworthiness of counterparties and borrowers is monitored, as is usage against relevant credit limits.<br><br>In Wealth Management, we seek to mitigate credit risk within lending activities, as appropriate, through collateralisation in the form of cash, portfolio investments or real estate. Credit risk is monitored and managed against approved limits and collateral. |
| 12. Liquidity risk | Liquidity risk is the risk that the Group or any of its subsidiaries cannot meet its contractual or payment obligations in a timely manner.<br><br>Liquidity risk in relation to client portfolios may arise in difficult market conditions from the inability to sell the portfolio's underlying investments for full value, or at all. This could affect performance and also prevent cash or other assets from being readily available to meet redemptions or other obligations. | The Group Capital Committee reviews the Group's liquidity needs, considering the current liquidity position, future cash flows, regulatory requirements and potential stress scenarios.<br><br>Liquidity is also considered at a legal entity level based on the specific circumstances and regulatory requirements of each company. The Wealth Management Executive Committee monitors and manages liquidity risk in the Group's banking businesses.<br><br>We seek to match liquidity of underlying investments with the anticipated redemption requirements in client portfolios. We have an established process to assess and monitor the liquidity risk profile of funds on an on-going basis.<br><br>We also review products and portfolios on a regular basis to identify and manage possible capacity constraints. |
| 13. Risk of insufficient capital | The risk of insufficient capital would arise if the Group was unable to support its strategic business objectives beyond its minimum regulatory capital requirements. | Maintaining a strong capital base is important to our business and is a core part of our strategy. We ensure each of our regulated subsidiaries, and the Group as a whole, meet their minimum regulatory capital requirements. The Group maintains a prudent level of capital, including a significant buffer over the minimum regulatory capital requirement, which allows us to conduct our business and invest in new business opportunities that may arise.<br><br>The Group Capital Committee supports the Chief Financial Officer in exercising responsibility for the management of the Group's capital.<br><br>The Group performs a thorough assessment of the adequacy of its capital through the ICAAP. In addition, Wealth Management in London and the Channel Islands also perform an ICAAP. |

ᵏ See glossary.

**Strategic report**
Strategy and business review

# Key risks and mitigations
continued

## Operational risks

Operational risks are inherent globally in all activities and processes we perform within the Group. To manage and mitigate these risks, the second line of defence provides oversight and challenge to the business through an operational risk framework. Tools to manage this include RCAs, risk event management processes and new product approval processes. We manage risk events through identification, reporting and resolution in order to prevent risk events from recurring.

| Key risk | Description | How we manage risk |
|---|---|---|
| 14. Conduct and regulatory risk | The risks of client detriment arising from inappropriate conduct, conflicts, management, practice or behaviour or failing to meet client needs, interests or expected outcomes.<br><br>The risks of money laundering, bribery or market abuse shortcomings on the part of fund investors, clients or our employees.<br><br>The risk of fines, penalties, censure or other sanctions arising from failure to identify or meet regulatory requirements.<br><br>The risk that new regulations or changes to existing interpretations of them, can have a material effect on the Group's operations, risk profile or cost base and be complex to implement and difficult to manage. | We promote a strong compliance culture and we promote good relationships with our regulators. Our Compliance function supports management in identifying our regulatory obligations and enabling these to be met through relevant training and procedures. Compliance with relevant regulatory requirements is monitored in accordance with a risk-based programme.<br><br>Our approach to encouraging appropriate conduct and minimising the risk of client detriment is set out in our conduct risk framework, and is built on our culture and values, supported by appropriate governance and reporting.<br><br>Risk based client take-on and review processes are among our key controls to address the risks of money laundering. Trading is subject to clear policies and to transaction surveillance processes, which are being enhanced. Financial crime oversight is provided by the Financial Crime Committee.<br><br>Regulatory and legal change is monitored by the Compliance, Legal and Public Policy teams. We engage with our regulators where appropriate in relation to potential and planned changes. |
| 15. Legal risk | The risk that Schroders or its counterparties, clients or suppliers with whom we contract fail to meet their legal obligations, that Schroders takes on obligations that it did not intend to assume and the risk of legal claims and loss.<br><br>The risk that client expectations and obligations with respect to our own and third-party responsibilities under investment management and other agreements will not be met, with a revenue or contingent liability impact. | We rely on our employees, with support from our Legal function, to consider the obligations we assume across the Group and our compliance with them. Our policies and procedures across the Group are developed having regard to recognised legal risks.<br><br>Confirmations are obtained from representatives around the Group that actual or potential disputes or claims have been brought promptly to the attention of the General Counsel.<br><br>We have an escalation process for areas of identified material risk. |
| 16. Tax risk | The Group and its managed funds are exposed to:<br><br>– compliance and reporting risks, which would include the submission of late or inaccurate tax returns<br>– transactional risks, which would include actions being taken without appropriate consideration of the potential tax consequences<br>– reputational risks, which cover the wider impact that our conduct in relation to our tax affairs can have on our relationships with our stakeholders. | Our approach to managing our tax affairs and tax risk is set out in our tax strategy. This is reviewed by the Audit and Risk Committee annually. It is supported by a tax governance framework, which aligns to the Group's wider risk and control framework. Independent monitoring and reporting of tax risks and controls is supported by Group Risk and key risks and issues related to tax are escalated to, and considered by, the Group Risk Committee and the Audit and Risk Committee, on at least an annual basis.<br><br>In accordance with the tax governance framework, the Tax function works with management and advisers to monitor the tax position of the Group. Local management, with oversight from our Tax function, is generally responsible for identifying and managing the tax position of our managed funds, with the assistance of third party service providers. Developments in taxation are monitored by the Tax function and local management. We engage with representative industry organisations and advisers to ensure we are kept abreast of relevant tax changes impacting the Group and its clients. |
| 17. Process and change risk | The risk of failure of significant business processes, such as mandate compliance, client suitability checks and asset pricing.<br><br>Poor execution of acquisitions or management of strategic relationships which fail to deliver intended benefits in terms of revenue or costs. | Our key business processes have been identified and the risks assessed by first line of defence owners through the RCA process.<br><br>This is used to determine the adequacy and effectiveness of key controls; with second line providing oversight and challenge. Associated controls are assessed with regard to their design and performance. Output from the RCA process is presented to the GRC.<br><br>As part of our due diligence process when we consider an acquisition or strategic partnership we identify areas that will need to be remediated after a transaction is completed. Subject matter experts will be involved throughout the transition. |

Group Chief Executive's statement     Key performance indicators     Our people
Market trends     Business and financial review     Our impact
Strategy     Business model     **Key risks and mitigations**

| Key risk | Description | How we manage risk |
|---|---|---|
| 18. Fraud risk | Fraud could arise from either internal or external parties who attempt to defraud the firm or our clients by circumventing either our processes and controls, or the controls operated by our third party providers (e.g. within our outsourced transfer agency activities). | Policies and procedures are in place to manage fraud risk. Controls in place to manage fraud risk are assessed as part of the RCA process. Attempted or successful frauds are investigated by the Financial Crime team, with oversight from Group Risk.<br><br>The Financial Crime Committee provides oversight of the management of fraud risk and is a sub-committee of the Group Risk Committee. |
| 19. Technology risk and information security | Technology and information security risk relates to the risk that:<br>– our technology systems and support are inadequate or fail to adapt to changing requirements<br>– our systems are penetrated by third parties<br>– data is held insecurely. | Formal governance over information risks has been established across the three lines of defence through the Information Security Risk Oversight committee. The Group holds insurance to cover cyber risks.<br><br>A number of policies and technical standards, including security awareness training, have been deployed across the Group.<br><br>Robust project management of a new front office technology platform and assessment of business requirements, implementation risks and scalability. |
| 20. People and employment practices risk | Talented employees may be targeted by competitors seeking to build their businesses. This is particularly important for key revenue generators in investment given the potential impact their departure could have on the Group's financial position.<br><br>The risk that we are unable to retain key employees across the firm in a situation where revenue and profitability are deteriorating and variable compensation is reduced.<br><br>The need to attract new employees for new business activities or strategic initiatives that require different skills to those that currently exist within the business.<br><br>People and employment practices risk incorporates the risk that our employment practices do not comply with local legislation, such as equal opportunities, human rights or the safety and wellbeing of employees when at work.<br><br>The risk that employees do not adequately fulfil their role.<br><br>The impact on staff mobility in and out of the EU as a result of Brexit. | We have competitive remuneration and retention plans, with appropriate deferred benefits targeted at key employees. We keep our remuneration structures under review to ensure that they are appropriate as the firm develops new business areas. The Remuneration Committee has oversight of compensation arrangements that deviate from our existing compensation approach to ensure that they are appropriate and in line with the firm's strategic priorities.<br><br>We seek to build strength and depth through sustainable succession and development plans. This includes identifying new skills that the business will require in the future, for which we can recruit selectively either through our entry-level or experienced hire programmes.<br><br>We operate a global model, which reduces our reliance on single pools of talent. Clear objectives are set for employees and success is measured in an annual review process, allowing us to manage under performance, identify motivational development initiatives and take disciplinary action if required.<br><br>We have policies and procedures in place to encourage diversity, provide for the safety and wellbeing of staff and to manage employment issues appropriately, handling them consistently, fairly and in compliance with local legislation.<br><br>We continue to monitor Brexit developments closely and their implications for employment practices. |
| 21. Third-party service provider risk | Third-party service provider risk relates to the risk that suppliers may not be able to meet their agreed service level terms.<br><br>We have a number of outsourced supplier relationships as part of our business model, particularly in respect of: information technology, fund administration, custody and transfer agency services. | The Audit and Risk Committee reviews all material outsourced relationships, focusing on significant aspects such as service quality and risk management.<br><br>Policies are in place that govern our approach to appointing, managing and performing relevant due diligence of third-party service providers including regular reviews of performance against agreed service levels. In addition, for service providers not covered under the outsourcing policy, minimum requirements are established for overseeing service provider risk and performance, as well as the requirement to perform risk assessments on service providers deemed critical to business operations.<br><br>Exit plans are considered prior to appointment and provide a framework for transitioning business from one service provider to another should the quality fall below the agreed service level. |

The Strategic report was approved by the Board on 1 March 2017 and signed on its behalf by:

**Peter Harrison**
Group Chief Executive



 **Pension schemes**

We work with trustees of
over 1,600 schemes globally
to provide investment
solutions through every
stage of a scheme's life cycle.



# Governance

| | |
|---|---|
| Board of Directors and Company Secretary | 46 |
| Group Management Committee | 48 |
| Corporate governance report | 50 |
| Directors' report | 66 |
| Remuneration report | 68 |
| Statement of Directors' responsibilities | 97 |

Governance

# Board of Directors and Company Secretary

## Chairman and executive Directors



**Michael Dobson**
Chairman (64)

Appointed Chairman in April 2016, having been Chief Executive since November 2001. He first joined the Board as a non-executive Director in April 2001.

Experience: Prior to joining Schroders he was previously Chief Executive of Morgan Grenfell Group and a member of the Board of Managing Directors of Deutsche Bank AG.

External appointments: Member of the FCA Practitioner Panel and the President's Committee of the Confederation of British Industry.

Committee membership: Chairman of the Nominations Committee.



**Peter Harrison**
Group Chief Executive (50)

Appointed Group Chief Executive in April 2016. He was previously an executive Director and Head of Investment from May 2014.

Experience: He began his career at Schroders as a graduate in 1988 and subsequently held roles at Newton Investment Management, JP Morgan Asset Management as Head of Global Equities and Multi-asset and at Deutsche Asset Management as Global Chief Investment Officer. He was Chairman and Chief Executive of RWC Partners before re-joining Schroders as Global Head of Equities in March 2013.

External appointments: Director of the Investment Association and Chairman from 1 May 2017.



**Richard Keers**
Chief Financial Officer (53)

Appointed a Director and Chief Financial Officer in April 2013.

Experience: He is a chartered accountant and was a Senior Audit Partner of PwC until May 2013. He became a partner of PricewaterhouseCoopers LLP (PwC) in 1997 and has 25 years' experience in the audits of global financial services groups. His experience includes time spent in PwC's New York, Sydney, Edinburgh and London offices.

External appointments: Non-executive member of Lloyd's Franchise Board and Chairman of its Audit Committee.

## Non-executive Directors



**Lord Howard of Penrith**
Senior Independent Director (71)

Appointed Senior Independent Director in April 2015, having been a non-executive Director since November 2008.

Experience: He was previously Deputy to the Chairman of Lehman in Europe until 1998 and was the Partner in charge of International fixed income at Phillips & Drew. He was also Chairman of Tarchon Capital Management LLP from 1998 until March 2013.

External appointments: Senior Adviser at Beazley plc having previously held the position of Chief Investment Officer until the end of 2015.

Committee membership: Chairman of the Remuneration Committee. Member of the Audit and Risk and Nominations Committees.



**Robin Buchanan**
Independent non-executive Director (64)

Appointed in March 2010.

Experience: He was the Senior Partner of Bain & Company Inc. in the UK for 12 years and remains a senior adviser. Most recently he served as Chairman of PageGroup plc until December 2015. He was Dean and President of London Business School. He is a chartered accountant and holds an MBA from Harvard Business School.

External appointments: Non-executive Director of LyondellBasell Industries N.V. He is Chairman of the Investment Committee of Access Industries, and a senior adviser to Coller Capital Ltd.

Committee membership: Member of the Audit and Risk, Remuneration and Nominations Committees.



**Rhian Davies**
Independent non-executive Director (52)

Appointed in July 2015.

Experience: She is a chartered accountant and was a partner at Electra Partners, an independent private equity fund manager until June 2015 and remains a senior adviser. She previously worked in PwC's audit and insolvency practice before joining Electra in 1992.

External appointments: Senior adviser at Electra Partners.

Committee membership: Chairman of the Audit and Risk Committee. Member of the Nominations Committee.

Board of Directors and Company Secretary
Group Management Committee

Corporate governance report
Directors' report

Remuneration report
Statement of Directors' responsibilities

> **Directors who left the Board during 2016**
> Andrew Beeson, Ashley Almanza and
> Massimo Tosato left the Board on 4 April,
> 28 April and 31 December 2016 respectively.
> Their biographical details are shown in the
> 2015 Annual Report and Accounts.



**Rakhi Goss-Custard**
Independent non-executive Director (42)

Appointed in January 2017. She will stand for election at the 2017 AGM.

Experience: She is an experienced executive in digital retailing having spent 11 years at Amazon. Prior to joining Amazon, she held roles at TomTom and in management consultancy in the US.

External appointments: Non-executive Director of Kingfisher plc, Rightmove plc, Intu Properties plc and AIM listed Be Heard plc.

Committee membership: Member of the Nominations Committee.



**Ian King**
Independent non-executive Director (60)

Appointed in January 2017. He will stand for election at the 2017 AGM.

Experience: He was appointed Chief Executive of BAE Systems plc in 2008 having been originally appointed to the BAE board as Chief Operating Officer, UK and Rest of the World. Prior to this, he was Chief Executive of Alenia Marconi Systems, having previously served as Finance Director of Marconi Electronic systems. He also served as a non-executive Director and Senior Independent Director of Rotork plc until June 2014.

External appointments: Chief Executive of BAE Systems plc.

Committee membership: Member of the Nominations Committee.



**Philip Mallinckrodt**
Non-executive Director (54)

Appointed an executive Director in January 2009 and a non-executive Director on 1 March 2017.

Experience: He started his career at Credit Suisse First Boston in 1985. He first joined Schroders in 1994, and then worked for Citigroup from 2000 to 2002. He rejoined Schroders in 2002 as Head of Corporate Development, was Group Head of Wealth Management from 2006 to 2016 and then Group Head of Private Assets and Wealth Management until 1 March 2017.

External appointments: Member of the International Advisory Council of the Brookings Institution.

Committee membership: Member of the Nominations Committee.



**Nichola Pease**
Independent non-executive Director (55)

Appointed in September 2012.

Experience: She has over 30 years' experience in the asset management and stock broking industries. She was the Chief Executive and then Deputy Chairman of J O Hambro Capital Management Ltd from 1998 until 2008, following which she held a number of roles in the charity and public sectors.

External appointments: Founder and Chairman of Investment 2020 and a Member of the Eton College Investment Committee.

Committee membership: Member of the Audit and Risk Committee, Remuneration and Nominations Committees.



**Bruno Schroder**
Non-executive Director (84)

Appointed in January 1963.

Experience: He is the great-great-grandson of John Henry Schroder, co-founder of the Schroders businesses in 1804. He joined the Schroder Group in London where he worked in the Commercial Banking and Corporate Finance divisions of J. Henry Schroder Wagg & Co Ltd.

External appointments: Director of a number of private limited companies.

Committee membership: Member of the Nominations Committee.



**Graham Staples**
Group Company Secretary (55)

Appointed in January 2004.

Experience: He joined Schroders in 2004. Previously, he held senior company secretarial, compliance and business development roles at NatWest, Barclays, TSB and Computershare.

As Secretary to the Board of Schroders plc and the GMC, he is responsible for the Group's governance framework and advising the Board and GMC on all governance matters.

Governance

# Group Management Committee

## Executive Directors

**Peter Harrison**
Group Chief Executive (50)

Responsible for the management of the overall business and strategic development of the Group.

**Richard Keers**
Chief Financial Officer (53)

Responsible for financial management, risk management, tax, capital and treasury, human resources, corporate services and a range of operational areas. He is also chair of the Global Operations Committee.

## Other Group Management Committee members



**Geoff Blanning**
Head of Emerging Market Debt and Commodities (55)

He joined Schroders in 1998 and developed the Commodity and Currency investment teams. He previously managed Global Bond Funds at N M Rothschild and Bankers Trust before developing and managing Morgan Grenfell's first Emerging Market Debt Fund in 1993.

He is responsible for the investment performance of the Emerging Market Debt and Commodities team.



**Stewart Carmichael**
Chief Technology Officer (51)

He joined Schroders in March 2015 as Group Head of IT. Prior to joining Schroders, he was Chief Technology Officer for JP Morgan Corporate and Investment Bank in Asia. From 1993 to 2008 he held numerous senior leadership positions at Merrill Lynch.



**Karl Dasher**
CEO North America and Co-Head of Fixed Income (47)

He joined Schroders in 2008 as Global Head of Product and became Head of Fixed Income in October 2008. He previously worked at SEI Investments in various investment roles, including Chief Investment Officer.

He is responsible for the Group's operations in North America and is also Co-Head of Fixed Income within the Investment division.



**Lieven Debruyne**
CEO Asia Pacific (47)

He joined Schroders in London in 2000 as Head of Asian Investment Product before moving to Hong Kong in 2005. Prior to joining Schroders, he worked for Mees Pierson Capital Management as Chief Investment Officer and for Fortis Investments.

He is responsible for the Group's operations in the Asia Pacific region.

Board of Directors and Company Secretary
**Group Management Committee**

Corporate governance report
Directors' report

Remuneration report
Statement of Directors' responsibilities



**Emma Holden**
Global Head of Human Resources (42)

She joined Schroders in 2007 and was appointed Global Head of Human Resources in November 2014. Prior to joining Schroders, she held various roles at Cerus Group. She qualified as a chartered accountant with PwC in 1998.

She works with senior management on the issues that affect our people and the development of talent throughout the business.



**Philippe Lespinard**
Co-Head of Fixed Income (53)

He joined Schroders in 2010 as Chief Investment Officer for Fixed Income. He was previously a partner at Brevan Howard and Chief Investment Officer at BNP Paribas Asset Management.

He is Co-Head of Fixed Income within the Investment division.



**Richard Mountford**
Global Head of Product (58)

He joined Schroders in 1980 as a graduate and held a number of investment and management roles before becoming Global Head of Intermediary Sales in 2008 and Head of Asia Pacific between 2012 and 2016.

He is responsible for developing product strategy and managing our diverse product range.



**Nicky Richards**
Global Head of Equities (50)

She began her investment career at Schroders as a graduate in 1987. She held a number of senior roles in the firm before joining Fidelity International and then MLC Investment Management in Australia. She re-joined Schroders in 2014 as Global Head of Equities. She was appointed non-executive Chairman of RWC Partners in March 2016.

She is responsible for the Equities business within the Investment division.



**Andrew Ross**
Global Head of Wealth Management (57)

He joined Schroders in 2013 having been Chief Executive of Cazenove Capital Management since 2001. Prior to that he was Chief Executive of HSBC Asset Management (Europe) Limited between 1998 and 2001.

He is responsible for the Wealth Management division.



**Carolyn Sims**
Chief Financial Officer of Wealth Management (51)

She joined Schroders in 2013 having been Chief Financial Officer of Cazenove Capital Management since 2007. Prior to that she was Finance Director at Lazard UK between 2004 and 2007.

She is responsible for finance and operations within the Wealth Management division.



**Huw van Steenis**
Global Head of Strategy (47)

He joined Schroders in 2016 as Global Head of Strategy. Prior to joining Schroders, he was Managing Director and Global Head of Banks and Diversified Financials Research at Morgan Stanley. Prior to Morgan Stanley he worked at JP Morgan and Boston Consulting Group.

He is responsible for helping Schroders develop and implement long-term goals and respond to the competitive financial services landscape.



**John Troiano**
Global Head of Distribution (58)

He began his career at Schroders as a graduate in 1981. After holding a number of senior roles, he was appointed the Deputy Head of Distribution in September 2012 and was appointed Head of Distribution in 2016.



**Howard Trust**
General Counsel (62)

He joined Schroders in 2003 from Barclays where he held various roles including Group General Counsel and Board Secretary.

He is responsible for the Group's Compliance, Legal and Governance function.

Governance



# Corporate governance report



## The culture of the firm, built over many years, represents a key competitive advantage.



I am pleased to introduce this governance report in which we describe the operation of the Board and its Committees, and how the Board discharged its responsibilities during the year.

The Board pays great attention to the culture of the firm which we believe, built over many years, represents a key competitive advantage. Schroders above all values integrity and always seeks to act in the best interest of clients and shareholders. Our shareholding structure supports the long term approach we take in the management of our business and enables the Board and management to avoid being overly influenced by short term considerations.

We have made important changes to our governance structure to ensure it supports the Company as we adapt to a changing environment. We have appointed two additional independent non-executive Directors so that we have a majority of independent non-executive Directors on the Board.

With these appointments we have addressed some skills gaps that we had identified on the Board, specifically in relation to listed company experience and digital. We have also increased the level of gender diversity on the Board and we intend to achieve the targets for women of 33% amongst senior management and Board members by 2019 and 2020 respectively.

As part of our focus on the long term we have decided to cease issuing financial reports every quarter and we will now restrict information released at the end of the first and third quarters to movements in assets under management.

As set out in detail in the Audit and Risk Committee report, in 2016 we undertook a tender process to select new external auditors. This process was led by Rhian Davies and the Board will propose the appointment of Ernst & Young LLP as auditors in succession to PwC with effect from the financial year commencing 1 January 2018.

Our remuneration policy will be put to shareholders for approval at the Annual General Meeting in April. Philip Howard and his colleagues on the Remuneration Committee have assessed our policy in the context of a changing external environment as well as the Company's own requirements. While maintaining the principal features of our existing policy we have made some important changes to align further the interests of management, shareholders and clients. Philip Howard explains this in detail in the Remuneration report. This being such an important area in terms of attracting, motivating and retaining talent, aligning the interests of different stakeholders and taking account of the public interest in these issues, the Board now considers remuneration on an annual basis.

I would like to thank all my colleagues on the Board for their contribution during the year.

Michael Dobson
Chairman
1 March 2017

Board of Directors and Company Secretary
Group Management Committee

**Corporate governance report**
Directors' report

Remuneration report
Statement of Directors' responsibilities

## 2016 Board and Committee meeting attendance

| | Board[1] | Audit and Risk Committee | Nominations Committee | Remuneration Committee[2] |
|---|---|---|---|---|
| Andrew Beeson[3] | 1(1) | | 1(1) | |
| Michael Dobson | 6(6) | | 3(3) | |
| **Executive Directors** | | | | |
| Peter Harrison | 6(6) | | | |
| Richard Keers | 6(6) | | | |
| Philip Mallinckrodt | 6(6) | | | |
| Massimo Tosato | 6(6) | | | |
| **Non-executive Directors** | | | | |
| Ashley Almanza[4] | 1(1) | 1(1) | 1(1) | |
| Robin Buchanan | 6(6) | 5(5) | 4(4) | 6(6) |
| Rhian Davies | 6(6) | 5(5) | 4(4) | |
| Philip Howard | 6(6) | 5(5) | 4(4) | 6(6) |
| Nichola Pease[5] | 6(6) | 4(5) | 4(4) | 5(6) |
| Bruno Schroder[5] | 3(6) | | 4(4) | |

[1] There were five scheduled Board meetings held during the year and one additional Board meeting to discuss corporate activity.

[2] There were four scheduled Remuneration Committee meetings held during the year and two additional Committee meetings to discuss the Directors' remuneration policy.

[3] Andrew Beeson retired from the Board on 4 April 2016.

[4] Ashley Almanza stepped down from the Board at the 2016 AGM.

[5] Nichola Pease was unable to attend one Audit and Risk Committee meeting and one Remuneration committee meeting due to prior commitments. Bruno Schroder was unable to attend three Board meetings due to illness.

## Compliance with the 2014 UK Corporate Governance Code (Code)

Throughout 2016, the Company has applied the main principles of the Code and complied with its provisions with the exception of the following:

A.3.1 – Michael Dobson was not independent on appointment as Chairman on 4 April 2016. When deciding on his appointment, the Board recognised that the Code states that the Chairman should on appointment meet the independence criteria set out in the Code and that ordinarily the Chief Executive should not go on to be the Chairman. In accordance with the Code and as explained in the 2015 Annual Report and Accounts, the Chairman, Senior Independent Director and the Company Secretary consulted with major shareholders and considered the provisions of the Code prior to the Board making its decision.

B.1.2 – From 1 January 2016 to 31 December 2016, the Board did not include a sufficient number of independent non-executive Directors.

Executive and non-executive Director succession planning has been a long-term priority for the Board for some time. It was anticipated that with the appointment of Peter Harrison as Group Chief Executive and Michael Dobson as Chairman we would have had the requisite number of independent non-executive Directors as required under the Code. However, with the departure of Ashley Almanza at the 2016 AGM this was no longer the case. As set out in the Nominations Committee report, the appointment of Ian King and Rakhi Goss-Custard means the Board is now compliant with this requirement.

Copies of the Code can be obtained from the FRC's website at www.frc.org.uk.

## The Board and its Committees

The Board has collective responsibility for the management, direction and performance of the Company. The Board is accountable to shareholders for the creation and delivery of strong, sustainable financial performance and long-term shareholder value. It is authorised to manage the business of the Company in accordance with the Company's Articles of Association, which may only be amended by special resolution of shareholders except where the Articles specify otherwise. Some decisions can only be taken by the Board, including in respect of the Group's overall strategy, significant new business activities and the strategy for the management of the Group's investment capital. These are contained in the Schedule of Matters Reserved to the Board. Under the Company's Articles of Association all Directors have the right to convene Board meetings.

The Board has delegated specific responsibilities to Board committees, notably the Audit and Risk Committee, the Remuneration Committee and the Nominations Committee. At the discretion of the Board or relevant Committee, senior management are invited to attend meetings and make presentations on developments and results in their areas of the business. Membership of the Committees is detailed in each Committee report. The Schedule of Matters Reserved to the Board and each of the Committee's terms of reference can be found on the Company's website. These are reviewed periodically to support the Directors in discharging their responsibilities.

The diagram on page 52 illustrates the Board and Committee structure including how authority is delegated from the Board to specific areas and how independent oversight is organised.

There is also a Chairman's Committee whose membership is comprised of the non-executive Directors. The Chairman's Committee is not a Committee of the Board and serves as an informal forum for the discussion of such matters as the Chairman considers appropriate. This includes the annual evaluation of the Group Chief Executive, the review of the Group Chief Executive's plan for management succession and the evaluation of the performance of the Board and its Committees. The Chairman's Committee met three times during the year.

The Board believes that it operates most effectively with an appropriate balance of executive Directors, independent non-executive Directors and Directors who have a connection with the Company's principal shareholder group. No individual or group of individuals is in a position to dominate the Board's decision making.

Each Director brings different skills, experience and knowledge to the Company, with the non-executive Directors bringing additional independent thought, judgement and challenge. Our Board comprises 11 Directors, made up of the Chairman, two executive Directors, six independent non-executive Directors and two non-executive Directors not deemed to be independent. Biographies of each of the Directors are set out on pages 46 and 47.

We currently have three female Directors on the Board. The Board has adopted a revised diversity policy and this is set out on page 57 in the Nominations Committee report.

Governance

# Corporate
# governance report
continued



**Governance framework**

- Executive Committees
- Executives
- Independent oversight Committees composed entirely of non-executive Directors
- - - Direct access to the Audit and Risk Committee
- — Secondary reporting line

**Board**
Accountable to shareholders for the creation and delivery of strong, sustainable financial performance and long-term shareholder value

**Group Chief Executive**
Responsible for the management of the business and strategic development

**Nominations Committee**
Responsible for reviewing and recommending changes to the composition of the Board and its Committees

**Remuneration Committee**
Responsible for reviewing and recommending the remuneration strategy for the Group and the remuneration policy for the Directors

**Audit and Risk Committee**
Responsible for overseeing financial reporting, risk management and internal controls and external audit

**Group Management Committee**
Assists the Group Chief Executive in discharging his responsibilities. Functional responsibilities delegated to individual members

**Chief Financial Officer**
Responsible for financial management, capital management, human resources, oversight of risk and systems of internal controls

**General Counsel**
Responsible for the Group's compliance, legal and governance functions

**Group Capital Committee**
Assists the Chief Financial Officer in the deployment of operating and investment capital

**Group Risk Committee**
Assists the Chief Financial Officer in discharging his responsibilities in respect of risk and controls

**Group Head of Risk**
Identifies and quantifies risks before and after mitigation

**Global Head of Compliance**
Assists the General Counsel in promoting and monitoring compliance with regulatory requirements and relationships with regulatory authorities

**Group Head of Internal Audit***
Provides independent, objective assurance to management and to the Audit and Risk Committee in respect of risk management, controls and governance processes

**Wealth Management Audit and Risk Committee†**
Responsible for overseeing financial reporting, risk management and internal controls in the Wealth Management business

\* Reports to the Chairman of the Audit and Risk Committee.
† Composed of independent non-executive Directors of Schroder & Co. Limited.

### Division of responsibilities of the Chairman and Group Chief Executive

There is a clear division of responsibilities between the Chairman and Group Chief Executive that is set out in job descriptions. This has not changed following the appointment of Michael Dobson as Chairman.

### Role of the Chairman

The Chairman is responsible for leadership of the Board, ensuring its effectiveness and setting its agenda. He is responsible for creating an environment for open, robust and effective debate. This includes ensuring that the Directors receive accurate, timely and clear information in order to discharge their responsibilities. The Chairman is also responsible for ensuring effective communication with shareholders and other stakeholders. This involves supporting the Group's relationships with major clients, shareholders, strategic and commercial partners and regulators.

### Role of the Group Chief Executive

The Group Chief Executive is responsible for the executive management of the Company and its subsidiaries, including the creation of shareholder value over the long term through growth in profits and the recommendation of the Group's strategy and budget. He is assisted by members of the GMC in the delivery of his and the Board's objectives for the business.

### Role of the Senior Independent Director

The role of the Senior Independent Director is an essential part of the Group's governance structure.

Philip Howard's role is to act as a sounding board for the Chairman, oversee the evaluation of the Chairman's performance and serve as an intermediary for the other Directors if necessary. He is also available as an additional point of contact for shareholders should they wish to raise matters with him rather than the Chairman or Group Chief Executive. Philip Howard led the process for the appointment of a new Chairman in 2016 and has overseen a review of the relationship between Michael Dobson and Peter Harrison. He is fully aware of the importance of the role of the Senior Independent Director, particularly in light of Michael Dobson's appointment as Chairman.

In addition, as Chairman of the Remuneration Committee, he has also led the review of the Directors' remuneration policy and subsequent consultation with major shareholders. More information can be found in the Remuneration report from page 68.

### Role of the non-executive Directors

Non-executive Directors have a responsibility to uphold high standards of integrity and probity and are expected to provide constructive challenge and help develop proposals on strategy. Non-executive Directors are also expected to monitor the performance of management in meeting agreed objectives while satisfying themselves on the integrity of financial information and that financial controls and risk management systems are robust and appropriate. The Board assesses the independence of its non-executive Directors using the criteria set out in the Code. The non-executive Directors participate fully in open and constructive Board and Committee meetings and their views are actively sought, particularly when developing and setting strategy.

### Key areas of focus during the year

The Chairman, in conjunction with the Group Chief Executive and Company Secretary, maintains an annual rolling agenda which sets the framework for Board meetings so that the Board covers an appropriate range of topics from matters of strategy and reviews of the Group's businesses and operations through to more routine business.

Each Board meeting receives a report from the Group Chief Executive on the performance of the business, the Chief Financial Officer on financial performance, a governance report and, where relevant, a report from each of the Board committees. In addition to these regular matters, specific areas of focus by the Board during 2016 included:

| Meeting dates | Key areas considered |
|---|---|
| March | – Annual Report and Accounts, dividend proposal and AGM<br>– Global Distribution<br>– Brexit<br>– Board succession |
| May | – Key trends in Asset Management<br>– Equities review<br>– Intermediary and Defined Contribution strategy<br>– Wealth Management strategy<br>– Efficiency and effectiveness |
| July | – Half-year results and dividend proposal<br>– Remuneration strategy<br>– Asset management trends<br>– Private Assets strategy<br>– Brexit<br>– ICAAP |
| September | – Talent and people strategy<br>– North America strategy<br>– Corporate and Social Responsibility<br>– Regulation<br>– Appointment of the external auditor<br>– Group recovery plan and resolution pack<br>– ILAAP |
| November | – UK Distribution Strategy<br>– UK Investment strategy<br>– Global Operating Model strategy<br>– 2017 budget<br>– Audit tender<br>– Charitable donations |

One additional unscheduled Board meeting was held in October to consider the acquisition of our interest in Benchmark Capital.

Governance

# Corporate
# governance report
## continued

**Director appointments, tenure and time commitment**
The rules providing for the appointment, election, re-election and
the removal of Directors are contained in the Company's Articles
of Association. Under the Company's Articles of Association Ian King
and Rakhi Goss-Custard will resign and offer themselves for election
at the Company's AGM on 27 April 2017. All other Directors seek
re-election on an annual basis.

Non-executive Directors are expected to serve two three-year terms,
although the Board may ask a non-executive Director to serve an
additional three year period. Where an appointment extends beyond
six years, continued appointment is subject to particularly rigorous
review, taking into account the need for progressive refreshing of
the Board. Details of the Directors' length of tenure are set out in
the below chart.

**Length of tenure**



- 0-3 years
- 3-6 years
- 6-9 years
- 9+ years

19% 27% 27% 27%

Non-executive Directors' letters of appointment stipulate that they
are expected to commit sufficient time to discharge their duties.
The Board considers the time commitments and, where relevant,
the independence of all Directors standing for election or re-election
before making a recommendation to shareholders. The Board has
adopted a policy that does not normally allow executive Directors
to take up more than one external non-executive directorship.
Non-executive Directors are required to notify the Chairman
before taking on any additional appointments. The Board
is satisfied that all Directors continue to be effective and
demonstrate commitment to their respective roles.

Details of executive Directors' service contracts, termination
arrangements and non-executive Directors' letters of appointment
are set out on page 81.

**Independence**
The Board considers all of its non-executive Directors, with the
exception of Michael Dobson, Philip Mallinckrodt and Bruno Schroder,
to be independent under the criteria set out in the Code. All are
independent in terms of character and judgement and free from
any business or other relationship that could materially interfere
with the exercise of their judgement.

Michael Dobson, as the former Chief Executive, is not considered
independent under the Code. Philip Mallinckrodt is not considered
independent as he is a former executive Director and is a member
of the principal shareholder group. Bruno Schroder is not considered
independent as he is a member of the principal shareholder group
and because he has served on the Board for more than nine years.

The Nominations Committee believes that their experience continues
to add value to the Board and Nominations Committee discussions.
The Board will therefore recommend their re-election at the 2017 AGM.

**Board induction and training**
The Company Secretary supports the Chairman and Group Chief
Executive in providing a personalised induction programme to all
new Directors. This helps to familiarise them with their duties and
the Group's culture and values, strategy, business model, businesses,
operations, risks and governance arrangements.

Following Ian King's and Rakhi Goss-Custard's appointments in
January 2017, comprehensive induction programmes were developed
and are ongoing. The induction process involves:

- meeting all members of the GMC to gain an insight into and an
  understanding of the opportunities and challenges facing their
  areas of the business;
- one-to-one meetings with other senior management across
  the Company, including from the first, second and third lines
  of defence to understand the Group's internal control and risk
  management framework (see page 36);
- access to an online board portal which holds copies of all recent
  Board and Committee reports and minutes, the Company's Articles
  of Association, Committee terms of reference and previous Annual
  Report and Accounts; and
- briefing sessions with the Chairman of the Nominations Committee
  on the responsibilities and activities of this Committee.

The Board believes firmly that the ongoing development and
briefing of Directors is an important aspect of the Board's agenda.
Briefing sessions are arranged each year which, during 2016, included
presentations on the development of the ICAAP and updates on
Real Estate and Quantitative Equity Products. Members of the Board
Committees also receive regular updates on technical developments
at scheduled Committee meetings.

**Board effectiveness and evaluation**
Our externally facilitated Board evaluation in 2015 identified some
demand to widen the Board's discussions on strategy and risks to
the strategy, for greater diversity in terms of gender, nationality and
sector and to enhance the induction process for executive Directors.
We took action to address these points in 2016. Board agendas and
their supporting papers have focused more on strategic matters, with
an emphasis on the impact of the headwinds in our industry and how
we react to them. In terms of diversity we have broadened the range
of sector skills on the Board and increased the proportion of women.
We have also confirmed that our aim is to increase female representation
to 33% by 2020. We have not appointed any new executive Directors
in 2016, but when we do, a tailored induction will be developed.

The 2016 Board evaluation was undertaken internally. The Chairman
with the Company Secretary had individual meetings with each
Director to discuss the following core questions:

- How effective has the Board been in 2016?
- Have we focused on the right things and what would you
  like to change this year?
- How can we make the Board more effective?
- How well has the transition to Peter Harrison gone?
- What would you like from Peter Harrison this year?
- What concerns do you have about the Board?
- Where are the weaknesses on the Board?
- Are the Board Committees operating effectively?
- Is there any feedback on individual Directors?
- How well did we manage the independent non-executive Director
  search and do we now have the right skills around the table?
- What are our succession challenges in 2017?

Board of Directors and Company Secretary
Group Management Committee

Corporate governance report
Directors' report

Remuneration report
Statement of Directors' responsibilities

Directors were free to raise any other issues they wished to. Following the interviews, a report was prepared and discussed by the whole Board at the February 2017 meeting. The overall conclusion was that the Board continued to operate effectively, that there had been a significant shift in focus to more strategic issues and that the process to find the new independent non-executive Directors had been thorough and had gone well.

Looking forward, there was support for continuing the shift in emphasis to strategic issues and to look in more detail at the strategic choices open to us to address the challenges facing the industry. Directors also wanted see more opportunities for 'first line' attendees at Board and Committee meetings and to expose more senior managers to the Board in support of succession planning. There was a clear desire for a continued focus on Board and executive succession.

Philip Howard, as Senior Independent Director, led the review of Michael Dobson's performance. Philip Howard held regular meetings and discussions with the Chairman, the Group Chief Executive and individual Directors. In 2017, he met with all the non-executive Directors and the Group Chief Executive to discuss the Chairman's overall performance. The consensus was that Michael Dobson had been a highly effective Chairman. He had stood back from his executive responsibilities fully and had assumed an entirely non-executive role. He had undertaken his external duties diligently, having numerous meetings with key clients and regulators, as envisaged when he was appointed. His time commitment had been approximately two days per week, although this was an average rather than a fixed commitment. He had acted as a sounding board for Peter Harrison and he had taken the Board in a more strategic direction, which was what the Board had asked for. He had led the search for the two additional non-executive Directors in a highly effective way. The Board reiterated its support for Michael Dobson as Chairman.

The Board has gone through a period of significant change over the past year. In light of this, the Chairman proposed that the evaluation for 2017 should be externally facilitated again, one year earlier than would normally be expected. The Board supported this proposal and therefore it is anticipated that Independent Board Evaluation will conduct a review in late 2017.

### Directors' conflicts of interest
The Company has procedures in place to identify, authorise and manage conflicts of interest, and these procedures have operated effectively during the year. Any planned changes in the Board's directorships outside the Group are subject to prior approval by the Board. In circumstances where a potential conflict arises, the Board (excluding the Director concerned) will consider the situation and either authorise the arrangement in accordance with the Companies Act 2006 and the Company's Articles of Association or take other appropriate action.

All potential conflicts authorised by the Board are recorded in a conflicts register which is maintained by the Company Secretary and reviewed by the Board on an annual basis. Directors have a continuing duty to update the Board with any changes to their conflicts of interest.

### Company Secretary
Graham Staples, the Company Secretary, is responsible for the following key matters in relation to the effective operation of the Board:
- advising and supporting the Chairman and the Board on all obligations and developments in corporate governance;
- ensuring that appropriate and timely information is provided to the Board and its Committees and that there are good information flows between senior management and the non-executive Directors;
- acting as a point of contact for shareholders on matters of corporate governance; and
- implementing a robust governance framework throughout the Group.

All Directors have access to the advice and services of the Company Secretary and can arrange through him to receive professional advice independently of the Company, at the Company's expense.

### Shareholder engagement
The Board recognises the importance of establishing and maintaining good relationships with all of the Company's shareholders and the wider investment community. As part of the Company's investor relations programme, the Group Chief Executive and Chief Financial Officer participated in a number of roadshows in the UK, continental Europe and the US as well as attending several investor conferences. Feedback from these meetings and conferences is provided to the Board to ensure that the Directors develop an understanding of the views of our major shareholders. All Directors are available to engage in dialogue with shareholders and would do so if requested.

In early 2016 we engaged directly with our major shareholders, who between them represented over 70% of our issued ordinary shares, to discuss our succession plans. Whilst the vast majority of those shareholders supported our proposals, we recognised that a significant minority did not. We appreciated the feedback from those shareholders and we gave commitments to provide them with reassurance regarding the elevation of the Chief Executive to the role of Chairman. This included a commitment to appoint two additional independent non-executive Directors such that there was an absolute majority of independent non-executive Directors on the Board, and a commitment to update shareholders following those appointments on how the transition from Michael Dobson to Peter Harrison had gone. Consequently, a number of meetings have been held with major shareholders to provide the promised update and also to discuss our proposed remuneration policy. Most of these meetings were with the Senior Independent Director and the Company Secretary, but both the Chairman and the Group Chief Executive were available to meet any shareholder who wished to see them.

The primary means of communicating with the Company's shareholders is through the Annual Report and Accounts and half-yearly results. These are available on the Company's website and the Annual Report and Accounts is posted to all shareholders who elect to receive it. Our Group website also contains information on the business of the Company, Corporate Governance, all regulatory announcements, key dates in the financial calendar and other important shareholder information.

The AGM is another important opportunity to meet with shareholders, hear their views and to answer their questions about the Group and its business. All resolutions are voted on by way of a poll. This allows the Company to count all votes rather than just those of shareholders attending the meeting. All resolutions are voted on separately and the final voting results are published as soon as practicable after the meeting. Together with the rest of the Board, the Chairmen of the Audit and Risk, Remuneration and Nominations Committees will be present to answer questions. The 2017 AGM is to be held on Thursday 27 April 2017.



Governance

# Nominations Committee report



**Succession planning remains at the forefront of the Committee's thinking.**



Succession planning remains at the forefront of the Committee's thinking. After nine years on the Board, Philip Howard will step down as a Director at the AGM in 2018. We are already giving consideration to his succession as Senior Independent Director and Chairman of the Remuneration Committee. We will begin a search for an additional independent non-executive Director later in the year.

The Committee considered Philip Mallinckrodt's appointment as a non-executive Director at its meeting held in February 2017. The Committee fully supported his appointment which was approved by the Board on 1 March 2017.

Executive succession is also an important area of focus for the Board. We need to develop our talent such that we have a pipeline of executive management below Board level with the potential to lead the business in the future. Talent management and succession planning is considered by the full Board at least once a year.

**Responsibilities of the Committee**
The Committee is responsible for keeping under review the composition of the Board and its Committees and to ensure appropriate executive and non-executive Director succession plans are in place.

The Committee's terms of reference are available on our website.

**Board composition**
Following the appointment of Ian King and Rakhi Goss-Custard and with Philip Mallinckrodt's move to a non-executive Director role, the make up of the Board is illustrated below:

**Committee membership** (meeting attendance is on page 51)

| |
|---|
| Michael Dobson (Chairman) |
| Robin Buchanan |
| Rhian Davies |
| Rakhi Goss-Custard |
| Lord Howard |
| Ian King |
| Philip Mallinckrodt |
| Nichola Pease |
| Bruno Schroder |

I am pleased to present the Nominations Committee report for 2016.

As I outlined in my Chairman's statement earlier, we have made a number of changes to the Board in 2016. The first part of the year was focused on managing the succession to me as Chief Executive and Andrew Beeson as Chairman. The process for succession to the Chief Executive was led by Andrew and succession to the Chairman was led by the Senior Independent Director, Philip Howard. The detail behind this process was set out in our 2015 Annual Report and Accounts.

I took over as Chairman of the Committee on 4 April 2016 and my priority was to lead the process to deliver on our commitment to appoint two additional independent non-executive Directors by the end of 2016. The process we followed is set out in more detail in this report and I am delighted that we were able to announce in December the appointments of Ian King and Rakhi Goss-Custard. Ian and Rakhi bring skills and experience that are complementary to those of the existing non-executive Directors. They will both make a significant contribution to our Board discussions.



- Independent non-executive Directors
- Non-independent non-executive Directors
- Executive Directors

18%
55%
27%

We have three female Directors representing 27% of the Board.

As a multinational Company with offices staffed by local nationals in 27 different countries, diversity for us goes beyond gender or ethnic background. We look for a diversity of skills and experience, particularly international experience, which we believe is vital for an effective Board and this will continue to be the primary criterion by which we select candidates for the Board.

The Board is also supportive of the recommendations set out in the Parker Report on ethnic diversity.

Board of Directors and Company Secretary
Group Management Committee

**Corporate governance report**
Directors' report

Remuneration report
Statement of Directors' responsibilities

**Board policy on diversity**
The Board recognises the importance of diversity and that it is a wider issue than gender. We believe that members of the Board should collectively possess a diverse range of skills, expertise, industry knowledge, business and other experience necessary for the effective oversight of the Group. The Nominations Committee considers diversity as one of many factors when recommending new appointments to the Board.

The Board aims to have 33% of Board positions held by women by 2020. We also endeavour to only use the services of executive search firms who have signed up to the Voluntary Code of Conduct on Gender Diversity.

**Appointment of new independent non-executive Directors**
In April 2016 we said we would increase the independent representation on the Board by appointing two additional independent non-executive Directors.

I met separately with each member of the Committee and the Group Chief Executive to discuss the desired skills and experience required in potential non-executive candidates. The Committee met in June and agreed the required skill sets which included:

– Current or recent board level experience within a major UK-listed company
– Broad international experience
– Experience of multi-product and channel businesses
– Experience of technological and digital change as a strategic enabler
– A background in finance and risk would be useful to support the Chairman of the Audit and Risk Committee
– Preferably one non-British national but with a strong preference that both are based in the UK
– Diversity in all respects, but particularly gender.

To facilitate the search, we appointed MWM Consulting who assisted in formulating the role specification and provided us with a long-list of potential candidates for consideration. We also used Korn Ferry to identify potential candidates. Both firms are signatories to the Voluntary Code of Conduct on Gender Diversity and were independent of Schroders.

After initial screening, I interviewed several candidates and five went on to meet the Nominations Committee and the Group Chief Executive. In December we announced the appointment of Ian King and Rakhi Goss-Custard with effect from 1 January 2017. The appointments met many of the requirements we set out in our original specification. Ian brings extensive experience in leadership positions in major multinational companies which will be of great value to us as we continue

to grow our business internationally. Rakhi's experience in the digital world, through her work at Amazon and, more recently, through her experience as a non-executive Director on other boards, will have a significant contribution to make as the impact of digital becomes increasingly important in the asset management industry. I look forward to their contribution over the coming years

**Directors' re-election to the Board**
In accordance with the Company's Articles of Association, Ian King and Rakhi Goss-Custard will be put forward for election at the 2017 AGM. The remaining Directors will retire from the Board and submit themselves for re-election at the AGM.

The Committee has assessed the independence, time commitment and effectiveness of the non-executive Directors and is satisfied that all non-executive Directors continue to fulfil their fiduciary responsibilities and statutory duties.

As Robin Buchanan, Philip Howard and Bruno Schroder have served on the Board for more than six years, the proposal for their re-election was given particular consideration. The Committee also considered Philip Mallinckrodt's re-election as a non-executive Director. The Committee agreed that these Directors continue to provide a valuable contribution to the Board's deliberations and recommends their re-appointment.

As required by the UK Listing Rules, the appointment of independent Directors must be approved by a simple majority of all shareholders and by a simple majority of the independent shareholders. Further details are set out in the 2017 Notice of AGM.

**Evaluating the performance of the Committee**
The evaluation process for 2016 is set out on page 54. As part of that process I discussed with each Director how the Committee had performed in 2016. The overall feedback was that the Committee had performed its role well during the year. Establishing at the outset clear requirements in relation to the new independent non-executive Directors was seen as central in delivering a successful outcome. All members fully engaged in the process and they were updated regularly on progress in addition to the reports they received in Committee meetings.

**Priorities for 2017**
Succession planning is seen as a constant requirement. Over the next two years two non-executive Directors, Philip Howard and Robin Buchanan, will have completed nine years on the Board and our focus in 2017 will be to establish a pipeline of potential candidates who could succeed them. As stated above we will begin a search for a new independent non-executive Director later this year. Executive succession, vital to the future success of the Company, is considered annually by the full Board.

**Michael Dobson**
Chairman of the Nominations Committee
1 March 2017

Governance

# Audit and Risk Committee report



Schroders' approach demonstrates its culture of putting clients first, of wanting to do the right thing while ensuring the business grows sustainably.



**Committee membership** (meeting attendance is on page 51)

Rhian Davies (Chairman)

Robin Buchanan

Philip Howard

Nichola Pease

Having been a member of the Committee since July 2015 and Chairman since April 2016, I have been impressed with the openness and willingness with which management engages with me, the Committee and the business' key stakeholders, including its global regulators. At a time of unprecedented change and scrutiny of the asset management sector, Schroders' approach demonstrates to the Committee its culture of putting clients first and of wanting to do the right thing while ensuring the business grows sustainably within a strong governance framework.

Through our work, the Committee embraces its role of protecting the interests of shareholders in connection with the integrity of published financial information and the effectiveness of the audit. During 2016, the Committee's activity has been focused towards this area of its

responsibility, notably the work involved in undertaking the external audit tender. As reported in the 2015 Annual Report and Accounts, in order to meet new European audit reforms we are required to replace PwC as our external auditor no later than 2020. The external audit tender was put out to tender in 2016. In November 2016, we announced that EY would replace PwC as the Group's auditor for the financial year commencing 1 January 2018. In addition, a number of audit related services will be transferred to EY during 2018. Further information can be found on page 62.

The Committee has also reviewed the Group's control environment and system of internal controls and the Group's management of risk and compliance related activities, including oversight of the Group's material outsource providers. As a part of this work, the Committee considered the Group's ICAAP, ILAAP, its risk appetite and various operational stress scenarios in order that the Board can make the viability statement as set out on page 37.

We have also continued to oversee the development of our conduct programme designed to identify emerging trends and heightened risk issues.

There will be a number of significant strategic, commercial and operational impacts on asset and wealth managers arising from both MIFID II and Brexit. Preparation for the implementation of MIFID II, which has been delayed until January 2018, is ongoing. The result of the referendum on 23 June 2016, which means that the UK is expected to exit the European Union, and the US presidential election are likely to continue to cause heightened economic, political and regulatory uncertainty over the medium term. Schroders is well placed to manage the risks arising from these events and the Committee is reassured by the readiness work being undertaken, including the impact of potential legal and regulatory changes on Schroders' business model. This will continue to be an area that the Board as a whole will keep under review.

We seek to ensure that appropriate systems and controls continue to be in place across the Group to identify and mitigate threats or to take advantage of opportunities that might arise. This focus will remain an important part of the Committee's work during 2017 and beyond.

**Rhian Davies**
Chairman of the Audit and Risk Committee

* See glossary.

Board of Directors and Company Secretary
Group Management Committee

**Corporate governance report**
Directors' report

Remuneration report
Statement of Directors' responsibilities

## Responsibilities of the Committee

The principal role of the Committee is to assist the Board in fulfilling its oversight responsibilities in relation to financial reporting, financial controls and audit, risk and internal controls.

All members of the Committee are independent non-executive Directors. Biographical details and the experience of Committee members are set out on pages 46 to 47. The Board has determined that, by virtue of their previous experience gained in other organisations, members collectively have competence relevant to the sector in which the Group operates. In addition, the Board considers that Rhian Davies, a chartered accountant, has the recent and relevant financial experience required to chair the Committee.

At the invitation of the Chairman of the Committee, the Chairman, Group Chief Executive, Chief Financial Officer and Bruno Schroder attended most meetings. Other regular attendees who advised the Committee were the Group Financial Controller, the heads of Compliance, Risk and Internal Audit and the General Counsel. Other members of senior management were also invited to attend as appropriate. The Chairman of the WMARC who is an independent non-executive Director of Schroder & Co. Limited, attended one meeting and provided a report to each Committee meeting on matters related to the Wealth Management business. Representatives from the Group's auditor, PwC, attended all of the Committee's scheduled meetings.

During 2016, two private meetings were held with PwC without management present. Private meetings were also held with the Chief Financial Officer and the heads of the Compliance, Risk and Internal Audit functions. These meetings provided an opportunity for any matters to be raised confidentially.

Following the publication of the 2016 UK Corporate Governance Code and revised FRC Guidance for Audit Committees, the Board approved amendments to the Committee's terms of reference. The changes largely formalised the Committee's oversight of the Group's internal and external audit arrangements. The terms of reference are available on our website.

The Committee's primary activities are the oversight of:

| Financial reporting, financial controls and audit | Risk and internal controls |
|---|---|
| – The content and integrity of financial and Pillar 3 reporting<br>– The appropriateness of accounting judgements<br>– The effectiveness of the financial control framework<br>– The effectiveness of the external auditor<br>– Independence of the external auditor<br>– Recommending to the Board the appointment of the external auditor | – The Group's risk and control framework, including the Group's whistleblowing procedures and the Money Laundering Reporting Officer's reports<br>– The Group's ICAAP, ILAAP, risk appetite and recovery and resolution planning<br>– The Group's regulatory processes and procedures and its relationships with regulators<br>– The Group's Internal Audit function<br>– Emerging and thematic risks which may have a material impact on the Group's operations in the future |

## Key areas of focus during the year

The table below summarises the key issues that the Committee considered at each of its meetings during 2016.

| Meeting date | Financial reporting, financial controls and audit | Risk and internal controls |
|---|---|---|
| February | – Annual Report and Accounts including financial judgements<br>– Viability statement<br>– Pillar 3 disclosures | – Key risks and risk management<br>– Internal audit control framework review<br>– Risk and control framework review |
| May | – External audit tender plan<br>– External audit plan | – ICAAP<br>– Money Laundering Reporting Officer's annual report<br>– Client take on<br>– Business continuity<br>– Oversight of outsource providers |
| July | – Half-year results<br>– External audit tender | – ICAAP<br>– Risk control assessments<br>– ILAAP<br>– Infrastructure finance business<br>– Fund liquidity |
| September | – Reappointment of external auditor for 2017<br>– Tax strategy | – Conduct<br>– MiFID II<br>– Group recovery plan and resolution pack |
| November | – Financial controls<br>– Accounting policies<br>– External audit effectiveness review and independence<br>– External audit tender | – Information security and the management of technology change<br>– Oversight of outsource providers<br>– Key risks review<br>– Insurance<br>– 2017 Internal Audit and Compliance monitoring plans |

Governance

# Audit and Risk Committee report
continued

**Financial reporting, financial controls and audit**
The Committee reviews the half-year and annual results and the Annual Report and Accounts, before recommending them to the Board for approval.

The Committee assesses whether suitable accounting policies have been adopted and whether management has made appropriate estimates and judgements, including those in respect of financial assets, goodwill and intangible assets, provisions and contingent liabilities, the UK DB pension scheme funding level and the determination of entities that are consolidated into the Group where these are subject to material judgement. As a result of new guidance issued by the European Securities and Markets Authority on Alternative Performance Measures (APMs) further information on each of the Group's APMs has been provided in the glossary (see page 174). The Committee agrees that these APMs help better describe how business performance is assessed by management and overseen by the Board. Other changes made to the presentation of the Annual Report and Accounts are described on page 151 and were also discussed by the Committee.

The Group's financial control environment is set out in detailed risk and control documents. These documents provide a comprehensive summary of the risks and controls that exist across the Finance function globally and support the Group's risk and control assessments (see page 37). During the year, the Committee received reports from Finance on the operation of the controls over the financial reporting process including changes to the finance management team, revenue and rebates processes and ongoing developments to processes

and systems. New tools for allocating revenues in accordance with the Group's transfer pricing policy and an automated solution for calculating segregated accounts performance fees will be implemented during 2017. A process for replacing the Group's proprietary rebates engine is underway and is expected to be delivered in 2017. A reporting strategy is also being developed to ensure the Group remains well placed to manage future reporting demands.

The Committee receives regular reports from PwC on the audit scope, progress against the audit plan, an independent assessment of financial reporting, an audit opinion on the Annual Report and Accounts and an independent report on the half-year results. Relevant controls are also reviewed by PwC.

The Committee's responsibilities include whether it can recommend to the Board that the Annual Report and Accounts when taken as a whole is fair, balanced and understandable and whether it provides the information necessary for shareholders to assess the Group's position and performance, business model and strategy. To support the Committee in making this recommendation it assessed the key messages being communicated in the Annual Report and Accounts, as well as the information the Committee and the Board as a whole had received and their discussions throughout the year.

The Group's tax strategy is reviewed annually and is discussed with the external auditors (see page 35 for more information).

The Committee is required to report to shareholders on the process it follows in its review of significant judgemental issues that it has considered during the year. These issues are set out below.

| Significant judgements and issues | Action |
| --- | --- |
| **Accounting for acquisitions**<br>During the year the Group made a number of acquisitions. These acquisitions required judgement as to the basis of consolidation and the fair value of assets and liabilities acquired.<br><br>See note 29 to the accounts. | The Committee considered reports from Group Finance that set out the basis of consolidation, including key assumptions used to determine the acquired intangible assets and goodwill. The Committee considered the work performed by Group Finance and a valuation specialist in establishing the key assumptions, including the terms of client relationships, the profit before tax and the discount rate. Having considered supporting information, the Committee was satisfied with the basis of consolidation and initial carrying value of the relevant assets. |
| **Recognition and disclosure of liabilities**<br>The Group has some uncertainty over the recognition, timing and amount in respect of certain obligations. These can arise in a number of areas but principally comprise legal and regulatory matters and leasehold related obligations. In addition, the calculation of the Group's tax charge necessarily involves a degree of estimation and judgement, given the many jurisdictions in which it has operations and the complexity of the applicable tax rules in each of those jurisdictions.<br><br>See notes 5, 6 and 18 to the accounts. | During 2016 detailed reports were presented by management to the Committee addressing the judgemental issues and estimates, which included the key assumptions and basis for the main areas of uncertainty regarding the recognition of liabilities.<br><br>The Group Head of Tax presented an update on the Group's tax strategy and associated governance process to the Committee in September. The Committee reviewed and approved the Group's updated tax strategy which is published on the Group's website. During the year changes were made to the Group's transfer pricing policy to reflect new rules introduced as a result of the OECD BEPS* initiative.<br><br>Key judgements on uncertain liabilities have been discussed with PwC, who have completed their independent assessment. The Committee considers that the judgements made by management in respect of all relevant liabilities are reasonable and that appropriate disclosures have been included in the accounts.<br><br>During the year the Committee received updates on the Swiss Bank's continuing engagement with the US Department of Justice under the terms of the agreement reached in 2015. |

* See glossary.

Board of Directors and Company Secretary
Group Management Committee

Corporate governance report
Directors' report

Remuneration report
Statement of Directors' responsibilities

| Significant judgements and issues | Action |
|---|---|
| **Carrying values of assets**<br>The Group holds material balances in respect of acquisitions completed and the UK DB pension scheme surplus which are subject to judgement regarding their carrying value.<br><br>See notes 13 and 25 to the accounts. | The Committee considered reports prepared by management that set out relevant considerations in assessing the carrying value of material assets that required judgement in the determination of their valuation.<br><br>Acquisition related items comprising goodwill and intangible assets, were assessed against the performance and outlook of the relevant cash generating units and the application of growth assumptions and discount rates.<br><br>Reports from management included the key financial assumptions that had been used by the independent qualified actuaries, Aon Hewitt Limited, to determine the UK DB pension scheme surplus. The pension trustee company has also considered the low interest rate environment and its impact on yields for investments in the UK pension scheme, and while the scheme remains in surplus no material change to the scheme's investment strategy has been recommended.<br><br>The basis for determining the carrying value of certain other assets was also considered in the management report.<br><br>Having considered the supporting information, the Committee was satisfied with management's conclusions regarding the carrying values of the relevant assets. |
| **Presentation of profits**<br>Since 2013 the consolidated income statement separately presents exceptional items which are permitted by accounting rules for specific items of income or expense that are material.<br><br>See note 1(b) to the accounts. | The Committee considered and was satisfied with the continued presentation of exceptional items within a separate column in the consolidated income statement. This presentation is considered appropriate as it provides a transparent view of certain items and the underlying performance of the business. For 2016, exceptional items principally comprised amortisation of acquired intangible assets and costs associated with entering into the strategic relationship with Hartford Funds. |

**Oversight of the relationship with the external auditor**
The Committee places great importance on the quality, effectiveness and independence of the external audit process.

The Committee is responsible for evaluating the performance of the external auditor. To assist the Committee in fulfilling these responsibilities, an assessment of the external auditor was carried out with feedback collected from key stakeholders by way of a questionnaire. The content of the questionnaire was prepared in accordance with the FRC's guidance comprising four criteria: mindset and culture; skills, character and knowledge; quality control; and judgement. There was no significant change in the overall perceived quality of the 2015 audit and feedback did not identify any areas of significant concern. Areas for improvement identified were communicated to PwC who responded appropriately.

Audit effectiveness is also assessed throughout the year using a number of measures including: reviewing the quality and scope of the proposed audit plan and progress against the plan; responsiveness to changes in our businesses; and monitoring the independence and transparency of the audit. The assessment of the auditor's effectiveness forms part of the Committee's annual consideration of whether the auditor should be recommended to the Board for reappointment. We continue to believe that PwC are performing effectively and their reappointment will be recommended to shareholders at the 2017 AGM. There are no contractual or similar

obligations restricting the Group's choice of external auditors. Following the audit tender process EY will be recommended to shareholders for appointment as the Group's external auditor for the 2018 financial year at the 2018 AGM.

**Non-audit services**
In order to help safeguard the independence and objectivity of the auditor, the Committee maintains a policy on their engagement to provide non-audit services. This precludes the provision of certain non-permitted audit services and contains rules regarding the approval of permitted non-audit services. In November, the Committee reviewed the following Group policies developed to help ensure the continued independence of the external auditor: the provision of non-audit services by the Group's external auditor, the personal use of the external auditor and the employment of former employees of the external auditor. The relevant policies were also updated to reflect the proposed appointment of EY as the Group's external auditor to ensure that no engagements would restrict their appointment. The policy on the provision of non-audit services was updated to comply with the new EU audit reform regulation which was effective from 1 January 2017 and all non-audit services provided to the Group now require pre-approval from the Committee. In addition, non-audit services provided to Schroder & Co. Limited, the Group's UK bank, must also first be approved by the WMARC and non-audit services provided to Schroder Pension Management Limited, the Group's Life Company', must also be first approved by that company's board.

Governance

# Audit and Risk Committee report
continued

The approach that has been adopted is more restrictive than the legislation requires but it reduces the risk of independence breaches and allows a practical application of the policy. The scope of the policy has also been extended to incorporate both consolidated and non-consolidated pooled fund vehicles. As the permitted choice of non-audit service providers will be limited during the transition period from PwC to EY, certain non-audit services that are not permitted under the new policy but which are permitted under the rules, will be allowed to continue, with prior approval from the Committee.

Prior to undertaking any non-audit service, PwC, and now also EY, complete their own independence confirmation processes which are approved by the senior statutory auditor. To provide the Committee with oversight in this area, it will receive six-monthly reports on the non-audit services provided by each of the firms.

Details of the total fees paid to PwC are set out in note 5 to the accounts. Non-audit fees, excluding audit related assurance services required under regulation, were equivalent to 37% (2015: 50%) of audit fees.

The Committee was satisfied that the quantity and type of non-audit work undertaken throughout the year did not impair PwC's independence or objectivity and that their appointments were in the best interests of shareholders due to PwC's pre-existing knowledge of the Group's operations and practices. The Group's overall approach is only to use PwC where there is a strong case to do so in preference to obtaining the services from an alternative supplier. Other non-audit services are put out to tender as appropriate.

The Committee confirms that the Company has complied with the provisions of the Competition Markets Authority Order 2014 throughout the year under review and as at the date of this report.

**Audit tender process**

PwC, or its predecessor firms, have been the Company's auditor since Schroders became a listed company in 1959. As a consequence of new EU audit regulations, Schroders is required to replace PwC as its statutory auditor by 2020. In order to minimise the disruption to the business the Board, on the recommendation of the Committee, agreed to replace PwC as external auditor at the conclusion of the 2017 audit. This coincides with the end of tenure for the current lead engagement partner Andrew Kail who, having been the lead engagement partner for five years, in accordance with audit regulations, is required to rotate off the Schroders account at that time.

The Committee initiated an audit tender process which it owned from the outset. The process was designed to be transparent, effective and efficient and give each participating firm an equal opportunity to tender for the services. Prior to the tender, the participating firms had been given an equal opportunity to meet with Schroders employees and had provided some non-audit services to Schroders to enable them to develop their understanding of the business. Procedures for managing potential conflicts of interest, including gifts and hospitality, were communicated to each participating firm and access to certain employees and the Board was restricted.

The main elements of planning for the tender began in May 2016 when the proposed process was approved by the Committee. The Chairman of the Audit and Risk Committee took the principal role in overseeing the work of management, who supported the Committee in developing and implementing the planned approach. The Chairman met with the tender project team regularly and received and commented on the main materials prior to them being issued, either to the Committee or to the participating firms. Except for PwC no other firms were prevented from participating in the tender. However, the Committee agreed that only Deloitte, EY and KPMG should be issued with the Request For Proposal (RFP). This recommendation was made on the basis of the tender process experience in 2012, when it was concluded that no other firms outside of the 'Big 4' had the geographical reach necessary to respond effectively to an RFP for the Schroders' audit. The Committee recognised that since 2012, although there had been some changes with respect to these other firms, none were transformative with regards to their ability to conduct the global audit of Schroders.

In addition, no other firms had maintained significant relationships with Schroders.

Therefore, it was concluded that no other firms should be issued with the RFP as there was not a reasonable expectation of any other firm performing well when judged against the agreed evaluation criteria determined by the Committee.

In line with FRC guidance the evaluation criteria for the process were agreed as:
– Organisation and capability
– Audit approach and delivery
– Audit quality and value-add
– Resourcing and engagement team
– Fees and contracts.

In order to evaluate each of the firms against the criteria the Committee oversaw a number of activities including:
– Analysis of the RFP responses
– Management presentations, including technical queries
– Presentations to the Committee and the WMARC
– Assessment of performance on non-audit services provided in the preceding 24 months
– Due diligence including reviewing Audit Quality Review Team reports published by the FRC, references and media searches.

At the conclusion of the process the Committee recommended a first and second placed firm to the Board, supported by the rationale for the recommendation. In summary, the Committee concluded that EY had: a strong team proposition in each of the key regions where the Group's finance operations were located; good knowledge of the business's and sector's key risks; had performed well on non-audit engagements during the past 24 months providing the Committee with reassurance around delivery, planning and culture; and through certain other actions demonstrated their commitment to providing Schroders with a high quality focused audit. Accordingly, the Board agreed to recommend to shareholders the appointment of EY at the 2018 AGM.

The Committee continues to oversee a detailed transition plan and will receive regular reports through 2017, including an 'initial observations' report on our systems and controls from EY.

Board of Directors and Company Secretary
Group Management Committee

**Corporate governance report**
Directors' report

Remuneration report
Statement of Directors' responsibilities

## Risk and internal controls

The Board has overall responsibility for the Company's system of internal controls, the ongoing monitoring of risk and internal control systems and for reporting on any significant failings or weaknesses.

The system of control is designed to manage rather than eliminate the risk of failure to achieve our strategic objectives and can only provide reasonable assurance against material misstatement or loss. The Board has delegated to the Committee responsibility for reviewing the effectiveness and monitoring of the risk and internal controls framework.

On behalf of the Board, the Committee carried out the annual assessment of the effectiveness of internal controls during 2016, including those related to the financial reporting process. The Committee also considered the adequacy of the Group's risk management arrangements in the context of the Group's business and strategy. In carrying out its assessment, the Committee considered reports from the Group Financial Controller and the heads of Compliance, Risk and Internal Audit and also from PwC. This enabled an evaluation of the effectiveness of the Group's internal controls. No significant failings or weaknesses were identified. The Committee keeps under review the Group's risk management arrangements and internal controls through quarterly reports from representatives of each line of defence. The Group's three lines of defence model provides an ongoing process for identifying, evaluating and mitigating risks faced by the Group. This model together with the most significant developments in the risk profile of the business and a description of how we control and manage risks are set out on pages 36 to 43.

## Risk

Risk reports set out changes in the level or nature of the risks faced by the Group, developments in risk management and operational events, including significant errors and omissions. Separate reports allowed the Committee to consider a range of factors when determining the key risks and uncertainties faced by the Group. These included assessments of risk tolerance and stress testing of the Group's capital position, as well as the production of the Group's ICAAP, ILAAP and the Group's Recovery and Resolution Plan.

The Committee considers emerging and thematic risks that may have a material impact on the Group. During the year, the Committee reviewed the Group's arrangements in the areas of business continuity, information security, the management of technology change risk and our infrastructure finance business. Set out below are examples of the Committee's activity where members of the first line of defence attended and presented to the Committee in relation to emerging and thematic risks.

## Client take-on

As part of the Group's Efficiency and Effectiveness review, a series of projects were initiated in order to better manage client onboarding and end-to-end life cycle processes across the Group. Initial focus was given to the take-on elements of institutional clients, in order to form a solid basis for future work across the life cycle more broadly.

The Committee spent time considering the institutional client take-on process and the interconnections with key finance processes, notably in relation to billing and rebates. The project aims to improve efficiency and through increased collaboration across the business to expedite the take-on process thereby improving clients' experience of doing business with Schroders. Direct commercial benefits will arise from the reduction in overall time taken to fund client mandates. Improved data collection and work flow management will also enhance controls around billing and provide a single-source of information for the Group's finance systems, thereby allowing better control of key terms that could impact our revenue and rebate processes.

The work is ongoing and the Committee will be kept up to date with progress during 2017.

## Outsource providers

During 2016 the Committee conducted its annual review of the Group's material outsource providers. None of our key relationships had needed to be changed during 2016. However, action plans were implemented to improve performance and service quality in some instances including with respect to a third party provider engaged to provide transfer agency and other services for the Group's UK-domiciled mutual fund ranges.

Notwithstanding the Group's outsourcing of transfer agency and other services, the Group remains responsible for the services provided and is required to establish assurance over its compliance with the FCA's Client Assets Sourcebook (CASS). The Group looks to the provider to develop and implement appropriate systems, processes and controls to enable compliance and therefore an independent review was commissioned to assess the provider's controls and our own oversight arrangements. There were a number of findings many of which were common to other clients of the provider. None of the findings gave the Committee reason to believe that there had been any client detriment.

The Committee continues to provide oversight of the Group's and the provider's programme to deliver CASS compliant operations and management continues to work with the industry to resolve the issues faced. Within Schroders, processes have been reviewed and strengthened, employees retrained, with new employees added to work exclusively on CASS monitoring. Management reporting has also been enhanced.

Ongoing oversight of the Group's outsource arrangements will be a priority for the Committee during 2017.

Governance

# Audit and Risk Committee report
## continued

**Compliance**

Compliance reports describe the status of our relationships and dealings with our principal global regulators and material changes in the regulatory environment in which the Group operates. The reports also outline key compliance issues, and the planning and execution of the compliance monitoring programme. The Committee also received reports on the operation of the Group's whistleblowing arrangements, anti-money laundering processes and client asset controls.

**Internal Audit**

The Committee has authority to appoint or remove the Group Head of Internal Audit, who reports directly to the Chairman of the Committee. The Chairman of the Committee is accountable for setting the objectives of the Group Head of Internal Audit, appraising his performance against those objectives and for recommending his remuneration to the Remuneration Committee, with advice from the Group Chief Executive.

The Committee also has responsibility for approving the Internal Audit budget and being satisfied that the Internal Audit function has appropriate resources and continues to be effective. The Committee satisfies itself as to the quality, experience and expertise of the function

through regular interaction with the Group Head of Internal Audit, both when the Committee meets and also through other meetings outside the formal meeting schedule. In 2016 an independent review of the function's methodology was undertaken. Feedback was broadly positive with some process enhancements adopted. In accordance with the recommended practice of the Institute of Internal Auditors, the Committee will during 2017 approve the appointment of an independent third party to conduct a detailed 'Effectiveness Review' of the Internal Audit function. The appointed third party will be required to report its findings to the Committee during the second half of the year.

Internal Audit reports to the Committee set out progress against a rolling plan of audits approved by the Committee on an annual basis. These reports include significant findings from audits and their subsequent remediation, and recommendations to improve the control environment. During the year the Committee flexed the Internal audit plan to meet the evolving risks faced by the business.

**Fund liquidity – Brexit**

Following the UK referendum vote to leave the EU, the Committee received an update on liquidity and controls within the three areas of the business most likely to be impacted by reduced liquidity, Fixed Income, Real Estate and Equities,

Some third party daily-priced real estate funds held by retail investors had been closed to redemptions caused by reaction to the result of the vote. As Schroders chooses not to offer these types of products and Schroders' Real Estate funds had little leverage and strong performance the principal risk for our Real Estate business had been one of market contagion. This did not occur.

Overall the Group's liquidity response to Brexit had been well planned and executed, and the Committee agreed the business is well positioned to take advantage of any opportunities which may arise.

**Conduct risk**

In 2015 the Committee had focused on the Group's approach to conduct and culture in the business and agreed that a conduct risk framework should be developed. The four key components were: integration into culture and people management; accountability and governance; the relevant policy framework; and management information,

During 2016 the Committee received an update on key activities since the framework had been introduced. This included presentations from the Equities business in Investment and the Institutional channel in Distribution on the development of management information; the approach to integrating people and culture metrics into conduct oversight processes; and the development of a single firm-wide view of conduct risk.

The firm's conduct programme looks to encourage forward-looking indicators in order to identify emerging trends or heightened risk issues before an adverse event occurs. Each stage of the employee life cycle has also been reviewed to consider culture and conduct with conduct more formally included in appraisals for 2016 onwards, while feedback on behaviours in line with Schroders values had already been added to the annual appraisal process. More information is included in the Remuneration report on page 95.

The Committee will continue to monitor progress of the global roll out of the programme which is planned to commence in 2017.

Board of Directors and Company Secretary
Group Management Committee

Corporate governance report
Directors' report

Remuneration report
Statement of Directors' responsibilities

Both the annual compliance monitoring and Internal Audit plans are developed on a risk weighted basis to provide proportionate reassurance over the Group's controls for the key risks set out on pages 38 to 43.

**Evaluating the performance of the Committee**
The annual evaluation of the Committee's effectiveness was undertaken as part of the overall Board evaluation process. The findings relating to the Committee were discussed with the Committee Chairman. Overall, the Committee is considered to be thorough and effective.

**Priorities for 2017**
As well as considering the standing items of business, the Committee will also focus on the following areas during 2017:
− Review of the Group's risk appetite
− Client take-on
− Information security
− Outsource providers
− MiFID II readiness
− Conduct risk
− Statutory auditor transition.

**Committee's assessment of internal control and risk management arrangements**
In light of its work, the Committee was content with the effectiveness of the Group's processes governing financial and regulatory reporting and controls, its culture, ethical standards and its relationships with regulators. The Committee was also satisfied with the appropriateness and adequacy of the Group's risk management arrangements as well as supporting risk management systems including the risk monitoring processes, internal controls framework and three lines of defence model.

**Rhian Davies**
Chairman of the Audit and Risk Committee
1 March 2017

Governance



# Directors' report

## Directors' report
The information contained in the sections of this Annual Report and Accounts identified below forms part of this Directors' report:
- Strategic report which includes that part of the Financial review contained on pages 102, 104 and 106
- Board of Directors
- Corporate governance report, including the Nominations Committee report and the Audit and Risk Committee report
- The Statement of Directors' responsibilities.

## Share capital
Schroders has developed under stable ownership for more than 200 years and has been a public company whose ordinary shares have been listed on the London Stock Exchange since 1959. The Company's share capital is comprised of ordinary shares of £1 each and non-voting ordinary shares of £1 each. The ordinary shares have a premium listing on the London Stock Exchange and the non-voting ordinary shares have a standard listing on the London Stock Exchange.

226,022,400 ordinary shares (80% of the total issued share capital) were in issue throughout the year. The Company has no authority to issue or buy back any ordinary shares. Each ordinary share carries the right to attend and vote at general meetings of the Company. 56,505,600 non-voting ordinary shares (20% of the total issued share capital) were in issue at the beginning of 2016. No shares were held in treasury.

The non-voting ordinary shares were created in 1986 to facilitate the operation of an employee share plan without diluting the voting rights of ordinary shareholders. The non-voting ordinary shares carry the same rights as ordinary shares except that they do not provide the right to attend and vote at general meetings of the Company and that, on a capitalisation issue, they carry the right to receive non-voting ordinary shares rather than ordinary shares.

When the non-voting ordinary shares were created the ratio of ordinary shares to non-voting ordinary shares was 4:1. The Company has at times issued non-voting ordinary shares, principally in connection with the Group's employee share plans. The Company has not intended and does not intend to increase the issued non-voting ordinary share capital over the medium term and therefore has, at times, bought back non-voting ordinary shares.

At the 2016 AGM shareholders renewed the Directors' authority to issue 5,000,000 non-voting ordinary shares in order to provide the Directors with the flexibility to issue non-voting ordinary shares or to grant rights to subscribe for, or convert securities into, non-voting ordinary shares. Shareholders also gave approval for the Company to buy back up to 14,100,000 non-voting ordinary shares which will expire at the 2017 AGM. Renewal of these authorities will be sought at the 2017 AGM which will be held at 11.30 a.m. on 27 April 2017.

On 21 December 2016, the Company issued 233,623 non-voting ordinary shares in part consideration for the acquisition of the Company's interest in Benchmark Capital. The total number of non-voting ordinary shares in issue at the year end was 56,739,223.

On 30 December 2016, the Company entered into a share buy-back programme operated by a third party within set parameters to repurchase a maximum of 233,623 of its non-voting ordinary shares.

Once completed this will restore the 4:1 ratio of ordinary shares to non-voting ordinary shares. Since 1 January 2017, the Company purchased 171 non-voting ordinary shares at an average price of £21.40, representing 0.0003% of the issued non-voting ordinary share capital. Of the shares repurchased, all were cancelled immediately.

Under the terms of the Schroders Employee Benefit Trust* and the Schroder US Holdings Inc. Grantor Trust ordinary and non-voting ordinary shares are held on trust on behalf of employee share plan participants. The trustees may exercise the voting rights in any way they think fit. In doing so, they may consider the financial and non-financial interests of the beneficiaries and their dependents. As at 28 February 2017, being the latest practicable date before the publication of this Annual Report and Accounts, the Schroders Employee Benefit Trust and the Schroder US Holdings Inc. Grantor Trust together held 9,453,080 ordinary shares and 347,701 non-voting ordinary shares.

Under the terms of the Share Incentive Plan, as at 28 February 2017, 567,887 ordinary shares were held in trust on behalf of plan participants. At the participants' direction, the trustees can exercise the voting rights over ordinary shares in respect of participant share entitlements.

There are no restrictions on the transfer of the Company's shares save for:
- Restrictions imposed by laws and regulations
- Restrictions on the transfer of shares imposed under the Company's Articles of Association or under Part 22 of the UK Companies Act 2006, in either case after a failure to supply information required to be disclosed following service of a request under section 793 of the UK Companies Act 2006
- Restrictions on the transfer of shares held under certain employee share plans while they remain subject to the plan.

The Company is not aware of any agreement between shareholders that may restrict the transfer of securities or voting rights.

## Substantial shareholdings
As at 31 December 2016, the Company had received notifications, in accordance with rule 5.1.2R of the Disclosure and Transparency Rules, of interests in 3% or more of the voting rights attaching to the Company's issued share capital, as set out in the table below. There had been no changes to these notifications as at the date of this report.

| Member | Class of shares | No. of voting rights held | % of voting rights held |
|---|---|---|---|
| Vincitas Limited[1] | Ordinary | 60,724,609 | 26.87 |
| Veritas Limited[1] | Ordinary | 36,795,041 | 16.28 |
| Flavida Limited[2] | Ordinary | 60,951,886 | 26.97 |
| Fervida Limited[2] | Ordinary | 39,225,379 | 17.37 |
| Harris Associates L.P.[3] | Ordinary | 11,443,978 | 5.06 |
| Lindsell Train Limited[3] | Ordinary | 11,312,070 | 5.01 |

[1] Vincitas Limited and Veritas Limited are trustee companies which act as trustees of certain settlements made by members of the Schroder family. Vincitas Limited and Veritas Limited are party to the Relationship Agreement.
[2] The interests of Flavida Limited include interests in voting rights in respect of all the shares in which Vincitas Limited is interested as trustee. Flavida Limited is party to the Relationship Agreement. The interests of Fervida Limited include interests in voting rights in respect of all the shares in which Veritas Limited is interested as trustee. Fervida Limited is party to the Relationship Agreement.
[3] Harris Associates L.P. and Lindsell Train Limited are not party to the Relationship Agreement.

## Relationship Agreement
The Schroder family interests are in shares owned directly or indirectly by trustee companies which act as trustees of various trusts settled by family individuals, in shares owned by family individuals, and in shares owned by a family charitable trust. The trustee holdings include the interests (43.15%) held by Vincitas Limited and Veritas Limited, as disclosed in the table above, and further interests (1.6%) held by two other companies which are not required to be disclosed under the Disclosure and Transparency Rules.

If aggregated, the total interests covered by the Relationship Agreement including shares held by the trustee companies, individuals and the family charitable trust amount to 108,323,711 of the Company's ordinary shares (47.93%).

Following changes made to the UK Listing Rules in May 2014, companies with a shareholder or shareholders who could, when acting in concert, exercise 30% or more of the voting rights of a company at a general meeting, are required to enter into a binding agreement with that shareholder or shareholders. This is intended to ensure that the parties to the agreement comply with certain independence provisions as set out in the Listing Rules. Accordingly, on 14 November 2014, the Company entered into such an agreement (the 'Relationship Agreement') with a number of shareholders who own or control the ordinary shares (and associated voting rights) referred to above.

In accordance with Listing Rule 9.8.4(14), the Board confirms that for the year ended 31 December 2016:
(i)  the Company has complied with the independence provisions included in the Relationship Agreement; and
(ii) so far as the Company is aware, the independence provisions included in the Relationship Agreement have been complied with by the other parties to the Relationship Agreement and their associates.

### Dividends
The Directors are recommending a final dividend of 64 pence per share which, if approved by shareholders at the AGM, will be paid on 4 May 2017 to shareholders on the register of members at close of business on 31 March 2017. Details on the Company's dividend policy are set on page 23. Dividends payable in respect of the year, subject to this approval, along with prior year payments, are set out below.

| Ordinary shares and non-voting ordinary shares | 2016 pence | 2016 £m | 2015 pence | 2015 £m |
|---|---|---|---|---|
| Interim | 29.0 | 78.9 | 29.0 | 79.0 |
| Final | 64.0* | 174.7 | 58.0 | 158.0 |
| Total | 93.0 | 253.6 | 87.0 | 237.0 |

* Subject to approval by shareholders at the 2017 AGM.

The Schroders Employee Benefit Trust and the Schroder US Holdings Inc. Grantor Trust have waived their rights to dividends paid on both the ordinary and non-voting ordinary shares in respect of 2016 and future periods. See notes 8 and 22 to the accounts.

### Corporate Responsibility
Details of the Company's employment practices, including diversity and employee involvement can be found in the Strategic report on pages 30 and 31.

We are committed to minimising the environmental impact of our operations and to delivering continuous improvement in our environmental performance. See page 32 and 33 for more details on our total $CO_2$e emissions data.

### Indemnities and Insurance
At the 2007 AGM, shareholders authorised the Company to provide indemnities to, and to fund defence costs for, Directors in certain circumstances. All Directors at the time shareholder approval was received were granted specific deeds of indemnity and any Director appointed subsequently has been granted such an indemnity. This means that, on their appointment, new Directors are granted an indemnity as defined in the Companies Act 2006 in respect of any third party liabilities that they may incur as a result of their service on the Board. All Directors' indemnities were in place during the year and remain in force.

Directors' and Officers' Liability Insurance is maintained by the Company for all Directors.

As part of the integration of Cazenove Capital, the Cazenove Capital Management Limited Pension Scheme was merged with the Schroders Retirement Benefits Scheme with effect from 31 December 2014. Pursuant to that merger, a qualifying pension scheme indemnity (as defined in section 235 of the Companies Act 2006) provided by Schroders plc for the benefit of the Directors of Cazenove Capital Management Pension Trustee Limited, a subsidiary of the Company, was put in place at that time and remains in force.

§ See glossary.

This indemnity provision covers, to the extent permitted by law, certain losses or liabilities incurred by the Directors of Cazenove Capital Management Pension Trustee Limited in connection with that company's activities as trustee of the Cazenove Capital Management Limited Pension Scheme.

### Change of control
Directors' and employees' employment contracts do not normally provide for compensation for loss of office or employment as a result of a change of control. However, the provisions of the Company's employee share schemes may cause awards granted to employees under such schemes to vest on a change of control.

The Company is not party to any significant agreements that would take effect, alter or terminate on a change of control of the Company.

### Political donations
No political donations or contributions were made or expenditure incurred by the Company or its subsidiaries during the year (2015: nil) and there is no intention to make or incur any in the current year.

### UK Listing Authority Listing Rules (LR) – compliance with LR 9.8.4C
The majority of the disclosures required under LR 9.8.4 are not applicable to Schroders. The table below sets out the location of the disclosures for those requirements that are applicable:

| Applicable sub-paragraph within LR 9.8.4 | Disclosure provided |
|---|---|
| (12) Details of any arrangements under which a shareholder has waived or agreed to waive any dividends. | See page 67 |
| (13) Where a shareholder has agreed to waive future dividends, details of such waiver together with those relating to dividends which are payable during the period under review. | See pages 67, 115 and 137 |
| (14) A statement made by the Board that the Company has entered into an agreement under LR 9.2.2A, that the Company has, and, as far as it is aware, the other parties to the agreement have, complied with the provisions in the agreement. | See page 67 |

### Post year end events
On 17 February 2017, the Group acquired the wealth management business of C. Hoare & Co. Further information can be found in note 30 to the accounts.

### Going concern
The Group's business activities, together with the factors likely to affect its future development, performance and position are set out in the Strategic report. In addition, the financial statements include information on the Group's approach to managing its capital and financial risk; details of its financial instruments and hedging activities; and its exposures to credit and liquidity risk.

The Group has considerable financial resources, a broad range of products and a geographically diversified business. As a consequence, the Directors believe that the Group is well placed to manage its business risks in the context of the current economic outlook.

Accordingly, the Directors have a reasonable expectation that the Company and the Group have adequate resources to continue in operational existence for the foreseeable future. They therefore continue to adopt the going concern basis in preparing the Annual Report and Accounts.

In addition, the Directors have assessed the Company's viability over a period of five years. The results of this assessment are set out on page 37.

By Order of the Board.

**Graham Staples**
Company Secretary
1 March 2017

Governance



# Remuneration report



We pay for performance in a transparent and simple way, aligned clearly to client and shareholder interests.



**Committee membership** (meeting attendance is on page 51)

Lord Howard (Chairman)

Robin Buchanan

Nichola Pease

Another year of record net income and profits gives us confidence that our employees are motivated to perform above expectations for clients and shareholders. Since our current Directors' remuneration policy was approved in 2014, over 96% of shareholder votes cast have been in favour of our remuneration report each year. Over that period, retention of high performing employees has averaged 95%. We believe this policy of aligning employee pay with the interests of clients and shareholders while keeping total pay levels competitive with our predominantly international competitors meets our stakeholders' needs.

As we ask shareholders to approve a new policy at the 2017 AGM, the success of our current approach might suggest limited policy change. However, we recognise that much has changed in the past three years. We have revisited our remuneration philosophy, reviewed our remuneration strategy from the top down and listened to views from shareholders, the government and regulators. The resulting changes to our Directors' remuneration policy are outlined opposite. We have also managed significant internal change – the transition to a new Group Chief Executive and changes in leadership in Distribution. It is important at this time to provide stability for our employees.

We also recognise the significant challenges that our industry faces, as outlined in our Group Chief Executive's statement on pages 10 and 11. In light of this, it is right to be prudent on pay levels. Although profits are up, we have maintained the total compensation ratio at 44%, below our target range of 45% to 49%, and higher fixed pay costs mean the bonus pool is down on last year.

## Our remuneration philosophy

In 2016, the Committee carried out a fundamental review of our remuneration philosophy and the resulting pay structures. We continue

\* See glossary.

to believe in our current approach, where the remuneration policy for our executive Directors is aligned with that for other employees. Remuneration is clearly aligned to the performance of the Group and the value delivered for our clients and shareholders. Long-term thinking is core to Schroders, as our success depends on helping our clients meet their long-term financial goals. Our philosophy is to reward value creation and recognise appropriately employees who do the right thing, delivering good outcomes for our clients, fund investors and shareholders.

We compete for talent in a global marketplace, with employees in 27 countries and with 42 nationalities employed in our London headquarters. Most of our key competitors are headquartered outside the UK, particularly in the US, and many are not publicly listed and are therefore subject to lower standards of transparency. It is against this backdrop that we determine both our pay structures and levels of pay, to ensure that we are able to attract, motivate, reward and retain the best people. On page 86 we set out the competitiveness of pay for the executive Directors.

We charge the Group Chief Executive with maintaining a total cost ratio of 65%. Within that we set a target range for remuneration, our largest cost item, capping overall spend within a total compensation ratio range of between 45% and 49% depending on market conditions. We also look at a profit share ratio* to manage variable remuneration spend, to align remuneration further with the Group's financial performance. These ratios are simple to understand and clear for both shareholders and employees. Our approach allows us to keep base salaries relatively low, ensuring we are able to control our cost base when times are challenging, and we believe maintaining this approach is important at a time when the asset management industry is undergoing significant change. The salaries of our executive Directors are among the lowest in the FTSE-100 and we have only increased them twice in the last ten years. Benefits and retirement savings for the executive Directors are also low compared to the FTSE-100, though for most employees the benefits we offer are competitive when compared to market norms.

We believe in a discretionary approach to assessing performance and determining annual bonus awards, as opposed to formulaic incentives. For the executive Directors, this includes taking a balanced approach to growing the business profitably and sustainably, encouraging the longevity of client relationships while retaining and developing our talented people who are key to organisational stability and long-term success. Formulaic pay can often drive the wrong behaviours and the wrong long-term outcomes for clients and shareholders. We look to reward appropriately all employees who adhere to the firm's values – excellence, innovation, teamwork, passion and integrity – and who demonstrate the behaviours we expect in a client-centric culture. Our discretionary approach also ensures we assess performance on management of risks and adherence to compliance controls (page 95).

Our remuneration philosophy supports our long-term approach by deferring a significant part of annual variable remuneration into fund and share awards, which provides clear alignment with the long-term interests of clients and shareholders, through awards under the Long Term Incentive Plan (LTIP) and by requiring executives to acquire and maintain significant shareholdings in the Group.

## Structure of the remuneration report
- Statement by the Chairman of the Remuneration Committee (pages 68 and 69)
- 'At a glance' summary (pages 70 and 71)
- Governance (pages 72 and 73)
- Remuneration principles (page 74)
- Directors' remuneration policy (pages 75 to 81)
- Annual report on remuneration (pages 82 to 96)

### Directors' remuneration policy changes

While maintaining our overall remuneration philosophy, we propose some important changes to our Directors' remuneration policy to strengthen the alignment of executive pay to the financial performance of the Group and the interests of clients and shareholders, including:

| Element of pay | Changes proposed (for three years from the 2017 AGM |
|---|---|
| Annual incentive | – Increasing the proportion of executive Directors' annual bonus awards that is deferred from approximately 50% to approximately 60%<br>– Introducing greater disclosure of executive Directors' targets and performance in determining variable pay<br>– Applying deferral into ECP to any payment to a departing Director for their contribution in their final year, as with annual bonus awards |
| LTIP | – Introducing a discretionary override for LTIP vesting, so the Remuneration Committee may reduce the extent to which awards vest if the Group has suffered a material failure of risk management or if the outcome from the performance conditions does not appropriately reflect underlying performance<br>– Introducing a 12-month holding period following vesting, during which awards cannot be exercised and malus terms continue to apply |
| Personal shareholding policy | – Increasing the Group Chief Executive's shareholding requirement from 300% of salary to 500% of salary<br>– Requiring executive Directors on stepping down to maintain a level of shareholding for two years |

We face continued regulatory uncertainty, which could affect our future remuneration approach. If policy changes are required then we will consult with shareholders at that time.

### Shareholder engagement

At last year's AGM, shareholders showed strong support for our Remuneration report, with 96% of votes cast in favour. Each year, the Committee reviews how shareholders voted on remuneration, together with any feedback received. Concerns raised by a small minority of shareholders about the policy changes proposed are on page 78. I met with a number of our shareholders recently to discuss our remuneration philosophy and the policy changes we propose to make.

### 2016 performance and remuneration outcomes

Schroders has again delivered record results in 2016 and it is in this context that the remuneration of all employees, including the executive Directors, has been determined. Profit before tax and exceptional items was up 6% to £644.7 million. The Board has recommended a 7% increase in the total dividend per share for the year. The Board approved a total compensation ratio of 44%, unchanged from 2015, and a profit share ratio of 34% (2015: 37%).

Information on the annual bonus awards for the executive Directors is outlined on pages 87 to 89. Other than the Group Chief Executive, the year-on-year change in variable pay for the executive Directors varies from a decrease of 68% to an increase of 2%, compared to a decrease in the average annual bonus award across our employees of 11%.

We have awarded Peter Harrison a bonus of £5.5 million, reflecting his increased responsibilities following his appointment as Group Chief

Executive on 4 April 2016. He succeeded Michael Dobson, who received a bonus of £7.9 million for 2015. Peter has made an excellent start in his new role, ensuring a smooth transition in the senior leadership of the Group and maintaining the strong financial performance of the business in volatile market conditions. Investment performance is a key measure of success and we remain significantly ahead of target, with 74% of assets outperforming over three years and 85% over five years. Talent retention through this period of transition has been well-managed and good progress has been made against target growth opportunities, including in the development of our North American business. The Group Chief Executive's pay is 33 times the employee mean and 60 times the employee median, as shown on page 87.

The Committee believes the LTIP performance conditions are highly demanding. In March 2017, we expect LTIP awards granted in 2013 to vest at 50%, as the earnings per share target will not be met. This is despite the strong performance of the Group, generating earnings per share growth of 76% over the four-year performance period. The net new business target was significantly exceeded, with a total of £46.8 billion of net new business over the performance period (see page 90).

### Departing executives

The Committee awarded Michael Dobson an annual bonus award of £2.0 million, reflecting his performance as Chief Executive for part of 2016 and his work in ensuring a smooth transition of his responsibilities. Michael waived his contractual rights to £7.5 million on stepping down as Chief Executive. He is not eligible for a bonus in respect of his role as Chairman. The Committee awarded Massimo Tosato an annual bonus award of £1.3 million, reflecting his contribution during 2016, and a payment of £3.0 million in settlement of his rights on stepping down, which were equal to one year's salary plus bonus or £4.7 million, from his 2001 employment contract. These payments to Michael and Massimo were made in cash in February 2017 and clawback terms apply.

On 1 March 2017, Philip Mallinckrodt relinquished his executive responsibilities. He continues on the Board as a non-executive Director. Page 96 outlines the approach the Committee has taken to his remuneration in light of this.

### Diversity

As one of the first signatories of the Women in Finance Charter in the UK, we are committed to increasing the representation of women within senior management. We targeted 30% representation by 2019. Having made significant progress, moving from 25% at the end of 2015 to 29% this year, we have increased our target to 33%. This year we have disclosed gender pay gap data for the first time, on page 84, in advance of UK disclosure rules coming into effect in April 2017. This shows a gap of 31% to 33% for salary and other cash allowances per hour and 59% to 66% for bonus, though these figures may be misleading. Our analysis of comparable roles shows that we reward men and women fairly for similar work and that the gap reflects the lower representation of women at senior levels within the organisation.

**Lord Howard of Penrith**
Chairman of the Remuneration Committee

Governance

# Remuneration report

## At a glance

---

### 1. How we performed

The charts below provide an overview of Schroders' performance. Pages 14 and 15 provide information on how our objectives are aligned with those of our clients and pages 16 and 17 give more information on our key performance indicators. Pages 87 to 90 outline the basis for determining annual bonus awards for the executive Directors and the vesting of LTIP awards granted in March 2013.

**Performance of Schroders shares against the FTSE-100 Index and the relative spend on pay**
The left-hand chart below compares the performance of Schroders shares with that of the FTSE-100 over eight years to 31 December 2016. Over this period the Index has returned 117%, compared to a 334% return on Schroders ordinary shares. The right-hand chart shows how net income has been utilised over the same period, comparing remuneration costs before exceptional items and shareholder distributions to taxes arising and earnings retained. Distributions to shareholders in respect of 2016 formed a similar proportion of the total as for 2015.



--- Schroders ordinary shares
--- Schroders non-voting ordinary shares
--- FTSE-100 Index

Fixed remuneration
Other operating expenses
Retained earnings

Variable remuneration
Corporate tax and social security
Interim and final dividend

**Other key factors in assessing the performance of the Group (see pages 87 to 89)**
The following key performance indicators were amongst those that formed part of the Committee's determination of the executive Directors' pay.



| Three-year investment performance | % |
|---|---|
| | 72 |
| 2016 | 74 |
| Target ≥ 60% | |

| Net new business | £bn |
|---|---|
| | 13.0 |
| 2016 | 1.7 |
| Target: positive NNB / budgeted NNB | |

| Assets under management and administration | £bn |
|---|---|
| | 313.5 |
| 2016 | 397.1 |
| Target: AUMA growth in excess of market growth | |

| Total cost ratio* | % |
|---|---|
| | 63 |
| 2016 | 64 |
| Target ≤ 65% | |

| Talent retention | % |
|---|---|
| | 94 |
| 2016 | 95 |
| Target > 90% | |

| Basic earnings per share* | pence per share |
|---|---|
| | 176.9 |
| 2016 | 186.3 |
| Target: grow consistently recognising potential impact of market volatility | |

**Determining the vesting of LTIP awards granted in March 2013 (see page 90)**
LTIP awards granted in March 2013 are expected to vest on 2 March 2017, based on two metrics as set out below.

| | | 0% | 20% | 40% | 60% | 80% | 100% | Vesting (% of award) |
|---|---|---|---|---|---|---|---|---|
| Earnings per share (EPS) | Growth in composite index | | | | | | | |
| | Schroders EPS growth | | | | | | | 0% |
| Net new business (NNB) | | £bn 0 | 10 | 20 | 30 | 40 | 50 | 60 |
| | Schroders cumulative NNB | | | | | | | 50% |
| Total vested in relation to 2013-2016 performance | | | | | | | | 50% |

\* Before exceptional items.
† See glossary.

Board of Directors and Company Secretary    Corporate governance report    Remuneration report
Group Management Committee                   Directors' report             Statement of Directors' responsibilities

## 2. Executive Directors' remuneration and shareholdings

The left-hand chart below compares the single total remuneration figures for 2016 and 2015 for each executive Director role. The right-hand chart compares each executive Director's shareholdings with that required under the personal shareholding policy.

| Executive Director | | Single total remuneration figure (£'000) | | Value of shareholding vs shareholding policy (% of salary) | | |
|---|---|---|---|---|---|---|
| Group Chief Executive[1] Peter Harrison (2015: Michael Dobson) | 2016 | | 6,293 | Policy | | 300 |
| | 2015 | | 8,905 | Actual | (Peter Harrison) | 553 |
| Chief Financial Officer Richard Keers | 2016 | | 2,878 | Policy | | 300 |
| | 2015 | | 2,828 | Actual | | 419 |
| Group Head of Private Assets and Wealth Management Philip Mallinckrodt[2] | 2016 | 5% | 2,307 | Policy | | 300 |
| | 2015 | 7% | 2,525 | Actual | | 1,934 |
| Executive Vice Chairman Massimo Tosato[3] | 2016 | 7% | 1,959 | Policy | | 300 |
| | 2015 | 3% | 4,995 | Actual | | 508 |

● Fixed   ● Bonus – cash   ● Deferred bonus – share awards   ● Deferred bonus – fund awards   ● LTIP vesting[4]

[1] Peter Harrison was appointed Group Chief Executive on 4 April 2016. The bar representing 2016 remuneration in the left-hand chart above reflects his full-year remuneration in respect of 2016, while the bar representing 2015 remuneration reflects his predecessor Michael Dobson's remuneration as Chief Executive that year.
[2] Philip Mallinckrodt's shareholding in the right-hand chart above is his holding derived from employment. It does not include his other share interests, see page 95.
[3] Massimo Tosato's shareholding in the right-hand chart above is his holdings as at 31 December 2016, the final day of his employment with Schroders.
[4] LTIP vesting represents the estimated value at vesting from awards granted under the LTIP on 27 March 2013, which are expected to vest on 2 March 2017 based on performance against the performance conditions over the four financial years ended 31 December 2016.

❶ For more information on the single total remuneration figures see pages 85 to 90. For more information on the personal shareholding policy see page 93.

## 3. Executive Directors' remuneration policy overview

Components of executive Directors' remuneration:

| Component | New policy overview | Proposed policy changes for approval at the 2017 AGM |
|---|---|---|
| Base salary | – Group Chief Executive: £500,000 <br> – Other executive Directors: £375,000 <br> These rates were last increased on 1 March 2014. | No policy changes are proposed. |
| Benefits and allowances | Executive Directors receive benefits on the same basis as other UK employees. | No policy changes are proposed. |
| Retirement benefits | Executive Directors may participate in UK pension arrangements or receive cash in lieu of pension on the same basis as other employees, 16% of base salary up to a maximum pensionable salary of £250,000, plus a match on employee contributions up to a further 2% of pensionable salary. | No policy changes are proposed. |
| Annual bonus award | Awarded to incentivise the achievement of business priorities for the financial year, to align pay with performance and promote the long-term success of the Company. Approximately 60% is normally deferred to align Directors' interests with those of clients and shareholders. | In the proposed new policy, the proportion of annual bonus awards to executive Directors that is deferred is increased from approximately 50% to approximately 60%. Also, any future payment to a departing Director in respect of their contribution in their final year will be subject to the same deferral as applies to annual bonus awards. |
| LTIP | To incentivise long-term performance and the achievement of strategic priorities to ensure the sustainable growth of the Group. The performance hurdles are highly demanding, based on earnings per share and net new business performance over a four-year period. | In the proposed new policy, a 12-month holding period applies from the date of vesting for future LTIP awards, during which they cannot be exercised and malus conditions continue to apply. The Committee will be able to reduce the extent to which awards vest if the Group has suffered a material failure of risk management or if the Committee considers that the outcome from the performance conditions does not appropriately reflect underlying performance. |
| Personal shareholding policy | To align their interests with those of shareholders, the executive Directors are required to acquire and retain a holding of Schroders shares or rights to shares[1] equivalent to 300% of base salary, or 500% of base salary for the Group Chief Executive. On stepping down as an executive Director, half that level of shareholding must be maintained for two years. | The proposal is to increase the shareholding requirement for the Group Chief Executive from 300% to 500% of salary, to create further alignment with shareholder interests. It is also proposed to require executive Directors on stepping down to maintain a level of shareholding for two years, to reflect better the period in which decisions made while serving as a Director might impact the Group. |

❶ For more information on the policy see pages 75 to 81. For more information on implementation of the policy during 2017 see page 96.

Governance

# Remuneration report

## Governance

**Responsibilities of the Committee**
The responsibilities of the Committee include:
- Reviewing the Group's remuneration strategy and recommending the Directors' remuneration policy to the Board
- Determining the remuneration of executive Directors within the policy approved by shareholders
- Determining the remuneration of the Company Secretary, reviewing the remuneration of the Heads of Compliance, Risk, Internal Audit and the General Counsel, monitoring the level and structure of remuneration for other senior employees and material risk takers and overseeing remuneration more broadly across the Group
- Recommending to the Board the annual spend on fixed and variable remuneration
- Reviewing the design and operation of share-based remuneration and other deferred remuneration plans
- Overseeing any major change in the employee benefits structure throughout the Group
- Reviewing the remuneration disclosures required and ensuring compliance with those requirements
- Receiving and considering feedback from shareholders and representative shareholder bodies.

The Committee carried out a fundamental review of its terms of reference during 2016. The Board approved amendments clarifying the Committee's responsibilities to align better with applicable regulations and guidance. The terms of reference are available on our website.

All members of the Committee are independent non-executive Directors. Biographical details and the experience of Committee members are set out on pages 46 and 47.

At the invitation of the Committee Chairman, Michael Dobson attended six meetings, two as Chief Executive and four as Chairman. Following his appointment as Group Chief Executive, Peter Harrison attended three meetings. The Chief Financial Officer attended four meetings and Bruno Schroder attended six. No Director or employee was present during discussions relating to their own remuneration.

The Group Head of Risk, the General Counsel and the Global Head of Compliance also advised the Committee on matters that could influence remuneration decisions and attended meetings if required. The Global Head of Human Resources and the Head of Compensation and Benefits attended meetings to provide advice and support the Committee with secretarial services.

**Key areas of focus during the year**
The table below summarises the key issues that the Committee considered at each of its meetings during 2016. Remuneration packages for new hires or severance arrangements for roles subject to the Committee's oversight were reviewed at each meeting as required. In addition, the Board as a whole reviewed the remuneration strategy in July.

| Meeting date | Key issues considered | |
|---|---|---|
| January | – Succession plans for executive Directors<br>– Compensation review 2015<br>– Remuneration disclosures | – Forecast vesting of LTIP awards granted in 2012<br>– Performance conditions for LTIP awards to be granted in 2016<br>– Regulatory developments pertaining to remuneration |
| February | – Succession plans for executive Directors | – Performance conditions for LTIP awards to be granted in 2016 |
| May | – Shareholder and voting agency feedback on remuneration<br>– Advisers to the Committee<br>– Alignment of remuneration to client and shareholder interests | – Remuneration Committee Terms of Reference<br>– Regulatory developments pertaining to remuneration |
| July<br>(Board meeting) | – Board review of remuneration strategy<br>– Directors' remuneration policy | – Potential impact of a future Brexit on remuneration regulations |
| October | – Directors' remuneration policy<br>– Approval of proposed Equity Incentive Plan awards<br>– Compensation review 2016<br>– Material risk taker population | – Remuneration disclosures<br>– Regulatory and corporate governance developments<br>– Remuneration Committee Terms of Reference |
| November | – Directors' remuneration policy | – Shareholder and market practice considerations |
| December | – Directors' remuneration policy<br>– Compensation review 2016<br>– Sustainability of earnings<br>– Risk, legal and compliance matters<br>– Forecast vesting of LTIP awards granted in 2013 | – Remuneration disclosures<br>– Total compensation ratio target range<br>– Remuneration benchmarking for key leadership roles<br>– Termination arrangements for Massimo Tosato<br>– Regulatory and corporate governance developments |

Board of Directors and Company Secretary        Corporate governance report        Remuneration report
Group Management Committee                       Directors' report                  Statement of Directors' responsibilities

**Shareholder voting on remuneration**
At the 2014 AGM, shareholders approved the Directors' remuneration policy, to apply for three years from the date of the AGM. At the 2016 AGM, shareholders approved the Remuneration report that was published in the 2015 Annual Report and Accounts. The results of these votes are shown below:

**To approve the Directors' remuneration policy at the 2014 AGM**



8%

92%

☐ Votes for
☐ Votes against

| | 2014 AGM voting |
|---|---|
| Votes for | 165,335,404 |
| Votes against | 14,014,099 |
| (Votes withheld | 1,658,194) |

**To approve the remuneration report at the 2016 AGM**



4%

96%

☐ Votes for
☐ Votes against

| | 2016 AGM voting |
|---|---|
| Votes for | 181,872,576 |
| Votes against | 8,153,419 |
| (Votes withheld | 2,925,090) |

| To approve the relevant remuneration report | Votes for | Votes against |
|---|---|---|
| 2014 AGM | 94% | 6% |
| 2015 AGM | 97% | 3% |
| 2016 AGM | 96% | 4% |

**External advisers**
The Committee appointed or received advice from the advisers shown in the table below. Advisers were selected on the recommendation of the Global Head of Human Resources and the Head of Compensation and Benefits.

| | Appointed by | Services provided to the Committee | Other services provided to the Group | Fees paid for services to the Committee during 2016 (£'000) |
|---|---|---|---|---|
| McLagan International Inc (McLagan) | The Committee | Information on market conditions and competitive rates of pay. | Information on market conditions and competitive rates of pay. | 15 |
| PwC | The Company | The Remuneration Committee did not independently engage PwC to provide any services. However, advice to management on market practice and conditions for directors' remuneration and compliance with remuneration regulations was discussed at Committee meetings. | Advice to management on market practice and conditions for directors' remuneration and on compliance with remuneration regulations. | 109 |

The Committee is satisfied that the advice received from McLagan was independent and objective as it was factual and not judgemental. McLagan is part of Aon Hewitt, which also provides advice and services to the Company in relation to pension administration, pension benefit valuations and pension actuarial advice. McLagan's fees were charged on the basis of a fixed fee for the preparation of reports setting out the information requested.

PwC is the Group's external auditor. Any non-audit services provided by PwC are subject to review in accordance with arrangements for the provision of such services, as described in the Audit and Risk Committee report on page 61. The Committee did not independently engage PwC to provide any services but is satisfied that the advice received from PwC was independent and objective as it was factual and not judgemental. PwC's fees for services provided to the Company were charged on the basis of time spent. The increase in PwC fees reported, compared to the £8,000 reported for 2015, reflects the use of data and advice provided by PwC to support discussions during 2016 at the Remuneration Committee and the Board on the remuneration philosophy and Directors' remuneration policy, as outlined in the table.

**Evaluating the performance of the Committee**
The annual evaluation of the Committee's effectiveness was undertaken as part of the overall Board evaluation process. The findings relating to the Committee were discussed with the Committee Chairman, with the Committee found to be thorough and effective. Further information can be found in the Corporate governance report, on page 54.

Governance

# Remuneration report

Remuneration principles

**The overall remuneration policy is designed to promote the long-term success of the Group.**

The Committee has developed the remuneration policy with the following principles in mind:



Aligned with clients

A proportion of higher-earning employees' deferred remuneration is delivered as fund awards, which are notional investments in funds managed by the Group, thereby aligning the interests of employees and clients. This includes the executive Directors, other members of the GMC and other key employees such as senior fund managers.



Aligned with shareholders

A significant proportion of variable remuneration is delivered in the form of deferred awards over Schroders shares, thereby aligning the interests of employees and shareholders. Executive Directors and other members of the GMC are required, over time, to acquire and retain a significant holding of Schroders shares or rights to shares. If shareholders approve the proposed new Directors' remuneration policy then executive Directors on stepping down will be required to maintain a level of shareholding for two years.



Aligned with financial performance

Total variable remuneration is managed as a percentage of pre-bonus profit before tax and exceptional items, the profit share ratio. The total spend on remuneration is managed as a percentage of net income, the total compensation ratio. These ratios are determined by the Committee and recommended to the Board. This approach aligns remuneration with financial performance.



Competitive

Employees receive a competitive remuneration package, which is reviewed annually and benchmarked by reference to the external market. This allows us to attract and retain the best talent, who know that good performance will be rewarded.



Designed to encourage retention

Deferred variable remuneration does not give rise to any immediate entitlement. Awards normally require the participant to be employed continuously by the Group until at least the third anniversary of grant in order to vest in full.

Board of Directors and Company Secretary
Group Management Committee

Corporate governance report
Directors' report

Remuneration report
Statement of Directors' responsibilities

# Directors' remuneration policy

The current Directors' remuneration policy can be found on pages 68 to 73 of our 2013 Annual Report and Accounts, which is available on our website. This was approved for three years at the 2014 AGM and therefore will expire this year. The new Directors' remuneration policy proposed by the Committee is set out on pages 75 to 81. Shareholders will be asked to approve the new policy at the 2017 AGM on 27 April 2017. This policy will take effect for Directors from the date it is approved and is expected to apply for three years.

## Remuneration policy for employees including the executive Directors

The table below sets out the key components of the remuneration policy for employees and the policy that will apply to the executive Directors, subject to approval at the 2017 AGM, which is the same except where specified below. The remuneration policy for non-executive Directors is set out on page 80.

| Component, purpose and link to strategy | Current operation for employees | Application to executive Directors |
|---|---|---|
| **Base salary** To help recruit, reward and retain talent. Reflects a market competitive rate of pay taking account of the employee's role and responsibilities, skills and experience, and ongoing contribution. | Base salary is paid in cash via payroll. Base salaries are reviewed annually. The Group actively targets its spend on salary increases at lower-paid employees, for whom fixed pay forms a larger proportion of total remuneration. For higher-paid employees base salaries are adjusted infrequently. The financial situation of the Group and the performance of the individual are taken into account when determining the appropriate level of base salary increase each year, if any. | We aim to pay executive Directors base salaries that are competitive with other large international asset management firms. As a result, it is likely that salaries will be relatively low when compared to other listed financial services firms and FTSE-100 companies. Like other higher-paid employees, the executive Directors' base salaries are adjusted infrequently. When salaries for executive Directors are increased, the percentage increase will not normally exceed the average annualised increase across the wider workforce. Larger increases may be awarded where Directors' salaries have fallen significantly below international competitors. |
| **Benefits and allowances** To help recruit and retain talent. Reflects local market practice and aims to support employee health and wellbeing. | Employee benefits vary between jurisdictions, reflecting local market practice and statutory requirements. Cash allowances are sometimes paid, typically after a benefit has been phased out and paid in lieu offered in exchange. For employees in the UK, a cash allowance is provided to fund benefit options under a flexible benefits plan. Available benefits include private healthcare, life assurance, accidental death, injury or sickness insurances and tax-efficient charitable donations which are matched by the Company (see page 32). No performance conditions apply. | Executive Directors receive benefits on the same basis as other UK employees, which are relatively low by UK standards for executive Directors. Directors are covered by the Group's Directors' and Officers' Liability Insurance. Executive Directors may also benefit from private use of a driver. The cost of providing benefits varies according to a range of factors, such as insurance premium rates, so no formal maximum exists.

Additional benefits may be provided if required, for example to support international relocation. |
| **SIP** To help increase the number of employee shareholders and increase their participation as shareholders. Provides potential UK tax benefits. | UK employees are eligible to participate in the Share Incentive Plan (SIP). Participating employees use their own funds to acquire Schroders shares (partnership shares) and in return receive awards of shares from Schroders (matching shares) of up to £100 per month, based on the market value of the shares. To qualify for maximum tax benefits these shares must be left in the SIP for five years. Performance conditions do not apply. Participants are free to withdraw their Partnership Shares at any time but forfeit the corresponding Matching Shares if they do so or cease to be in employment within one year of acquiring the relevant Partnership Shares, except in certain circumstances as set out in the rules of the SIP.

77% of UK employees participated in the plan as at 31 December 2016 (2015: 78%). | Executive Directors may participate in the SIP on the same basis as other UK employees. The value of any SIP matching shares awarded during the year is included within the value reported for benefits and allowances. |
| **Retirement benefits** To help recruit and retain talent. Reflects local market practice and enables and encourages provision for retirement. | Retirement benefits vary between jurisdictions in a similar way to benefits and allowances. Base salary is generally the only pensionable element of remuneration. No performance conditions apply. In the UK, base salary up to a maximum of £250,000 is pensionable. The Group's contributions are currently 16% of pensionable salary, plus a contribution to match employee contributions up to a further 2% of salary. Employees in the UK have flexibility and choice over the balance between employer pension contributions and cash in lieu, with options to take as cash some or all of the amount the Company would otherwise contribute to the pension plan. | Executive Directors may participate in pension arrangements, or receive cash in lieu of pension, on the same basis as other employees. |

Governance

# Remuneration report

Directors' remuneration policy
continued

| Component, purpose and link to strategy | Current operation for employees | Application to executive Directors |
|---|---|---|
| **Annual bonus award** To motivate employees to achieve financial, non-financial and personal objectives for the financial year, which are consistent with the Group's strategy. Helps reward talent for their individual contribution. For executive Directors, awards reflect annual performance along with performance over a longer timeframe for some metrics. | Permanent employees are eligible to be considered for an annual bonus award. Awards in respect of each financial year are discretionary and non-pensionable. The Group's total spend on remuneration is managed via the total compensation ratio target and the profit share ratio (see page 74). Individual awards are not capped. The amount if any that eligible employees are awarded is determined based on a number of financial and non-financial factors, including individual performance objectives, that may vary from year to year to ensure alignment with the Group's strategic goals. Bonuses are delivered as a combination of cash, normally payable in February following the end of the financial year, and deferrals. For most employees, any annual bonus award worth up to £52,000 will be payable in cash. Larger awards are subject to a graduated level of deferral, up to 50%. For members of the GMC, 50% of any annual bonus award is deferred. | Annual bonus awards operate the same way for the executive Directors as for other employees except that the proportion deferred is larger, at 60%. Where a LTIP award has been granted during the year, the deferral in respect of that year is reduced by 25% of the grant value of the LTIP award. In setting executive Directors' annual bonus awards, the Committee assesses the overall performance of the business and of each individual and applies its judgement to determine an award, taking account of the recommendation of the Chairman in respect of the Group Chief Executive and of the Group Chief Executive in respect of the other executive Directors. There is no prescribed weighting of particular metrics but financial performance factors are central to the decision. Factors considered include the trend in profit for the year; investment performance; the management of risks facing the Group; talent retention and succession planning; progress on diversity and inclusion strategy; cost control; the Company's reputation; business performance in each Director's area of responsibility; and Schroders share price performance. Targeted performance is in line with the Group's strategic goals and the budget for the year. In addition, performance against the annual objectives of each Director is taken into account. These metrics were chosen as they are aligned with the corporate strategy and reflect the areas on which the executive Directors should focus. |
| **ECP** The Group's main deferral arrangement for annual bonus awards. Aligns the interests of employees with those of shareholders and clients, provides an incentive for the employee to stay at Schroders and makes it more expensive for competitors to recruit talent from Schroders. May be used to compensate new recruits who forfeit remuneration from their previous employer to join Schroders. | Equity Compensation Plan (ECP) awards are granted to executive Directors on the same basis as those granted to other employees, albeit with a larger proportion of any annual bonus award deferred. Deferral of annual bonus awards is generally delivered as a combination of ECP fund awards, which are conditional rights to receive a cash sum based on the value of a notional investment in a range of Schroders funds, and ECP share awards, which are conditional rights to acquire shares in the Company at nil cost. In 2016, deferrals were generally delivered equally between ECP fund awards and ECP share awards, subject to a minimum fund award of £10,000. For ECP share awards, additional shares equivalent to dividends paid accrue until the award is exercised. At the Company's discretion, ECP share awards may be settled in cash but this would only be used in exceptional circumstances, for instance in a jurisdiction where settlement in shares would create an adverse outcome for the Group or award holder. The general application of the ECP is subject to variation in some locations to reflect local restrictions, regulation and practice. Awards can be adjusted to take account of legal, tax and regulatory changes, a change in the Group's capital or following change of control, or in other circumstances that the Committee considers appropriate. Awards relate to past performance and so no further performance conditions apply. To provide an incentive to stay at Schroders, ECP awards do not give rise to any immediate entitlement and normally require the participant to be employed continuously by the Group until the third anniversary of grant in order to vest in full. If a participant resigns before the third anniversary of grant, awards are normally subject to forfeiture as follows: |
| | Years since grant date      less than 1      1 to 2      2 to 3 | |
| | % lost                             100%       66.7%       33.3% | |
| | An award holder who leaves the Group may be entitled to retain more of their awards in certain circumstances, such as death, ill health or injury, or otherwise at the Committee's discretion. When ECP awards are used as part of recruitment, the Committee can set a different vesting period to better align with the awards that the recruit is forfeiting. | |
| **EIP** To reward exceptional performance and potential. Aligns employee interests with shareholders or clients, provides an incentive to stay at Schroders and makes it more expensive for competitors to recruit from Schroders. | Executive Directors are not eligible to receive Equity Incentive Plan (EIP) awards. The EIP is an additional deferred remuneration plan, used to reward exceptional performance and potential. No further performance conditions apply. EIP awards do not give rise to any immediate entitlement and require the participant to be employed continuously by the Group until the fifth anniversary of grant. Malus and clawback terms apply, in a similar way to awards under the ECP. If a participant resigns before the fifth anniversary of grant, awards are normally forfeited in full. EIP share awards are conditional rights to acquire shares in the Company at nil cost. Additional shares equivalent to the dividends paid accrue until the award is exercised. EIP fund awards are conditional rights to receive a cash sum based on the value of a notional investment in a range of Schroders funds. EIP awards may also be used as part of recruitment, in a similar way to ECP. | |

Board of Directors and Company Secretary
Group Management Committee

Corporate governance report
Directors' report

Remuneration report
Statement of Directors' responsibilities

| Component, purpose and link to strategy | Current operation for employees | Application to executive Directors |
|---|---|---|
| **LTIP** <br> To incentivise executive Directors to deliver long-term performance and the achievement of strategic priorities, while maximising alignment with shareholder interests. | Only executive Directors receive awards under the LTIP currently. <br><br> Executive Directors typically receive an LTIP award in March each year. LTIP awards are conditional rights to acquire shares in the Company at nil cost. Annual LTIP awards can be up to four times base salary for any individual and have a four-year performance period. Awards granted to executive Directors from 2018 will be subject to a 12-month holding period from when they vest, during which they cannot be exercised, after which they may then be exercised within a 12-month period. <br><br> LTIP awards do not give rise to any immediate entitlement and normally require the participant to be employed continuously by the Group until the awards may be exercised. Following the end of the four-year performance period, the Committee will determine the extent to which the performance conditions have been achieved and the extent to which the awards may be exercised. A participant who leaves the Group may still receive a proportion of their awards in certain circumstances, such as death, ill health or injury, or otherwise at the Committee's discretion. In these circumstances, the award vests at the end of the performance period in the normal way, subject to meeting the performance conditions, with the proportion that vests adjusted downwards for the proportion of the performance period worked. Vesting may be accelerated if the participant dies, with the proportion that vests determined by estimating the extent to which the performance conditions will be met. At the Company's discretion, LTIP awards may be settled in cash but this discretion would only be exercised in exceptional circumstances, for instance in a jurisdiction where settlement in shares would create an adverse outcome for the Group or award holder. <br><br> The Committee determines the performance conditions for each award and uses its judgement to set challenging criteria that are consistent with the Group's strategy. Since the LTIP was approved by shareholders in 2010, the vesting of awards has been subject to EPS and NNB performance conditions. <br> – EPS growth was chosen as a measure of profitability and is measured relative to a composite index that the Committee believes to be a reasonable proxy for the market movement of Schroders' AUM. As a result, earnings increases or decreases purely as a result of movements in financial markets are excluded from the measurement of performance. Each year that this EPS performance condition is used, the balance of Schroders' AUM at the previous year end has been reviewed to determine the weighting of the underlying indices that make up the composite index for new awards. If the growth of adjusted EPS in the fourth year compared with that in the year prior to grant exceeds the growth in the composite index over the same period by 20% then 12.5% of the award vests, rising on a straight-line basis to 50% vesting for comparative growth of 40% or more. Comparative growth of 20% or less is not rewarded. Targets were set at 20% to 40% as a range of outperformance of the composite index that is very stretching. <br> – NNB, being gross sales less gross redemptions, was chosen as a measure of the Group's organic growth. If cumulative NNB over the four-year performance period is £15 billion then 12.5% of the award vests, rising on a straight-line basis to 50% vesting for NNB of £25 billion or more. NNB of less than £15 billion is not rewarded. Targets were set by reference to historical actual performance, aiming to provide targets that are stretching but not unrealistic. <br><br> For LTIP awards made from 2018 onwards, when determining vesting the Committee has the discretion to reduce the extent to which awards vest if the Group has suffered a material failure of risk management or if the Committee judges that the unadjusted outcome from the performance conditions does not reflect underlying performance. | |
| **Malus and clawback terms** <br> To allow variable remuneration awards to be risk adjusted in certain circumstances. | Under malus terms, deferred remuneration awards granted under the ECP, EIP or LTIP may be reduced or lapsed at the Committee's discretion in the event of a material misstatement of the Group's financial results or individual misconduct. Under clawback terms, amounts paid or released from such awards may be recovered for a period of 12 months from the date of payment or release in the event of individual misconduct, at the Committee's discretion. | Malus and clawback terms apply to deferred remuneration granted to the executive Directors on the same basis as for other employees. In addition, executive Directors' contracts extend clawback terms to the cash element of any annual bonus awards. <br><br> Malus terms apply to ECP awards granted since May 2011, to EIP awards granted since July 2013 and to LTIP awards granted at any time. Clawback applies to ECP, EIP and LTIP awards granted since October 2013. |
| **Personal shareholding policy** <br> To align the interests of senior management with those of shareholders. | Members of the GMC are required, over time, to acquire and retain a holding of Schroders shares or rights to shares equivalent to 300% of base salary. Each GMC member undertakes not to sell any Schroders shares until their share ownership target has been reached and to ensure that the required shareholding is maintained when selling or transferring shares, except that shares may be sold to satisfy tax and social security liabilities arising when an award vests or is exercised. For these purposes, rights to shares includes the estimated after-tax value of ECP and EIP share awards but does not include any unvested rights to shares awarded under the LTIP as these are subject to performance conditions. | The personal shareholding policy for the Group Chief Executive requires the acquisition and retention of Schroders shares or rights to shares equivalent to 500% of base salary. For the other executive Directors the requirement is 300% of base salary. <br><br> On stepping down as an executive Director, half the level of shareholding required while an executive Director must be maintained for two years, or the actual level of shareholding on stepping down if lower. |
| **Shareholder dilution** | Deferred remuneration plans involving Schroders shares are non-dilutive to shareholders, as shares to satisfy awards are purchased in the market. | |

Schroders Annual Report and Accounts 2016    77

Governance

# Remuneration report

Directors' remuneration policy
continued

In approving the application of this policy to the executive Directors, authority is given for the Group to honour any commitments entered into with current or former Directors prior to the approval and implementation of this policy (such as payment of pension or the vesting or exercise of past share awards), provided that such commitments complied with any applicable remuneration policy in effect at the time they were made. Any remuneration commitment made prior to an individual becoming a Director and not in anticipation of their appointment to the Board may be honoured, even where it is not consistent with the Directors' remuneration policy in place at the time it is fulfilled.

**New policy for 2017 and considerations when setting policy**
In recommending the Directors' remuneration policy to the Board and to shareholders, the Committee aims to ensure that policies and practices are consistent with the principles outlined on page 74, while supporting effective risk management so as not to encourage excessive or inappropriate risk-taking.

During 2016, the Committee and the Board discussed possible changes in remuneration philosophy and approach, including aligning more closely with FTSE-100 norms. The simplicity of the current approach has many benefits, including keeping the fixed cost base of the Group relatively low. The Board concluded that overall it remains appropriate but that changes to the Directors' remuneration policy should be made to develop further the alignment of executive pay to the financial performance of the Group and the interests of clients and shareholders.

Feedback received from shareholders on Directors' remuneration was discussed by the Committee and the Board and taken into account when considering the new policy. Overall, 96% of shareholder votes received at the 2016 AGM were cast in favour of the Annual report on remuneration and 92% of votes received at the 2014 AGM were cast in favour of the current Directors' remuneration policy. The table below summarises concerns raised by a small minority of shareholders during 2016 and the policy changes proposed as a result, while the table on page 69 summarises the policy changes proposed.

As far as possible, the remuneration policy for executive Directors is consistent with that applied for other employees, as shown in the tables on pages 75 to 77. Employees are not consulted on the Directors' remuneration policy but management engage with employees on a wide range of other relevant issues, including in the UK via an Employee Forum that provides an additional channel for representing and understanding employee views.

The Group's remuneration policies and practices take account of legislation, regulation, corporate governance standards, best practice and guidance issued by regulators, shareholders and shareholder representative bodies. Reward policies comply with the relevant provisions of the FCA's Remuneration Codes, the Remuneration Part of the PRA Rulebook and the UK Corporate Governance Code. Each year the Committee works to ensure that variable remuneration reflects performance and strikes the appropriate balance between managing current and future risk and reward. The Committee reviews Directors' remuneration in the context of remuneration across the Group, including financial performance, the total compensation ratio, the profit share ratio and the allocation of variable remuneration between employees.

| Shareholder comments | Committee's considerations during 2016 |
| --- | --- |
| Total remuneration for the executive Directors is too high. | The Group aims to pay employees including the executive Directors competitive levels of total remuneration, which are reviewed annually and benchmarked by reference to the external market. Pay is driven by the performance of the Group and of each Director. Benchmarking is used to establish a frame of reference for what competitors are paying, rather than as a start point or primary factor when remuneration decisions are made. Information on the competitive positioning of executive Directors' remuneration is on page 86. We have also disclosed the ratio of the Group Chief Executive's remuneration to that of other employees across the Group, on page 87. |
| A maximum annual bonus award should be specified for each executive Director. | During 2016 the Committee again revisited the merits of capping annual bonus awards at an individual level. We continue to believe that not setting a cap for individual annual bonus awards is in the best interests of shareholders. It allows us to attract, retain and motivate the best talent, who know that good performance and behaviour in line with our values will be rewarded. It also allows us to keep base salaries relatively low, controlling the fixed cost base when times are challenging. |
| Remuneration is too short-term. Bonus deferral should be higher and LTIP awards should make up more of total remuneration. | Under the new Directors' remuneration policy, the proposal is to increase the proportion of any annual bonus awards for executive Directors that is deferred from approximately 50% to approximately 60%. LTIP grant levels have varied historically and the existing approach continues to be appropriate, using LTIP awards alongside significant deferral of annual bonus awards into share and fund awards. Although the LTIP incentivises long-term performance and the achievement of strategic priorities it also creates challenges in setting meaningful longer-term targets that are aligned with the interests of shareholders and clients and remain so as the economy and business cycles evolve. |
| The LTIP performance metrics are too complex. | The Committee recognises that the composite index used for EPS performance measurement is complex but considers that the benefits, in excluding earnings increases or decreases purely as a result of movements in financial markets, justify the continuation of this approach. |
| LTIP performance and holding periods should total at least five years. | Under the new Directors' remuneration policy, LTIP awards may not be exercised in the first year following vesting, which alongside the four-year performance period will align the LTIP with this guidance. |

Board of Directors and Company Secretary
Group Management Committee

Corporate governance report
Directors' report

**Remuneration report**
Statement of Directors' responsibilities

The Committee does not set fixed ratios for Directors' pay relative to other employees as it believes this would restrict flexibility in aligning reward and performance appropriately. However, the Committee does consider this when setting the level of annual bonus award payable to the Group Chief Executive, as described on pages 87 to 89.

This year the Committee has introduced additional disclosures, aiming to increase transparency and provide more insight into the decisions the Committee has made and the rationale behind those decisions, both on the remuneration of the executive Directors and more broadly across the Group. The ratios of the Group Chief Executive's remuneration to the average for members of the GMC and the average for employees as a whole are shown on page 87.

## Remuneration policy illustrations

These scenario charts show, for each of the executive Director roles, the relative split of fixed elements of remuneration, annual bonus awards and LTIP awards, in accordance with the proposed new Directors' remuneration policy. The lowest, average and highest remuneration over the eight years ended 31 December 2016 has been used as an indication of the earnings potential for each role. Over the same period, profit before tax and exceptional items has ranged from £137.5 million to £644.7 million. Future remuneration will be determined based on performance, as described elsewhere in this report.

- ● Fixed
- ● Bonus – cash
- ● Deferred bonus – share awards
- ● Deferred bonus – fund awards
- ● LTIP

### Group Chief Executive (£'000)

| | |
|---|---|
| Fixed | 557 |
| 8-year lowest | 2,867 |
| 8-year average | 6,354 |
| 8-year highest | 9,074 |

### Chief Financial Officer (£'000)

| | |
|---|---|
| Fixed | 428 |
| 8-year lowest | 1,377 |
| 8-year average | 2,519 |
| 8-year highest | 3,278 |

The remuneration policy illustrations are based on actual fixed pay and annual bonus awards for each role over the eight years ended 31 December 2016 and the LTIP grants due to be granted in March 2017, which are set out on page 96, as follows:

| Fixed pay | In these scenarios, fixed pay consists of base salary, benefits and allowances and retirement benefits. Salary is the annual salary effective from 1 March 2017. Benefits and allowances and retirement benefits are the anticipated annualised amounts from 1 March 2017. | | | |
|---|---|---|---|---|
| | Role | Base salary £'000 | Benefits and allowances £'000 | Retirement benefits £'000 | Total fixed pay £'000 |
| | Group Chief Executive | 500 | 12 | 45 | 557 |
| | Chief Financial Officer | 375 | 8 | 45 | 428 |

| | Lowest | Average | Highest |
|---|---|---|---|
| Annual bonus award | Being the lowest over the last eight years of the sum of actual annual bonus award and actual fixed pay each year, less the fixed pay value shown above. | Being the mean over the last eight years of the sum of actual annual bonus award and actual fixed pay each year, less the fixed pay value shown above. | Being the highest over the last eight years of the sum of actual annual bonus award and actual fixed pay each year, less the fixed pay value shown above. |
| | In all three scenarios the annual bonus award is then subject to deferral into ECP fund and share awards, as outlined in the policy. | | |
| LTIP | Assuming no vesting. | Being the face value of the award to be granted in March 2017, assuming 50% vesting. | Being the face value of award to be granted in March 2017, assuming 100% vesting. |

The total remuneration values used in these scenarios for the Group Chief Executive reflect the remuneration awarded to Peter Harrison in respect of 2016 performance and to Michael Dobson in respect of performance in 2009–2015.

Governance

# Remuneration report

Directors' remuneration policy
continued

## Remuneration policy for the non-executive Directors

The table below sets out the remuneration policy for non-executive Directors, who only receive fixed pay.

| Component | Operation | Further information |
|---|---|---|
| **Fees**<br>To reflect the skills, experience and time required to undertake the role. | Fees for the Chairman and other non-executive Directors are determined by the Board based on market information for comparable asset managers and other financial services groups and the constituent companies of the FTSE 100 Index. Non-executive Directors do not participate in decisions concerning their fees. | Fees are usually reviewed biennially. The fees for the non-executive Chairman were last reviewed in 2016, while fees for other non-executive Directors were last increased in 2014. The non-executive Directors' current annual fees are shown on page 91. |
| **Benefits**<br>To enable the non-executive Directors to undertake their roles. | Non-executive Directors' benefits are principally expenses incurred in connection with the Group's business and reflect business needs. Non-executive Directors may receive private use of a driver, car parking, meals, travel costs, tax on reimbursed benefits and, in the case of Bruno Schroder, private health care and medical benefits. Michael Dobson receives life insurance benefits on the same terms as UK employees and private health care and medical benefits for him and his family. | Schroders does not pay retirement or post employment benefits to non-executive Directors. They do not participate in any of the Group's incentive arrangements. Bruno Schroder and Michael Dobson, as former executives, have been in receipt of a pension since April 2007 and May 2012 respectively but have ceased accruing any further entitlement. |

## Recruitment of new Directors
The table that follows summarises the remuneration policy when hiring new executive Directors.

| Area | Policy and operation |
|---|---|
| Overall approach | On appointment, the Committee aims to pay executive Directors remuneration that is appropriate in level and structure to attract, motivate, retain and reward Directors of the quality required to run the Group successfully, while avoiding paying more than is necessary. |
| Notice periods | The Group's general policy is that each executive Director will have a rolling contract of employment with mutual notice periods of six months. The Committee will consider the appropriate notice period when appointing any new executive Director. If necessary to secure a new hire, a notice period of up to 12 months may be offered. When recruiting new executive Directors, the Committee's policy is that contracts will not contain any provision for compensation upon early termination. |
| Base salary | Base salary is likely to be set at the same level as for other Directors, provided this is justifiable by reference to the candidate's skills and experience, and taking into account remuneration in their most recent role, internal relativities and external market rates for roles with similar responsibilities. |
| Other fixed pay | Benefits and allowances, retirement benefits and SIP participation will be provided on a similar basis as those available to other employees. If the Group hires a new executive Director internationally then relocation support may be offered, on a similar basis as would be offered for other employees. This may include support such as temporary accommodation, assistance finding new accommodation, transportation of household goods, school search for children moving internationally with the Director, tax advice and assistance preparing tax returns and a one-off cash allowance of up to £5,000 after tax. |
| Annual bonus award | New executive Directors would be eligible to be considered for annual bonus awards in the same way as existing Directors. The Group does not award guaranteed annual bonuses to executive Directors. |
| LTIP | New executive Directors would be eligible to be considered for LTIP awards in the same way as existing Directors. |
| Legal fees | The Group may pay reasonable fees for a new executive Director to obtain independent legal advice in relation to their appointment. |
| Buy-out awards | Where a candidate will forfeit remuneration as a result of leaving their current employer or joining Schroders, the Group may mitigate that loss by making one-off awards as a term of their appointment. The Committee will take reasonable steps to ensure that any such awards are no more generous in either amount or terms than the remuneration being forfeited. Any deferred remuneration will be subject to malus and clawback terms, in the same way as the award being replaced. |

New non-executive Directors receive fees and benefits in line with the policy for other non-executive Directors. Non-executive Directors are engaged under letters of appointment. They do not have service contracts. When recruiting new non-executive Directors, the Board's policy is that letters of appointment will have a mutual notice period of six months.

Board of Directors and Company Secretary
Group Management Committee

Corporate governance report
Directors' report

Remuneration report
Statement of Directors' responsibilities

## Directors' service contracts and letters of appointment

Each of the executive Directors has a rolling service contracts with a mutual notice period of six months. Each of the non-executive Directors has a letter of appointment with a mutual notice period of six months, with the exception of Bruno Schroder who does not have a notice period. Letters of appointment and service contracts are available for shareholders to view at the Company's registered office on business days between the hours of 9 a.m. and 5 p.m. and will be available at the AGM.

## Policy on termination arrangements

The following table sets out the remuneration policy on termination of a Director.

| Area | Policy and operation |
|------|----------------------|
| Overall approach | When an executive Director leaves the Group, the Committee will review the circumstances and apply the treatment that it believes is appropriate. Any payments will be determined in accordance with the terms of the service contract between the Group and the employee, as well as the rules of any deferred remuneration plans and the Directors' remuneration policy. There are no contractual provisions for non-executive Directors to receive compensation upon termination. |
| Restrictive covenants | Executive Directors' service contracts include restrictions prohibiting the solicitation of clients and of Schroders employees for a period of 12 months after leaving employment, against which any period spent on notice or garden leave is offset. |
| Fixed pay | Base salary, benefits and allowances and retirement benefits for executive Directors and fees for non-executive Directors will continue to be paid through the notice period. The Committee also has the discretion to make a payment in lieu of notice to executive Directors, normally based on salary only. The treatment of shares acquired or awarded under the SIP will be in accordance with the plan rules. |
| Annual bonus awards | Departing executive Directors do not have a contractual entitlement to an annual bonus award. If a departing Director works during the notice period to achieve the Group's goals and supports an effective transition of responsibilities, the Committee may recommend to the Board that a discretionary payment be made to reflect the Director's contribution during the proportion of the financial year worked. Any such payment will normally be subject to the same deferral arrangements as an annual bonus award, provided this is permitted under applicable law and regulations and except in the case of death, ill health or injury when payment may be fully in cash, at the Committee's discretion. |
| Treatment of unvested ECP awards | The treatment of awards under the ECP held by departing executive Directors will be in accordance with the plan rules. In certain circumstances, those rules permit participants to retain some or all of their unvested awards following the termination of their employment, for example if the employee is leaving due to ill health or injury, or otherwise at the discretion of the Committee. Any unvested ECP awards that are retained will vest on their normal vesting date except in the case of death, and ill health at the Committee's discretion, when they vest immediately. |
| LTIP awards | Departing executive Directors are not eligible to receive new LTIP awards. |
| Treatment of unvested LTIP and EIP awards | The treatment of awards under the LTIP and EIP will be in accordance with the relevant plan rules. For the EIP this operates on a similar basis as for the ECP. For the LTIP this is similar except that in all cases any vesting remains subject to satisfaction of the associated performance conditions and will be reduced pro-rata for the proportion of the performance period worked. |
| Shareholding requirements | On stepping down, executive Directors are required to maintain for a period of two years a holding of shares or interests in shares equal in number to half that which applied under the personal shareholding policy, or the number actually held on stepping down if lower. |
| Legal fees | The Group may pay reasonable fees for a departing Director to obtain independent legal advice in relation to their termination arrangements and nominal consideration for agreement to any contractual terms protecting the Company's rights following termination. If the value of either of these exceeds £10,000 it will be disclosed in the Annual report on remuneration. |
| Retirement gifts | The Board may choose to make a retirement gift to a departing non-executive Director. If the value of any such gift exceeds £10,000 it will be disclosed in the Annual report on remuneration. |
| Settlement agreements | The Committee may agree additional exit payments where such payments are made in good faith to discharge an existing legal obligation, or as damages for breach of such obligation, or in settlement or compromise of any claim arising on termination of a Directors' office or employment. This may include the provision of outplacement support. If the value of any such payment exceeds £10,000 it will be disclosed in the Annual report on remuneration. |
| Other payments | Other payments to former Directors that do not exceed £10,000 will not be disclosed in the Annual report on remuneration. |

Governance

# Remuneration report

## Annual report on remuneration

Pages 82 to 96 constitute the Annual report on remuneration. Shareholders will have an advisory vote on this, together with pages 68 to 73, at the AGM. Where required, this information has been audited by PwC.

This section sets out remuneration disclosures for 2016, across Schroders as a whole and specifically for the executive and non-executive Directors, and compares this to remuneration for 2015. The Directors' remuneration was compliant with the policy approved by shareholders at the 2014 AGM.

This section also sets out the context for the Directors' remuneration, including the main performance metrics that the Committee considered when setting the overall annual bonus pool and information on how annual bonus awards were allocated across the Group, along with details of the key performance criteria considered when determining executive Directors' annual bonus awards. Returns to shareholders over the last eight years are compared with the total remuneration of the Group Chief Executive over the same period. Directors rights under fund and share awards and the share interests of Directors and their connected persons are also detailed.

---

## Aligning pay and performance across Schroders

### Group performance (audited)
Net income excluding exceptional items increased 8% in 2016 reflecting continued net new business wins and positive investment returns for clients. The Group saw record profit before tax and exceptional items of £644.7 million, up 6%, and earnings per share before exceptional items of 186.3 pence, up 5%. The Board is recommending a 7% increase in the total dividend per share for the year.

Net new business was £1.1 billion (2015: £13.0 billion), with net inflows in Institutional, while Intermediary and Wealth Management saw net outflows. AUMA ended the year at a record high of £397.1 billion (2015: £313.5 billion) and 74% (2015: 72%) of our AUM outperformed their benchmark or peer group in the three years to 31 December 2016.

Further information on the Group's operating and financial performance can be found in the Strategic report, beginning on page 4. Within the Strategic report, the table on pages 14 and 15 outlines the Group's strategy and how our objectives are aligned with those of our clients. Pages 16 and 17 show our performance against our key performance indicators over the five years to 31 December 2016.

### Aligning remuneration costs with financial performance
The total spend on remuneration is derived from the profit share ratio, measuring the bonus charge against pre-bonus profit, and from the total compensation ratio, measuring total remuneration expense against net income. This ensures that the interests of employees are aligned with the Group's financial performance.

The Committee received a report from the Group Chief Executive on the underlying strength and sustainability of the business and reports on risk, legal and compliance matters from the heads of those areas. These were considered as part of the 2016 compensation review.

The Committee determined the annual bonus pool for the year ended 31 December 2016 based on a profit share ratio of 36% (2015: 37%) and a total compensation ratio of 44% (2015: 44%). This is below our target total compensation ratio range of 45% to 49%, as the Committee and the Board as a whole were conscious of the macro trends facing asset managers including Schroders and the impact in 2016 of weaker sterling, but is in line with 2015. From 2015 to 2016, headcount is up 10% and fixed remuneration costs are up 16%. As a result the annual bonus pool was down 7% assuming constant currency rates.

### Key performance metrics

| | |
|---|---|
| Net income* | |
| Profit before tax* | +6% |
| Earnings per share* | +5% |
| Dividend per share | +7% |

◑ 2015 vs 2014    ● 2016 vs 2015

### Key remuneration metrics

| | |
|---|---|
| Headcount | |
| Fixed remuneration costs | +16% |
| Total remuneration costs | +8% |
| Annual bonus pool | |

◑ 2015 vs 2014    ● 2016 vs 2015

---

* Before exceptional items.

**Relative spend on pay**
The charts below illustrate the relative spend on pay for 2016 compared to 2015. The values are taken from the financial statements and
show how remuneration costs before exceptional items compare to shareholder distributions, taxes arising and earnings retained, in order
to illustrate how net income is utilised. Distributions to shareholders in respect of 2016 formed a similar proportion of the total as for 2015.

**2015 (% vs. 2014)**                                  **2016 (% vs. 2015)**



**2015 (% vs. 2014)**

- Fixed remuneration — £347.8m +6%
- Variable remuneration – cash — £232.8m +8%
- Variable remuneration – deferred — £90.8m +5%
- Other operating expenses — £314.8m +6%
- Corporate tax and social security — £188.9m +10%
- Retained earnings — £246.4m +2%
- Interim dividend paid and final dividend recommended — £237.0m +12%

**2016 (% vs. 2015)**

- Fixed remuneration — £403.6m +16%
- Variable remuneration – cash — £234.1m +1%
- Variable remuneration – deferred — £90.2m -1%
- Other operating expenses — £356.8m +13%
- Corporate tax and social security — £196.1m +4%
- Retained earnings — £258.7m +5%
- Interim dividend paid and final dividend recommended — £253.6m +7%

**The annual bonus pool and annual bonus award allocations across the Group**
The table below shows the total annual bonus pool, divided into amounts paid in cash and amounts deferred.

The Group Chief Executive allocates the overall pool between the divisions or functions headed by GMC members, taking into consideration the
objectives, both financial and non-financial, that were set at the beginning of the year. Variable remuneration awards for employees, other than
those determined, approved or reviewed by the Committee, are recommended to the Group Chief Executive by members of the GMC, taking
account of individual performance against objectives, the performance of the relevant area and the levels of reward for comparable roles in
the market. The Committee was satisfied that the process was rigorous and that the allocation of the pool and the individual bonus awards took
account of both financial and non-financial performance, including conduct, particularly with respect to client outcomes, as described on page 95.

The table below compares the annual bonus pools for 2015 and 2016. The 2015 figures are also shown after adjusting to reflect the foreign
exchange rates used during the 2016 compensation review, to provide a better comparison of what was awarded to employees each year.

| | 2015 | Adjusted 2015[1] | 2016 |
|---|---|---|---|
| Profit share ratio | 37% | n/a | 36% |
| Total compensation ratio | 44% | n/a | 44% |
| | £m | £m | £m |
| Total bonus paid in cash | 232.8 | 244.3 | 234.1 |
| Total bonus deferred into fund awards | 40.4 | 41.8 | 35.6 |
| Total bonus deferred into share awards | 45.2 | 47.0 | 41.3 |
| Bonus pool | 318.4 | 333.1 | 311.0 |
| Proportion of bonus pool that is deferred | 27% | 27% | 25% |
| Number of bonus-eligible employees | 3,447 | 3,447 | 3,622 |
| Mean annual bonus award per bonus-eligible employee | £92,369 | £96,645 | £85,857 |
| Median annual bonus award per bonus-eligible employee | £17,000 | £18,000 | £17,806 |
| Group Chief Executive's bonus as a % of the bonus pool | 2.5% | 2.4% | 1.8% |
| Aggregate bonuses to executive Directors as a % of the bonus pool | 6.5% | 6.2% | 4.2% |

[1] Adjusted to reflect the same foreign exchange rates as those used for the 2016 figures.

Governance

# Remuneration report

## Annual report on remuneration
continued

**Comparison of the percentage change in base salary, benefits and annual bonus award**
The chart on the right compares the percentage change from 2015 to 2016 in base salary, benefits and annual bonus award to the Group Chief Executive with the average year-on-year percentage change across employees of the Group taken as a whole (except where noted).

The salary increase shown for the Group Chief Executive reflects the part-year impact of increasing Peter Harrison's salary to £500,000 with effect from his appointment as Group Chief Executive on 4 April 2016. Salary increases across the Group during 2016 were targeted at employees whose roles had increased in scope materially during the year and those whose fixed pay significantly lagged behind market rates. Particular attention was given to those on lower salaries, for whom fixed pay forms a greater proportion of total remuneration.

The increase in the value of Peter Harrison's benefits reflects increased private use of a company driver, which is a taxable benefit and so must be reported in the single total remuneration figures on page 85.

Peter Harrison's annual bonus award for 2016 was 34% higher than for 2015, reflecting his appointment as Group Chief Executive and expanded responsibilities. The average annual bonus award per bonus-eligible employee fell 11%, reflecting a reduction in the annual

**Comparison of the percentage change in value from 2015 to 2016**

Base salary[1]    +3.3%   +29.0%
Benefits[2]    +3.4%   +100.0%
Bonus[3]    -11.2%   +34.1%

● Peter Harrison    ● Employees of the Group

[1] For base salary, employees of the Group are those who were in employment for the full year to 31 December 2016 and represents the average salary increase during 2016.
[2] For benefits, employees of the Group are those who were in employment in the UK for the full year to 31 December 2016 and represents the average change in benefits value during 2016.
[3] For bonus, employees of the Group are bonus-eligible employees and represents the change in average bonus per bonus-eligible employee each year, at constant currency, see page 83.

bonus pool coupled with headcount growth (see pages 82 and 83). Across the Group, individual annual bonus awards for 2016 compared with 2015 varied from an increase in excess of 100% to a reduction of bonus to nil, reflecting our pay for performance philosophy.

**Gender pay**
The UK Government Equalities Office has introduced legislation that will require employers with 250 or more UK employees to disclose annually information on their gender pay gap. The first disclosures will be based on amounts paid via payroll in April 2017 and must be published by 4 April 2018. The gender pay gap must be based on an hourly pay rate for each relevant employee, reflecting base salary and certain allowances, and total variable pay over the previous 12 months, representing cash bonus paid plus any proceeds on exercise of ECP, EIP or LTIP awards. Here we are voluntarily disclosing gender pay data for Schroders' global workforce, on a similar basis. We will publish our UK disclosures in due course.

Schroders was one of the first signatories of the Women in Finance Charter in the UK, as part of our commitment to promote diversity of thought and ensure Schroders is an inclusive place to work. This is broader than gender and more information on our approach to Diversity can be found on page 30. We originally committed to increase the representation of women in senior management to 30% by 2019. Management made good progress in the first year and female representation was increased from 25% to 29%, while female representation on the GMC increased from 7% to 19%. As a result, the target was increased to 33% female representation in senior management by the end of 2019. Our focus is building on progress to date and developing the pipeline of female talent immediately below the GMC, where female representation is currently 19%. The data below illustrates the representation issue by looking at the proportion of employees by gender according to quartile pay bands.

The proportion of female vs male employees according to quartile pay bands

| | |
|---|---|
| Top quartile of employees based on hourly fixed pay | 21% females, 79% males |
| Second quartile | 36% females, 64% males |
| Third quartile | 50% females, 50% males |
| Bottom quartile | 59% females, 41% males |
| Total workforce | 41% females, 59% males |

The lower representation of women at senior levels within the Group, which is an issue across the financial services sector, is reflected in the gender gap shown below. This looks across the total workforce and sets out the gender pay gap on a similar basis to the incoming UK disclosure rules. Our analysis of pay levels for comparable roles shows that male and female employees are paid fairly for equal work.

| | | Schroders globally |
|---|---|---|
| Hourly fixed pay | The amount by which the male median exceeds the female median, as a % of the male median | 33% |
| | The amount by which the male mean exceeds the female mean, as a % of the male mean | 31% |
| Total variable pay | The amount by which the male median exceeds the female median, as a % of the male median | 59% |
| | The amount by which the male mean exceeds the female mean, as a % of the male mean | 66% |
| | The proportion of female and male employees who received variable pay | 95% of females and 96% of males |

More information on our Diversity and Inclusion action plan can be found on our website, www.schroders.com/inclusion.

Board of Directors and Company Secretary
Group Management Committee

Corporate governance report
Directors' report

Remuneration report
Statement of Directors' responsibilities

## Single total remuneration figure for each executive Director (audited)

The total remuneration of each of the executive Directors for the years ended 31 December 2016 and 31 December 2015 is set out below.

| £'000 | Peter Harrison 2016 | Peter Harrison 2015 | Richard Keers 2016 | Richard Keers 2015 | Philip Mallinckrodt 2016 | Philip Mallinckrodt 2015 | Michael Dobson 2016 | Michael Dobson 2015 | Massimo Tosato 2016 | Massimo Tosato 2015 | Total 2016 | Total 2015 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Base salary | 468 | 375 | 375 | 375 | 375 | 375 | 127 | 500 | 375 | 375 | 1,720 | 2,000 |
| Benefits and allowances | 12 | 6 | 8 | 8 | 20 | 20 | 21 | 28 | 105 | 103 | 166 | 165 |
| Retirement benefits | 45 | 45 | 45 | 45 | 40 | 40 | 12 | 46 | 45 | 45 | 187 | 221 |
| Total fixed pay | 525 | 426 | 428 | 428 | 435 | 435 | 160 | 574 | 525 | 523 | 2,073 | 2,386 |
| Annual bonus award | 5,500 | 4,100 | 2,450 | 2,400 | 1,750 | 1,925 | 2,000 | 7,900 | 1,300 | 4,300 | 13,000 | 20,625 |
| LTIP vested | 268 | – | – | – | 122 | 165 | 272 | 431 | 134 | 172 | 796 | 768 |
| Total variable pay | 5,768 | 4,100 | 2,450 | 2,400 | 1,872 | 2,090 | 2,272 | 8,331 | 1,434 | 4,472 | 13,796 | 21,393 |
| Total remuneration | 6,293 | 4,526 | 2,878 | 2,828 | 2,307 | 2,525 | 2,432 | 8,905 | 1,959 | 4,995 | 15,869 | 23,779 |
| Contractual settlement | – | – | – | – | – | – | – | – | 3,000 | – | 3,000 | – |
| Total including contractual settlement | 6,293 | 4,526 | 2,878 | 2,828 | 2,307 | 2,525 | 2,432 | 8,905 | 4,959 | 4,995 | 18,869 | 23,779 |

Methodology for determining the single total remuneration figure

| | |
|---|---|
| Base salary | Represents the value of salary earned and paid during the financial year. As disclosed in the 2015 Annual report on remuneration, the Committee increased Peter Harrison's salary to £500,000 with effect from his appointment as Group Chief Executive on 4 April 2016. This salary is the same as was paid to his predecessor. |
| Benefits and allowances | Include one or more of: private healthcare, life assurance, permanent total disability insurance, SIP Matching Shares, car parking, private use of a company driver and cash in lieu of discontinued benefits. Michael Dobson's benefits include £15,000 paid by the Group during the year for legal advice to him in connection to his stepping down as Chief Executive and his appointment as Chairman. Massimo Tosato also benefited from additional permanent total disability cover, life assurance cover and private health care, where the premiums that Schroders paid for these benefits totalled £80,000. |
| Retirement benefits – see page 90 | Represents the aggregate of contributions to DC pension arrangements and cash in lieu of pension for Peter Harrison and Richard Keers and cash in lieu of pension for Philip Mallinckrodt, Michael Dobson and Massimo Tosato. The table on page 90 shows how the pension figure above is comprised for each Director. |
| Annual bonus award – see pages 87 to 89 | Represents the total value of the annual bonus award for performance during the relevant financial year. Page 87 breaks down the bonus into cash paid through the payroll and ECP fund and share awards that will be granted in March following the relevant financial year end. Pages 88 and 89 set out the basis on which annual bonus awards for 2016 were determined. |
| LTIP vested – see page 90 | Represents the estimated value that is expected to vest on 2 March 2017 from LTIP awards granted on 27 March 2013. More information on the performance achieved, how vesting will be determined and the value shown is provided on page 90. |
| Contractual settlement | Represents the amount paid to Massimo Tosato in settlement of his contractual rights on stepping down, which is in addition to remuneration awarded for 2016. Clawback terms apply to this payment. If the Group had ended his employment without cause he would have been entitled to 12 months' remuneration, calculated as the aggregate of base salary and annual bonus award for the previous year, which would have totalled £4.7 million. The Committee agreed to pay £3.0 million in settlement of this right. Michael Dobson also had a contractual entitlement when his employment ended, based on the average aggregate of base salary and annual bonus awards over the previous three years, which would have totalled £7.5 million. Michael Dobson waived that entitlement and as a result no payment was made. |
| | The current executive Directors do not have contractual terms entitling them to a payment if the Group ends their employment without cause. |

For Michael Dobson, the remuneration reported in the table above was paid in respect of his contribution during the period of 2016 that he was Chief Executive. His fees as Chairman are reported in the table of non-executive Directors' remuneration on page 91.

Governance

# Remuneration report

## Annual report on remuneration
continued

**Competitive positioning**

Remuneration levels for employees including the executive Directors are reviewed annually and benchmarked by reference to the external market to ensure they remain appropriately competitive. The chart below illustrates the competitive positioning of pay for each executive Director, followed by a table providing additional commentary on the remuneration benchmarking approach in each case. Total compensation (abbreviated below to total comp.) reflects base salary at the year-end, annual bonus award in respect of 2016 and the grant-date face value of any LTIP award granted during the year, assuming 50% vesting (see page 92). The market data used in benchmarking these roles was provided independently by external advisors and reflects competitor pay for 2015, which is the most up-to-date data available, whereas the competitive position shown for Schroders in each case reflects remuneration awarded in respect of 2016.

In considering competitiveness, the Committee focuses on levels of pay for comparable roles at other large international asset management firms, though the benchmark peer group is adjusted for some roles to provide a more appropriate comparison. This benchmarking is used to establish a frame of reference for what competitors are paying comparable roles, rather than as the start point or a primary factor when remuneration decisions are made. As outlined on pages 87 to 89, annual bonus awards are based on the Committee's assessment of the overall performance of the business and of each executive Director. The policy is to aim to pay executive Directors base salaries that are competitive with other large international asset management firms. As a result, it is likely that salaries will be relatively low when compared to other listed financial services firms, as can be seen below.



** Positioning of remuneration at Schroders relative to the market benchmarks

| Role | Commentary |
|---|---|
| Group Chief Executive | Approximately half of the global asset manager comparator roles are from non-listed businesses, including firms owned by a bank or insurance group and privately owned businesses, whereas Schroders is an independent publicly-listed company. Schroders differs from most of the global asset managers in including Wealth Management within the Group Chief Executive's remit, alongside Asset Management. As a result, the Schroders Group Chief Executive role sits amongst the more complex of the roles making up this competitive benchmark. |
| Chief Financial Officer | The peer group for this role includes large UK-listed insurers in place of bank or insurance-owned asset managers where asset management finance would report into a group finance function. The Schroders Chief Financial Officer has wider responsibilities than the market norm, covering financial management, risk management, capital and treasury, human resources, corporate communications and direct responsibility for a range of operational areas, as well as firm-wide operational oversight. |
| Group Head of Private Assets and Wealth Management | The peer group for this role focused on similarly sized wealth management businesses within Europe. The scope of this Schroders role is broad, covering Private Assets alongside the Wealth Management business. A more comparable benchmark could not be identified as this combination of responsibilities is not replicated at other firms. For the FTSE-100 financial services comparison, the range of competitive remuneration is broad as the data combines all executive Director roles other than Group Chief Executives and Chief Financial Officers. |

Board of Directors and Company Secretary
Group Management Committee

Corporate governance report
Directors' report

**Remuneration report**
Statement of Directors' responsibilities

### Performance of Schroders shares against the FTSE-100 Index and the Group Chief Executive's total remuneration

The graph on the right compares the total shareholder return of Schroders shares with that of the FTSE-100, of which Schroders is a long standing constituent. Over the last eight years, the index has returned 117%, compared to a 334% return for Schroders ordinary shares and 329% for Schroders non-voting ordinary shares. It also shows the Group Chief Executive's single total remuneration figure over the eight years ended 31 December 2016. The table below sets this out in figures, as well as how variable pay plans have paid out each year. It also shows the ratio of those single total remuneration figures to the mean and median total remuneration awarded to employees as a whole and to other members of the GMC.



- ⊙ Group Chief Executive's total remuneration
- — Schroders ordinary shares
- — Schroders non-voting ordinary shares
- — FTSE-100 Index

| Financial year | | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016[3] | 2016[4] Peter Harrison |
|---|---|---|---|---|---|---|---|---|---|---|
| Single total remuneration figure (£'000) | | 2,867 | 6,267 | 5,570 | 4,870 | 8,414 | 8,155 | 8,905 | 2,432 | 6,293 |
| Annual bonus award (actual award as a % of eight-year highest bonus)[1] | | 30% | 73% | 65% | 56% | 81% | 87% | 100% | 25% | 70% |
| LTIP (vesting as a % of maximum opportunity)[2] | | n/a | n/a | n/a | n/a | 100% | 50% | 50% | 50% | 50% |
| Ratio of single total remuneration figure shown to employees as a whole | to employee mean | 23 x | 38 x | 33 x | 31 x | 45 x | 44 x | 47 x | 13 x | 33 x |
| | to employee median | 44 x | 85 x | 67 x | 60 x | 99 x | 92 x | 93 x | 23 x | 60 x |
| Ratio of single total remuneration figure shown to GMC members | to GMC mean | 2.0 x | 2.7 x | 2.4 x | 2.9 x | 3.4 x | 2.9 x | 3.3 x | 1.2 x | 3.1 x |
| | to GMC median | 2.4 x | 2.9 x | 2.6 x | 2.9 x | 3.6 x | 3.0 x | 3.4 x | 1.2 x | 3.2 x |

1  No maximum annual bonus opportunity was in place so the actual annual bonus award is shown relative to the highest actual award over the last eight years.
2  Those years shown as 'n/a' include no LTIP value as the LTIP was introduced in May 2010 and the first award vested on 5 March 2014 based on the four-year performance period ending on 31 December 2013. The percentage shown for 2016 reflects the proportion of awards granted in March 2013 that is expected to vest on 2 March 2017.
3  The 2016 remuneration in respect of Michael Dobson reflects the actual remuneration that he received in respect of the period of 2016 that he served as Chief Executive, as shown on page 85. Fees in respect of his subsequent appointment as Chairman are shown in the table of non-executive Directors' remuneration on page 91.
4  Peter Harrison was appointed Group Chief Executive on 4 April 2016. 2016 remuneration reflect the full-year single total remuneration figure on page 85.

### Variable pay – annual bonus award (audited)
The table below sets out details of how the annual bonus award for each executive Director in respect of performance during 2016 was delivered. ECP awards normally require the participant to remain in employment with the Group until the third anniversary of grant in order to vest in full. These values are reflected in the single total remuneration figure for each executive Director.

| 2016 (£'000) | Cash bonus award | ECP award Fund award | ECP award Share award | Total ECP award[1] | Total annual bonus award | Percentage of total remuneration |
|---|---|---|---|---|---|---|
| Peter Harrison | 2,800 | 1,350 | 1,350 | 2,700 | 5,500 | 87% |
| Richard Keers | 1,262 | 594 | 594 | 1,188 | 2,450 | 85% |
| Philip Mallinckrodt | 912 | 419 | 419 | 838 | 1,750 | 76% |
| Michael Dobson | 2,000 | – | – | – | 2,000 | 82% |
| Massimo Tosato | 1,300 | – | – | – | 1,300 | 66% |

1  The total ECP award was reduced by 25% of the face value at grant of any LTIP award granted in 2016 (see page 92).

Governance

# Remuneration report

Annual report on remuneration
continued

Basis for determining annual bonus awards (audited)
In determining the annual bonus award for the executive Directors, the Committee made an assessment of the overall performance of the business using the key performance indicators that are aligned to delivering the Group's strategy, as outlined on pages 16 and 17. An assessment of each individual's performance was also made, including business performance within each individual's responsibilities, and the extent to which they have delivered against annual objectives.

Financial factors such as profitability, cost control and investment performance represent the significant majority of measures the Committee considers to ensure that remuneration outcomes are aligned to the value created for shareholders. Both short-term and long-term performance is taken into account. Non-financial factors such as risk management, conduct, employee engagement or achievement of key strategic goals in any year are also considered, although normally have less prominence in determining the annual bonus award.

Based on its assessment of performance, the Committee applied its judgement to determine annual bonus awards, taking into account the recommendation of the Group Chief Executive in respect of other executive Directors. At the Group level, the executive Directors have successfully delivered against all metrics, although the Committee recognised that while net new business was ahead of budget in absolute terms the mix of new business wins was different to that budgeted.

Group-wide metrics for determining executive Director annual bonus awards:

| Criteria | Target | Performance in 2016 | Extent to which target has been met | |
|---|---|---|---|---|
| Trend in profit for the year and appropriate cost control | Total cost ratio 65% / Total compensation ratio 45% to 49% depending on market conditions | 64% (2015: 63%) / 44% (2015: 44%) | The Group has again delivered record financial performance in 2016 with good management control of its cost base. | ● |
| Investment performance | 60% outperformance over 3 years | 74% (2015: 72%) | Investment performance remains strong over one, three and five years. | ● |
| Net new business | Achieve budgeted new business flows | £1.1bn (2015: £13.0bn) | Net new business was ahead of budget, though market volatility led to greater outflows in Intermediary than forecast and Wealth Management continued to see net outflows versus budgeted inflows. | ● |
| Talent retention and succession planning | Retention of key talent >90% / Identify and implement succession plans for key employees | 95% retention (2015: 94%) | Succession plans for key employees are in place and were successfully utilised during the year, particularly in Investment, including the leadership of our Multi-asset business. | ● |
| Diversity and inclusion | 30% female representation within senior management by the end of 2019 | 29% (2015: 25%) | Substantial progress has been made towards this target, including greater female representation on the GMC. | ● |
| Risk management and good conduct | Key issues considered by Audit and Risk Committee | No significant issues identified during the year | See the Audit and Risk Committee Report (page 58) and information on conduct, compliance and risk management in remuneration on page 95. | ● |
| | Employee Opinion Survey (EOS) results indicating the Company's values are embedded within the Group | Results confirm Schroders behaves in a responsible way towards clients, employees and society at large. See page 30 | Results are in line with or better than the 2015 EOS. 94% of employees are proud to be associated with Schroders (2015: 93%) and 93% believe Schroders behaves in a responsible way to its clients (2015: 93%). | ● |
| Share price performance | Total shareholder value in excess of that of the FTSE-100 Index | 4%, 26% and 160% return on ordinary shares over one, three and five years versus FTSE-100 returns of 19%, 18% and 54% respectively | Schroders continues to deliver significant value to shareholders over the long-term, although over one year returns lagged the FTSE-100 somewhat. | ● |
| Investment in future growth opportunities | Delivery against strategic priorities | Good progress has been made across the Group. Notably, diversifying our investment offering including the acquisition of a securitised credit business, repositioning of our US business with the Hartford partnership and important strategic relationship from the stake taken in Benchmark Capital (see page 11). | | ● |

Board of Directors and Company Secretary   Corporate governance report      Remuneration report
Group Management Committee               Directors' report             Statement of Directors' responsibilities

In addition to the Group-wide metrics, the performance factors outlined below, which have not been audited, were considered in determining individual Directors' remuneration.

Individual performance criteria for determining executive Director annual bonus awards:

| Executive Director | Criteria | Performance in 2016 and extent to which the Committee judged performance criteria had been met | |
|---|---|---|---|
| Peter Harrison | Overall performance of the Group | Group performance is outlined on the previous page. See page 69 for more information on the assessment of Peter Harrison's performance in 2016. | ◉ |
| | Establish and agree clear strategic priorities with the Board | Strategic priorities were agreed with the Board, see page 10. The opportunities to acquire the wealth management business of C. Hoare & Co. and a significant stake in Benchmark Capital were identified and approved. These transactions completed on 15 December 2016 and 17 February 2017 respectively. A Global Head of Strategy was appointed to develop and implement long-term goals and respond to the changing competitive landscape. | ◉ |
| | Review and strengthen product strategy | A new Product division was established to focus on franchises and product development, see page 27. A range of new strategies have been launched including credit value, credit absolute return, fiduciary and a low-risk Multi-asset offering. | ◉ |
| | Build momentum in the North American business | The US business generated positive flows in both Intermediary and Institutional. The Hartford strategic partnership repositions Intermediary distribution. The securitised credit team acquisition broadens our US product offering. | ◉ |
| | Successfully transition the leadership in the Distribution division | Overall leadership of Distribution was successfully transitioned to John Troiano. The next level of leadership within the division has also been refreshed using an appropriate balance of internal and external talent. | ◉ |
| Richard Keers | Accurate, appropriate, clear timely reporting | Positive feedback received from the Audit and Risk Committee, external auditors, analysts, shareholders and other industry bodies. | ◉ |
| | Co-ordination of our global operating platform | A new Global Operating Committee was established, chaired by Richard Keers, responsible for implementing the strategy for our operating platform. Good progress is being made on the transition to a new investment technology platform, which will be completed next year. | ◉ |
| | Enhance investment capital risk and liquidity reporting | The ILAAP received Board approval and positive PRA feedback. Investment risk appetites for investment capital were approved by the Board and significant capital management and reporting improvements were delivered. | ◉ |
| | Oversee a strong risk and control function | See the Audit and Risk Committee report – no significant issues were reported in the year. Particular improvements delivered to internal risk-assessment processes and the ICAAP. | ◉ |
| | Lead the delivery of the new London office | This significant project is on budget and on-track for employees to move in the first half of 2018. | ◉ |
| Philip Mallinckrodt | Ensure the smooth transition of the Global Head of Wealth Management role | The transition to Andrew Ross was achieved successfully in May. A new Chief Investment Officer for the division was recruited. Other succession planning was undertaken. | ◉ |
| | Performance of the Group's Wealth Management division | Wealth Management profit before tax and exceptional items increased by 8%, in line with budget. | ◉ |
| | Develop our Private Assets activities, including Real Estate | Real Estate revenues increased by 7%, though net new business was flat. Strategy formulation in other areas is underway. | ◎ |
| | Lead the Group's overall CR approach | A Head of CR was appointed to drive delivery of CR activities. Active support given to the firm's work on Diversity and Inclusion. | ◉ |
| Michael Dobson | Overall performance of the Group | Strong Group performance in the first quarter of the year, during his tenure as Chief Executive, as outlined on the previous page. | ◉ |
| | Ensure the smooth transition of the Chief Executive role | The transition to Peter Harrison was achieved successfully. | ◉ |
| Massimo Tosato | Ensure the smooth transition of the Global Head of Distribution role | The transition to John Troiano was achieved successfully and key client relationships maintained and built upon. | ◉ |

◉ Criteria met   ◎ Partially met   ⦿ Not met

The metrics and targets outlined above and on the previous page represent the most material criteria by which the Company's performance and the performance of the executive Directors were assessed. In addition, all of the key performance indicators set out in the Strategic report on pages 16 and 17 were considered, as these are used to measure our performance over the long term. The Committee members and the Board as a whole also review performance across a broad range of other metrics as part of the normal course of business throughout the year and during the year-end process. Performance against many of these metrics is disclosed in the half year and full year results announcements and in the Annual Report and Accounts.

Governance

# Remuneration report

## Annual report on remuneration
continued

**Variable pay – determining vesting of prior LTIP awards (audited)**
The LTIP awards granted on 27 March 2013, covering the 2013 to 2016 performance period, are expected to vest on 2 March 2017. The criteria for determining the extent of vesting are set out below. The composite index against which earnings per share performance was measured for these awards was set at the time that they were granted, as 60% equities, measured by the Morgan Stanley Capital International (MSCI) All Country Index, and 40% fixed income, measured by the Barclays Capital Global Aggregate Index.

Despite the strong performance of Schroders since awards were granted, only 50% of awards are expected to vest as the very demanding EPS target will not be met.

| Performance measure | | Maximum % of award | Performance achieved | Vesting % of award |
|---|---|---|---|---|
| EPS<br>If the growth of adjusted EPS in the fourth year compared to the year prior to grant exceeds a relevant composite index by: | | 50 | The four year growth in the MSCI All Countries Index was 81.1% and the Barclays Capital Global Aggregate Index was 27.4%. Weighting them 60% and 40% respectively, growth of the composite index was 59.6%. Four year growth in adjusted EPS was 75.6%, which exceeds the composite index by 16.0% but is insufficient to trigger any vesting. | 0 |
| – less than 20%<br>– equal to 20%<br>– between 20-40%<br>– 40% or greater | no vesting<br>12.5% vests<br>straight-line basis<br>50% vests | | | |
| NNB<br>– less than £15 billion<br>– equal to £15 billion<br>– between £15-25 billion<br>– £25 billion or greater | no vesting<br>12.5% vests<br>straight-line basis<br>50% vests | 50 | The four year cumulative NNB from 2013 to 2016 was £46.8 billion, which is sufficient to trigger full vesting of this part of the LTIP award. | 50 |
| Total vesting in relation to 2013-2016 performance | | | | 50 |

The Audit and Risk Committee independently reviewed key judgements made by management in respect of material provisions and contingent liabilities, to ensure these are reasonable, and this is reflected in these LTIP calculations.

**Value at vesting of prior LTIP awards (audited)**
The following table shows, for each Director, the estimated value vesting from LTIP awards granted on 27 March 2013, based on the average closing mid-market share price over the three months ended 31 December 2016 and the expected vesting percentage shown above. The total value that is expected to vest is reflected in the single total remuneration figure for each Director.

| Individual | Date of grant | Grant date face value of LTIP award £'000 | Expected date of vesting | Estimated total value of LTIP award shares £'000 | Proportion expected to vest in relation to 2013-2016 performance | Number of shares expected to vest | Estimated value vesting £'000 |
|---|---|---|---|---|---|---|---|
| Peter Harrison | 27 March 2013 | 400 | 2 March 2017 | 536 | 50% | 9,389 | 268 |
| Philip Mallinckrodt | 27 March 2013 | 200 | 2 March 2017 | 245 | 50% | 5,793 | 122 |
| Michael Dobson | 27 March 2013 | 500 | 2 March 2017 | 544 | 50% | 9,536 | 272 |
| Massimo Tosato | 27 March 2013 | 200 | 2 March 2017 | 268 | 50% | 4,694 | 134 |

**Fixed pay – retirement benefits (audited)**
The following table gives details of retirement benefits provided to executive Directors for the year ended 31 December 2016. The figures in the employer contribution columns represent contributions paid into DC pension arrangements during the year and exclude any contributions made by the Directors. There has been no DB accrual since 30 April 2011. Accrued DB pensions are subject to actuarial reduction on early retirement so there is no enhanced benefit entitlement in these circumstances.

| £'000 | 2016 Employer contributions | 2016 cash in lieu of pension[1] | 2016 retirement benefits total | 2015 Employer contributions | 2015 cash in lieu of pension[1] | 2015 retirement benefits total | Accrued DB pension at 31 December 2016 | Normal retirement age[2] |
|---|---|---|---|---|---|---|---|---|
| Peter Harrison | 20 | 25 | 45 | 40 | 5 | 45 | – | 60 |
| Richard Keers | 10 | 35 | 45 | 40 | 5 | 45 | – | 60 |
| Philip Mallinckrodt | – | 40 | 40 | – | 40 | 40 | 77 | 60 |
| Michael Dobson[3] | – | 12 | 12 | – | 46 | 46 | 4 | 60 |
| Massimo Tosato | – | 45 | 45 | – | 45 | 45 | – | 60 |

[1] Philip Mallinckrodt, Michael Dobson and Massimo Tosato received cash in lieu of pension and Richard Keers and Peter Harrison received a combination of employer contributions to the Group's DC pension arrangement and cash in lieu of pension contributions.
[2] Normal retirement age is the earliest age at which a Director can elect to draw their pension under the rules of the Schroders Retirement Benefits Scheme without the need to seek the consent of the Company or the pension scheme trustee.
[3] Michael Dobson began to draw his pension from the Scheme with effect from 13 May 2012. He has no further prospective pension benefits from the Group.

## Fees from external appointments

The executive Directors are permitted to retain for their own benefit fees they receive from any external non-executive directorships, provided the directorships do not relate to any interest held by the Group. These fees do not relate to the Group and so are not included in the single total remuneration figures on page 85. Richard Keers served as a non-executive member of the Franchise Board of Lloyd's from June 2016, for which he received fees of £43,000, including in respect of his membership and chairmanship of the Franchise Board's audit committee during the year.

## Non-executive Directors' remuneration (audited)

The total remuneration of each of the non-executive Directors for the years ended 31 December 2016 and 31 December 2015 is set out below.

| £'000 | 2016 | | | | | | 2015 | | | | | |
| | Basic fee | Committee chairman | Committee member | SID[1] | Taxable benefits | Total | Basic fee | Committee chairman | Committee member | SID[1] | Taxable benefits | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Michael Dobson[2] | 465 | – | – | – | 8 | 473 | – | – | – | – | – | – |
| Robin Buchanan | 70 | – | 40 | – | – | 110 | 70 | – | 40 | – | – | 110 |
| Rhian Davies[3] | 70 | 17 | 20 | – | – | 107 | 33 | – | 9 | – | – | 42 |
| Lord Howard | 70 | 20 | 40 | 10 | – | 140 | 70 | 20 | 40 | 7 | – | 137 |
| Nichola Pease | 70 | – | 40 | – | – | 110 | 70 | – | 40 | – | – | 110 |
| Bruno Schroder | 98 | – | – | – | 2 | 100 | 98 | – | – | – | 2 | 100 |
| **Former Directors** | | | | | | | | | | | | |
| Andrew Beeson[4] | 89 | – | – | – | – | 89 | 350 | – | – | – | – | 350 |
| Ashley Almanza[5] | 23 | 8 | 7 | – | – | 38 | 70 | 25 | 20 | – | 1 | 116 |

[1] Senior Independent Director.
[2] The remuneration reported for Michael Dobson was paid in respect of the period of 2016 that he was Chairman. His remuneration for the period of 2016 that he was Chief Executive is reported on page 85.
[3] Rhian Davies was appointed to the Board in July 2015 and as Chairman of the Audit and Risk Committee in May 2016.
[4] Andrew Beeson retired from the Board on 4 April 2016.
[5] Ashley Almanza stepped down from the Board on 28 April 2016.

Non-executive Directors' annual fees currently are as shown on the right.

Ian King and Rakhi Goss-Custard were appointed to the Board with effect from 1 January 2017 and on appointment their fees were set at the same level as for other non-executive Directors.

The benefits for Michael Dobson are private healthcare and medical benefits for him and his family and occasional private use of a driver and for Bruno Schroder are private healthcare and medical benefits.

| | £ |
|---|---|
| Chairman | 625,000 |
| Board member[1] | 70,000 |
| Senior Independent Director | 10,000 |
| Audit and Risk Committee Chairman[2] | 25,000 |
| Audit and Risk Committee member | 20,000 |
| Nominations Committee Chairman | nil |
| Nominations Committee member | nil |
| Remuneration Committee Chairman[2] | 20,000 |
| Remuneration Committee member | 20,000 |

[1] Bruno Schroder also receives an additional annual fee of £28,000 for services to the Group.
[2] In addition to the Committee membership fee.

## Payments to former Directors

No payments were made to former Directors during 2016.

Governance

# Remuneration report

Annual report on remuneration
continued

## Board changes in 2016 and treatment of deferred remuneration awards (audited)

On 4 April 2016, Michael Dobson ceased to be an executive Director and became non-executive Chairman. On 31 December 2016, Massimo Tosato retired from the Board and left the Group. As disclosed in the 2015 Annual Report and Accounts, the Committee considered Michael Dobson's continued role as Chairman and his more than 14 years of service to Schroders at that time, and Massimo Tosato's 20 years of service, together with their respective contribution to the Group and the significant value both have created for shareholders. In light of this, the Committee exercised its discretion under the plan rules of the ECP and LTIP to allow both Michael Dobson and Massimo Tosato to retain their unvested awards, outlined on pages 93 and 94, when their executive roles came to an end.

As a result, they retain their unvested ECP fund and share awards, which will continue to vest on the normal timescales in accordance with the ECP rules. For the purpose of the exercise period for ECP awards, the Committee exercised its discretion to treat Michael Dobson as though he remains in employment. Massimo Tosato's awards will be exercisable within 12 months following the end of the vesting period and he is subject to post-employment restrictions in respect of hiring key employees of Schroders. In accordance with the rules of the LTIP, their LTIP awards have been reduced pro-rata for the proportion of the performance period that each of them remained an employee of the Group (see page 94) and vesting remains subject to the satisfaction of the associated performance conditions.

## ECP and LTIP awards granted during 2016 (audited)

The following awards under the ECP were granted to Directors on 7 March 2016 in respect of deferred bonuses for performance during 2015. No further performance conditions need to be met for awards to vest but ECP awards normally require the participant to remain in employment with the Group until the third anniversary of grant in order to vest in full. ECP fund awards are conditional rights to receive a cash sum based on the value of a notional investment in a range of Schroders funds. ECP share awards were granted as nil-cost options. These awards were included in the single total remuneration figures disclosed last year and form part of the prior year value shown in this year's single total remuneration figure table on page 85. They are also shown in the tables of directors' rights under fund and share awards on pages 93 and 94.

| Individual | Basis of award granted | Face value at grant (£'000) Fund awards | Share awards | Total ECP award | Share price at grant | Number of shares | Performance conditions |
|---|---|---|---|---|---|---|---|
| Peter Harrison | Deferral of bonus awarded in respect of performance in 2015. | 975 | 975 | 1,950 | £26.24 | 37,157 | Awarded in respect of performance in 2015. No further performance conditions apply. |
| Richard Keers | | 575 | 575 | 1,150 | £26.24 | 21,913 | |
| Philip Mallinckrodt | | 456 | 456 | 912 | £20.35 | 22,422 | |
| Michael Dobson | | 1,925 | 1,925 | 3,850 | £26.24 | 73,361 | |
| Massimo Tosato | | 1,050 | 1,050 | 2,100 | £26.24 | 40,015 | |

The following awards under the LTIP were granted to Directors on 7 March 2016 as nil-cost options. These awards do not appear in the single total remuneration figure on page 85 as they are subject to performance conditions and will not vest until 2020. They are shown in the table of directors' rights under share awards on page 94.

| Individual | Basis of award granted as % of salary | Vesting maximum as % of face value | % of face value that would vest at threshold[1] | Face value at grant (£'000) | Share price at grant | Number of shares | End of performance period |
|---|---|---|---|---|---|---|---|
| Peter Harrison[2] | 80 | 100 | 25 | 400 | £26.24 | 15,243 | 31 December 2019 |
| Richard Keers | 80 | 100 | 25 | 300 | £26.24 | 11,432 | 31 December 2019 |
| Philip Mallinckrodt | 80 | 100 | 25 | 300 | £20.35 | 14,742 | 31 December 2019 |

[1] Performance under both the EPS and NNB performance measures at the threshold level to achieve non-zero vesting.
[2] The figure shown as the basis of award granted for Peter Harrison reflects his salary following his appointment as Group Chief Executive.

All ECP share awards and LTIP awards were granted over ordinary shares, except for the awards granted to Philip Mallinckrodt, which were granted over non-voting ordinary shares. The share price used to determine the number of shares under each ECP share award and LTIP award is the mid-market closing share price on the last trading day prior to the date of grant and this is the price used to calculate the face value shown. The vesting of the LTIP awards is subject to the performance conditions set out on page 77. The composite index for these awards is the same as will apply for awards to be granted in 2017, see page 96.

## Personal shareholding policy (audited)

To align the interests of senior employees with those of shareholders, the executive Directors and the other members of the GMC are required, over time, to acquire and retain a holding of Schroders shares or rights to shares equivalent to 300% of base salary. Each executive Director and GMC member undertakes not to sell any Schroders shares until their share ownership target has been reached.

For these purposes, rights to shares include the estimated after-tax value of unvested ECP or EIP share awards (shown as 'unvested no performance conditions' on page 94) and ECP share awards due to be granted in respect of performance in 2016 (see page 87) but do not include any unvested rights to shares from LTIP awards as these are subject to performance conditions. Subject to shareholder approval at the 2017 AGM, the Remuneration Committee intends to increase the shareholding requirement for the Group Chief Executive to 500%.

Each executive Director had achieved the current target of 300% of salary as at 28 February 2017, based upon the mid-market closing share price on that date. The chart opposite compares the value of each executive Director's shareholdings for these purposes as at

28 February 2017 with the shareholding required under the personal shareholding policy, as a percentage of salary, except for Massimo Tosato where the shareholding is as at 31 December 2016, the date he left the Group.

| | | |
|---|---|---|
| Peter Harrison | Proposed Policy | 500 |
| | Current Policy | 300 |
| | Actual | 553 |
| Richard Keers | Policy | 300 |
| | Actual | 419 |
| Philip Mallinckrodt[1] | Policy | 300 |
| | Actual | 1,934 |
| Massimo Tosato | Policy | 300 |
| | Actual | 508 |

[1] Philip Mallinckrodt's shareholding above is his holding derived from employment. It does not include his other share interests (see page 95).

## Directors' rights under fund and share awards and Directors' share interests

This section outlines Directors' rights at 31 December 2016 from fund and share awards granted under the Group's deferred remuneration plans. It goes on to set out the total interests in shares of the Directors and their connected persons at 31 December 2016.

### Directors' rights under fund awards (audited)

Directors had the following rights under fund awards, based on the award values at grant:

| | | Unvested ECP awards £'000 | Vested ECP awards £'000 | Total £'000 |
|---|---|---|---|---|
| Peter Harrison | At 31 December 2015 | 1,675 | – | 1,675 |
| | Granted | 975 | – | 975 |
| | At 31 December 2016 | 2,650 | – | 2,650 |
| Richard Keers | At 31 December 2015 | 844 | – | 844 |
| | Granted | 575 | – | 575 |
| | At 31 December 2016 | 1,419 | – | 1,419 |
| Philip Mallinckrodt | At 31 December 2015 | 988 | 456 | 1,444 |
| | Granted | 456 | – | 456 |
| | Vested | (138) | 138 | – |
| | Exercised | – | (213) | (213) |
| | At 31 December 2016 | 1,306 | 381 | 1,687 |
| Michael Dobson | At 31 December 2015 | 4,263 | – | 4,263 |
| | Granted | 1,925 | – | 1,925 |
| | Vested | (1,044) | 1,044 | – |
| | Exercised | – | (1,044) | (1,044) |
| | At 31 December 2016 | 5,144 | – | 5,144 |
| Massimo Tosato | At 31 December 2015 | 2,481 | – | 2,481 |
| | Granted | 1,050 | – | 1,050 |
| | Vested | (650) | 650 | – |
| | Exercised | – | (650) | (650) |
| | At 31 December 2016 | 2,881 | – | 2,881 |

Governance

# Remuneration report

## Annual report on remuneration
## continued

**Directors' rights under share awards (audited)**
Directors had the following rights to shares under the Group's deferred remuneration plans, in the form of nil-cost options.

| | | Unvested LTIP awards[1] | Unvested ECP or EIP awards[1] | Vested ECP, EIP or LTIP awards | Total |
|---|---|---:|---:|---:|---:|
| Peter Harrison | At 31 December 2015 | 44,167 | 83,824 | – | 127,991 |
| (Ordinary shares) | Granted | 15,243 | 37,157 | – | 52,400 |
| | Dividend-equivalent accrual | – | 4,172 | – | 4,172 |
| | At 31 December 2016 | 59,410 | 125,153 | – | 184,563 |
| Richard Keers | At 31 December 2015 | 31,281 | 52,089 | – | 83,370 |
| (Ordinary shares) | Granted | 11,432 | 21,913 | – | 33,345 |
| | Dividend-equivalent accrual | – | 2,329 | 222 | 2,551 |
| | Vested | – | (20,914) | 20,914 | – |
| | At 31 December 2016 | 42,713 | 55,417 | 21,136 | 119,266 |
| Philip Mallinckrodt | At 31 December 2015 | 68,507 | 55,048 | 232,924 | 356,479 |
| (Non-voting ordinary shares) | Granted | 14,742 | 22,422 | – | 37,164 |
| | Dividend-equivalent accrual | – | 2,946 | 9,139 | 12,085 |
| | Vested | (8,006) | (12,033) | 20,039 | – |
| | Lapsed where LTIP conditions were not met | (8,006) | – | – | (8,006) |
| | Exercised | – | – | (50,021) | (50,021) |
| | At 31 December 2016 | 67,237 | 68,383 | 212,081 | 347,701 |
| Michael Dobson | At 31 December 2015 | 110,652 | 173,175 | 108,916 | 392,743 |
| (Ordinary shares) | Granted | – | 73,361 | – | 73,361 |
| | Dividend-equivalent accrual | – | 6,583 | 5,671 | 12,254 |
| | Vested | (16,025) | (55,582) | 71,607 | – |
| | Lapsed where LTIP conditions were not met | (16,026) | – | – | (16,026) |
| | Exercised | – | .. | (16,025) | (16,025) |
| | Lapsed due to LTIP pro-rating on end of employment | (34,868) | – | – | (34,868) |
| | At 31 December 2016 | 43,733 | 197,537 | 170,169 | 411,439 |
| Massimo Tosato[1] | At 31 December 2015 | 53,490 | 103,216 | 114,330 | 271,036 |
| (Ordinary shares) | Granted | – | 40,015 | – | 40,015 |
| | Dividend-equivalent accrual | – | 3,711 | 4,364 | 8,075 |
| | Vested | (6,410) | (35,572) | 41,982 | – |
| | Lapsed where LTIP conditions were not met | (6,410) | – | – | (6,410) |
| | Exercised | – | – | (160,676) | (160,676) |
| | Lapsed due to LTIP pro-rating on end of employment | (10,994) | – | – | (10,994) |
| | At 31 December 2016 | 29,676 | 111,370 | – | 141,046 |

[1] These awards will only vest to the extent that the relevant performance conditions are met. Includes LTIP awards granted on 27 March 2013, which were unvested as at 31 December 2016 but are expected to partially vest on 2 March 2017 (see page 90) and any balance will lapse.

[2] No performance conditions apply for these awards. Although executive Directors are not eligible to receive EIP awards, Peter Harrison received an EIP award in December 2013, prior to his appointment as an executive Director in May 2014.

[3] Of the awards exercised by Massimo Tosato, awards over 17,186 shares were settled in cash. None of his remaining vested or unvested awards will be settled in cash.

During the year, the aggregate gain on nil-cost options for Philip Mallinckrodt was £1,057,000, for Michael Dobson was £424,000 and for Massimo Tosato was £4,509,000. These related to awards settled in shares or cash.

Board of Directors and Company Secretary       Corporate governance report       Remuneration report
Group Management Committee                      Directors' report                 Statement of Directors' responsibilities

**Directors' share interests (audited)**
The Directors and their connected persons had the following interests in shares in the Company at 31 December 2016:

| | Number of shares at 31 December 2016 | |
| | Ordinary shares | Non-voting ordinary shares |
|---|---:|---:|
| **Executive Directors** | | |
| Peter Harrison | 360 | - |
| Richard Keers | 351 | - |
| Philip Mallinckrodt | 79,461,706 | 6,030,782 |
| **Non-executive Directors** | | |
| Michael Dobson | 432,525 | 187,821 |
| Robin Buchanan | - | 9,839 |
| Rhian Davies | - | 1,000 |
| Lord Howard | - | 5,000 |
| Nichola Pease | - | 951 |
| Bruno Schroder[1] | 13,881,416 | 1,482,417 |
| **Former Directors** | | |
| Ashley Almanza | - | - |
| Andrew Beeson | - | 15,000 |
| Massimo Tosato | 2,983 | - |

[1] The interests of Philip Mallinckrodt and Bruno Schroder set out above include their beneficial interests (and those of their connected persons) in their respective capacities as members of a class of potential discretionary beneficiaries under certain settlements made by members of the Schroder family.

Between 31 December 2016 and 28 February 2017, the only movements in the Directors' share interests were the acquisition under the SIP of 16 ordinary shares by Peter Harrison, 17 ordinary shares by Richard Keers and eight ordinary shares by Massimo Tosato.

## Conduct, compliance and risk management in remuneration

During 2015, work was done to revalidate Schroders' core values of excellence, innovation, teamwork, passion and integrity, and expand on these to articulate expected employee behaviours more clearly.

To drive positive change and reinforce those messages, in 2016 a global employee recognition scheme was launched, which provides an opportunity to recognise employees who champion the Schroders values. Further information is on page 32.

Performance management and remuneration are important tools to reinforce expected standards of behaviour. During the annual performance appraisal, employees and line managers assess each individual's behaviours, to identify those whose behaviour exemplifies our values as well as any employees whose behaviour falls short of the standards that we expect.

In 2016, we have implemented a process where issues are independently identified by the Group's control functions and fed into the compensation review process, providing a further opportunity to

ensure that attitudes to risk and compliance and behaviours in line with our values are reflected in the determination or allocation of the bonus pool and in individual employee performance ratings and remuneration outcomes.

To ensure the Committee is adequately informed of risks facing the Group and the management of those risks, the Chairman of the Committee serves on the Audit and Risk Committee. The Committee also receives reports from the heads of Risk, Legal and Compliance as part of its consideration of remuneration proposals (see page 82).

The Committee also reviewed the Group's regulatory disclosures in the context of the FCA's and PRA's requirements. The remuneration disclosures required under CRD are incorporated into the Group's Pillar 3 disclosures and are available at www.schroders.com/ir. Other regulatory remuneration disclosures can be found at www.schroders.com/remuneration-disclosures.

Governance

# Remuneration report

Annual report on remuneration
continued

## Implementation of remuneration policy for 2017

The proposed Directors' remuneration policy is subject to a binding shareholder vote at the 2017 AGM. If approved, the policy will apply for performance-years 2017, 2018 and 2019, unless the Group seeks shareholder approval for changes to the policy in the meantime. If shareholders do not vote to approve the proposed new policy then the current policy will continue to apply.

### 2017 Board changes
The Company has announced changes to Philip Mallinckrodt's role, as outlined in the Chairman's statement on page 7. Philip relinquished his executive responsibilities on 1 March 2017 after more than 20 years with the Group.

He has waived his contractual notice period and will not be eligible for a bonus in respect of his contribution during the period of 2017 that he was Group Head of Private Assets and Wealth Management. His annual bonus award of £1.75 million in respect of his contribution during 2016 is subject to standard deferral as shown on page 87 and includes malus and clawback terms.

The Committee considered Philip's long service, his contribution to the Company and the significant value created for shareholders. In light of this, the Committee has exercised its discretion under the rules of the ECP and LTIP to allow him to retain his unvested awards when his executive role with the Company came to an end. These awards remain subject to malus and clawback terms. Once vested, each award will be exercisable within a 12-month period following vesting. His unvested ECP awards result from the deferral of bonuses relating to 2016 and prior years. The vesting of LTIP awards remains subject to the satisfaction of the associated performance conditions and will be time-apportioned for the proportion of the performance period that he remained an employee of the Group.

As a member of the principal shareholder group, he continues on the Board of the Company as a non-executive Director. In this role he has a letter of appointment with a mutual notice period of six months. His fees were set at the same level as for the other non-executive Directors. He will not be eligible for annual bonus awards. The private medical insurance and life assurance benefits that he received as an executive Director will continue until 30 June 2017.

By Order of the Board.

**Lord Howard of Penrith**
Chairman of the Remuneration Committee
1 March 2017

### Basis for determining executive Directors' annual bonus awards in respect of performance in 2017
Executive Directors' annual bonus awards in respect of performance in 2017 will be based on broadly the same performance metrics as were considered for 2016. The process to determine awards will be unchanged. Targets and performance against those targets will be disclosed retrospectively in the 2017 Annual report on remuneration.

### LTIP awards to be granted in 2017
In accordance with the current Directors' remuneration policy, the Committee intends to grant LTIP awards over shares with the following values to the executive Directors in March 2017:

| Director | LTIP face value at grant |
| --- | --- |
| Peter Harrison | £600,000 |
| Richard Keers | £400,000 |

Philip Mallinckrodt will not receive a LTIP award in 2017.

The vesting of these awards will be based on EPS and NNB performance conditions and targets as outlined on page 77. The Committee has reviewed the make up of Schroders AUM at 31 December 2016 to determine the indices and weightings that will make up the composite index against which EPS performance will be measured, as a proxy for the market movement of Schroders AUM. For awards to be granted in March 2017, the following weighted basket of indices will be used:

| Index | Weighting % |
| --- | --- |
| Morgan Stanley Capital International All Countries Asia Pacific | 15 |
| Morgan Stanley Capital International Emerging Markets | 7.5 |
| Morgan Stanley Capital International All Countries World | 15 |
| Morgan Stanley Capital International Europe | 5 |
| FTSE All Share | 7.5 |
| Barclays Capital Global Aggregate | 50 |

# Statement of Directors' responsibilities

The Directors are responsible for preparing the Annual Report and the Consolidated financial statements in accordance with applicable law and regulations.

The Companies Act 2006, being the applicable law in the UK, requires the Directors to prepare financial statements for each financial year. The Directors have prepared the Group and the Company financial statements in accordance with International Financial Reporting Standards (IFRS) as adopted by the European Union (EU). The financial statements are required by law to give a true and fair view of the state of affairs of the Company and the Group and of the profit or loss of the Group for that period.

In preparing those financial statements the Directors are required to:
- Select suitable accounting policies and then apply them consistently.
- Make judgements and estimates that are reasonable and prudent.
- State that the financial statements comply with IFRS as adopted by the EU, subject to any material departure disclosed and explained in the financial statements.
- Prepare the financial statements on a going concern basis, unless it is inappropriate to presume that the Group will continue in business, in which case there should be supporting assumptions or qualifications as necessary.

The Directors are also required by the Disclosure and Transparency Rules of the FCA to include a management report containing a fair review of the business and a description of the principal risks and uncertainties facing the Company and the Group.

The Directors are responsible for keeping proper books of accounting records that are sufficient to show and explain the Company's transactions and disclose with reasonable accuracy at any time the financial position of the Company and the Group and to enable them to ensure that the financial statements and the Remuneration report comply with the Companies Act 2006 and, as regards the Group financial statements, Article 4 of the International Accounting Standards Regulation. They are also responsible for safeguarding the assets of the Company and the Group and hence for taking reasonable steps for the prevention and detection of fraud and other irregularities.

### Directors' statement

Each of the Directors, whose name and functions are listed in the Board of Directors section of this Annual Report and Accounts, confirms that, to the best of each person's knowledge and belief:
- The consolidated financial statements, prepared in accordance with IFRS as adopted by the EU and in accordance with the Companies Act 2006, give a true and fair view of the assets, liabilities, financial position and profit of the Company and the Group.
- The Directors' report contained in this Annual Report and Accounts which comprises the sections described on page 66, includes a fair review of the development and performance of the business and the position of the Company and the Group and a description of the principal risks and uncertainties that they face.
- So far as the Director is aware, there is no relevant audit information of which the Company's auditors are unaware.
- The Director has taken all the steps that ought to have been taken as a Director in order to make himself or herself aware of any relevant audit information and to establish that the Company's auditors are aware of that information.

In addition, each of the Directors considers that this Annual Report and Accounts, taken as a whole, is fair, balanced and understandable and provides the information necessary for shareholders to assess the Company's performance, business model and strategy.

The Directors are responsible for the maintenance and integrity of the audited financial information on the website at www.schroders.com.

Legislation in the UK governing the preparation and dissemination of financial statements may differ from legislation in other jurisdictions.

### Forward-looking statements

This Annual Report and Accounts and the Schroders website may contain forward-looking statements with respect to the financial condition, performance and position, strategy, results of operations and businesses of the Company and the Group. Such statements and forecasts involve risk and uncertainty because they are based on current expectations and assumptions but relate to events and depend upon circumstances in the future and you should not place reliance on them. Without limitation, any statements preceded or followed by or that include the words 'targets', 'plans', 'believes', 'expects', 'confident', 'aims', 'will have', 'will be', 'will ensure', 'estimates' or 'anticipates' or the negative of these terms or other similar terms are intended to identify such forward-looking statements. There are a number of factors that could cause actual results or developments to differ materially from those expressed or implied by forward-looking statements and forecasts. Forward-looking statements and forecasts are based on the Directors' current view and information known to them at the date of this Annual Report and Accounts. The Directors do not make any undertaking to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise. Nothing in this Annual Report and Accounts should be construed as a forecast, estimate or projection of future financial performance.

# Financial report

Consolidated financial statements    101
Notes to the accounts    108
Schroders plc financial statements    153
Independent Auditors' report    164



**Insurance companies**

Our specialist team manages £35 billion assets for insurance companies, offering risk management expertise, specialist investment skills and dedicated actuarial resource.

Financial report

# Financial report contents

Helping you to navigate through
this section of the report

## Index

| | |
|---|---|
| Consolidated income statement | 101 |
| Consolidated statement of comprehensive income | 101 |
| Consolidated statement of financial position | 103 |
| Consolidated statement of changes in equity | 105 |
| Consolidated cash flow statement | 107 |
| | |
| Notes to the accounts | |
| 1. Segmental reporting | 108 |
| 2. Revenue | 111 |
| 3. Cost of sales | 111 |
| 4. Net gains on financial instruments and other income | 112 |
| 5. Operating expenses | 113 |
| 6. Tax expense | 114 |
| 7. Earnings per share | 115 |
| 8. Dividends | 115 |
| 9. Trade and other receivables | 116 |
| 10. Financial assets | 116 |
| 11. Associates and joint ventures | 119 |
| 12. Property, plant and equipment | 121 |
| 13. Goodwill and intangible assets | 122 |
| 14. Deferred tax | 123 |
| 15. Unit-linked liabilities and assets backing unit-linked liabilities | 124 |
| 16. Trade and other payables | 125 |
| 17. Financial liabilities | 126 |
| 18. Provisions and contingent liabilities | 127 |
| 19. Financial instrument risk management | 129 |
| 20. Derivative contracts | 134 |
| 21. Share capital and share premium | 136 |
| 22. Own shares | 137 |
| 23. Reconciliation of net cash from operating activities | 138 |
| 24. Commitments | 138 |
| 25. Retirement benefit obligations | 139 |
| 26. Share-based payments | 143 |
| 27. Related party transactions | 146 |
| 28. Interests in structured entities | 147 |
| 29. Business combinations | 149 |
| 30. Events after the reporting period | 150 |
| | |
| Presentation of the financial statements | 151 |
| | |
| Schroders plc | |
| Statement of financial position | 153 |
| Statement of changes in equity | 154 |
| Cash flow statement | 155 |
| | |
| Notes to the Schroders plc accounts | |
| 31. Significant accounting policies | 156 |
| 32. Expenses and other disclosures | 156 |
| 33. Trade and other receivables | 156 |
| 34. Trade and other payables | 156 |
| 35. Deferred tax | 157 |
| 36. Financial instrument risk management | 157 |
| 37. Own shares | 158 |
| 38. Related party transactions | 158 |
| 39. Subsidiaries and other related undertakings | 159 |
| | |
| Independent auditors' report | 164 |

The financial review is incorporated within the Business and
financial review on pages 18 to 23 and alongside some of the
primary statements on pages 102, 104 and 106. It forms part
of the Strategic report and does not form part of the financial
statements of the Group. It is unaudited.

# Consolidated income statement

for the year ended 31 December 2016

| | Notes | 2016 Before exceptional items £m | 2016 Exceptional items[4] £m | 2016 Total £m | 2015 Before exceptional items £m | 2015 Exceptional items[4] £m | 2015 Total £m |
|---|---|---|---|---|---|---|---|
| Revenue | 2 | 2,144.9 | – | 2,144.9 | 2,043.2 | – | 2,043.2 |
| Cost of sales | 3 | (432.1) | – | (432.1) | (442.5) | – | (442.5) |
| Net operating revenue | | 1,712.8 | – | 1,712.8 | 1,600.7 | – | 1,600.7 |
| | | | | | | | |
| Net gains on financial instruments and other income | 4 | 58.8 | (1.4) | 57.4 | 36.3 | – | 36.3 |
| Share of profit of associates and joint ventures | 11 | 21.5 | (2.0) | 19.5 | 21.5 | (2.2) | 19.3 |
| Net income[1] | | 1,793.1 | (3.4) | 1,789.7 | 1,658.5 | (2.2) | 1,656.3 |
| | | | | | | | |
| Operating expenses | 5 | (1,148.4) | (23.2) | (1,171.6) | (1,048.8) | (18.5) | (1,067.3) |
| Profit before tax | | 644.7 | (26.6) | 618.1 | 609.7 | (20.7) | 589.0 |
| | | | | | | | |
| Tax | 6(a) | (132.4) | 4.5 | (127.9) | (126.3) | 4.7 | (121.6) |
| Profit after tax[2] | | 512.3 | (22.1) | 490.2 | 483.4 | (16.0) | 467.4 |
| | | | | | | | |
| Earnings per share | | | | | | | |
| Basic | 7 | 186.3p | (8.0p) | 178.3p | 176.9p | (5.8p) | 171.1p |
| Diluted | 7 | 182.4p | (7.9p) | 174.5p | 172.2p | (5.7p) | 166.5p |
| | | | | | | | |
| Dividends per share[3] | 8 | | | 87.0p | | | 83.0p |

# Consolidated statement of comprehensive income

for the year ended 31 December 2016

| | Notes | 2016 £m | 2015 £m |
|---|---|---|---|
| Profit for the year | | 490.2 | 467.4 |
| | | | |
| Items that may be reclassified to the income statement on fulfilment of specific conditions: | | | |
| Net exchange differences on translation of foreign operations after hedging | | 101.3 | 5.4 |
| Net fair value movement arising from available-for-sale financial assets | 4 | 19.3 | (5.9) |
| Net fair value movement arising from available-for-sale financial assets held by associates | 11 | (4.8) | 5.2 |
| Tax on items taken directly to other comprehensive income | 6(b) | (2.9) | 3.8 |
| | | 112.9 | 8.5 |
| Items reclassified to the income statement: | | | |
| Net realised gains on disposal of available-for-sale financial assets | 4 | (5.2) | (16.8) |
| Net realised gains on disposal of available-for-sale financial assets held by associates | 11 | (1.4) | – |
| | | (6.6) | (16.8) |
| Items that will not be reclassified to the income statement: | | | |
| Actuarial (losses)/gains on defined benefit pension schemes | 25 | (2.0) | 7.3 |
| Tax on items taken directly to other comprehensive income | 6(b) | (0.1) | (2.3) |
| | | (2.1) | 5.0 |
| | | | |
| Other comprehensive income/(losses) for the year net of tax[2] | | 104.2 | (3.3) |
| | | | |
| Total comprehensive income for the year net of tax[2] | | 594.4 | 464.1 |

[1]  Previously referred to as Net revenue.
[2]  Non-controlling interest is presented in the Consolidated statement of changes in equity.
[3]  Prior year final dividend and current year interim dividend paid during the year.
[4]  See note 1(b) for a definition and further details of exceptional items.

Financial report

# Business and financial review

**Financial stability**
During the year, the Group's net assets increased by £357.2 million to £3.2 billion at 31 December 2016. This increase principally reflects the total comprehensive income of £594.4 million that was generated by the Group during the year, partially offset by £236.6 million of dividends that were paid to shareholders in 2016. Other movements in net assets are set out in the Consolidated statement of changes in equity.

The Group's total assets were £21.0 billion at 31 December 2016. Total assets accounted for in the Consolidated statement of financial position are impacted by the different legal forms of the businesses we conduct, as set out below.

| | Statement of financial position £bn | Not recorded in the Statement of financial position £bn | Total £bn |
|---|---|---|---|
| Life Company | 12.9 | – | 12.9 |
| Other Asset Management | – | 333.5 | 333.5 |
| **Total Asset Management** | 12.9 | 333.5 | 346.4 |
| Wealth Management | 3.9 | 46.8 | 50.7 |
| **Total AUMA** | 16.8 | 380.3 | 397.1 |
| Investment capital | 1.1 | | |
| Seed capital | 0.3 | | |
| Other assets | 2.8 | | |
| **Total assets** | 21.0 | | |

The Group's total AUMA rose by £83.6 billion to £397.1 billion at 31 December 2016.

Total Asset Management AUMA increased by 23% to £346.4 billion at 31 December 2016 (2015: £281.9 billion). Within Asset Management, assets that are managed for clients are not generally owned by the Group and are not recorded in the Group's Consolidated statement of financial position. Certain clients invest through life insurance policies that are managed by the Life Company. The assets backing these policies are owned by the Life Company and are included in the Consolidated statement of financial position along with a matching policyholder liability.

Wealth Management provides investment management, advisory and banking services. In 2016, the Group acquired Benchmark Capital, a technology-led adviser support business (see note 29). This acquisition brought £3.4 billion of AUM, as well as £11.1 billion of Assets under Administration (AUA). AUA is not included in the Consolidated statement of financial position. Wealth Management AUM was £39.6 billion at 31 December 2016 (2015: £31.6 billion), of which £3.9 billion (2015: £2.8 billion) is included in the Consolidated statement of financial position. Certain Wealth Management subsidiaries provide banking services. These entities are legally responsible for the banking assets and liabilities and the relevant AUM is therefore included in the Consolidated statement of financial position.

Reflecting the impact of these different business structures, the Group's total assets reported in the Consolidated statement of financial position increased by £2.9 billion to £21.0 billion at 31 December 2016. This increase was primarily due to the growth of AUM invested through life insurance policies managed by the Life Company and Wealth Management AUM that is also recorded on the Group's statement of financial position, along with corresponding increases in liabilities to clients.

Financial assets, excluding cash and cash equivalents and financial assets in the Life Company, increased by £658.3 million. This increase included a £213 million rise in the Group's investment and seed capital comprising total returns of £49 million and a net re-allocation of £164 million from operating capital representing surplus profits that were not required for day-to-day operational purposes by the Group's subsidiaries.

Goodwill and intangible assets increased by £139.7 million of which £126.6 million was due to business acquisitions made during the year. These acquisitions comprise the purchase of a 65% stake in Benchmark Capital which completed in December 2016, the purchase of a securitised credit business in September 2016, where we acquired all of the business, and a change to the Group's ownership interest of Secquaero Advisors AG, which increased from 30.0% to 50.1% in February 2016. More information on these acquisitions is set out in note 29. The remaining movement of £13.1 million comprises expenditure on software, net of amortisation of all intangible assets and the effect of a weaker sterling on assets denominated in other currencies.

Financial liabilities, excluding the Life Company, increased by £775.5 million mainly due to a rise in the value of client deposits within Wealth Management.

Other notable movements include the following:

Trade and other receivables increased by £121.4 million as a result of higher management fees and performance fees billed and accrued corresponding with higher levels of net operating revenue compared with 2015. Additionally, there was an increase in the value of settlement accounts of £30.9 million to £160.1 million (2015: £129.2 million). The settlement accounts are impacted by the timing and volume of transactions in the UK fund range and also resulted in a corresponding increase in trade and other payables. Property, plant and equipment increased by £24.6 million mainly due to spend relating to the Group's forthcoming change of headquarters in London.

Trade and other payables increased by £122.1 million in line with the increase in total costs and an increase in settlement accounts, broadly consistent with the corresponding increase in the settlement asset. In addition, the value of deferred cash awards to employees, which are primarily linked to the value of funds has increased due to the performance of the underlying funds. These underlying funds are acquired by the Group to hedge the obligation to employees and are included within Financial assets.

The surplus on the UK defined benefit pension scheme increased by £2.8 million during 2016. Net interest income of £4.4 million (2015: £3.7 million) was recorded through the Consolidated income statement and was partially offset by actuarial losses of £1.6 million (2015: gains of £8.0 million) recorded through the Consolidated statement of comprehensive income. Actuarial losses arise as a result of changes to the financial assumptions used to calculate the pension scheme liabilities together with experience gains or losses arising during the year. In 2016, actuarial losses principally reflect the impact of lower discount rates and higher inflation, partially offset by positive experience variances including returns on plan assets (see note 25).

# Consolidated statement of financial position

at 31 December 2016

| | Notes | 2016 £m | 2015 £m |
|---|---|---|---|
| **Assets** | | | |
| Cash and cash equivalents | | 3,318.9 | 3,019.0 |
| Trade and other receivables | 9 | 648.2 | 526.8 |
| Financial assets | 10 | 3,105.0 | 2,446.7 |
| Associates and joint ventures | 11 | 125.0 | 109.2 |
| Property, plant and equipment | 12 | 66.4 | 41.8 |
| Goodwill and intangible assets | 13 | 607.1 | 467.4 |
| Deferred tax | 14 | 66.0 | 53.7 |
| Retirement benefit scheme surplus | 26 | 118.2 | 115.4 |
| | | 8,054.8 | 6,780.0 |
| **Assets backing unit-linked liabilities** | | | |
| Cash and cash equivalents | | 466.7 | 603.1 |
| Financial assets | | 12,460.9 | 10,716.8 |
| | 15 | 12,927.6 | 11,319.9 |
| | | | |
| **Total assets** | | 20,982.4 | 18,099.9 |
| | | | |
| **Liabilities** | | | |
| Trade and other payables | 16 | 883.3 | 761.2 |
| Financial liabilities | 17 | 3,902.0 | 3,126.5 |
| Current tax | | 71.8 | 61.8 |
| Provisions | 18 | 33.1 | 26.3 |
| Deferred tax | 14 | 0.2 | 0.4 |
| Retirement benefit scheme deficits | | 11.6 | 8.2 |
| | | 4,902.0 | 3,984.4 |
| | | | |
| **Unit-linked liabilities** | 15 | 12,927.6 | 11,319.9 |
| | | | |
| **Total liabilities** | | 17,829.6 | 15,304.3 |
| | | | |
| **Net assets** | | 3,152.8 | 2,795.6 |
| | | | |
| **Equity**[1] | | 3,152.8 | 2,795.6 |

[1]  Non-controlling interest is presented in the Consolidated statement of changes in equity.

The financial statements were approved by the Board of Directors on 1 March 2017 and signed on its behalf by:

**Richard Keers**
Director

**Bruno Schroder**
Director

Financial report

# Business and financial review

## Capital strength

Group equity increased by £357.2 million during the year to £3,152.8 million. The increase was made up of £594.4 million of total comprehensive income partially offset by a reduction of £237.2 million as a result of net transactions with shareholders.

Transactions with shareholders included £236.6 million of dividends paid in the year by Schroders plc. Other transactions included the purchase of 2.2 million of own shares for £59.1 million offset by a £51.5 million credit arising as a result of the required accounting for share based payments, along with the issue of 0.2 million non-voting ordinary shares valued at £5.0 million relating to the acquisition of Benchmark Capital.

The Group's capital is managed within the categories set out below:

| | 2016 £m | 2015 £m |
|---|---|---|
| Regulatory capital | 814 | 653 |
| Other operating capital | 65 | 253 |
| Operating capital | 879 | 906 |
| Investment capital[1] | 1,059 | 942 |
| Seed capital | 325 | 229 |
| Other items[2] | 890 | 719 |
| Total capital | 3,153 | 2,796 |

[1] Includes RWC Partners Limited and Schroder Ventures Investments Limited associates.
[2] Comprises goodwill, intangible assets, pension scheme surplus, other associates and joint ventures, and deferred tax.

## Operating capital

Operating capital comprises the minimum regulatory capital and other capital required for day-to-day operational purposes. Schroders plc is regulated by the Prudential Regulation Authority (PRA) as a UK consolidated group. Using the capital resources requirement for a Group holding a banking licence, the Group's required capital was £814 million (2015: £653 million).

The operating businesses are regulated locally in the countries in which the Group operates. We monitor operating capital regularly against regulatory capital and liquidity requirements and other operational needs. Operating capital held in excess of those requirements is transferred to investment capital.

## Investment capital

Investment capital is shareholders' investible equity held in excess of operating requirements. It is managed with the aim of achieving a low-volatility return. Investment capital is comprised mainly of investment grade corporate bonds, government and government-guaranteed bonds and Schroders' funds.

Investment capital increased in the year as a result of the transfer of excess operating capital, partially offset by the deployment of capital on business acquisitions, dividends paid in the year and an increase to seed capital investments. Investment capital is managed in accordance with limits approved by the Board.

## Seed capital

Seed capital is used to develop new investment strategies, co-invest selectively alongside our clients and finance growth opportunities. Seed capital increased from £229 million to £325 million at 31 December 2016 as we identified opportunities for new product offerings which included the seeding of a securitised credit fund following the acquisition of the securitised credit business. Seed capital is deployed principally to support the growth of the Group's operating businesses and, where practical, the market risk on seed capital investments is hedged.

## Other items

Other items comprises assets that are not investible or available for the Group's general operating and regulatory requirements. It includes assets that are actually or potentially inadmissible for regulatory capital purposes, such as goodwill and intangible assets. The main movements during the year were: a higher goodwill and intangible assets balance (£139.7 million); returns from certain associates and joint ventures net of dividends returned to the Group (£16.3 million); a higher deferred tax asset (£12.3 million); and an increase in the UK pension scheme surplus (£2.8 million).

## Non-controlling interest

During 2016, the Group acquired a 65% controlling interest in Benchmark Capital and increased its stake in Secquaero Advisors AG (Secquaero) to 50.1%. The results of these businesses are fully consolidated from the date on which the Group acquired the controlling interest. The third party interest in the companies is shown as a non-controlling interest, representing £14.4 million of net assets at 31 December 2016.

In 2016, the Group also recognised an obligation to purchase the remaining 49.9% shareholding in Secquaero (see note 29). This was recorded as a financial liability in the Consolidated statement of financial position with a corresponding amount recorded within Other movements in the Consolidated statement of changes in equity.

## Transfers

Transfers normally comprise of vesting of share awards (see note 22) and dividends received from associates and joint ventures (see note 11). In 2016, Transfers also included £0.7 million in respect of Secquaero losses accumulated whilst it was held as a joint venture prior to it becoming a subsidiary.

## Dividends

The Group dividend policy is set out on page 23. The intention is to at least maintain or increase the dividend in line with the trend in profitability for the foreseeable future, having regard to overall Group strategy, capital requirements, liquidity and profitability. This approach will enable the Group to have sufficient surplus capital for future investment with consideration of possible risk scenarios including the impact of possible periods of economic downturn. We target a dividend payout ratio of between 45% to 50% determined as the total dividend per share in respect of the year, divided by the Group's pre-exceptional basic earnings per share.

Circumstances that could adversely impact the Group's ability to pay dividends in line with the policy include a combination of significantly increased costs and a prolonged deterioration in markets or performance leading to reduced revenues and a consequential increase in the total cost ratio. The distributable profits of Schroders plc are £2.5 billion (2015: £2.3 billion) and comprise retained profits of £2.6 billion (2015: £2.4 billion). The Group's ability to pay dividends is however restricted by the need to hold regulatory capital and to maintain sufficient other operating capital to support its ongoing business activities. In addition, the Group invests in its own funds as seed capital for the purposes of supporting new investment strategies.

The Board is recommending a final dividend of 64.0 pence per share, bringing the total dividend for the year to 93.0 pence per share, an increase of 7% from 2015, demonstrating our confidence in Schroders' long-term growth prospects. This represents a payout ratio of 50%, determined as the total dividend per share in respect of the year, divided by the Group's pre-exceptional basic earnings per share. After deducting the regulatory capital requirement and regulatory capital buffer, there continues to be sufficient capital to maintain our current dividend level for at least four years before taking account of any future profits.

ⓘ Further information The Pillar 3 report at www.schroders.com/ir provides further information on the calculation of regulatory capital.

Business and financial review
**Consolidated financial statements**

Notes to the accounts
Schroders plc financial statements

Independent Auditors' report

# Consolidated statement of changes in equity

for the year ended 31 December 2016

| | Notes | Share capital £m | Share premium £m | Own shares £m | Net exchange differences reserve £m | Associates and joint ventures reserve £m | Fair value reserve £m | Profit and loss reserve £m | Total £m | Non-controlling interest[1] £m | Total £m |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Attributable to owners of the parent | | | | | | |
| At 1 January 2016 | | 282.5 | 119.4 | (175.5) | 86.8 | 45.7 | 8.1 | 2,428.6 | 2,795.6 | – | 2,795.6 |
| Profit for the year | | – | – | – | – | 19.5 | – | 470.2 | 489.7 | 0.5 | 490.2 |
| Other comprehensive income/(losses)[2] | | – | – | – | 100.9 | (6.2) | 11.2 | (2.1) | 103.8 | 0.4 | 104.2 |
| Total comprehensive income for the year | | – | – | – | 100.9 | 13.3 | 11.2 | 468.1 | 593.5 | 0.9 | 594.4 |
| Shares issued | 21 | 0.2 | 4.8 | – | – | – | – | – | 5.0 | – | 5.0 |
| Own shares purchased | 22 | – | – | (59.1) | – | – | – | – | (59.1) | – | (59.1) |
| Share-based payments | 26 | – | – | – | – | – | – | 51.5 | 51.5 | – | 51.5 |
| Tax in respect of share schemes | 6(c) | – | – | – | – | – | – | 0.9 | 0.9 | – | 0.9 |
| Other movements | | – | – | – | – | (0.9) | – | (11.5) | (12.4) | 13.5 | 1.1 |
| Dividends | 8 | – | – | – | – | – | – | (236.6) | (236.6) | – | (236.6) |
| Transactions with shareholders | | 0.2 | 4.8 | (59.1) | – | (0.9) | – | (195.7) | (250.7) | 13.5 | (237.2) |
| Transfers | | – | – | 71.0 | – | (8.0) | – | (63.0) | – | – | – |
| At 31 December 2016 | | 282.7 | 124.2 | (163.6) | 187.7 | 50.1 | 19.3 | 2,638.0 | 3,138.4 | 14.4 | 3,152.8 |

| | Notes | Share capital £m | Share premium £m | Own shares £m | Net exchange differences reserve £m | Associates and joint ventures reserve £m | Fair value reserve £m | Profit and loss reserve £m | Total £m |
|---|---|---|---|---|---|---|---|---|---|
| At 1 January 2015 | | 282.5 | 119.4 | (200.1) | 81.4 | 29.6 | 27.0 | 2,198.0 | 2,537.8 |
| Profit for the year | | – | – | – | – | 19.3 | – | 448.1 | 467.4 |
| Other comprehensive income/(losses)[2] | | – | – | – | 5.4 | 5.2 | (18.9) | 5.0 | (3.3) |
| Total comprehensive income/(losses) for the year | | – | – | – | 5.4 | 24.5 | (18.9) | 453.1 | 464.1 |
| Own shares purchased | 22 | – | – | (51.1) | – | – | – | – | (51.1) |
| Share-based payments | 26 | – | – | – | – | – | – | 63.3 | 63.3 |
| Tax in respect of share schemes | 6(c) | – | – | – | – | – | – | 7.4 | 7.4 |
| Other movements in associates and joint ventures | 11 | – | – | – | – | 0.5 | – | – | 0.5 |
| Dividends attributable to shareholders | 8 | – | – | – | – | – | – | (226.3) | (226.3) |
| Dividends attributable to non-controlling interests | | – | – | – | – | – | – | (0.1) | (0.1) |
| Transactions with shareholders | | – | – | (51.1) | – | 0.5 | – | (155.7) | (206.3) |
| Transfers | | – | – | 75.7 | – | (8.9) | – | (66.8) | – |
| At 31 December 2015 | | 282.5 | 119.4 | (175.5) | 86.8 | 45.7 | 8.1 | 2,428.6 | 2,795.6 |

[1] A separate presentation of non-controlling interest is included following the acquisition of Benchmark Capital and an increase in the Group's interest in Secquaero during 2016.
[2] Other comprehensive income reported in the net exchange differences reserve represent foreign exchange gains and losses on the translation of foreign operations net of hedging. Other comprehensive (losses)/income reported in the associates and joint ventures reserve and the fair value reserve represent post-tax fair value movements on available-for-sale assets held. Other comprehensive (losses)/income reported in the profit and loss reserve represent post-tax actuarial (losses)/gains.

Financial report

# Business and financial review

**Analysis of cash flows**

**Cash position**

The Group recognises cash and cash equivalents with a value of £3,785.6 million in its Consolidated statement of financial position. This balance is analysed below:

| | 2016 £m | 2015 £m |
|---|---|---|
| Cash that the Group cannot use for its own corporate purposes | 498.7 | 649.1 |
| Cash in Wealth Management operations | 2,622.9 | 2,255.0 |
| Other cash | 664.0 | 718.0 |
| Cash and cash equivalents available for use by the Group | 3,286.9 | 2,973.0 |
| Total | 3,785.6 | 3,622.1 |

Cash held by the Life Company and within consolidated funds is not freely available for the Group's own corporate purposes. Similarly, cash within the Wealth Management banking entities is normally not made available for the Group's general corporate purposes. Excluding these cash positions, the Group's cash holdings available for general corporate use decreased by £54.0 million to £664.0 million. Cash generated was primarily used to fund dividend payments to shareholders, purchase financial assets for investment capital and seed capital purposes, finance the business combinations completed during the year and to acquire own shares to hedge the employee share scheme. The Group's general corporate cash position remains very strong. The Group also has access to a £200.0 million loan facility which provides additional short-term liquidity.

The liquidity position in Wealth Management is strong and all banking entities maintain liquidity ratios that are substantially in excess of those required by local regulators. Cash in Wealth Management increased by £367.9 million in the year, principally as a result of a rise in the value of client deposits.

**Operating cash flow (see note 23)**

Net cash inflows from operating activities were £563.7 million, an increase of £515.6 million from 2015. This increase was mainly driven by a large increase in the value of customer deposits within Wealth Management, partially offset by an increase in lending.

Adjustments for Life Company movements relate to movements in balances associated with the unit-linked liabilities. Operating cash outflows relating to the Life Company were £136.4 million (2015: £93.2 million).

**Investing activities**

Cash flows relating to investing activities include acquisitions, routine investment in property, plant and equipment and software, purchases and disposals of liquid securities in the investment capital portfolio, along with receipt of related investment income, and other short-term investments in the Wealth Management business.

Net cash outflows relating to investing activities were £294.9 million (2015: £430.6 million). The business combinations completed in the year and the purchase of an interest in NEOS together reduced the Group's cash by £84.8 million. Cash consideration of £90.1 million was paid in respect of business combinations and £3.5 million for the acquisition of NEOS. These cash outflows were partially offset by £8.8 million of cash held by the acquired entities at acquisition.

Other cash flows relating to investing activities include £183.0 million of net cash used to acquire financial assets and £65.2 million in respect of fixed assets, principally software and costs relating to the preparation for the Group's change of headquarters in London, completing in 2018. There were cash inflows of £29.4 million relating to interest receipts and £8.7 million of dividends received from associates and joint ventures.

**Financing activities**

Cash used in financing activities was £296.0 million (2015: £278.1 million). The outflow was driven by the payment of dividends to shareholders which amounted to £236.6 million (2015: £226.3 million). In addition, the Group had an outflow of £59.1 million (2015: £51.1 million) as a result of purchasing 2.2 million own shares to hedge share-based awards.

**Credit quality**

The Company has a credit rating of A+ from Fitch.

**Going concern**

Having considered the liquidity of the Group, the cash and other resources of the Group and the Group's cash requirements, the Directors consider the Group to be a going concern, as outlined on page 67.

# Consolidated cash flow statement

for the year ended 31 December 2016

| | Notes | 2016 £m | 2015 £m |
|---|---|---|---|
| Net cash from operating activities | 23 | 563.7 | 47.9 |
| | | | |
| **Cash flows from investing activities** | | | |
| Net acquisition of businesses and associate | | (84.8) | -- |
| Net acquisition of property, plant and equipment and intangible assets | | (65.2) | (38.8) |
| Acquisition of financial assets | | (1,398.6) | (1,556.3) |
| Disposal of financial assets | | 1,215.6 | 1,138.5 |
| Non-banking interest received | | 29.4 | 16.9 |
| Distributions and capital redemptions received from associates and joint ventures | 11 | 8.7 | 9.1 |
| Net cash used in investing activities | | (294.9) | (430.6) |
| | | | |
| **Cash flows from financing activities** | | | |
| Acquisition of own shares | 22 | (59.1) | (51.1) |
| Dividends paid | 8 | (236.6) | (226.3) |
| Other flows | | (0.3) | (0.7) |
| Net cash used in financing activities | | (296.0) | (278.1) |
| | | | |
| Net decrease in cash and cash equivalents | | (27.2) | (660.8) |
| | | | |
| Opening cash and cash equivalents | | 3,622.1 | 4,231.6 |
| Net decrease in cash and cash equivalents | | (27.2) | (660.8) |
| Effect of exchange rate changes | | 190.7 | 51.3 |
| Closing cash and cash equivalents | | 3,785.6 | 3,622.1 |
| | | | |
| Closing cash and cash equivalents consists of: | | | |
| Cash backing unit-linked liabilities | | 466.7 | 603.1 |
| Cash held in consolidated funds | | 32.0 | 46.0 |
| Cash that the Group cannot use for its own corporate purposes | | 498.7 | 649.1 |
| | | | |
| Cash | | 2,131.1 | 1,842.1 |
| Cash equivalents | | 1,155.8 | 1,130.9 |
| Cash and cash equivalents available for use by the Group | | 3,286.9 | 2,973.0 |
| | | | |
| Total cash and cash equivalents | | 3,785.6 | 3,622.1 |
| | | | |
| Comprising: | | | |
| Cash and cash equivalents presented within Assets | | 3,318.9 | 3,019.0 |
| Cash and cash equivalents presented within Assets backing unit-linked liabilities | | 466.7 | 603.1 |

Financial report

# Notes to the accounts

**1. Segmental reporting**
**(a) Operating segments**

The Group has three business segments: Asset Management, Wealth Management and the Group segment. Asset Management principally comprises investment management including advisory services, equity products, fixed income securities, multi-asset investments, real estate and other alternative asset classes such as commodities. Wealth Management principally comprises investment management, wealth planning and banking services provided to high net worth individuals and charities. Benchmark Capital was acquired on 15 December 2016 (see note 29) and now also forms part of the Wealth Management segment. The Group segment principally comprises the Group's investment capital and treasury management activities, business strategy and corporate development activities and the management costs associated with governance and corporate management.

Segment information is presented on the same basis as that provided for internal reporting purposes to the Group's chief operating decision maker, the Group Chief Executive.

Operating expenses include an allocation of costs between the individual business segments on a basis that aligns the charge with the resources employed by the Group in particular business areas. This allocation provides management information on the business performance to manage and control expenditure.

| Year ended 31 December 2016 | Asset Management £m | Wealth Management £m | Group £m | Total £m |
|---|---|---|---|---|
| Fee income | 1,902.7 | 210.6 | – | 2,113.3 |
| Wealth Management interest receivable | – | 31.6 | – | 31.6 |
| **Revenue** | **1,902.7** | **242.2** | **–** | **2,144.9** |
| | | | | |
| Fee expense | (413.2) | (7.9) | – | (421.1) |
| Wealth Management interest payable | – | (11.0) | – | (11.0) |
| **Cost of sales** | **(413.2)** | **(18.9)** | **–** | **(432.1)** |
| | | | | |
| **Net operating revenue** | **1,489.5** | **223.3** | **–** | **1,712.8** |
| | | | | |
| Net gains on financial instruments and other income | 28.2 | 0.7 | 29.9 | 58.8 |
| Share of profit of associates and joint ventures | 16.7 | – | 4.8 | 21.5 |
| **Net income[1]** | **1,534.4** | **224.0** | **34.7** | **1,793.1** |
| | | | | |
| Operating expenses | (962.0) | (157.6) | (28.8) | (1,148.4) |
| **Profit before tax and exceptional items** | **572.4** | **66.4** | **5.9** | **644.7** |

| Year ended 31 December 2015 | Asset Management £m | Wealth Management £m | Group £m | Total £m |
|---|---|---|---|---|
| Fee income | 1,817.7 | 198.2 | – | 2,015.9 |
| Wealth Management interest receivable | – | 27.3 | – | 27.3 |
| **Revenue** | **1,817.7** | **225.5** | **–** | **2,043.2** |
| | | | | |
| Fee expense | (424.3) | (6.4) | – | (430.7) |
| Wealth Management interest payable | – | (11.8) | – | (11.8) |
| **Cost of sales** | **(424.3)** | **(18.2)** | **–** | **(442.5)** |
| | | | | |
| **Net operating revenue** | **1,393.4** | **207.3** | **–** | **1,600.7** |
| | | | | |
| Net gains/(losses) on financial instruments and other income | 6.3 | (0.1) | 30.1 | 36.3 |
| Share of profit of associates and joint ventures | 12.8 | – | 8.7 | 21.5 |
| **Net income[1]** | **1,412.5** | **207.2** | **38.8** | **1,658.5** |
| | | | | |
| Operating expenses | (872.0) | (145.9) | (30.9) | (1,048.8) |
| **Profit before tax and exceptional items** | **540.5** | **61.3** | **7.9** | **609.7** |

[1] Previously referred to as Net revenue.

Segment assets and liabilities are not required to be presented as such information is not presented on a regular basis to the chief operating decision maker.

Business and financial review
Consolidated financial statements

Notes to the accounts
Schroders plc financial statements

Independent Auditors' report

## 1. Segmental reporting continued
## (b) Exceptional items

Exceptional items are significant items of income and expenditure that have been separately presented by virtue of their nature to enable a better understanding of the Group's financial performance. Exceptional items relate principally to acquisitions made by the Group, including amortisation of acquired intangible assets and one-off costs relating to the Group's strategic relationship with Hartford Funds.

| Year ended 31 December 2016 | Asset Management £m | Wealth Management £m | Group £m | Total £m |
|---|---|---|---|---|
| Profit before tax and exceptional items | 572.4 | 66.4 | 5.9 | 644.7 |
| | | | | |
| Exceptional items within net income: | | | | |
| Net gains on financial instruments and other income | (1.4) | – | – | (1.4) |
| Amortisation of acquired intangible assets relating to associates and joint ventures | (2.0) | – | – | (2.0) |
| | (3.4) | – | – | (3.4) |
| | | | | |
| Exceptional items within operating expenses: | | | | |
| Amortisation of acquired intangible assets | (11.5) | (8.1) | – | (19.6) |
| Deferred compensation arising directly from acquisitions | – | – | 2.0 | 2.0 |
| Other expenses | (3.6) | (2.0) | – | (5.6) |
| | (15.1) | (10.1) | 2.0 | (23.2) |
| | | | | |
| Profit before tax and after exceptional items | 553.9 | 56.3 | 7.9 | 618.1 |

| Year ended 31 December 2015 | Asset Management £m | Wealth Management £m | Group £m | Total £m |
|---|---|---|---|---|
| Profit before tax and exceptional items | 540.5 | 61.3 | 7.9 | 609.7 |
| | | | | |
| Exceptional items within net income: | | | | |
| Amortisation of acquired intangible assets relating to associates and joint ventures | (2.2) | – | – | (2.2) |
| | | | | |
| Exceptional items within operating expenses: | | | | |
| Amortisation of acquired intangible assets | (9.9) | (8.0) | – | (17.9) |
| Deferred compensation arising directly from acquisitions | – | – | (7.8) | (7.8) |
| Provisions and related costs | – | 7.2 | – | 7.2 |
| | (9.9) | (0.8) | (7.8) | (18.5) |
| | | | | |
| Profit before tax and after exceptional items | 528.4 | 60.5 | 0.1 | 589.0 |

Financial report

# Notes to the accounts

1. Segmental reporting continued
(c) Geographical information

Net operating revenue by country is presented below based on the location of clients:

| | Net operating revenue | |
| | --- | --- |
| Country | 2016 £m | 2015 £m |
| United Kingdom | 618.3 | 601.6 |
| United States | 135.8 | 127.8 |
| Switzerland | 118.0 | 105.5 |
| Italy | 117.6 | 105.4 |
| Hong Kong | 101.6 | 99.0 |
| Australia | 99.4 | 97.8 |
| Japan | 64.6 | 49.8 |
| Germany | 53.5 | 43.5 |
| Singapore | 51.7 | 51.4 |
| Other | 352.3 | 318.9 |
| Total | 1,712.8 | 1,600.7 |

The Group's non-current assets are located in the following countries:

| | Non-current assets[1] | |
| | --- | --- |
| Country | 2016 £m | 2015 £m |
| United Kingdom | 544.8 | 437.9 |
| China | 73.9 | 60.8 |
| United States | 62.0 | 28.4 |
| Switzerland | 39.1 | 26.4 |
| India | 19.9 | 17.7 |
| Singapore | 17.3 | 13.0 |
| Other | 41.7 | 34.5 |
| Total | 798.7 | 618.7 |

[1] Comprises the following non-current assets: property, plant and equipment, goodwill and intangible assets, associates and joint ventures and prepayments.

(d) Non-cash items

| Year ended 31 December 2016 | Asset Management £m | Wealth Management £m | Group £m | Total £m |
| --- | --- | --- | --- | --- |
| Operating expenses include the following non-cash items: | | | | |
| Share-based payments | (44.5) | (3.7) | (3.3) | (51.5) |
| Depreciation and amortisation | (37.8) | (8.6) | – | (46.4) |
| Net provisions charged | (7.3) | (1.0) | – | (8.3) |

| Year ended 31 December 2015 | Asset Management £m | Wealth Management £m | Group £m | Total £m |
| --- | --- | --- | --- | --- |
| Operating expenses include the following non-cash items: | | | | |
| Share-based payments | (49.5) | (3.1) | (10.7) | (63.3) |
| Depreciation and amortisation | (27.7) | (8.7) | – | (36.4) |
| Net provisions reversed | 7.4 | 7.4 | – | 14.8 |

Where applicable, exceptional items are included in the non-cash items above.

## 2. Revenue

The Group's primary source of revenue is fee income from investment management activities performed within both the Asset Management and Wealth Management segments. Fee income includes management fees, performance fees and other fees.

Management fees are generated through investment management agreements and are generally based on an agreed percentage of the valuation of AUM. The fees are recognised as the service is provided and it is probable that the fee will be received.

Performance fees are earned from some clients when contractually agreed performance levels are exceeded within specified performance measurement periods. They are only recognised at the end of those performance periods, when a reliable estimate of the fee can be made and it is almost certain that the fee will be received.

Revenue also includes other income. Other income principally comprises revenues for other asset management services driven by levels of AUM, along with revenues which vary according to the volume of transactions. Other income is recorded as the relevant services are provided and the receipt of income is almost certain.

Within Wealth Management, earning a net interest margin is a core activity. Interest income earned as a result of placing loans and deposits with other financial institutions, advancing loans and overdrafts to clients and holding debt and other fixed income securities is recognised within revenue. Interest income is recognised as it is earned using the effective interest method, which allocates interest at a constant rate of return over the expected life of the financial instrument based on the estimated future cash flows.

Revenue comprises:

|  | 2016 £m | 2015 £m |
|---|---|---|
| Management fees | 1,848.3 | 1,763.0 |
| Performance fees | 41.2 | 36.3 |
| Other income | 223.8 | 216.6 |
| Interest income earned by Wealth Management | 31.6 | 27.3 |
|  | 2,144.9 | 2,043.2 |

## 3. Cost of sales

Commissions, external fund manager fees and distribution fees payable to financial institutions, investment platform providers and financial advisers that distribute our products are recorded as fee expense within cost of sales. Fee expense varies primarily in proportion to the relevant AUM and is generally based on an agreed percentage of the value of the investments placed with the Group and is recognised in the income statement as the service is received.

Wealth Management pays interest to clients on deposits taken. For Wealth Management, earning a net interest margin is a core activity; interest payable in respect of these activities is therefore recorded separately from interest payable elsewhere in the business and is reported as part of cost of sales. Interest payable is recognised using the effective interest method (see note 2).

Cost of sales comprises:

|  | 2016 £m | 2015 £m |
|---|---|---|
| Fee expense | 421.1 | 430.7 |
| Interest expense incurred by Wealth Management | 11.0 | 11.8 |
|  | 432.1 | 442.5 |

Financial report

# Notes to the accounts

### 4. Net gains on financial instruments and other income

The Group holds financial instruments to support its Group capital strategies. The Group's operating capital includes low risk financial instruments held for regulatory capital purposes in certain operating entities. Investment capital is invested in a variety of financial instruments to generate a low-volatility return. Financial instruments are also held to hedge fair value movements on certain deferred cash awards, as seed capital to support new investment strategies, to co-invest selectively alongside our clients and to finance other growth opportunities.

A portion of the Group's financial instruments held at fair value are carried at fair value through profit or loss (FVP). FVP financial instruments are those that are initially designated as such and those that are held for regular trading. Net gains and losses on FVP financial instruments principally comprises market returns on investments in fixed income debt instruments, equities and any gains and losses on derivatives (which mainly arise from hedging activities). Net gains and losses on certain FVP financial instruments held to hedge deferred employee cash awards are presented separately and are included within operating expenses (see note 5). This presentation better reflects the substance of these transactions and provides more relevant information about the Group's net income and operating expenses.

The remainder of the Group's investments held at fair value are classified as available-for-sale. This classification is typically selected when the investment is expected to be held for the long-term but not necessarily to maturity and where short-term volatility does not reflect long-term expected returns. Generally, unrealised gains and losses on available-for-sale investments are recorded in other comprehensive income, but the cumulative gains and losses are transferred to the income statement if the investment is impaired, sold or otherwise realised. The fair value reserve in the statement of changes in equity represents the difference between the cost (or, if the asset has been reclassified or impaired, the fair value at the date of reclassification or impairment) and the fair value of financial assets that are classified as available-for-sale. Any impairments of loans and receivables are also included in the income statement. The Group reviews its available-for-sale investments and loans and receivables for impairment at the end of each reporting period.

Net finance income is derived from interest on non-banking activities, principally generated from cash and deposits with banks, but also as a result of holding investments in debt and fixed income securities. Fixed income investments and cash held outside of Wealth Management entities are managed mainly by Group Treasury to earn competitive rates of return and provide liquidity throughout the Group. Significant amounts of the Group's cash and interest-earning securities are held within Wealth Management and are managed by the Wealth Management treasury team. Interest earned on the assets held within Wealth Management is included in revenue; interest incurred on the liabilities assumed is included in cost of sales. Interest is recognised using the effective interest method (see note 2).

Other income includes gains and losses on foreign exchange and rent receivable from subletting properties.

Net gains and losses on financial instruments and other income are:

| | 2016 | | | 2015 | | |
|---|---|---|---|---|---|---|
| | Income statement £m | Other comprehensive income £m | Total £m | Income statement £m | Other comprehensive income £m | Total £m |
| Net gains/(losses) on financial instruments held at fair value through profit or loss | 14.2 | – | 14.2 | (4.2) | – | (4.2) |
| Net fair value movements on available-for-sale financial assets | – | 18.5 | 18.5 | – | (5.9) | (5.9) |
| Net exchange differences on available-for-sale financial assets | – | 0.8 | 0.8 | – | – | – |
| Net transfer on disposal of available-for-sale financial assets – equities | 5.2 | (5.2) | – | 16.8 | (16.8) | – |
| Net gains/(losses) on available-for-sale financial assets | 5.2 | 14.1 | 19.3 | 16.8 | (22.7) | (5.9) |
| Net finance income | 18.8 | – | 18.8 | 12.7 | – | 12.7 |
| Other income | 19.2 | – | 19.2 | 11.0 | – | 11.0 |
| Net gains/(losses) on financial instruments and other income – presented within net income | 57.4 | 14.1 | 71.5 | 36.3 | (22.7) | 13.6 |
| Net gains on financial instruments held to hedge deferred cash awards – presented within operating expenses | 25.6 | – | 25.6 | – | – | – |
| Net gains/(losses) on financial instruments and other income | 83.0 | 14.1 | 97.1 | 36.3 | (22.7) | 13.6 |

## 5. Operating expenses

Operating expenses represent the Group's administrative expenses and are recognised as the services are provided. Operating expenses are presented net of gains and losses on financial instruments held to hedge deferred employee cash awards (see note 4). Certain costs, including leases and capitalised costs, are charged evenly over the life of the relevant contract or useful life of the asset. The biggest part is employee benefits, as shown below. Other costs include accommodation, information technology and marketing, along with movements in provisions which are recorded based on an estimate of unavoidable costs relating to past transactions.

The control of compensation and total cost are both key performance objectives of the Group. Compensation is managed to a target total compensation ratio of between 45% to 49%. Targeting a total compensation ratio range provides some flexibility to manage the overall cost base in response to market conditions. Total costs are managed to a target long-term ratio of 65%.

Employee benefits expense includes salaries and wages, together with the cost of other benefits provided to employees such as pension and bonuses. The Group makes some performance awards to employees which are deferred over a specified vesting period. Such awards are charged to the income statement over the performance period and the vesting period. The Group holds investments that are linked to these performance awards in order to hedge the related expense. Gains and losses on these investments are presented separately below.

Further detail on other types of employee benefit can be found elsewhere within these financial statements: see note 25 for pension costs, and note 26 for more detail on compensation that is awarded in Schroders plc shares.

### (a) Employee benefits expense and number of employees

|  | 2016 £m | 2015 £m |
|---|---|---|
| Salaries, wages and other remuneration | 714.9 | 645.0 |
| Social security costs | 63.7 | 63.3 |
| Pension costs | 37.9 | 33.5 |
| Employee benefits expense | 816.5 | 741.8 |
| Net gains on financial instruments held to hedge deferred cash awards | (25.6) | – |
| Employee benefits expense net of hedging | 790.9 | 741.8 |

The employee benefits expense net of hedging of £790.9 million (2015: £741.8 million) includes a credit of £0.7 million (2015: £7.8 million charge) that is presented within exceptional items, comprising a £2.0 million net reduction (2015: £7.8 million charge) of compensation costs relating to acquisitions partially offset by £1.3 million (2015: nil) of restructuring costs.

Pre-exceptional compensation costs include a bonus charge of £356.2 million (2015: £359.2 million) relating to discretionary bonuses linked to the Group's performance.

Information about the compensation of key management personnel can be found in note 27. Details of the amounts paid to or receivable by Directors along with the number who exercised share options in the year is provided in the Remuneration report on pages 68 to 96.

The monthly average number of employees of the Company and its subsidiary undertakings during the year was:

|  | 2016 Number | 2015 Number |
|---|---|---|
| Full-time employees | 3,643 | 3,424 |
| Contract and temporary employees | 277 | 267 |
|  | 3,920 | 3,691 |
| Employed as follows: | | |
| Asset Management | 3,251 | 3,073 |
| Wealth Management | 640 | 608 |
| Group | 29 | 10 |
|  | 3,920 | 3,691 |

### (b) Audit and other services

|  | 2016 £m | 2015 £m |
|---|---|---|
| Fees payable to the auditor for the audit of the Company and consolidated financial statements | 0.5 | 0.5 |
| Fees payable to the auditor and its associates for other services: | | |
| Audit of the Company's subsidiaries | 2.5 | 2.5 |
| Audit-related assurance services | 0.9 | 0.8 |
| Other assurance services | 0.5 | 0.5 |
| Tax advisory services | 0.1 | 0.1 |
| Tax compliance services | 0.2 | 0.7 |
| Other non-audit services | 0.3 | 0.2 |
|  | 5.0 | 5.3 |

Financial report

# Notes to the accounts

6. Tax expense

The Group is headquartered in the UK and pays taxes according to the rates applicable in the countries and states in which it operates. Most taxes are recorded in the income statement (see part (a)) and relate to taxes payable for the reporting period (current tax). The charge also includes benefits and charges relating to when income or expenses are recognised in a different period for tax and accounting purposes or specific treatment relating to acquisitions (deferred tax – see note 14). Some current and deferred taxes are recorded through other comprehensive income (see part (b)), or directly to equity where the tax arises from changes in the value of remuneration settled as shares (see part (c)).

(a) Analysis of tax charge reported in the income statement

|  | 2016 £m | 2015 £m |
|---|---|---|
| UK current year charge | 54.0 | 45.7 |
| Rest of the world current year charge | 89.0 | 84.0 |
| Adjustments in respect of prior periods | (0.3) | 4.9 |
| Total current tax | 142.7 | 134.6 |
| Origination and reversal of temporary differences | (10.4) | (7.5) |
| Adjustments in respect of prior year estimates | (2.0) | (4.3) |
| Effect of changes in Corporation Tax rates | (2.4) | (1.2) |
| Total deferred tax | (14.8) | (13.0) |
| Tax charge reported in the income statement | 127.9 | 121.6 |

(b) Analysis of tax charge/(credit) reported in other comprehensive income

|  | 2016 £m | 2015 £m |
|---|---|---|
| Current income tax on movements in available-for-sale financial assets | 2.9 | (3.8) |
| Deferred tax on actuarial (losses)/gains on defined benefit pension schemes | (0.3) | 1.6 |
| Deferred tax – effect of changes in Corporation Tax rates | 0.4 | 0.7 |
| Tax charge/(credit) reported in other comprehensive income | 3.0 | (1.5) |

(c) Analysis of tax credit reported in equity

|  | 2016 £m | 2015 £m |
|---|---|---|
| Current income tax on Equity Compensation Plan and other share-based remuneration | (4.2) | (12.5) |
| Deferred tax on Equity Compensation Plan and other share-based remuneration | 3.6 | 4.7 |
| Deferred tax – effect of changes in Corporation Tax rates | (0.3) | 0.4 |
| Tax credit reported in equity | (0.9) | (7.4) |

(d) Factors affecting tax charge for the year

The UK standard rate of corporation tax for 2016 is 20% (2015: effective rate of 20.25%). The tax charge for the year is higher (2015: higher) than the UK standard rate of corporation tax for the period of 20%. The differences are explained below:

|  | 2016 £m | 2015 £m |
|---|---|---|
| Profit before tax | 618.1 | 589.0 |
| Less post-tax profits of associates and joint ventures | (19.5) | (19.3) |
| Profit before tax of Group entities | 598.6 | 569.7 |
| Profit before tax of consolidated Group entities multiplied by Corporation Tax at the UK standard rate of 20% (2015: 20.25%) | 119.7 | 115.4 |
| **Effects of:** |  |  |
| Different statutory tax rates of overseas jurisdictions | 12.1 | 12.8 |
| Permanent differences including non-taxable income and non-deductible expenses | 1.7 | (4.1) |
| Net movement in timing differences for which no deferred tax is recognised | (0.9) | (1.9) |
| Deferred tax adjustments in respect of changes in Corporation Tax rates | (2.4) | (1.2) |
| Prior year adjustments | (2.3) | 0.6 |
| Tax charge reported in the income statement | 127.9 | 121.6 |

## 6. Tax expense continued

**Estimates and judgements**
The Group is subject to corporate income taxes in the various locations in which it operates. The calculation of the Group's tax charge involves a degree of estimation and judgement. Liabilities relating to open and judgemental matters, including those in relation to deferred taxes, are based on estimates made after taking into account external advice, where appropriate. The Group engages constructively and transparently with tax authorities with a view to early resolution of any uncertain tax matters. Where the final tax outcome of these matters is different from the amounts provided, such differences will impact the tax charge in a future period.

Future tax charges may also be impacted by the different rates of growth in the jurisdictions in which the Group operates, business acquisitions and disposals and changes to tax rules.

## 7. Earnings per share

This key performance indicator shows the portion of the Group's profit after tax that is attributable to each share (excluding own shares held by the Group). The calculation is based on the weighted average number of shares in issue during the year. The diluted figure recalculates that number as if all share options that would be expected to be exercised, as they have value to the option holder, had been exercised in the period. Shares that may be issued are not taken into account if the impact does not reduce earnings per share.

Reconciliation of the figures used in calculating basic and diluted earnings per share:

| | 2016 Number Millions | 2015 Number Millions |
|---|---|---|
| Weighted average number of shares used in calculation of basic earnings per share | 274.7 | 273.1 |
| Effect of dilutive potential shares – share options | 5.6 | 7.0 |
| Effect of dilutive potential shares – contingently issuable shares | 0.2 | 0.6 |
| Weighted average number of shares used in calculation of diluted earnings per share | 280.5 | 280.7 |

The earnings per share calculations are based on profit after tax excluding non-controlling interest of £0.5 million (2015: £0.1 million).

## 8. Dividends

Dividends are distributions of profit to holders of the Group's share capital, usually announced with the Group's half-year and annual results. Dividends are recognised only when they are paid or approved by shareholders. The reduction in equity in the year therefore comprises the prior year final dividend and the current year interim dividend.

| | 2017 £m | 2017 Pence per share | 2016 £m | 2016 Pence per share | 2015 £m | 2015 Pence per share |
|---|---|---|---|---|---|---|
| Prior years final dividend paid | | | 157.7 | 58.0 | 147.3 | 54.0 |
| Interim dividend paid | | | 78.9 | 29.0 | 79.0 | 29.0 |
| Total dividends paid | | | 236.6 | 87.0 | 226.3 | 83.0 |
| Current year final dividend recommended | 174.7 | 64.0 | | | | |

Dividends of £9.2 million (2015: £8.2 million) on shares held by employee benefit trusts have been waived; dividends may not be paid on treasury shares. The Board has recommended a 2016 final dividend of 64.0 pence per share (2015 final dividend: 58.0 pence), amounting to £174.7 million (2015 final dividend: £157.7 million). The dividend will be paid on 4 May 2017 to shareholders on the register at 31 March 2017 and will be accounted for in 2017.

Financial report

# Notes to the accounts

### 9. Trade and other receivables

Trade and other receivables includes prepayments and deposits with banks in the form of bullion as well as amounts the Group is due to receive from third parties in the normal course of business. Trade and other receivables, other than deposits with banks in the form of bullion which are recorded at fair value, are recorded initially at fair value and subsequently at amortised cost (see note 10), after the deduction of provisions for impairment. Prepayments arise where the Group pays cash in advance for services. As the service is provided, the prepayment is reduced and the operating expense recognised in the income statement. Amounts due from third parties include fees yet to be received as well as settlement accounts for transactions undertaken on behalf of funds and investors.

| | 2016 | | | 2015 | | |
|---|---|---|---|---|---|---|
| | Non-current £m | Current £m | Total £m | Non-current £m | Current £m | Total £m |
| Trade and other receivables held at amortised cost: | | | | | | |
| Fee debtors | – | 67.2 | 67.2 | – | 38.1 | 38.1 |
| Settlement accounts | – | 160.1 | 160.1 | – | 129.2 | 129.2 |
| Accrued income | – | 325.4 | 325.4 | – | 282.8 | 282.8 |
| Prepayments | 0.2 | 26.6 | 26.8 | 0.3 | 25.1 | 25.4 |
| Other receivables | 2.0 | 26.1 | 28.1 | 2.0 | 20.5 | 22.5 |
| Current tax | – | 11.8 | 11.8 | – | 8.7 | 8.7 |
| | 2.2 | 617.2 | 619.4 | 2.3 | 504.4 | 506.7 |
| Trade and other receivables held at fair value: | | | | | | |
| Deposits with banks in the form of bullion | – | 28.8 | 28.8 | – | 20.1 | 20.1 |
| | 2.2 | 646.0 | 648.2 | 2.3 | 524.5 | 526.8 |

As a result of their short-term nature, the fair value of trade and other receivables held at amortised cost approximates to their carrying value. Deposits with banks in the form of bullion are categorised as level 1 in the fair value hierarchy (see note 10).

### 10. Financial assets

The Group holds financial assets including equities, debt securities and derivatives to support its Group capital strategies and its Wealth Management book and client loans. The Group enters into derivatives on behalf of Wealth Management clients, referred to as client facilitation (see note 20).

The Group initially records all financial assets at fair value, which is the cost of acquiring the asset or, in the case of loans, the amount loaned to clients. The Group holds each financial asset either at fair value ('fair value through profit or loss' and 'available-for-sale') or at amortised cost ('held to maturity' and 'loans and receivables'). Fair value is explained on page 117. Amortised cost is the basis of moving the initial value at which the financial instrument is recognised to the maturity value on a systematic basis using a fixed interest rate (effective interest rate), taking account of repayment dates and initial premiums or discounts. The carrying value of amortised cost financial instruments is adjusted for impairments. Impairment is normally determined based on an assessment of future cash flows discounted using the original effective interest rate compared with contractual amounts.

**Hedge accounting**
Where derivatives are held for risk management purposes, the Group designates certain derivatives as fair value hedges or hedges of a net investment in a foreign operation. In these scenarios, and where relevant conditions are met, hedge accounting is applied and the Group formally documents the relationship between the derivative and any hedged item, its risk management objectives and its strategy for undertaking the various hedging transactions. It also documents its assessment, both at hedge inception and on an ongoing basis, of whether the derivatives that are used in hedging transactions are highly effective in offsetting changes in the fair value of hedged items.

For fair value hedges which meet the conditions for hedge accounting, any gain or loss from remeasuring the hedging instrument at fair value is recognised immediately in the income statement. Any gain or loss on the hedged item attributable to the hedged risk is adjusted against the carrying amount of the hedged item and recognised in the income statement whereas, for an available-for-sale asset, it would otherwise have been recorded in other comprehensive income. Hedge accounting is discontinued when the hedging instrument no longer qualifies for hedge accounting or the instrument is derecognised.

In respect of hedges of a net investment in a foreign operation, the portion of the gain or loss on the hedging instrument that is determined to be an effective hedge is recognised directly in other comprehensive income. The ineffective portion is recognised in the income statement. On disposal of the foreign operation, the cumulative gain or loss on the hedging instrument recognised directly in other comprehensive income is transferred to the income statement.

Business and financial review
Consolidated financial statements

Notes to the accounts
Schroders plc financial statements

Independent Auditors' report

## 10. Financial assets continued

| | 2016 | | | 2015 | | |
|---|---|---|---|---|---|---|
| | Listed £m | Unlisted £m | Total £m | Listed £m | Unlisted £m | Total £m |
| **Non-current financial assets:** | | | | | | |
| Held to maturity | 2.8 | – | 2.8 | 15.0 | – | 15.0 |
| Loans and receivables | – | 179.6 | 179.6 | – | 273.4 | 273.4 |
| Fair value through profit or loss – derivatives | – | 17.2 | 17.2 | – | 0.3 | 0.3 |
| Fair value through profit or loss – other investments | – | 0.7 | 0.7 | – | 0.1 | 0.1 |
| Available-for-sale | 16.3 | 41.9 | 58.2 | 18.6 | 32.8 | 51.4 |
| | 19.1 | 239.4 | 258.5 | 33.6 | 306.6 | 340.2 |
| **Current financial assets:** | | | | | | |
| Held to maturity | 146.7 | – | 146.7 | 99.6 | – | 99.6 |
| Loans and receivables | – | 1,174.0 | 1,174.0 | – | 736.3 | 736.3 |
| Fair value through profit or loss – derivatives | – | 23.2 | 23.2 | – | 37.9 | 37.9 |
| Fair value through profit or loss – other investments | 647.8 | 131.6 | 779.4 | 523.1 | 56.8 | 579.9 |
| Available-for-sale | 672.1 | 51.1 | 723.2 | 632.9 | 19.9 | 652.8 |
| | 1,466.6 | 1,379.9 | 2,846.5 | 1,255.6 | 850.9 | 2,106.5 |
| | 1,485.7 | 1,619.3 | 3,105.0 | 1,289.2 | 1,157.5 | 2,446.7 |

The fair value of held to maturity financial assets and loans and receivables held at amortised cost approximates to their carrying value in both 2016 and 2015.

---

**Estimates and judgements – fair value measurements**

The Group holds financial instruments that are measured at fair value. Fair value is the amount for which an asset could be exchanged, or a liability settled, between knowledgeable, willing parties in an arm's length transaction.

The fair value of financial instruments may require some judgement or may be derived from readily available sources. The degree of judgement involved is reflected below, although this does not necessarily indicate that the fair value is more or less likely to be realised.

For investments that are actively traded in financial markets, fair value is determined by reference to official quoted market prices. For investments that are not actively traded, fair value is determined by using quoted prices from third parties such as brokers, market makers and pricing agencies.

Financial assets that have no quoted price principally consist of investments in private equity funds, derivatives and certain loans in Wealth Management. The determination of fair value for these instruments requires significant judgement, particularly in determining whether changes in fair value have occurred since the last formal valuation.

The Group's financial instruments have been categorised using a fair value hierarchy that reflects the extent of judgements used in the valuation. These levels are based on the degree to which the fair value is observable and are defined as follows:

– Level 1 fair value measurements are those derived from quoted prices (unadjusted) in active markets for identical assets or liabilities and principally comprise investments in quoted equities and government debt, daily-priced funds and exchange-traded derivatives;
– Level 2 fair value measurements are those derived from prices that are not traded in an active market but are determined using valuation techniques, which make maximum use of observable market data. The Group's level 2 financial instruments principally comprise foreign exchange contracts, certain debt securities, asset and mortgage backed securities, and loans held at fair value. Valuation techniques may include using a broker quote in an inactive market or an evaluated price based on a compilation of primarily observable market information utilising information readily available via external sources. For funds not priced on a daily basis, the net asset value which is issued monthly or quarterly is used; and
– Level 3 fair value measurements are those derived from valuation techniques that include inputs for the asset or liability that are not based on observable market data and principally comprise investments in private equity funds. These funds are managed by third parties and are measured at the values provided by the relevant fund managers, unadjusted by the Group except for known events, such as calls or distributions, that have occurred between the valuation and reporting date. The valuation review is a continual process throughout the year.

---

Financial report

# Notes to the accounts

**10. Financial assets** continued
The Group's financial assets held at fair value (excluding those held in the Life Company – see note 15) at the year end date are analysed as follows:

| | 2016 | | | |
| | Level 1 £m | Level 2 £m | Level 3 £m | Total £m |
|---|---|---|---|---|
| **Non-current financial assets:** | | | | |
| Equities | 15.6 | 1.6 | 37.2 | 54.4 |
| Debt securities | – | 3.8 | – | 3.8 |
| Derivative contracts | – | 0.1 | 17.1 | 17.2 |
| Other instruments | – | 0.7 | – | 0.7 |
| | 15.6 | 6.2 | 54.3 | 76.1 |
| **Current financial assets:** | | | | |
| Equities | 591.6 | 8.1 | 1.2 | 600.9 |
| Debt securities | 180.1 | 720.3 | 1.3 | 901.7 |
| Derivative contracts | 0.6 | 22.6 | – | 23.2 |
| | 772.3 | 751.0 | 2.5 | 1,525.8 |
| | 787.9 | 757.2 | 56.8 | 1,601.9 |

£703.3 million of debt securities were transferred from level 1 to level 2 during the year (2015: no transfers from level 1 to level 2) as a result of a change to the methodology applied by the Group's third party pricing provider. This change did not represent degradation in the quality of assets held. No financial assets were transferred from level 2 to level 1 during 2015 or 2016.

| | 2015 | | | |
| | Level 1 £m | Level 2 £m | Level 3 £m | Total £m |
|---|---|---|---|---|
| **Non-current financial assets:** | | | | |
| Equities | 14.5 | 1.1 | 32.6 | 48.2 |
| Debt securities | – | 3.2 | – | 3.2 |
| Derivative contracts | – | 0.3 | – | 0.3 |
| Other instruments | – | 0.1 | – | 0.1 |
| | 14.5 | 4.7 | 32.6 | 51.8 |
| **Current financial assets:** | | | | |
| Equities | 520.1 | 5.4 | 1.0 | 526.5 |
| Debt securities | 677.5 | 17.8 | – | 695.3 |
| Derivative contracts | 15.5 | 22.4 | – | 37.9 |
| Other instruments | – | 10.9 | – | 10.9 |
| | 1,213.1 | 56.5 | 1.0 | 1,270.6 |
| | 1,227.6 | 61.2 | 33.6 | 1,322.4 |

Movements in financial assets categorised as Level 3 during the year were:

| | 2016 £m | 2015 £m |
|---|---|---|
| At 1 January | 33.6 | 40.0 |
| Exchange translation adjustments | 3.9 | (0.9) |
| Total gains recognised in the income statement | 0.3 | – |
| Total gains recognised in other comprehensive income[1] | 1.9 | 13.5 |
| Additions | 23.7 | – |
| Disposals | (6.6) | (19.0) |
| At 31 December | 56.8 | 33.6 |

[1] Reported within net fair value movement arising from available-for-sale financial assets.

Transfers are assumed to have occurred at the beginning of the period.

---

**Estimates and judgements – impairment of financial assets**
The Group's financial assets categorised as available-for-sale are assessed for impairment by considering the extent to which the fair value of an investment is below cost and to the length of time that the fair value of an instrument has been below cost.

In determining whether financial assets are impaired, the Group considers whether there are any indicators that counterparties are experiencing financial difficulty or that the fair value is otherwise unlikely to recover in the long-term. The Group monitors its Wealth Management loans on a daily basis and exercises judgement in determining whether a loan should be impaired. This includes, amongst other steps, assessing the financial condition of the borrower and the value of the loan compared to the collateral pledged by the borrower.

---

## 11. Associates and joint ventures

Associates are entities the Group partly owns and over which it has significant influence, but not control, through participation in the financial and operating policy decisions. Joint ventures are entities in which the Group has an investment where it, along with one or more other shareholders, has contractually agreed to share control of the business and where the major decisions require the unanimous consent of the joint partners. In both cases, the Group's income statement reflects its share of the entity's profit or loss after tax and amortisation of intangible assets, the statement of other comprehensive income records the Group's share of gains and losses arising from the entity's available-for-sale financial assets, the statement of financial position records the Group's share of the net assets of the entity plus any goodwill and intangible assets that arose on purchase less subsequent amortisation and the statement of changes in equity records the Group's share of other equity movements of the entity. Goodwill and intangible assets are reviewed regularly for impairment.

The associates and joint ventures reserve in the statement of changes in equity represents the Group's share of profits in its investments yet to be received (for example, in the form of dividends or distributions), less any amortisation of intangible assets.

### (a) Investments in associates and joint ventures accounted for using the equity method

|  | 2016 | | | 2015 | | |
|---|---|---|---|---|---|---|
|  | Associates[1] £m | Joint ventures[2] £m | Total £m | Associates £m | Joint ventures £m | Total £m |
| At 1 January | 104.9 | 4.3 | 109.2 | 88.3 | 4.3 | 92.6 |
| Exchange translation adjustments | 10.7 | 0.1 | 10.8 | 0.8 | (0.1) | 0.7 |
| Additions | 3.5 | – | 3.5 | – | – | – |
| Disposals | – | (2.2) | (2.2) | – | – | – |
| Profit for the year after tax | 19.0 | 0.5 | 19.5 | 18.4 | 0.9 | 19.3 |
| (Losses)/gains recognised in other comprehensive income | (6.2) | – | (6.2) | 5.2 | – | 5.2 |
| Other movements in reserves of associates and joint ventures | (0.9) | – | (0.9) | 0.5 | – | 0.5 |
| Capital redemptions and distributions of profit | (7.9) | (0.8) | (8.7) | (8.3) | (0.8) | (9.1) |
| At 31 December | 123.1 | 1.9 | 125.0 | 104.9 | 4.3 | 109.2 |

[1] On 22 March 2016, the Group entered into a strategic relationship with a Dutch direct lending platform, NEOS Finance Group B.V. Schroders acquired a 25% holding in the business, which is accounted for as an associate using the equity accounting method.

[2] On 1 February 2016, the Group increased its holding in Secquaero Advisors AG (Secquaero) from 30.0% to 50.1%. Accordingly, from 1 February 2016, Secquaero was consolidated into the Group as a subsidiary. Prior to this date, Secquaero was accounted for as a joint venture using the equity accounting method. This change in ownership is required to be accounted for as a disposal of a joint venture and an acquisition of a subsidiary (see note 29).

Information about the associates held by the Group at 31 December 2016 is shown below. The companies are unlisted.

| Name of associate | Status | Nature of its business | Principal place of business | Class of share | Percentage owned by the Group |
|---|---|---|---|---|---|
| Schroder Ventures Investments Limited (SVIL) | Associate | Private equity investment | Guernsey | Ordinary, deferred and redeemable preference shares | 50%[1] |
| RWC Partners Limited (RWC) | Associate | Investment management | England | Ordinary shares | 43% |
| Bank of Communications Schroder Fund Management Co. Ltd. (BoCom) | Associate | Investment management | China | Ordinary shares | 30% |
| Axis Asset Management Company Limited (Axis) | Associate | Investment management | India | Ordinary shares | 25% |
| NEOS Finance Group B.V. (NEOS) | Associate | Direct lending platform provider | Netherlands | Ordinary shares | 25% |

[1] The Group holds 50% of each class of share.

# Notes to the accounts

**11. Associates and joint ventures continued**

Summarised financial information in respect of the Group's associates accounted for using the equity method is set out below:

| | 2016 | | | | | | 2015 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | SVIL £m | RWC £m | BoCom £m | Axis £m | NEOS £m | Total £m | SVIL £m | RWC £m | BoCom £m | Axis £m | Total £m |
| Non-current assets | 1.5 | 0.4 | 51.4 | 13.5 | 1.3 | 68.1 | 1.4 | 0.5 | 23.0 | 13.8 | 38.7 |
| Current assets | 3.9 | 44.0 | 254.0 | 27.3 | 0.6 | 329.8 | 4.0 | 42.7 | 232.0 | 15.1 | 293.8 |
| Non-current liabilities | (1.3) | – | – | (5.4) | (1.5) | (8.2) | (1.3) | – | – | (7.1) | (8.4) |
| Current liabilities | (0.1) | (12.6) | (59.2) | (11.9) | (0.3) | (84.1) | (0.1) | (12.9) | (52.3) | (7.1) | (72.4) |
| Total equity | 4.0 | 31.8 | 246.2 | 23.5 | 0.1 | 305.6 | 4.0 | 30.3 | 202.7 | 14.7 | 251.7 |
| Group's share of net assets | 2.0 | 13.7 | 73.9 | 5.9 | – | 95.5 | 2.0 | 13.7 | 60.8 | 3.7 | 80.2 |
| Goodwill and intangible assets | – | 10.2 | – | 14.0 | 3.4 | 27.6 | – | 10.7 | – | 14.0 | 24.7 |
| Carrying value held by the Group | 2.0 | 23.9 | 73.9 | 19.9 | 3.4 | 123.1 | 2.0 | 24.4 | 60.8 | 17.7 | 104.9 |
| Net income | – | 36.2 | 133.0 | 53.4 | 0.3 | 222.9 | 5.8 | 37.5 | 111.8 | 34.1 | 189.2 |
| Profit/(loss) for the year | – | 11.1 | 49.8 | 5.6 | (0.4) | 66.1 | 5.6 | 13.2 | 37.1 | 1.6 | 57.5 |
| Other comprehensive (loss)/income | – | – | (20.7) | – | – | (20.7) | – | – | 17.3 | – | 17.3 |
| Total comprehensive income/(loss) | – | 11.1 | 29.1 | 5.6 | (0.4) | 45.4 | 5.6 | 13.2 | 54.4 | 1.6 | 74.8 |
| Group's share of profit/(loss) for the year before amortisation | – | 4.8 | 14.9 | 1.4 | (0.1) | 21.0 | 2.8 | 5.9 | 11.1 | 0.4 | 20.2 |
| Amortisation charge | – | – | – | (2.0) | – | (2.0) | – | – | – | (1.8) | (1.8) |
| Group's share of profit/(losses) for the year | – | 4.8 | 14.9 | (0.6) | (0.1) | 19.0 | 2.8 | 5.9 | 11.1 | (1.4) | 18.4 |
| Group's share of other comprehensive (loss)/income | – | – | (6.2) | – | – | (6.2) | – | – | 5.2 | – | 5.2 |
| Group's share of total comprehensive income/(losses) | – | 4.8 | 8.7 | (0.6) | (0.1) | 12.8 | 2.8 | 5.9 | 16.3 | (1.4) | 23.6 |

**(b) Investments in associates measured at fair value**

Where the Group holds units in investment vehicles that give the Group significant influence, but not control, through participation in the financial and operating policy decisions, the Group records such investments at fair value. Information about the Group's principal associates measured at fair value is shown below. The investments are recorded as financial assets within the Group's statement of financial position.

Summarised financial information in respect of the Group's associates held at fair value is set out below:

| | 2016 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Hartford Schroder Emerging Markets Multi-Sector Bond Fund £m | SISF Global Unconstrained Bond Fund £m | Schroder Global Shariah Equity Fund £m | Schroder Specialist Value UK Equity Fund £m | Schroder All Maturities Corporate Bond Fund £m | Schroder Institutional Sterling Bond Fund £m | Schroder Global Equity Fund £m | Schroder QEP Global Emerging Markets Fund £m |
| Current assets | 47.7 | 50.9 | 20.1 | 102.0 | 889.8 | 10.4 | 345.9 | 632.9 |
| Current liabilities | (0.1) | (1.7) | (3.1) | (0.1) | (2.5) | (0.2) | (4.5) | (0.6) |
| Total equity | 47.6 | 49.2 | 17.0 | 101.9 | 887.3 | 10.2 | 341.4 | 632.3 |
| Net income | 6.2 | 3.2 | 1.2 | 24.5 | 98.1 | 7.0 | 72.7 | 14.5 |
| Profit for the year | 5.9 | 2.7 | 0.5 | 24.5 | 97.9 | 6.9 | 72.7 | 14.2 |
| Total comprehensive income | 5.9 | 2.7 | 0.5 | 24.5 | 97.9 | 6.9 | 72.7 | 14.2 |
| Country of incorporation | USA | Luxembourg | Indonesia | UK | UK | UK | UK | UK |
| Percentage owned by the Group | 39% | 29% | 25% | 32% | 25% | 23% | 21% | 30% |

## 11. Associates and joint ventures continued

| | BB Multimercado Schroder Europa Investimento No Exterior Fundo De Investimento £m | BB Multimercado Schroder Investimento No Exterior Fundo De Investimento £m | Schroder Specialist Value UK Equity Fund £m | Schroder All Maturities Corporate Bond Fund £m | Schroder Institutional International Bond Fund £m | Schroder Dynamic Multi Asset Fund £m |
|---|---|---|---|---|---|---|
| Current assets | 10.9 | 39.1 | 102.8 | 859.6 | 58.4 | 223.3 |
| Current liabilities | – | (0.5) | (0.1) | (3.2) | (0.3) | (5.4) |
| Total equity | 10.9 | 38.6 | 102.7 | 856.4 | 58.1 | 217.9 |
| Net income | 0.6 | 4.7 | (3.3) | 11.7 | 0.6 | (4.2) |
| Profit/(loss) for the year | 0.6 | 4.7 | (3.7) | 11.2 | 0.6 | (4.9) |
| Total comprehensive income/(loss) | 0.6 | 4.7 | (3.7) | 11.2 | 0.6 | (4.9) |
| Country of incorporation | Brazil | Brazil | UK | UK | UK | UK |
| Percentage owned by the Group | 39% | 32% | 38% | 24% | 31% | 37% |

2015 column header above.

## 12. Property, plant and equipment

The Group's property, plant and equipment provide the infrastructure to enable the Group to operate and principally comprise computer equipment and leasehold improvements. Assets are initially stated at cost, which includes expenditure associated with acquisition. The cost of the asset is recognised in the income statement as a depreciation charge on a straight line basis over the estimated useful life.

| | 2016 £m | 2015 £m |
|---|---|---|
| **Cost** | | |
| At 1 January | 113.6 | 106.2 |
| Exchange translation adjustments | 8.3 | (0.1) |
| Additions | 33.5 | 21.0 |
| Disposals | (0.6) | (13.5) |
| At 31 December | 154.8 | 113.6 |
| **Accumulated depreciation** | | |
| At 1 January | (71.8) | (76.3) |
| Exchange translation adjustments | (5.3) | – |
| Depreciation charge for the year | (11.7) | (8.7) |
| Disposals | 0.4 | 13.2 |
| At 31 December | (88.4) | (71.8) |
| Net book value at 31 December | 66.4 | 41.8 |

Financial report

# Notes to the accounts

### 13. Goodwill and intangible assets

Intangible assets (other than software) arise when the Group acquires a business and the fair value paid exceeds the fair value of the net tangible assets acquired. This premium reflects additional value that the Group determines to be attached to the business. Intangible assets include technology, contractual agreements to manage client funds and gain additional access to new or existing clients, geographies and brand names. Where such assets can be identified, they are classified as intangible assets arising from business combinations and charged to the income statement over time.

Consideration paid to acquire the business in excess of the acquisition date fair value of net tangible and intangible assets is known as goodwill. Goodwill is not charged to the income statement unless its value has diminished. Assessment of whether goodwill has become impaired is based on the expected future returns of the relevant business area as a whole.

Software purchased for use in the business is also classified as an intangible asset. The cost of purchasing software is taken to the income statement over time as an amortisation charge within operating expenses. The treatment is similar to property, plant and equipment and the asset is normally amortised on a straight line basis over three to five years, but can have estimated useful lives of up to 10 years.

| | 2016 | | | | 2015 | | | |
| | Goodwill £m | Acquired intangible assets £m | Software £m | Total £m | Goodwill £m | Acquired intangible assets £m | Software £m | Total £m |
|---|---|---|---|---|---|---|---|---|
| **Cost** | | | | | | | | |
| At 1 January | 359.1 | 136.7 | 80.8 | 576.6 | 357.3 | 135.5 | 88.2 | 581.0 |
| Exchange translation adjustments | 13.2 | 5.9 | 3.1 | 22.2 | 1.8 | 1.2 | 0.1 | 3.1 |
| Additions | 82.6 | 44.0 | 32.3 | 158.9 | – | – | 18.4 | 18.4 |
| Disposals | – | – | – | – | – | – | (25.9) | (25.9) |
| At 31 December | 454.9 | 186.6 | 116.2 | 757.7 | 359.1 | 136.7 | 80.8 | 576.6 |
| **Accumulated amortisation** | | | | | | | | |
| At 1 January | – | (73.9) | (35.3) | (109.2) | – | (55.1) | (51.4) | (106.5) |
| Exchange translation adjustments | – | (4.0) | (2.7) | (6.7) | – | (0.8) | (0.1) | (0.9) |
| Amortisation charge for the year | – | (19.4) | (15.3) | (34.7) | – | (18.0) | (9.7) | (27.7) |
| Disposals | – | – | – | – | – | – | 25.9 | 25.9 |
| At 31 December | – | (97.3) | (53.3) | (150.6) | – | (73.9) | (35.3) | (109.2) |
| **Carrying amount at 31 December** | 454.9 | 89.3 | 62.9 | 607.1 | 359.1 | 62.8 | 45.5 | 467.4 |

Of the total goodwill of £454.9 million (2015: £359.1 million), £320.2 million (2015: £290.2 million) is allocated to Asset Management and £134.7 million (2015: £68.9 million) to Wealth Management.

The Group acquired £44.0 million of intangible assets as a result of business combinations completed in 2016 (see note 29). Additionally, the Group has intangible assets arising from the 2013 acquisition of Cazenove Capital Holdings Limited (Cazenove Capital); the proportion of assets allocated to Asset Management (£34.1 million at 2 July 2013) is being charged to the income statement over four years, and the proportion allocated to Wealth Management (£66.7 million at 2 July 2013) over eight years.

### Estimates and judgments
The Group determined the fair value of acquired intangible assets based on estimated profits, taking account of synergies, derived from contractual relationships that existed at the acquisition date. This assessment involved judgements and assumptions relating to potential future revenues, appropriate discount rates and the expected duration of client relationships. The difference between the fair value of the consideration and the value of the identifiable assets and liabilities acquired, including intangible assets, was accounted for as goodwill.

At each reporting date, an assessment is made as to whether there is any indication that goodwill or an acquired intangible asset may be impaired. If any indication exists and a full assessment determines that the carrying value exceeds the estimated recoverable amount at that time, the assets are written down to their recoverable amount.

The recoverable amount of goodwill is determined using a discounted cash flow model, details of which are provided on page 123. Any impairment is recognised immediately in the income statement and cannot be reversed. Goodwill acquired in a business combination is allocated to the cash-generating units (CGUs) that are expected to benefit from that business combination. For all relevant acquisitions, the lowest level of CGU is the Group uses to determine impairment is segment level for Asset Management. The Benchmark Capital business within Wealth Management is assessed separately from the rest of Wealth Management.

The recoverable amount of acquired intangible assets is the greater of fair value less costs to sell and the updated discounted valuation of the remaining net residual income stream. Any impairment is recognised immediately in the income statement but may be reversed if relevant conditions improve.

### 13. Goodwill and Intangible assets continued

The recoverable amounts of the CGUs are determined from value-in-use calculations applying a discounted cash flow model. The key assumptions on which the Group's cash flow projections are based include long-term market growth rates of 2% per annum (2015: 2%), a pre-tax discount rate of 10% (2015: 12%), expected fund flows and expected changes to margins. The results of the calculation indicate that goodwill is not impaired.

The sensitivity of the carrying amounts of goodwill to the methods and assumptions used in estimating the recoverable amounts of the CGUs is small. This is due to the amount of goodwill allocated to the relevant CGU relative to the size of the relevant future profitability estimate. Movements in the growth rate and/or the discount rate of 1% would not lead to any impairment. A comparison of actual results to the projected results used to assess goodwill impairment in prior years reveals that the Group would have recognised no changes (2015: nil) to its goodwill asset in the year as a result of inaccurate projections.

### 14. Deferred tax

Deferred tax assets and liabilities represent amounts of tax that will become recoverable and payable in future accounting periods. They arise as a result of temporary differences, where the time at which profits and losses are recognised for tax purposes differs from the time at which the relevant transaction is recorded in the accounts. A deferred tax asset represents a tax reduction that is expected to arise in a future period. A deferred tax liability represents taxes which will become payable in a future period as a result of a current or prior year transaction.

Deferred tax liabilities also arise on acquisitions where the amortisation of the acquired intangible asset does not result in a tax deduction. The deferred tax liability is established on acquisition and is released to the income statement to match the intangible asset amortisation.

Deferred tax assets and liabilities are measured at the tax rates that are expected to apply to the period when the asset is realised or the liability is settled, based on tax rates (and tax laws) that have been enacted or substantively enacted at the year end date.

**Movement in deferred tax assets and liabilities**

|  | Accelerated capital allowances £m | Deferred employee awards £m | Pension surplus £m | Other net temporary differences £m | Total £m |
|---|---|---|---|---|---|
| At 1 January 2016 | 1.9 | 79.9 | (20.8) | (7.7) | 53.3 |
| Income statement credit/(charge) | 2.1 | 6.9 | (0.8) | 4.2 | 12.4 |
| Income statement credit/(charge) due to changes in tax rates | 0.1 | 0.9 | 1.6 | (0.2) | 2.4 |
| Credit to statement of other comprehensive income | – | – | 0.3 | – | 0.3 |
| Charge to statement of other comprehensive income due to changes in tax rates | – | – | (0.4) | – | (0.4) |
| Charge taken to equity | – | (3.6) | – | – | (3.6) |
| Credit to equity due to changes in tax rates | – | 0.3 | – | – | 0.3 |
| Acquisitions and disposals (see note 29) | – | – | – | (7.1) | (7.1) |
| Exchange adjustments | (0.6) | 8.3 | – | 0.5 | 8.2 |
| At 31 December 2016 | 3.5 | 92.7 | (20.1) | (10.3) | 65.8 |

|  | Accelerated capital allowances £m | Deferred employee awards £m | Pension surplus £m | Other net temporary differences £m | Total £m |
|---|---|---|---|---|---|
| At 1 January 2015[1] | 0.3 | 80.4 | (20.8) | (12.5) | 47.4 |
| Income statement credit/(charge) | 1.7 | 6.0 | (0.7) | 4.8 | 11.8 |
| Income statement (charge)/credit due to changes in tax rates | (0.1) | (2.4) | 3.0 | 0.7 | 1.2 |
| Charge to statement of other comprehensive income | – | – | (1.6) | – | (1.6) |
| Charge to statement of other comprehensive income due to changes in tax rates | – | – | (0.7) | – | (0.7) |
| Charge taken to equity | – | (4.7) | – | – | (4.7) |
| Charge to equity due to changes in tax rates | – | (0.4) | – | – | (0.4) |
| Exchange adjustments | – | 1.0 | – | (0.7) | 0.3 |
| At 31 December 2015 | 1.9 | 79.9 | (20.8) | (7.7) | 53.3 |

[1] 2015 has been re-presented for consistency with the 2016 presentation, see Presentation of the financial statements on page 151.

A deferred tax asset of £31.3 million (2015: £23.4 million) relating to realised and unrealised capital losses has not been recognised as there is insufficient evidence that there will be sufficient taxable gains in the future against which the deferred tax asset could be utilised.

A deferred tax asset of £10.2 million (2015: £9.2 million) relating to losses and other temporary differences has not been recognised as there is insufficient evidence that there will be sufficient taxable profits against which these losses and temporary differences can be utilised.

Financial report

# Notes to the accounts

**14. Deferred tax continued**

The aggregate amount of gross temporary differences regarding investments in subsidiaries is £5.1 million (2015: £5.7 million). Deferred tax has not been provided as the relevant parent company is able to control the timing of the reversal of the temporary differences and it is probable that the temporary differences will not reverse in the foreseeable future.

After offsetting deferred tax assets and liabilities where appropriate within territories, the net deferred tax asset comprises:

|  | 2016 £m | 2015 £m |
|---|---|---|
| Deferred tax assets | 66.0 | 53.7 |
| Deferred tax liabilities | (0.2) | (0.4) |
|  | 65.8 | 53.3 |

**15. Unit-linked liabilities and assets backing unit-linked liabilities**

The Group operates a unit-linked life assurance business through the wholly-owned subsidiary, Schroder Pension Management Limited (referred to as 'the Life Company'). The Life Company provides investment products through a life assurance wrapper. The investment products do not provide cover for any insurance risk and are therefore recognised and accounted for as financial instruments and presented as financial liabilities due to Life Company investors (policyholders) within unit-linked liabilities.

The investment product is almost identical to a unit trust. The Group earns fee income from managing the investment, which is included in revenue. As it is a life assurance product, the contractual rights and obligations of the investments remain with the Group and the AUM is therefore included on the Group's statement of financial position, together with the liability to investors.

Financial assets and liabilities held by the Life Company are measured at fair value through profit or loss. Other balances include cash and receivables, which are measured at amortised cost (see note 10). The Life Company's assets are regarded as current assets as they represent the amount available to Life Company investors (or third party investors in other funds) who are able to withdraw their funds on call, subject to certain restrictions in the case of illiquidity. Gains and losses from assets and liabilities held to cover investor obligations are attributable to investors in the Life Company or third party investors in the funds. As a result, any gain or loss is offset by a change in the obligation to investors.

Unit-linked liabilities comprise:

|  | 2016 £m | 2015 £m |
|---|---|---|
| Financial liabilities due to Life Company investors | 10,273.3 | 9,851.0 |
| Financial liabilities due to third party investors[1] | 2,654.3 | 1,468.9 |
|  | 12,927.6 | 11,319.9 |

[1] In accordance with accounting standards, the Group is deemed to hold a controlling interest in certain funds as a result of the investments held by the Life Company. This results in all of the assets and liabilities of those funds being consolidated within the Group's statement of financial position and the third party interest in the fund being recorded as a financial liability due to third party investors.

The Group has no primary exposure to market risk, credit risk or liquidity risk in relation to the investments of the Life Company. The risks and rewards associated with its investments are normally borne by the investors in the Life Company's investment products or third party investors in the funds and not by the Life Company itself.

**Fair value measurements of Life Company financial assets and liabilities**

Each of the Life Company's financial assets and liabilities has been categorised using a fair value hierarchy. These levels are based on the degree to which the fair value is observable and are defined in note 10.

The Life Company's financial instruments at the year end date are analysed as follows:

|  | 2016 | | | | |
|---|---|---|---|---|---|
|  | Level 1 £m | Level 2 £m | Level 3 £m | Financial instruments not at fair value £m | Total £m |
| Assets backing unit-linked liabilities | 9,063.0 | 3,289.2 | 44.5 | 530.9 | 12,927.6 |
| Unit-linked liabilities | 12,840.9 | 49.2 | – | 37.5 | 12,927.6 |

|  | 2015 | | | | |
|---|---|---|---|---|---|
|  | Level 1 £m | Level 2 £m | Level 3 £m | Financial instruments not at fair value £m | Total £m |
| Assets backing unit-linked liabilities | 9,007.6 | 1,605.5 | 43.4 | 663.4 | 11,319.9 |
| Unit-linked liabilities | 11,148.2 | 129.5 | – | 42.2 | 11,319.9 |

### 15. Unit-linked liabilities and assets backing unit-linked liabilities continued

The types of instruments found in each of the above levels 1 and 3 for the Life Company are the same as those listed for the non-Life Company instruments in note 10. Level 2 investments principally comprise commercial papers, certificates of deposit, forward foreign exchange contracts and certain debt securities. £1,927.7 million of debt securities were transferred from level 1 to level 2 during the year (2015: no transfers from level 1 to level 2) as a result of a change to the methodology applied by the Group's third party pricing provider. This change did not represent degradation in the quality of assets held.

The fair value of financial instruments not held at fair value approximates to their carrying value in 2015 and 2016.

Movements in financial assets categorised as Level 3 during the year were:

|  | 2016 £m | 2015 £m |
|---|---|---|
| At 1 January | 43.4 | 49.6 |
| Exchange translation adjustments | 6.5 | (3.4) |
| Gains recognised in the income statement | 4.8 | 12.1 |
| Additions | 0.9 | – |
| Disposals | (11.1) | (14.9) |
| At 31 December | 44.5 | 43.4 |

### 16. Trade and other payables

Trade and other payables at amortised cost represent amounts the Group is due to pay in the normal course of business and deferred income, being fees received in advance of services provided. Amounts the Group is due to pay in the normal course of business are made up of creditors and accruals. Accruals represent costs, including remuneration, that are not yet billed or due for payment, but for which the goods or services have been received.

Trade and other payables at fair value comprise deferred cash awards (deferred employee remuneration payable in cash) and bullion deposits by customers.

Trade and other payables are initially recorded at fair value, and are subsequently measured at amortised cost or fair value (see note 10), as shown below.

|  | 2016 | | | 2015 | | |
|---|---|---|---|---|---|---|
|  | Non-current £m | Current £m | Total £m | Non-current £m | Current £m | Total £m |
| **Trade and other payables at amortised cost:** |  |  |  |  |  |  |
| Settlement accounts | – | 169.8 | 169.8 | – | 142.3 | 142.3 |
| Trade creditors | – | 6.3 | 6.3 | – | 8.0 | 8.0 |
| Social security | 22.2 | 53.3 | 75.5 | 19.8 | 50.3 | 70.1 |
| Accruals and deferred income | 9.2 | 447.6 | 456.8 | 10.6 | 408.5 | 419.1 |
| Other payables | 0.6 | 23.2 | 23.8 | 0.6 | 21.8 | 22.4 |
|  | 32.0 | 700.2 | 732.2 | 31.0 | 630.9 | 661.9 |
| **Trade and other payables at fair value:** |  |  |  |  |  |  |
| Deferred cash awards | 78.5 | 43.8 | 122.3 | 50.1 | 29.1 | 79.2 |
| Bullion deposits by customers | – | 28.8 | 28.8 | – | 20.1 | 20.1 |
|  | 78.5 | 72.6 | 151.1 | 50.1 | 49.2 | 99.3 |
|  | 110.5 | 772.8 | 883.3 | 81.1 | 680.1 | 761.2 |

As a result of their short-term nature, the fair value of trade and other payables held at amortised cost approximates to their carrying value. The fair value of bullion deposits by customers is derived from level 1 inputs. The fair value of deferred cash awards is derived from level 1 inputs, being equal to the fair value of the units in funds to which the employee award is linked.

The Group's trade and other payables contractually mature in the following time periods:

|  | 2016 £m | 2015 £m |
|---|---|---|
| Less than 1 year[1] | 772.8 | 680.1 |
| 1 – 2 years | 60.9 | 35.0 |
| 2 – 5 years | 49.0 | 45.9 |
| More than 5 years | 0.6 | 0.2 |
|  | 110.5 | 81.1 |
|  | 883.3 | 761.2 |

[1] Settlement accounts are generally settled within four working days and trade creditors have an average settlement period of 19 working days (2015: 20 working days).

Financial report

# Notes to the accounts

### 17. Financial liabilities

The Group's financial liabilities principally comprise deposits by Wealth Management clients and banking counterparties. They also include derivatives held for client facilitation or interest rate matching in Wealth Management (see note 20), and the hedging of risk exposures within investment capital. The fair value measurements section below reflects the level of judgement involved in determining fair value although this does not necessarily indicate that the fair value is more or less likely to equal the actual settlement cost. Liabilities arise in respect of consolidated funds (consolidation occurs when the Group is deemed to control a fund, usually in respect of Life Company or seed capital investments). When this happens, the Group accounts for the fund in its statement of financial position as if it were wholly-owned by the Group, but records an additional liability representing the fair value of the proportion of the fund owned by third party investors. Where the investment is held by the Life Company, the fair value of the proportion of the fund owned by third party investors is shown as part of unit-linked liabilities (see note 15).

Financial liabilities are initially recorded at fair value, and subsequently at amortised cost or fair value (see note 10), as shown below.

| | 2016 | | | 2015 | | |
|---|---|---|---|---|---|---|
| | Non-current £m | Current £m | Total £m | Non-current £m | Current £m | Total £m |
| **Financial liabilities at amortised cost:** | | | | | | |
| Client accounts | 68.1 | 3,632.2 | 3,700.3 | 187.0 | 2,781.7 | 2,968.7 |
| Deposits by banks | – | 62.5 | 62.5 | – | 51.2 | 51.2 |
| Loan notes in issue | – | 1.8 | 1.8 | – | 2.9 | 2.9 |
| | 68.1 | 3,696.5 | 3,764.6 | 187.0 | 2,835.8 | 3,022.8 |
| **Financial liabilities at fair value:** | | | | | | |
| Derivative contracts (see note 20) | – | 22.3 | 22.3 | – | 47.3 | 47.3 |
| Other financial liabilities held at fair value through profit or loss | 45.6 | 69.5 | 115.1 | 5.4 | 51.0 | 56.4 |
| | 45.6 | 91.8 | 137.4 | 5.4 | 98.3 | 103.7 |
| | | | | | | |
| | 113.7 | 3,788.3 | 3,902.0 | 192.4 | 2,934.1 | 3,126.5 |

Maturity profiles of client accounts, deposits by banks and derivative contracts can be found in notes 19 and 20.

The fair value of financial liabilities held at amortised cost approximates to their carrying value in 2015 and 2016.

Fair value measurements
The Group holds financial liabilities that are measured at fair value. Each instrument has been categorised within one of three levels using a fair value hierarchy that reflects the significance of the inputs used in making the measurements. These levels are based on the degree to which the fair value is observable and are defined in note 10.

The Group's financial liabilities held at fair value (excluding those held in the Life Company – see note 15) at the year end date are analysed as follows:

| | 2016 | | | |
|---|---|---|---|---|
| | Level 1 £m | Level 2 £m | Level 3 £m | Total £m |
| **Non-current financial liabilities:** | | | | |
| Other financial liabilities held at fair value through profit or loss | – | 1.4 | 44.2 | 45.6 |
| | – | 1.4 | 44.2 | 45.6 |
| **Current financial liabilities:** | | | | |
| Derivative contracts | 1.4 | 20.9 | – | 22.3 |
| Other financial liabilities held at fair value through profit or loss | 69.5 | – | – | 69.5 |
| | 70.9 | 20.9 | – | 91.8 |
| | | | | |
| | 70.9 | 22.3 | 44.2 | 137.4 |

## 17. Financial liabilities continued

| | 2015 | | | |
| --- | --- | --- | --- | --- |
| | Level 1 £m | Level 2 £m | Level 3 £m | Total £m |
| **Non-current financial liabilities:** | | | | |
| Other financial liabilities held at fair value through profit or loss | – | 5.4 | – | 5.4 |
| | – | 5.4 | – | 5.4 |
| **Current financial liabilities:** | | | | |
| Derivative contracts | 30.6 | 16.7 | – | 47.3 |
| Other financial liabilities held at fair value through profit or loss | 51.0 | – | – | 51.0 |
| | 81.6 | 16.7 | – | 98.3 |
| | 81.6 | 22.1 | – | 103.7 |

## 18. Provisions and contingent liabilities

Provisions are liabilities where there is uncertainty over the timing or amount of settlement and therefore usually require the use of estimates. They are recognised when three conditions are fulfilled: when the Group has a present obligation (legal or constructive) as a result of a past event, when it is probable that the Group will incur a loss in order to settle the obligation, and when a reliable estimate can be made of the amount of the obligation. They are recorded at the Group's best estimate of the cost of settling the obligation. Any differences between those estimates and the amounts for which the Group actually becomes liable are taken to the income statement as additional charges where the Group has underestimated and credits where the Group has overestimated. Where the estimated timing and settlement is longer-term, the amount is discounted using a rate reflecting specific risks associated with the provision.

Contingent liabilities are potential liabilities where there is even greater uncertainty, which could include a dependency on events not within the Group's control, but where there is a possible obligation. Contingent liabilities are only disclosed and are not included within the statement of financial position.

### (a) Provisions

| | Dilapidations and onerous leases £m | Legal and regulatory £m | Total £m |
| --- | --- | --- | --- |
| At 1 January 2016 | 12.4 | 13.9 | 26.3 |
| Exchange translation and other movements | 0.7 | 1.2 | 1.9 |
| Provisions utilised | (0.8) | (2.6) | (3.4) |
| Additional provisions charged in the year | 9.0 | 2.2 | 11.2 |
| Unused amounts reversed in the year | (2.8) | (0.1) | (2.9) |
| At 31 December 2016 | 18.5 | 14.6 | 33.1 |
| | | | |
| Current – 2016 | 5.0 | 8.0 | 13.0 |
| Non-current – 2016 | 13.5 | 6.6 | 20.1 |
| | 18.5 | 14.6 | 33.1 |
| | | | |
| Current – 2015 | 2.4 | 7.0 | 9.4 |
| Non-current – 2015 | 10.0 | 6.9 | 16.9 |
| | 12.4 | 13.9 | 26.3 |

Financial report

# Notes to the accounts

**18. Provisions and contingent liabilities** continued
The Group's provisions are expected to mature in the following time periods:

|  | 2016 £m | 2015 £m |
|---|---|---|
| Less than 1 year | 13.0 | 9.4 |
| 1 – 2 years | 17.9 | 10.9 |
| 2 – 3 years | 1.3 | 4.9 |
| 3 – 4 years | 0.2 | 0.5 |
| 4 – 5 years | 0.2 | 0.1 |
| More than 5 years | 0.5 | 0.5 |
|  | 20.1 | 16.9 |
|  | 33.1 | 26.3 |

The provision for dilapidations and onerous leases covers lease commitments with a weighted average maturity of two years (2015: two years).

Legal and regulatory obligations associated with the Group's business arise from past events that are estimated to crystallise mainly within two years (2015: two years). These matters are ongoing.

The Group's Swiss bank has participated voluntarily in the US Department of Justice (DoJ) programme, announced on 29 August 2013, which applied industry wide to Swiss banks in order to identify accounts related to persons who may not have been US-tax compliant. Where a Swiss bank was unable to provide fully sufficient evidence of compliance, a penalty could be payable. For Schroders the penalty was determined and paid in 2015. The Group continues to engage with the DoJ as part of the DoJ's ongoing inquiries and requests for co-operation pursuant to the programme.

> **Estimates and judgements**
> The timing and amount of settlement of each legal claim or potential claim, regulatory matter and constructive obligation is uncertain. The Group has performed an assessment of the timing and amount, and reviews this assessment periodically. For some provisions, including the provision for onerous leases, there is greater certainty as the cash flows have largely been determined. However, the onerous lease provision also includes an assessment of potential cash inflows (where these are not contractually binding) from subletting arrangements. Potential legal claims, regulatory related costs and other obligations to third parties arise as a consequence of normal business activity. They can arise from actual or alleged breaches of obligations and may be covered by the Group's insurance arrangements, but subject to insurance excess. In certain circumstances, legal and regulatory claims can arise despite there being no error or breach. Our risk management and compliance procedures are designed to mitigate, but are not able to eliminate, the risk of losses occurring. Where such claims and costs arise there is often uncertainty over whether a payment will be required and the quantum and timing of that payment. As a result there is also uncertainty over the timing and amount of any insurance recovery, although this does not change the likelihood of insurance cover being available, where applicable. The Group makes periodic assessments of all cash flows, including taking external advice where appropriate, to determine an appropriate provision. Some matters may be settled through commercial negotiation as well as being covered in whole or in part by the Group's insurance arrangements. The Group has made provisions based on the reasonable expectation of likely outflows. However the results of negotiations and insurance cover may result in different outcomes.

**(b) Contingent liabilities**

|  | 2016 £m | 2015 £m |
|---|---|---|
| Assets pledged as collateral security | 32.4 | 37.4 |
| Guarantees and irrevocable letters of credit | 29.7 | 23.9 |
|  | 62.1 | 61.3 |

Transactions giving rise to contingent liabilities are principally in Wealth Management and are only entered into by the Group once it has received sufficient high quality collateral from the client. Assets pledged as collateral security reflect the value of instruments that the Group is required to hold with clearing agents in order to support the execution of the Group's security transactions. The pledged assets provide collateral in the event of the Group not settling trades within agreed time frames.

## 19. Financial instrument risk management

Capital is the Group's assets minus its liabilities and comprises operating capital, investment capital, seed capital and other capital. The Group Capital Committee (GCC) is responsible for the management of capital and sets objectives for how it is deployed. This note explains how the Group categorises and manages its capital, setting out the nature of the risks the Group faces as a result of its operations, and how these risks are quantified and managed.

The Group is exposed to multiple forms of risk including: (i) the risk that money owed to the Group will not be received (credit risk); (ii) the risk that the Group may not have sufficient cash available to pay its creditors as they fall due (liquidity risk); and (iii) the risk that the value of assets will fluctuate as a result of movements in factors such as market prices, interest rates and foreign exchange rates (market risk). The management of such risks is embedded in managerial responsibilities fundamental to the wellbeing of the Group.

The Group's primary exposure to financial instrument risk is derived from the financial instruments that it holds as principal. In addition, due to the nature of the business, the Group's exposure extends to the impact on investment management and other fees that are determined on the basis of a percentage of AUM and are therefore impacted by financial instrument risk exposure of our clients – the secondary exposure. This note deals with the primary exposure only.

Financial instruments give rise to credit, liquidity and market risk exposures. Settlement of financial instruments (on both a principal and agency basis) gives rise to operational risk. The execution and effectiveness of the Group's risk management process is, therefore, critical to its soundness and profitability and considerable resources are dedicated to this area. Risk management is the direct responsibility of the Board and is then delegated to senior management.

The Audit and Risk Committee provide oversight and the Risk and Compliance functions are responsible for monitoring the overall risk environment. The Group has established a control environment that ensures risks are reviewed regularly and that all risk controls operating throughout the Group are in accordance with regulatory requirements. In addition, an independent assessment of the control environment is provided by Internal Audit.

The Life Company provides investment products through a life assurance wrapper. The financial risks of these products are largely borne by the third party investors, consistent with other investment products managed by the Group. However, since the Life Company provides the investment products, both the investments and the third party obligations are recorded in the statement of financial position. Financial instrument risk management in respect of the Life Company is set out in note 15.

### (a) Capital
Total capital comprises:

|  | 2016 £m | 2015 £m |
|---|---|---|
| Regulatory capital | 814 | 653 |
| Other operating capital | 65 | 253 |
| Operating capital | 879 | 906 |
| Investment capital[1] | 1,059 | 942 |
| Seed capital | 325 | 229 |
| Other items[2] | 890 | 719 |
| Total capital | 3,153 | 2,796 |

[1] Includes RWC Partners Limited and Schroder Ventures Investments Limited associates at their carrying value, as presented in note 11.
[2] Comprises goodwill, intangible assets, pension scheme surpluses, other associates and joint ventures, and deferred tax.

### (i) Regulatory and operating capital
Regulatory and operating capital is the capital required to meet regulatory and working capital requirements.

Regulators oversee the activities and impose minimum capital requirements on the Group's operating subsidiaries. The Group's policy is for subsidiaries to have sufficient capital to meet regulatory requirements, maintain an appropriate standing with counterparties and meet working capital requirements. The GCC reviews compliance with this policy.

Schroders plc is regulated by the PRA as a UK consolidated group. Its capital resources calculated for a Group holding a banking licence amounted to £2,265 million (2015: £2,065 million) and its Pillar 1 minimum capital requirement was £526 million (2015: £428 million). Other regulatory minimum capital requirements apply to the Group which set the minimum requirement at £814 million (2015: £653 million).

The Group holds sufficient capital to meet its regulatory capital requirements. All regulated entities within the Group complied with regulatory minimum capital requirements during the year.

### (ii) Investment capital
Investment capital is shareholders' investible equity held in excess of operating requirements. It is managed with the aim of achieving a low-volatility return. It is mainly held in government and government-guaranteed bonds, investment grade corporate bonds and Schroders' funds. Investment capital is also used to help support the organic development of existing and new business strategies and to respond to other investment and growth opportunities as they arise, such as acquisitions that will accelerate the development of the business.

### (iii) Seed capital
Seed capital may be used to develop new investment strategies, co-invest selectively alongside our clients and finance growth opportunities. Seed capital is deployed principally to support the growth of Asset Management and, where practical, the market risk on seed capital investments is hedged. Surplus capital is deployed in accordance with limits approved by the Board.

Financial report

# Notes to the accounts

**19. Financial instrument risk management** continued
The categorisation of the Group's assets and liabilities (the difference between which represents the Group's capital) analysed by accounting treatment is summarised below:

| | | | 2016 | | | | |
|---|---|---|---|---|---|---|---|
| | | | At fair value through profit or loss | | | | |
| | Loans and receivables/ liabilities at amortised cost £m | Held to maturity £m | Held for trading £m | Designated as at fair value through profit or loss £m | Available-for-sale £m | Non-financial instruments and other £m | Total £m |
| **Assets** | | | | | | | |
| Cash and cash equivalents | 3,318.9 | – | – | – | – | – | 3,318.9 |
| Trade and other receivables | 580.8 | – | – | – | – | 67.4 | 648.2 |
| Financial assets – non-debt securities | 1,134.7 | – | 496.7 | 0.7 | 199.0 | – | 1,831.1 |
| Financial assets – debt securities | 218.9 | 149.5 | 323.1 | – | 582.4 | – | 1,273.9 |
| Associates and joint ventures | – | – | – | – | – | 125.0 | 125.0 |
| Property, plant and equipment | – | – | – | – | – | 66.4 | 66.4 |
| Goodwill and intangible assets | – | – | – | – | – | 607.1 | 607.1 |
| Deferred tax | – | – | – | – | – | 66.0 | 66.0 |
| Retirement benefit scheme surplus | – | – | – | – | – | 118.2 | 118.2 |
| Assets backing unit-linked liabilities | 530.9 | – | – | 12,396.7 | – | – | 12,927.6 |
| **Total assets** | 5,784.2 | 149.5 | 819.8 | 12,397.4 | 781.4 | 1,050.1 | 20,982.4 |
| **Liabilities** | | | | | | | |
| Trade and other payables | 656.7 | – | – | 122.3 | – | 104.3 | 883.3 |
| Financial liabilities | 3,764.6 | – | 22.3 | 115.1 | – | – | 3,902.0 |
| Current tax | – | – | – | – | – | 71.8 | 71.8 |
| Provisions | 33.1 | – | – | – | – | – | 33.1 |
| Deferred tax | – | – | – | – | – | 0.2 | 0.2 |
| Retirement benefit scheme deficits | – | – | – | – | – | 11.6 | 11.6 |
| Unit-linked liabilities | 37.5 | – | – | 12,890.1 | – | – | 12,927.6 |
| **Total liabilities** | 4,491.9 | – | 22.3 | 13,127.5 | – | 187.9 | 17,829.6 |
| **Capital** | | | | | | | 3,152.8 |

| | | | 2015 | | | | |
|---|---|---|---|---|---|---|---|
| | | | At fair value through profit or loss | | | | |
| | Loans and receivables/ liabilities at amortised cost £m | Held to maturity £m | Held for trading £m | Designated as at fair value through profit or loss £m | Available-for-sale £m | Non-financial instruments and other £m | Total £m |
| **Assets** | | | | | | | |
| Cash and cash equivalents | 3,019.0 | – | – | – | – | – | 3,019.0 |
| Trade and other receivables | 472.6 | – | – | – | – | 54.2 | 526.8 |
| Financial assets – non-debt securities | 821.5 | – | 255.8 | 11.0 | 357.1 | – | 1,445.4 |
| Financial assets – debt securities | 188.2 | 114.6 | 351.4 | – | 347.1 | – | 1,001.3 |
| Associates and joint ventures | – | – | – | – | – | 109.2 | 109.2 |
| Property, plant and equipment | – | – | – | – | – | 41.8 | 41.8 |
| Goodwill and intangible assets | – | – | – | – | – | 467.4 | 467.4 |
| Deferred tax | – | – | – | – | – | 53.7 | 53.7 |
| Retirement benefit scheme surplus | – | – | – | – | – | 115.4 | 115.4 |
| Assets backing unit-linked liabilities | 647.5 | – | – | 10,672.4 | – | – | 11,319.9 |
| **Total assets** | 5,118.8 | 114.6 | 607.2 | 10,683.4 | 704.2 | 841.7 | 18,099.9 |
| **Liabilities** | | | | | | | |
| Trade and other payables | 591.8 | – | – | 79.2 | – | 90.2 | 761.2 |
| Financial liabilities | 3,022.8 | – | 47.3 | 56.4 | – | – | 3,126.5 |
| Current tax | – | – | – | – | – | 61.8 | 61.8 |
| Provisions | 26.3 | – | – | – | – | – | 26.3 |
| Deferred tax | – | – | – | – | – | 0.4 | 0.4 |
| Retirement benefit scheme deficits | – | – | – | – | – | 8.2 | 8.2 |
| Unit-linked liabilities | 35.9 | – | – | 11,284.0 | – | – | 11,319.9 |
| **Total liabilities** | 3,676.8 | – | 47.3 | 11,419.6 | – | 160.6 | 15,304.3 |
| **Capital** | | | | | | | 2,795.6 |

### 19. Financial instrument risk management continued
### (b) Credit risk, liquidity risk and market risk
### (i) Credit risk

Credit risk is the risk that a counterparty to a financial instrument, loan or commitment will cause the Group financial loss by failing to discharge an obligation. For this purpose, the impact on fair value of a credit loss arising from credit spread price changes in a portfolio of investments is excluded. This risk is addressed within Pricing risk.

The Group has exposure to credit risk from its normal activities where the risk is that a counterparty will be unable to pay, in full, amounts when due. The Group carefully manages its exposure to credit risk by: approving lending policies that specify the type of acceptable collateral and minimum lending margins; setting limits for exposures to individual counterparties and sectors; and by taking security. The Group's maximum exposure to credit risk is represented by the carrying value of its financial assets. In addition the Group holds collateral on its loans and advances to clients and certain derivative positions. The Group also holds collateral on some short-term advances to counterparties, as part of its liquidity management. The collateral accepted includes investment-grade securities that can be sold or repledged without default of the provider. At 31 December 2016 the fair value of collateral which could be sold or repledged but had not been, relating solely to these arrangements, was £495.5 million (2015: £517.8 million).

A breakdown of the Group's relevant financial assets by credit rating is set out below:

| | Cash and cash equivalents | | Debt securities at amortised cost | | Debt securities at fair value | |
|---|---|---|---|---|---|---|
| | 2016 £m | 2015 £m | 2016 £m | 2015 £m | 2016 £m | 2015 £m |
| Credit rating[1]: | | | | | | |
| AAA | 533.9 | 1,397.7 | 33.5 | 47.0 | 66.2 | 194.6 |
| AA+ | 15.9 | 12.8 | 43.1 | 60.0 | 10.2 | 15.8 |
| AA[2] | 1,178.6 | 45.0 | 63.0 | – | 124.8 | 0.6 |
| AA- | 279.5 | 304.4 | 10.0 | 7.6 | 57.2 | 21.7 |
| A+ | 765.4 | 418.6 | 130.0 | 52.0 | 65.1 | 19.1 |
| A | 187.5 | 523.4 | 80.0 | 56.0 | 68.4 | 54.4 |
| A- | 274.1 | 252.1 | 7.3 | 55.0 | 117.5 | 61.9 |
| BBB+ and lower | 67.2 | 59.8 | 1.5 | 25.2 | 336.7 | 261.0 |
| Not rated | 16.8 | 5.2 | – | – | 59.4 | 69.4 |
| | 3,318.9 | 3,019.0 | 368.4 | 302.8 | 905.5 | 698.5 |

[1]  Provided by rating agencies.
[2]  The increase in the AA credit rating of cash and cash equivalents is principally represented by the downgrade of the British Government's credit rating during 2016.

#### Wealth Management activities

All customer credit requests are presented to the relevant Wealth Management approval authorities and counterparty exposures are monitored daily against limits. Loans, overdrafts and advances to clients are secured on a range of assets including real estate (both residential and commercial), cash, client portfolios and life insurance policies. The Group does not usually provide loans, overdrafts and advances to clients on an unsecured basis. Where disposal of non-cash collateral is required, in the event of default, the terms and conditions relevant to the specific contract and country will apply. Portfolios held as collateral are marked to market daily and positions compared to clients' exposures. Credit limits are set following an assessment of the market and lending value of each type of collateral, depending on the perceived risk associated with the collateral. Clients are contacted if these limits are breached, or if collateral is not sufficient to cover the outstanding exposure.

No provisions (2015: nil) are held against gross loans and receivables that are recorded at amortised cost. The amount of change in the year in the fair value of loans and receivables held at fair value through profit or loss that is attributable to changes in credit risk is nil (2015: nil) and nil (2015: nil) cumulatively.

Wealth Management takes a conservative approach to its treasury investments placing them with, or purchasing debt securities issued by, UK and overseas banks and corporates, central banks, supranational banks and sovereigns.

Debt securities held within the Wealth Management treasury book are classified as loans and receivables or as held to maturity financial assets and are unsecured. Policies covering various counterparty and market risk limits are set and monitored by the relevant Wealth Management asset and liability management committees. All instruments held within Wealth Management have an investment grade credit rating.

#### Other activities

Fee debtors and other receivables arise as a result of the Group's Asset Management activities and amounts are monitored regularly. Historically, default levels have been insignificant and unless a client has withdrawn its funds, there is an ongoing relationship between the Group and the client.

Fee debtors past due but not yet impaired as at 31 December 2016 were £29.8 million (2015: £17.3 million), the majority of which is less than 90 days past due (2015: less than 60 days past due). Factors considered in determining whether impairment has taken place include how many days past the due date a receivable is, deterioration in the credit quality of a counterparty, and knowledge of specific events that could influence a debtor's ability to pay.

The Group seeks to manage its exposure to credit risk arising from debt securities and derivatives within the investment portfolio by adopting a conservative approach and through ongoing credit analysis. Cash is held with well-rated banks, government and government-guaranteed bonds are rated A- or better, corporate bond portfolios have an investment grade mandate, and exposure to sub-investment grade debt is low. Derivative positions are taken in exchange-traded securities where there is minimal credit risk. Forward foreign exchange positions generally have a maturity of one month.

Financial report

# Notes to the accounts

**19. Financial instrument risk management** continued
The Group's cash and cash equivalents in the non-Wealth Management entities are invested primarily in current accounts, on deposit with well-rated banks, and invested in money market funds.

**(ii) Liquidity risk**
Liquidity risk is the risk that the Group cannot meet its obligations as they fall due or can only do so at a cost. The Group has a clearly defined liquidity risk management framework in place in the form of a Consolidated Group Internal Liquidity Adequacy Assessment Process (ILAAP). The Group policy is that its subsidiaries should trade solvently, comply with regulatory liquidity requirements, and have adequate liquidity for all activities undertaken in the normal course of business. In particular, all companies should maintain sufficient liquid funds to meet peak working capital requirements. Financial liabilities relating to other operating entities are £123.0 million (2015: £96.5 million), the majority of which are current.

**Wealth Management activities**
The principal liquidity risk the Group faces concerns its Wealth Management liabilities. The liquidity policy is to maintain sufficient liquidity to meet regulatory and prudential requirements, to cover cash flow imbalances and fluctuations in funding, and to ensure the timely repayment of funds to depositors.

The contractual maturity of Wealth Management financial assets and liabilities is set out below:

| | 2016 | | | | | | |
|---|---|---|---|---|---|---|---|
| | Less than 1 year £m | 1-2 years £m | 2-3 years £m | 3-4 years £m | 4-5 years £m | More than 5 years £m | Total £m |
| **Assets** | | | | | | | |
| Cash and cash equivalents | 2,622.9 | – | – | – | – | – | 2,622.9 |
| Loans and advances to clients[1] | 933.3 | 48.5 | 75.0 | 9.7 | 47.0 | – | 1,113.5 |
| Debt securities | 365.5 | 2.9 | – | – | – | – | 368.4 |
| Other financial assets | 17.1 | 0.1 | – | – | – | – | 17.2 |
| **Total financial assets** | 3,938.8 | 51.5 | 75.0 | 9.7 | 47.0 | – | 4,122.0 |
| **Liabilities** | | | | | | | |
| Client accounts | 3,632.2 | 11.7 | 43.0 | 1.8 | 11.6 | – | 3,700.3 |
| Deposits by banks | 62.5 | – | – | – | – | – | 62.5 |
| Other financial liabilities[2] | 14.8 | 1.4 | – | – | – | – | 16.2 |
| **Total financial liabilities** | 3,709.5 | 13.1 | 43.0 | 1.8 | 11.6 | – | 3,779.0 |
| **Cumulative gap** | 229.3 | 267.7 | 299.7 | 307.6 | 343.0 | 343.0 | 343.0 |

| | 2015 | | | | | | |
|---|---|---|---|---|---|---|---|
| | Less than 1 year £m | 1-2 years £m | 2-3 years £m | 3-4 years £m | 4-5 years £m | More than 5 years £m | Total £m |
| **Assets** | | | | | | | |
| Cash and cash equivalents | 2,255.0 | – | – | – | – | – | 2,255.0 |
| Loans and advances to clients[1] | 544.0 | 68.5 | 23.7 | 41.7 | 70.5 | 69.0 | 817.4 |
| Debt securities | 287.8 | 15.0 | – | – | – | – | 302.8 |
| Other financial assets | 16.4 | – | 0.3 | – | – | – | 16.7 |
| **Total financial assets** | 3,103.2 | 83.5 | 24.0 | 41.7 | 70.5 | 69.0 | 3,391.9 |
| **Liabilities** | | | | | | | |
| Client accounts | 2,781.7 | 6.8 | 14.3 | 41.7 | 62.5 | 61.7 | 2,968.7 |
| Deposits by banks | 51.2 | – | – | – | – | – | 51.2 |
| Other financial liabilities[2] | 10.1 | – | – | – | – | – | 10.1 |
| **Total financial liabilities** | 2,843.0 | 6.8 | 14.3 | 41.7 | 62.5 | 61.7 | 3,030.0 |
| **Cumulative gap** | 260.2 | 336.9 | 346.6 | 346.6 | 354.6 | 361.9 | 361.9 |

[1] Includes loans and advances to clients held at fair value through profit or loss of £0.6 million (2015: £10.8 million).
[2] Includes client accounts held at fair value through profit or loss of £1.4 million (2015: £5.4 million).

**Other activities**
Liquidity risk in the rest of the Group is low. Excluding the Life Company and consolidated funds, the Asset Management and Group segment together hold cash and cash equivalents of £664.0 million (2015: £718.0 million).

The Group has a committed loan facility of £200.0 million (2015: £200.0 million) that expires on 24 September 2021 and £1.8 million (2015: £2.9 million) of loan notes as part of the acquisition of Cazenove Capital that are repayable on 12 July 2018 and subject to early redemption rights in certain circumstances.

### 19. Financial instrument risk management continued
**(iii) Market risk**
The sensitivities to market risk are estimated as follows:

| Variable[1] | | A reasonable change in the variable within the next calendar year % (31 December 2016) | Increase/ (decrease) in post-tax profit £m (31 December 2016) | Increase/ (decrease) in other components of equity £m (31 December 2016) | A reasonable change in the variable within the next calendar year % (31 December 2015) | Increase/ (decrease) in post-tax profit £m (31 December 2015) | Increase/ (decrease) in other components of equity £m (31 December 2015) |
|---|---|---|---|---|---|---|---|
| Interest rates[2] | -increase | 0.50 | 4 | – | 0.75 | 5 | – |
| | -decrease | (0.25) | (2) | – | (0.50) | (4) | – |
| US dollar against sterling | -strengthen | 10 | 1 | 19 | 8 | – | 15 |
| | -weaken | (6) | (1) | (14) | (6) | – | (11) |
| Euro against sterling | -strengthen | 7 | 4 | 9 | 7 | 8 | 7 |
| | -weaken | (8) | (4) | (9) | (8) | (9) | (8) |
| FTSE-All Share Index[3] | -increase | 20 | 6 | 27 | 20 | 4 | 18 |
| | -decrease | (20) | (32) | 1 | (20) | (24) | 3 |

[1] The underlying assumption is that there is one variable increase/decrease with all other variables held constant.
[2] Assumes that the fair value of assets and liabilities will not be affected by a change in interest rates.
[3] Assumes that changes in the FTSE-All Share Index correlate to changes in the fair value of the Group's equity investments.

These sensitivities concern only the impact on financial instruments and exclude indirect impacts of the variable on fee income and certain costs which may be effected by the variable. The changes used in the sensitivity analysis were provided by the Group's Global Economics team who determine reasonable assumptions.

**Pricing risk**
Pricing risk is the risk that the fair value or future cash flows of financial instruments will fluctuate because of changes in market prices other than those arising from interest rate risk or currency risk.

In respect of financial instrument risk, the Group's exposure to pricing risk is principally through investments held in investment capital, seed capital, deferred employee compensation in the form of fund awards and some investments held for regulatory capital purposes. However, the more significant risk is the impact on the Group's fee income as this is principally determined on percentages of the fair value of AUM. This risk cannot be easily mitigated but is addressed to some extent by ongoing net new business.

The Group does not hedge exposure to pricing risk except for seed capital, where practical to do so, and also in respect of deferred employee compensation awards in the form of fund awards. Where financial instruments are held to hedge deferred compensation awards this is normally offset by charges in the amounts payable to employees (see note 5).

**Interest rate risk**
Interest rate risk is the risk that the fair value or future cash flows of financial instruments will fluctuate because of changes in market interest rates.

Wealth Management activities
In Wealth Management, interest rate risk is monitored against policies and limits set by the relevant risk committee on a daily basis.

Wealth Management manages its interest rate risk within limits by matching asset and liability positions and through the use of interest rate swaps.

Within Wealth Management, there are sensitivity-based and stress-based models used for monitoring interest rate risk. These involve assessing the impact of a prescribed basis point rise in interest rates, together with extreme scenarios for the stress tests. The impact is calculated regularly for each currency and in aggregate.

Other activities
Cash held by the other operating companies is not normally expected to be placed on deposit for longer than three months.

The Group's capital includes investments in government bonds and corporate investment-grade bonds managed by the Group's fixed income fund managers.

**Foreign exchange risk**
Foreign exchange risk is the risk that the fair value or future cash flows of financial instruments will fluctuate because of changes in foreign exchange rates.

Wealth Management activities
In Wealth Management, some loans and advances to clients, client deposits and a proportion of the treasury activities, are undertaken in foreign currencies. This is managed by the treasury departments within agreed limits that are set and monitored by the relevant risk committees.

Financial report

# Notes to the accounts

**19. Financial instrument risk management** continued
Other activities
The Group's policy in relation to revenue, expenditure and capital currency exposure in Asset Management activities is generally not to hedge. The Group's revenue is earned and expenditure incurred in many currencies and the resulting exposure is considered part of the business.

The Group also has exposure to foreign currency through investments in currencies other than sterling. The Group uses forward foreign exchange contracts with third parties to mitigate this exposure. The gain or loss on the hedging instruments is included in the statement of other comprehensive income or the income statement, as appropriate. The use of such instruments is subject to the approval of the GCC.

The Group's gross and net exposure to foreign currencies is set out below:

| | 2016 | | | 2015 | | |
|---|---|---|---|---|---|---|
| | Gross exposure £m | Hedged £m | Net exposure £m | Gross exposure £m | Hedged £m | Net exposure £m |
| US dollar | 360 | (61) | 299 | 494 | (61) | 433 |
| Euro | 196 | (5) | 191 | 161 | (4) | 157 |
| Swiss franc | 170 | – | 170 | 135 | – | 135 |
| Singapore dollar | 129 | – | 129 | 92 | – | 92 |
| Chinese renminbi | 75 | – | 75 | 61 | – | 61 |
| Hong Kong dollar | 63 | – | 63 | 65 | – | 65 |
| Australian dollar | 30 | – | 30 | 30 | – | 30 |
| Other | 105 | (1) | 104 | 92 | (4) | 88 |
| Total currency exposures | 1,128 | (67) | 1,061 | 1,130 | (69) | 1,061 |
| Sterling | 2,025 | 67 | 2,092 | 1,666 | 69 | 1,735 |
| | 3,153 | – | 3,153 | 2,796 | – | 2,796 |

**20. Derivative contracts**
**(a) The Group's use of derivatives**

The Group holds derivatives for risk management, client facilitation, and within its investment portfolios to provide exposure to market returns. The Group most commonly uses forward foreign exchange contracts where it agrees to buy or sell specified amounts of a named currency at a future date, allowing the Group effectively to fix exchange rates so that it can avoid unpredictable gains and losses on receivables and payables in foreign currencies. The Group uses equity contracts to hedge market-related gains and losses on its seed capital investments where the purpose of investing is to help establish a new product rather than gain additional market exposure. Interest rate contracts are used to hedge exposures to fixed or floating rates of interest.

Risk management: the Group actively seeks to limit and manage its exposures to risk where that exposure is not desired by the Group. This may take the form of unwanted exposures to a particular currency, type of interest rate or other price risk. By entering into derivative contracts, the Group is able to mitigate or eliminate such exposures. The principal risk that the Group faces through such use of derivative contracts is credit risk.

Client facilitation: the Group's Wealth Management entities are involved in providing portfolio management, banking and investment advisory services, primarily to private clients. In carrying out this business, they transact as agent or as principal in financial assets and liabilities (including derivatives) in order to facilitate client portfolio requirements. Wealth Management's policy is to hedge, as appropriate, exchange rate and interest rate risk on its client facilitation positions. This does not eliminate the possibility of credit risk.

For details of how the Group manages its exposure to credit risk, see (b) below and note 19.

**(b) Derivatives used by the Group**
Currency forwards are contractual obligations to receive or pay amounts based on changes in currency rates or to buy or sell foreign currency or a financial instrument on a future date at a specified price. For currency forward contracts, the maximum exposure to credit risk is represented by the fair value of the contracts.

Currency and interest rate swaps are commitments to exchange one set of cash flows for another. Swaps result in an economic exchange of currencies or interest rates (for example, fixed rate for floating rate) or a combination of all these (i.e. cross-currency interest rate swaps). No exchange of principal takes place, except in the case of certain currency swaps. The Group's credit risk represents the potential cost of replacing the swap contracts if counterparties fail to perform their obligations. This risk is monitored on an ongoing basis with reference to the current fair value, a proportion of the notional amount of the contracts, and the liquidity of the market. To control the level of credit risk taken, the Group assesses counterparties in accordance with its internal policies and procedures.

## 20. Derivative contracts continued

Foreign exchange, equity and interest rate options are contractual agreements under which the seller grants the purchaser the right, but not the obligation, either to buy (a call option) or sell (a put option) at or by a set date or during a set period, a specific amount of a foreign currency or a financial instrument at a predetermined price. The seller receives a premium from the purchaser and assumes foreign exchange, equity or interest rate risk. Options may be either exchange-traded or negotiated between the Group and a customer or market counterparty. The Group is exposed to credit risk on purchased options only, and only to the extent of their carrying amount, which is their fair value.

Futures contracts are standardised contracts to buy or sell specified assets for an agreed price at a specified future date. Contracts are negotiated at a futures exchange which acts as an intermediary between the two parties. For futures contracts, the maximum exposure to credit risk is represented by the fair value of the contracts.

The fair value of derivative instruments becomes favourable (assets) or unfavourable (liabilities) as a result of fluctuations in market interest rates, indices, foreign exchange rates and other relevant variables relative to their terms. The aggregate contractual amount of derivative financial instruments held, the extent to which instruments are favourable or unfavourable, and thus the aggregate fair values of derivative financial assets and liabilities, can fluctuate significantly from time to time. The fair values are set out below:

| | 2016 Assets £m | 2016 Liabilities £m | 2015 Assets £m | 2015 Liabilities £m |
|---|---|---|---|---|
| Interest rate contracts | 0.2 | (0.1) | 0.4 | (0.3) |
| Forward foreign exchange contracts | 21.3 | (19.0) | 14.9 | (11.5) |
| Equity contracts | 18.9 | (3.2) | 22.9 | (35.5) |
| | 40.4 | (22.3) | 38.2 | (47.3) |

| | 2016 Assets £m | 2016 Liabilities £m | 2015 Assets £m | 2015 Liabilities £m |
|---|---|---|---|---|
| Net-settled derivative contracts[1] maturing/repricing[2] in: | | | | |
| Less than 1 year | 1.9 | (3.3) | 23.0 | (35.8) |
| 1 – 3 years | 0.1 | – | 0.3 | – |
| 3 – 5 years | – | – | – | – |
| More than 5 years | 17.1 | – | – | – |
| | 19.1 | (3.3) | 23.3 | (35.8) |
| Gross-settled derivatives[3] maturing/repricing[2] in: | | | | |
| Less than 1 year: | | | | |
| Gross inflows | 896.5 | 1,605.0 | 498.0 | 743.3 |
| Gross outflows | (892.1) | (1,609.1) | (494.4) | (750.2) |
| Difference between future contractual cash flows and fair value | 16.9 | (14.9) | 11.3 | (4.6) |
| | 21.3 | (19.0) | 14.9 | (11.5) |
| | 40.4 | (22.3) | 38.2 | (47.3) |

[1] Comprise interest rate and equity contracts.
[2] Whichever is earlier.
[3] Comprise forward exchange contracts.

Financial report

# Notes to the accounts

21. Share capital and share premium

Share capital represents the number of issued ordinary and non-voting ordinary shares in Schroders plc multiplied by their nominal value of £1 each. Share premium substantially represents the aggregate of all amounts that have ever been paid above nominal value to Schroders plc when it has issued ordinary and non-voting ordinary shares. There are certain circumstances in which the share premium can be reduced but these have not arisen in 2016 or 2015. The Company has no authority to issue, buy back, or cancel ordinary shares in issue (including those held in trust) and has authority limited by shareholder resolution to issue or purchase non-voting ordinary shares, which may either be cancelled or held in treasury.

| | Number of shares Millions | Ordinary shares £m | Non-voting ordinary shares £m | Total shares £m | Share premium £m |
|---|---|---|---|---|---|
| At 1 January 2016 | 282.5 | 226.0 | 56.5 | 282.5 | 119.4 |
| Shares issued | 0.2 | – | 0.2 | 0.2 | 4.8 |
| At 31 December 2016 | 282.7 | 226.0 | 56.7 | 282.7 | 124.2 |

On 21 December 2016, Schroders plc issued 233,623 non-voting ordinary shares as part of the consideration paid for the acquisition of Benchmark Capital (see note 29).

| | Number of shares Millions | Ordinary shares £m | Non-voting ordinary shares £m | Total shares £m | Share premium £m |
|---|---|---|---|---|---|
| At 1 January 2015 | 282.5 | 226.0 | 56.5 | 282.5 | 119.4 |
| At 31 December 2015 | 282.5 | 226.0 | 56.5 | 282.5 | 119.4 |

| | 2016 Number of shares Millions | 2015 Number of shares Millions |
|---|---|---|
| Issued and fully paid: | | |
| Ordinary shares of £1 each | 226.0 | 226.0 |
| Non-voting ordinary shares of £1 each | 56.7 | 56.5 |
| | 282.7 | 282.5 |

The difference between the share classes
The non-voting ordinary shares carry the same rights as ordinary shares except they do not confer the right to attend and vote at any general meeting of the Company, and that on a capitalisation issue they carry the right to receive non-voting ordinary shares rather than ordinary shares.

## 22. Own shares

Own shares are recorded by the Group when non-voting ordinary shares are acquired by the Company, or ordinary or non-voting ordinary shares are acquired through employee benefit trusts. There are two main reasons why this may happen: first, the Group may wish to hold some of its shares in treasury to settle option exercises or for other permitted purposes. Second, it enables the Group to meet share-based remuneration awards to employees in the form of shares (see note 26) in a way that does not dilute the percentage holdings of existing shareholders. Own shares are held at cost and their purchase reduces the Group's net assets by the amount spent. When shares vest unconditionally or are cancelled, they are transferred from own shares to the profit and loss reserve at their weighted average cost.

Movements in own shares during the year were as follows:

|  | 2016 £m | 2015 £m |
|---|---|---|
| At 1 January | (175.5) | (200.1) |
| Own shares purchased | (59.1) | (51.1) |
| Awards vested | 71.0 | 75.7 |
| At 31 December | (163.6) | (175.5) |

During the year 2.2 million own shares were purchased and held for hedging share-based awards. 3.3 million shares awarded to employees vested in the period and were transferred out of own shares.

The total number of shares in the Company held within the Group's employee benefit trusts comprise:

|  | 2016 | | | 2015 | | |
|---|---|---|---|---|---|---|
|  | Number of vested shares Millions | Number of unvested shares Millions | Total Millions | Number of vested shares Millions | Number of unvested shares Millions | Total Millions |
| Ordinary shares | 2.0 | 7.5 | 9.5 | 2.2 | 8.1 | 10.3 |
| Non-voting ordinary shares | 0.2 | 0.1 | 0.3 | 0.2 | 0.6 | 0.8 |
|  | 2.2 | 7.6 | 9.8 | 2.4 | 8.7 | 11.1 |

|  | 2016 | | | 2015 | | |
|---|---|---|---|---|---|---|
|  | Vested shares £m | Unvested shares £m | Total £m | Vested shares £m | Unvested shares £m | Total £m |
| Ordinary shares: |  |  |  |  |  |  |
| Cost | 31.2 | 161.3 | 192.5 | 30.9 | 164.9 | 195.8 |
| Fair value | 61.2 | 224.8 | 286.0 | 65.7 | 240.0 | 305.7 |
| Non-voting ordinary shares: |  |  |  |  |  |  |
| Cost | 2.3 | 2.3 | 4.6 | 2.5 | 10.6 | 13.1 |
| Fair value | 4.7 | 3.0 | 7.7 | 5.2 | 13.7 | 18.9 |
| Total: |  |  |  |  |  |  |
| Cost | 33.5 | 163.6 | 197.1 | 33.4 | 175.5 | 208.9 |
| Fair value | 65.9 | 227.8 | 293.7 | 70.9 | 253.7 | 324.6 |

Financial report

# Notes to the accounts

### 23. Reconciliation of net cash from operating activities

> This note should be read in conjunction with the Cash flow statement. It provides a reconciliation to show how profit before tax, which is based on accounting rules, translates to cash flows.

| | 2016 £m | 2015[1] £m |
|---|---|---|
| Profit before tax | 618.1 | 589.0 |
| | | |
| **Adjustments for income statement non-cash movements:** | | |
| Depreciation of property, plant and equipment and amortisation of intangible assets | 46.4 | 36.4 |
| Net gains taken through the income statement on financial instruments | (45.0) | (12.6) |
| Share-based payments | 51.5 | 63.3 |
| Net charge/(release) for provisions | 8.3 | (14.8) |
| Other non-cash movements | (6.1) | (3.8) |
| | 55.1 | 68.5 |
| **Adjustments for which the cash effects are investing activities:** | | |
| Net finance income | (18.8) | (12.7) |
| Share of profit of associates and joint ventures | (19.5) | (19.3) |
| | (38.3) | (32.0) |
| **Adjustments for statement of financial position movements:** | | |
| Increase in loans and advances within Wealth Management | (232.9) | (237.6) |
| (Increase)/decrease in trade and other receivables | (70.7) | 6.4 |
| Increase/(decrease) in deposits and customer accounts within Wealth Management | 550.4 | (160.9) |
| (Decrease)/increase in trade and other payables, other financial liabilities and provisions | (42.2) | 5.0 |
| | 204.6 | (387.1) |
| **Adjustments for Life Company movements:** | | |
| Net (increase)/decrease in financial assets backing unit-linked liabilities | (1,744.1) | 2,245.3 |
| Net increase/(decrease) in unit-linked liabilities | 1,607.7 | (2,338.5) |
| | (136.4) | (93.2) |
| | | |
| Tax paid | (139.4) | (97.3) |
| | | |
| Net cash from operating activities | 563.7 | 47.9 |

[1] 2015 has been reformatted for consistency with the 2016 presentation, see Presentation of the financial statements on page 151.

Net cash from operating activities includes cash outflows of £2.9 million (2015: £11.2 million) in respect of exceptional items.

### 24. Commitments

> Commitments represent amounts the Group has contractually committed to pay to third parties but which do not yet represent a charge or asset. This gives an indication of committed future cash flows. Commitments at the year end do not impact on the Group's financial results for the year.
>
> The Group leases office space and equipment. Lease agreements can commit the Group to significant future expenditure and the table below discloses the Group's commitments to make such payments. Such commitments are not recorded on the Group's statement of financial position in advance of the period to which they relate.
>
> The Group sublets a small number of its leased properties where such properties, or parts of such properties, are no longer required for use by the Group. The table below discloses the commitments its sublessees have made in respect of such arrangements. These commitments are not recorded on the statement of financial position in advance of the period to which they relate. However, they may be used to determine the onerous lease provision if the rental income does not equal or exceed the Group's own rental obligation (see note 18). Rental income is recorded in the income statement as it is earned.

| | 2016 | | | |
|---|---|---|---|---|
| | No later than 1 year £m | Later than 1 year and no later than 5 years £m | Later than 5 years £m | Total £m |
| Operating leases as lessee | 35.3 | 113.9 | 375.6 | 524.8 |
| Undrawn loan facilities | 13.2 | – | – | 13.2 |
| Investment call commitments | 16.9 | – | – | 16.9 |
| Commitments for purchase of property, plant and equipment | 92.8 | 4.7 | – | 97.5 |
| Commitments under a service agreement for provision of an investment platform | 7.5 | 47.6 | 19.0 | 74.1 |
| Total commitments | 165.7 | 166.2 | 394.6 | 726.5 |
| | | | | |
| Operating leases receivable as lessor | (1.7) | (1.8) | (0.9) | (4.4) |
| Net commitments payable | 164.0 | 164.4 | 393.7 | 722.1 |

### 24. Commitments continued

| | No later than 1 year £m | Later than 1 year and no later than 5 years £m | Later than 5 years £m | Total £m |
|---|---|---|---|---|
| | | | | 2015 |
| Operating leases as lessee | 30.9 | 85.2 | 326.0 | 442.1 |
| Undrawn loan facilities | 32.0 | 0.2 | – | 32.2 |
| Investment call commitments | 15.2 | – | – | 15.2 |
| **Total commitments** | **78.1** | **85.4** | **326.0** | **489.5** |
| Operating leases receivable as lessor | (2.0) | (2.6) | (1.0) | (5.6) |
| **Net commitments payable** | **76.1** | **82.8** | **325.0** | **483.9** |

The Group has entered into agreements to lease new office premises in London and New York. The tables include the committed amounts payable under these agreements and reflect the expectation that lease payments will commence in 2018 and 2017 respectively. The commitments for the purchase of property, plant and equipment in the table above reflect the contractually committed cost to furnish these premises. Additionally, during 2016 the Group entered into an agreement with a third party provider for a new investment platform.

Leases in respect of office properties are negotiated for a weighted average term of 13.8 years (2015: 15.2 years) and rentals are fixed for a weighted average term of 5.1 years (2015: 4.4 years). Leases in respect of office equipment are negotiated for a weighted average term of 2.0 years (2015: 2.2 years) and rentals are fixed for a weighted average term of 1.9 years (2015: 2.2 years).

Office property subleases have a weighted average term of 5.0 years (2015: 4.6 years) and rentals are fixed for a weighted average term of 5.0 years (2015: 4.6 years).

Lease payments recognised as an expense during the year were £40.2 million (2015: £36.7 million).

### 25. Retirement benefit obligations

The Group has two types of pension benefit for employees: defined benefit (DB) where the Group has an obligation to provide participating employees with pension payments that represent a specified percentage of their final salary for each year of service, and defined contribution (DC), where the Group's contribution to an employee's pension is measured as, and limited to, a specified percentage of salary.

Accounting for DB schemes requires an assessment of the likely quantum of future pension payments to be made. If ring-fenced assets are held specifically to meet this cost, the scheme is funded, and if not, it is unfunded. The Group periodically reviews its funded DB schemes using actuarial specialists to assess whether it is on course to meet the expected pension payments that current and former employees are or will be entitled to. In the case of a projected shortfall, a plan must be formulated to reverse the deficit.

The income statement charge or credit represents the sum of pension entitlements earned by employees in the period, plus a notional net interest charge (if the scheme is in deficit) or income (if it is in surplus) based on the market yields on high quality corporate bonds. Experience differences, principally the difference between actual investment returns and the notional interest amount, as well as actuarial changes in estimating the present value of future liabilities, are recorded in other comprehensive income.

Assets or liabilities recognised in the statement of financial position represent the differences between the fair value of plan assets (if any) and the actuarially-determined estimates of the present value of future liabilities. The Group closed its largest DB scheme to future accrual on 30 April 2011, although it still operates some small unfunded schemes overseas. This means that no future service will contribute to the closed scheme member benefits but those members continue to have the benefits determined by the Scheme rules as at 30 April 2011.

The Group's exposure to funding DC pension schemes is limited to the contributions it has agreed to make. These contributions generally stop when employment ceases. The income statement charge represents the contributions the Group has agreed to make into employees' pension schemes in that period.

The disclosures within this note are provided mainly in respect of the principal DB scheme which is the DB section of the funded Schroders Retirement Benefits Scheme (the Scheme).

The income statement charge for retirement benefit costs is as follows:

| | 2016 £m | 2015 £m |
|---|---|---|
| Pension costs – defined contribution plans | 40.4 | 36.0 |
| Pension credit – defined benefit plans | (2.7) | (2.7) |
| Other post-employment benefits | 0.2 | 0.2 |
| | **37.9** | **33.5** |

Financial report

# Notes to the accounts

**25. Retirement benefit obligations** continued
**(i) Profile of the Scheme**
The Scheme is administered by a Trustee company, Schroder Pension Trustee Limited. The board of the Trustee company comprises an independent chairman, three directors appointed by the employer and two directors elected by the Scheme members. The Trustee is required by law to act in the interest of all relevant beneficiaries and is responsible for setting the investment strategy and for the day-to-day administration of the benefits. The Trustee's investment committee comprises four of the Trustee directors and two representatives of the Group. This committee, which reports to the Trustee board, is responsible for making investment strategy recommendations to the board of the Trustee and for monitoring the performance of the investment manager.

Under the Scheme, employees are entitled to annual pensions on retirement based on a specified percentage of their final pensionable salary or, in the case of active members at 30 April 2011, actual pensionable salaries at that date, for each year of service. These benefits are adjusted for the effects of inflation, subject to a cap of 2.5% for pensions accrued after 12 August 2007 and 5.0% for pensions accrued before that date.

As at 31 December 2016, there were no active members in the DB section (2015: nil) and 1,753 active members in the DC section (2015: 1,709). The weighted average duration of the Scheme's DB obligation is 21 years (2015: 19 years).

Membership details of the DB section of the Scheme as at 31 December are as follows:

|  | 2016 | 2015 |
|---|---|---|
| Number of deferred members | 1,535 | 1,601 |
| Total deferred pensions (at date of leaving Scheme) | £13.2m per annum | £14.2m per annum |
| Average age (deferred) | 51 | 51 |
| Number of pensioners | 796 | 779 |
| Average age (pensioners) | 69 | 69 |
| Total pensions in payment | £18.1m per annum | £17.7m per annum |

**(ii) Funding requirements**
The last completed triennial valuation of the Scheme was carried out as at 31 December 2014. The funding level at that date was 109% on the technical provisions basis and no contribution to the Scheme was required (2015: nil). The next triennial valuation will be due as at 31 December 2017. The Group does not expect to make any contributions before this date.

**(iii) Risks of the Scheme**
The Company and the Trustee have agreed a long-term strategy for reducing investment risk as and when appropriate. This includes, as detailed below, an asset-liability matching policy which aims to reduce the volatility of the funding level of the Scheme by investing in assets such as swaps which perform in line with the liabilities of the Scheme so as to protect against inflation and/or interest rates being higher than expected.

The most significant risks that the Scheme exposes the Group to are:

**Asset Volatility**
The liabilities are calculated using a discount rate set with reference to corporate bond yields; if assets underperform this yield, this may create a deficit. The Group manages this risk by holding 51.4% (2015: 43.5%) of Scheme assets in an LDI portfolio and the remainder in growth assets such as the Schroder Life Diversified Growth Fund and a Strategic Beta portfolio. This asset mix is designed to provide returns that match or exceed the unwinding of the discount rate in the long term, but which can create volatility and risk in the short term. The allocation to growth assets is monitored to ensure it remains appropriate given the Scheme's long-term objectives.

**Credit risk**
The assets of the Scheme include LDI and other fixed income instruments that expose the Group to credit risk. A significant amount of this exposure is to the UK Government as a result of holding gilts and bonds guaranteed by the UK Government. Other instruments held include derivatives, which are collateralised daily to cover unrealised gains or losses. The minimum rating for any derivatives counterparty is BBB.

**Interest rate risk**
A decrease in corporate bond yields will increase the value placed on the Scheme's liabilities for accounting purposes, although this should be partially offset by an increase in the value of the Scheme's LDI portfolio which comprises gilts and other LDI instruments. The LDI portfolio has been designed to mitigate interest rate exposures measured on a funding rather than an accounting basis. One of the principal differences between these bases is that the liability under the funding basis is calculated using a discount rate set with reference to gilt yields; the latter uses corporate bond yields. As a result, the LDI portfolio hedges against interest rate risk by purchasing instruments that seek to replicate movements in gilt yields rather than corporate bond yields. Movements in the different types of instrument are not exactly correlated, and it is therefore likely that a tracking error can arise when assessing whether the LDI portfolio has provided an effective hedge against interest rate risk on an accounting basis. At 31 December 2016, the LDI portfolio was designed to mitigate 74% (2015: 70%) of the Scheme's exposure to changes in gilt yields.

**Inflation risk**
A significant proportion of the Scheme's benefit obligations are linked to inflation, and higher inflation will lead to higher liabilities. However, in most cases, caps on the level of inflationary increases are in place to protect against inflation. The majority of the growth assets are either unaffected by or not closely correlated with inflation, which means that an increase in inflation will also decrease any Scheme surplus. The LDI portfolio includes instruments such as index-linked gilts to provide protection against inflation risk. At 31 December 2016, the LDI portfolio was designed to mitigate 74% (2015: 70%) of the Scheme's exposure to inflation risk.

**25. Retirement benefit obligations** continued
**Life expectancy**
The majority of the Scheme's obligations are to provide benefits for the life of the member, so increases in life expectancy will result in an increase in the liability.

**(iv) Reporting at 31 December 2016**
The principal financial assumptions used for the Scheme were as listed below:

|  | 2016 % | 2015 % |
|---|---|---|
| Discount rate | 2.7 | 3.8 |
| RPI inflation rate | 3.4 | 3.3 |
| CPI inflation rate | 2.3 | 2.2 |
| Future pension increases (for benefits earned before 13 August 2007) | 3.2 | 3.2 |
| Future pension increases (for benefits earned after 13 August 2007) | 2.2 | 2.2 |
| Average number of years a current pensioner is expected to live beyond age 60: | | |
| Men | 29 | 29 |
| Women | 30 | 31 |
| Average number of years future pensioners currently aged 45 are expected to live beyond age 60: | | |
| Men | 30 | 31 |
| Women | 32 | 32 |

The net interest for pension costs is determined by applying the corporate bond rate to the opening net surplus in the Scheme. The Group determines the appropriate discount rate at the end of each year. This is the interest rate that should be used to determine the present value of estimated future cash outflows expected to be required to settle the pension obligations. In determining the appropriate discount rate, the Group considers the interest rates of high quality, long dated corporate bonds that are denominated in the currency in which the benefits will be paid.

---

**Estimates and judgements**
Assumptions made on expected mortality rates are inherently uncertain. The Group's mortality assumptions are based on standard mortality tables with Continuous Mortality Investigation core projection factors and a long-term rate of mortality improvement of 1.5% per annum. Mortality tables for male pensioners are scaled back by 5% and female pensioners are scaled back by 10% to reflect the history of longer life expectancy of the Group's employees. The Group reviews its assumptions annually in conjunction with its independent actuaries and considers this adjustment appropriate given the geographic and demographic profile of Scheme members. Other assumptions for pension obligations are based in part on current market conditions.

---

The financial impact of the Scheme on the Group has been determined by independent qualified actuaries, Aon Hewitt Limited, and is based on an assessment of the Scheme as at 31 December 2016.

The amounts recognised in the income statement are:

|  | 2016 £m | 2015 £m |
|---|---|---|
| Interest income on Scheme assets | (34.6) | (35.0) |
| Interest cost on Scheme liabilities | 30.2 | 31.3 |
| Net interest income recognised in the income statement in respect of the Scheme | (4.4) | (3.7) |
| Income statement charge in respect of other defined benefit schemes | 1.7 | 1.0 |
| Total defined benefit schemes income statement credit | (2.7) | (2.7) |

The amounts recognised in the statement of comprehensive income are:

|  | 2016 £m | 2015 £m |
|---|---|---|
| Return on Scheme assets (in excess of)/below that recognised in interest income | (174.3) | 54.0 |
| Actuarial gains due to change in demographic assumptions | (16.5) | (13.1) |
| Actuarial losses/(gains) due to change in financial assumptions | 202.7 | (31.2) |
| Actuarial gains due to experience | (10.3) | (17.7) |
| Total other comprehensive loss/(gain) in respect of the Scheme | 1.6 | (8.0) |
| Other comprehensive losses in respect of other defined benefit schemes | 0.4 | 0.7 |
| Total other comprehensive losses/(gains) in respect of defined benefit schemes | 2.0 | (7.3) |

Financial report

# Notes to the accounts

**25. Retirement benefit obligations** continued
The sensitivity of the Scheme pension liabilities to changes in assumptions is as follows:

| | | 2016 | | 2015 | |
|---|---|---|---|---|---|
| Assumption | Assumption change | Estimated (increase)/ reduction in pension liabilities £m | Estimated (increase)/ reduction in pension liabilities % | Estimated (increase)/ reduction in pension liabilities £m | Estimated (increase)/ reduction in pension liabilities % |
| Discount rate | Increase by 0.5% per annum | 98.2 | 10.1 | 74.7 | 9.1 |
| Discount rate | Decrease by 0.5% per annum | (107.1) | (11.0) | (82.2) | (10.0) |
| Expected rate of pension increases | Increase by 0.5% per annum | (83.9) | (8.6) | (65.3) | (8.0) |
| Expected rate of pension increases | Decrease by 0.5% per annum | 78.4 | 8.0 | 56.4 | 6.9 |
| Life expectancy | Reduce by one year | 35.3 | 3.6 | 26.5 | 3.2 |

Movements in respect of the assets and liabilities of the Scheme are:

| | 2016 £m | 2015 £m |
|---|---|---|
| At 1 January | 936.5 | 987.8 |
| Interest on assets | 34.6 | 35.0 |
| Remeasurement of assets | 174.3 | (54.0) |
| Benefits paid | (52.2) | (32.3) |
| Fair value of plan assets | 1,093.2 | 936.5 |
| | | |
| At 1 January | (821.1) | (884.1) |
| Interest cost | (30.2) | (31.3) |
| Actuarial gains due to change in demographic assumptions | 16.5 | 13.1 |
| Actuarial (losses)/gains due to change in financial assumptions | (202.7) | 31.2 |
| Actuarial gains due to experience | 10.3 | 17.7 |
| Benefits paid | 52.2 | 32.3 |
| Present value of funded obligations | (975.0) | (821.1) |
| | | |
| Net asset | 118.2 | 115.4 |

The Group has not materially changed the basis of any of the principal financial assumptions underlying the calculation of the Scheme's net financial position during 2016, although such assumptions have been amended where applicable to reflect current market conditions and expectations.

Administration expenses and the levy payable to the Pension Protection Fund are met directly by the Group.

The fair value of the Scheme assets at the year end date is analysed as follows:

| | 2016 | | 2015 | |
|---|---|---|---|---|
| | Value £m | Of which not quoted in an active market £m | Value £m | Of which not quoted in an active market £m |
| Liability driven investments | 562.0 | 20.7 | 407.1 | (3.8) |
| Bonds (excluding those held as part of the liability driven investment portfolio) | 128.9 | – | 119.8 | – |
| Portfolio funds | 359.3 | – | 363.9 | – |
| Exchange-traded futures and over the counter derivatives | 0.4 | 36.8 | (0.4) | (27.8) |
| Cash | 42.6 | – | 46.1 | – |
| | 1,093.2 | 57.5 | 936.5 | (31.6) |

## 26. Share-based payments

Share-based payments are remuneration payments to selected employees that take the form of an award of shares in Schroders plc. Employees are generally not able to exercise such awards until three years after the award has been made, although conditions vary between different types of award. Accounting for share-based awards settled by transferring shares to the awardee (equity-settled) differs from accounting for similar awards settled in cash (cash-settled). The charge for equity-settled share-based payments is determined based on the fair value of the award on the grant date or, in the case of grandfathered awards arising on business combinations, the fair value of the share awards at the acquisition date. Such awards can include share options or share awards which may or may not have performance criteria. The initial fair value of the award takes into account the current value of shares expected to be issued (i.e. estimates of the likely levels of forfeiture and achievement of performance criteria), the contribution, if required, by the employee and the time value of money. This initial fair value is charged to the income statement reflecting benefits received from employment, where relevant, in the performance period and over the vesting period. The income statement charge is offset by a credit to the statement of changes in equity, where the award is expected to be settled through the issue of shares. Such awards constituted 7.2% (2015: 9.8%) of salaries and other remuneration.

The Group may make share-based payments to employees through awards over or linked to the value of ordinary and non-voting ordinary shares and by the grant of market value share options over ordinary or non-voting ordinary shares. These arrangements involve a maximum term of 10 years.

It is our practice to hedge all awards to eliminate the impact of changes in the market value of shares between the grant date and the exercise date.

Awards that lapse or are forfeited during the vesting period result in a credit to the income statement (reversing the previous charge) in the year in which they lapse or are forfeited.

The Group recognised total expenses of £52.4 million (2015: £63.7 million) arising from share-based payment transactions during the year, of which £51.5 million (2015: £63.3 million) were equity-settled share-based payment transactions. Included within equity-settled share-based payments were exceptional items of £0.9 million (2015: £6.6 million).

The Group has the following share-based payment arrangements (further details of the current schemes may be found in the Remuneration Report):

### (a) 2000 Equity Compensation Plan and 2011 Equity Compensation Plan

Awards over ordinary and non-voting ordinary shares made under the Group's Equity Compensation Plans are charged at fair value as 'Operating expenses' in the income statement. There are no performance conditions attached to the awards. For the 2000 Equity Compensation Plan the fair value of an award is calculated using the market value of the shares at the date of grant, discounted for the dividends forgone over the average holding period of the award. For the 2011 Equity Compensation Plan the fair value of an award is calculated using the market value of the shares on the date of grant. The fair value charges, adjusted to reflect actual levels of vesting, are spread over the performance period and the vesting period of the awards. The award is structured as a nil-cost option.

| | 2016 | | 2015 | |
| --- | --- | --- | --- | --- |
| | Ordinary shares Number Millions | Non-voting ordinary shares Number Millions | Ordinary shares Number Millions | Non-voting ordinary shares Number Millions |
| Rights outstanding at 1 January | 6.9 | 0.2 | 8.4 | 0.3 |
| Granted | 2.1 | 0.1 | 1.5 | - |
| Forfeited | (0.1) | - | (0.1) | - |
| Exercised | (2.0) | - | (2.9) | - |
| Rights outstanding at 31 December | 6.9 | 0.3 | 6.9 | 0.3 |
| Vested | 1.9 | 0.2 | 2.1 | 0.2 |
| Unvested | 5.0 | 0.1 | 4.8 | 0.1 |
| Weighted average fair value of share granted (£) | 26.26 | 20.35 | 31.51 | 24.25 |
| Weighted average share price at dates of exercise (£) | 27.13 | 20.91 | 31.50 | 23.45 |

The weighted average exercise price per share is nil.

A charge of £42.3 million (2015: £45.6 million) was recognised during the financial year.

The table below shows the expected charges for awards issued under the Equity Compensation Plan to be expensed in future years:

| | £m |
| --- | --- |
| 2017 | 12.6 |
| 2018 | 3.9 |
| 2019 | 0.1 |
| | 16.6 |

Financial report

# Notes to the accounts

**26. Share-based payments** continued
**(b) Equity Incentive Plan**

Awards over ordinary shares made under the Group's Equity Incentive Plan are charged at fair value to the income statement over a five-year vesting period. Fair value is determined at the date of grant and is equal to the market value at that time. The award is structured as a nil-cost option.

| | 2016<br>Number of<br>ordinary shares<br>Millions | 2015<br>Number of<br>ordinary shares<br>Millions |
|---|---|---|
| Rights outstanding at 1 January | 2.1 | 2.2 |
| Granted | 0.4 | 0.3 |
| Forfeited | (0.1) | – |
| Exercised | (0.3) | (0.4) |
| Rights outstanding at 31 December | 2.1 | 2.1 |
| | | |
| Vested | 0.2 | 0.1 |
| Unvested | 1.9 | 2.0 |
| | | |
| Weighted average fair value of share granted (£) | 27.60 | 30.14 |
| Weighted average share price at dates of exercise (£) | 26.11 | 30.02 |

The weighted average exercise price per share is nil.

A charge of £7.7 million (2015: £7.5 million) was recognised during the financial year.

The table below shows the expected charges for awards issued under the Equity Incentive Plan to be expensed in future years:

| | £m |
|---|---|
| 2017 | 8.8 |
| 2018 | 8.4 |
| 2019 | 5.7 |
| 2020 | 2.9 |
| 2021 | 1.3 |
| | 27.1 |

**(c) Long Term Incentive Plan**

Awards over ordinary and non-voting ordinary shares made under the Group's Long Term Incentive Plan are charged at fair value to the income statement over a four-year vesting period. Fair value is calculated using the market value of the shares at the grant date, discounted for dividends forgone over the vesting period of the award and adjusted based on an estimate at the year end date of the extent to which the performance conditions are expected to be met. The award is structured as a nil-cost option.

| | 2016 | | 2015 | |
|---|---|---|---|---|
| | Number of<br>ordinary<br>shares<br>Millions | Number of<br>non-voting<br>ordinary<br>shares<br>Millions | Number of<br>ordinary<br>shares<br>Millions | Number of<br>non-voting<br>ordinary<br>shares<br>Millions |
| Rights outstanding at 1 January | 0.8 | 0.1 | 1.2 | 0.1 |
| Granted | – | – | 0.1 | – |
| Forfeited | (0.2) | – | (0.2) | – |
| Exercised | (0.2) | – | (0.3) | – |
| Rights outstanding at 31 December – unvested | 0.4 | 0.1 | 0.8 | 0.1 |
| | | | | |
| Weighted average fair value of share granted (£) | 23.03 | 17.21 | 28.57 | 21.37 |
| Weighted average share price at dates of exercise (£) | 26.98 | 21.52 | 31.20 | – |

The weighted average exercise price per share is nil.

A credit of £0.9 million (2015: £2.5 million charge) was recognised during the financial year.

## 26. Share-based payments continued

The table below shows the expected charges for awards issued under the Long Term Incentive Plan to be expensed in future years:

| | £m |
|---|---|
| 2017 | 0.5 |
| 2018 | 0.3 |
| 2019 | 0.1 |
| | 0.9 |

### (d) Share Incentive Plan

The employee monthly share purchase plan is open to UK permanent employees and provides free shares from the Group to match the employee purchase up to a maximum of £100 per month. The shares vest after one year.

Pursuant to this plan, the Group purchased 59,933 ordinary shares in 2016 (2015: 39,007) at a weighted average share price of £26.42 (2015: £30.10). A charge of £1.5 million (2015: £1.1 million) was recognised during the financial year.

### (e) Restricted and Growth Share Plan

Awards under this plan were made by Cazenove Capital in June 2011 to certain employees. Following the Group's acquisition of Cazenove Capital in 2013, the awards were modified to be settled in ordinary and non-voting ordinary shares of Schroders plc. The awards do not have performance conditions attached and vest in three equal tranches between three and five years from the date of award. The Group does not intend to make any further awards under the Plan. The fair value of awards made under the Plan at the acquisition date is spread over the performance and vesting periods. The fair value, at the acquisition date, of the award attributable to the pre-acquisition part of the vesting period formed part of the cost of acquisition and is not charged to the income statement. All outstanding awards under this plan at 31 December 2015 vested in 2016.

| | 2016 Number of ordinary shares Millions | 2016 Number of non-voting ordinary shares Millions | 2015 Number of ordinary shares Millions | 2015 Number of non-voting ordinary shares Millions |
|---|---|---|---|---|
| Rights outstanding at 1 January | 0.5 | 0.5 | 0.9 | 0.9 |
| Exercised | (0.5) | (0.5) | (0.4) | (0.4) |
| Rights outstanding at 31 December – unvested | – | – | 0.5 | 0.5 |
| Weighted average share price at dates of exercise (£) | 26.70 | 20.23 | 27.45 | 21.82 |

A charge of £0.9 million (2015: £6.6 million) was recognised during the financial year. This charge is included within exceptional items.

Financial report

# Notes to the accounts

27. Related party transactions

Transactions between the Group and parties related to the Group are required to be disclosed to the extent that they are necessary for an understanding of the potential effect of the relationship on the financial statements. Other disclosures, such as key management personnel compensation, are also required.

The Group is not deemed to be controlled or jointly controlled by a party directly or through intermediaries under accounting standards. As a result the related parties of the Group are members of the Group, including associates and joint ventures, key management personnel, close family members of key management personnel and any entity controlled by those parties.

Cash transactions with associates or joint ventures are reported in the Cash flow statement and in note 11. During 2016, the Group provided a £2.1 million unsecured loan facility to NEOS which expires on 22 March 2021. At 31 December 2016, NEOS had drawn down £1.3 million of this facility.

£20.7 million (2015: £21.3 million) was held in customer accounts. All amounts were payable to key management personnel or their related parties.

Some of the plan assets of the Schroders Retirement Benefit Scheme are invested within Life funds controlled by the Group. At 31 December 2016, the fair value of these assets was £231.0 million (2015: £240.1 million).

Peter Harrison has an interest in 100,252 shares (2015: 100,252) in an associate of the Group, RWC Partners Limited, representing 5.1% (2015: 5.9%) of its issued share capital.

Transactions between the Group and its related parties were made at market rates. Any amounts outstanding are unsecured and will be settled in cash. No guarantees have been given or received.

Key management personnel compensation
Key management personnel are defined as members of the Board or the Group Management Committee. The remuneration of key management personnel during the year was as follows:

| Type of remuneration | Typical composition of this type of benefit | 2016 £m | 2015 £m |
|---|---|---|---|
| Short-term employee benefits | Salary, cash bonus | 27.4 | 29.8 |
| Share-based payments | Deferred share awards | 8.7 | 16.6 |
| Other long-term benefits | Other life assurance plans and deferred cash awards | 13.5 | 11.0 |
| Termination benefits | Termination benefits | 3.4 | – |
| Post-employment benefits | Pension plans | 0.2 | 0.2 |
| | | 53.2 | 57.6 |

The remuneration of key management personnel is based on individual performance and market rates. The remuneration policy (which applies to Directors and management) is described in more detail in the Remuneration report.

## 28. Interests in structured entities

Structured entities are those entities that have been designed so that voting or similar rights are not the dominant factor in deciding who has control, such as when any voting rights relate to administrative tasks only, or when the relevant activities are directed by means of contractual arrangements. The Group's interests in consolidated and unconsolidated structured entities are described below.

The Group has interests in structured entities as a result of contractual arrangements arising from its principal activity, the management of assets on behalf of its clients. AUM, excluding deposits by Wealth Management clients and some segregated client portfolios held within the institutional channel of the Group's Asset Management business, are managed within structured entities. These structured entities typically consist of unitised vehicles such as Open Ended Investment Companies (OEICs), Authorised Unit Trusts (AUTs) and Sociétés d'Investissement à Capital Variable (SICAVs), which entitle investors to a percentage of the vehicle's net asset value. The vehicles are financed by the purchase of units or shares by investors. The Group also has interests in structured entities through proprietary investments. These are mainly into vehicles which help facilitate the Group's stated aim of generating a return on investment capital and when it deploys seed capital in developing new investment strategies. The Group does not have any contractual relationships with or interests in structured entities related to AUA.

Additionally, the Group holds interests in structured entities for liquidity management purposes, for example via investment in money market funds.

As fund manager, the Group does not guarantee returns on its funds or commit to financially support its funds. A small proportion of the Group's funds, principally real estate funds, are permitted to raise finance through loans from banks and other financial institutions. Where external finance is raised, the Group does not provide a guarantee for the repayment of any borrowings.

The business activity of all structured entities, in which the Group has an interest, is the management of assets in order to generate investment returns for investors from capital appreciation and/or investment income. The Group earns a management fee from its structured entities, based on a percentage of the entity's net asset value and, where contractually agreed, a performance fee, based on outperformance against predetermined benchmarks. In addition, where the Group owns a proportion of the structured entity it is entitled to receive investment returns.

### (a) Interests arising from managing assets

The Group's interests in structured entities arising as a result of contractual relationships from its principal activity, the management of assets on behalf of its clients, are reflected in the Group's AUM.

| | 2016 | | | |
|---|---|---|---|---|
| | AUM outside of structured entities £bn | AUM within consolidated structured entities £bn | AUM within unconsolidated structured entities £bn | Total £bn |
| Asset Management | 173.7 | 10.8 | 161.9 | 346.4 |
| Wealth Management | 33.8 | – | 5.8 | 39.6 |
| | 207.5 | 10.8 | 167.7 | 386.0 |

| | 2015 | | | |
|---|---|---|---|---|
| | AUM outside of structured entities £bn | AUM within consolidated structured entities £bn | AUM within unconsolidated structured entities £bn | Total £bn |
| Asset Management | 136.5 | 9.4 | 136.0 | 281.9 |
| Wealth Management | 26.2 | – | 5.4 | 31.6 |
| | 162.7 | 9.4 | 141.4 | 313.5 |

Certain AUM is managed in investment vehicles that are not considered to be structured entities. Within Asset Management, this occurs either because it is formed of segregated investment portfolios for institutional clients comprising directly-held investments in individual financial instruments, or because the voting structures of the vehicles themselves allow the investment manager to be removed without cause. Within Wealth Management AUM is not considered to be within structured entities due to contractual relationships existing with clients rather than structured entities, for example discretionary and advisory asset management and banking services. In addition, Wealth Management AUM in the form of loans and advances to customers is conducted outside of structured entities.

Certain structured entities are deemed to be controlled by the Group and are accounted for as subsidiaries and consolidated in accordance with IFRS 10. AUM within consolidated structured entities represents the net assets of the beneficial interest in the consolidated structured entity owned by third parties.

AUM within unconsolidated structured entities constitutes the remaining balance, represented principally by the net asset value of funds managed for intermediary clients, as well as some assets invested in funds on behalf of institutional and Wealth Management clients. The Group's beneficial interest in structured entities is not included within AUM and is described separately over the page.

Financial report

# Notes to the accounts

**28. Interests in structured entities** continued
**(a) Interests arising from managing assets** continued
The Group has no direct exposure to losses in relation to the AUM reported above, as the investment risk is borne by clients. The main risk the Group faces from its interest in AUM managed on behalf of clients is the loss of fee income as a result of the withdrawal of funds by clients. Outflows from funds are dependent on market sentiment, asset performance and investor considerations.

Fee income includes £1,182.3 million (2015: £1,152.3 million) of fees from structured entities managed by the Group. The table below shows the carrying value of the Group's interests in structured entities as a result of its management of assets, where income is accrued over the period for which assets are managed before being invoiced. The carrying value represents the Group's maximum exposure to loss from these interests.

|  | 2016 £m | 2015 £m |
|---|---|---|
| Fee debtors[1] | 16.8 | 7.0 |
| Accrued income[1] | 156.9 | 147.2 |
| **Total exposure due to asset management activities** | **173.7** | **154.2** |

[1] Recognised in trade and other receivables.

**(b) Interest arising from the Group's investment in unconsolidated structured entities**
The table below shows the carrying values of the Group's proprietary investment in unconsolidated structured entities, which resulted in net gains on financial instruments and other income of £7.5 million (2015: £6.0 million). The carrying values represent the Group's maximum exposure to loss from these interests.

|  | 2016 £m | 2015 £m |
|---|---|---|
| Cash and cash equivalents | 320.0 | 350.3 |
| Financial assets | 478.2 | 458.6 |
| **Total exposure due to the Group's investments** | **798.2** | **808.9** |

The Group's proprietary investments include interests in unconsolidated structured entities in the form of cash and cash equivalents and financial assets. Cash and cash equivalents comprise investments in money market funds, of which £30.2 million (2015: £39.8 million) is managed by the Group. Financial assets comprise investments in unitised funds and legacy private equity investments and include seed capital and hedges of deferred cash awards (see note 16). Of the financial assets, £470.2 million (2015: £454.2 million) is invested in funds managed by the Group. The Group has no interest apart from its role as investor in those funds for which it does not act as manager. The main risk the Group faces from its interests in unconsolidated structured entities arising from proprietary investments is that the investments will decrease in value. Note 19 includes further information on the Group's exposure to market risk arising from investments held in investment capital.

The Group's statement of financial position also includes the Life Company assets of £12,927.6 million (2015: £11,319.9 million), which are included in the AUM information presented on page 147. The exposure to the risks and rewards associated with these assets is borne by unit-linked policyholders, or, where Life Company funds are consolidated, third party investors in those funds.

Financial support for consolidated structured entities where there is no contractual obligation to do so
The Group supports some of its funds through the injection of seed capital in order to enable the funds to establish a track record before they are more widely marketed. During the year, the Group purchased units at a cost of £129.6 million (2015: £124.4 million) to provide seed capital to investment funds managed by the Group, of which £114.0 million (2015: £95.5 million) resulted in the consolidation of those funds, and £15.6 million (2015: £28.9 million) did not.

## 29. Business combinations

> The Group applies the acquisition method to account for business combinations. The consideration transferred for the acquisition of a subsidiary is the fair values of the assets transferred, the liabilities incurred to the former owners of the acquiree and the equity interests issued by the Group. The consideration transferred includes the fair value of any asset or liability resulting from a contingent consideration arrangement. Identifiable assets acquired and liabilities and contingent liabilities assumed in a business combination are measured initially at their fair values at the acquisition date. The Group recognises any non-controlling interest (NCI) in the acquiree on an acquisition-by-acquisition basis, either at fair value or at the non-controlling interest's proportionate share of the recognised amounts of the acquiree's identifiable net assets.

The Group completed three business combinations during the year.

On 15 December 2016, the Group acquired a 65% interest in Benchmark Capital Limited (Benchmark Capital), a technology-led adviser support business based in the United Kingdom. Benchmark Capital comprises a wealth management business including an IFA network and a full service technology platform. The acquisition provides the Group with enhanced capabilities to meet the needs of retail investors and contributed £3.4 billion of AUM and £11.1 billion of AUA within Wealth Management.

On 16 September 2016, the Group acquired a securitised credit business (Securitised Credit) through an asset purchase agreement. The acquisition contributed £3.3 billion of Asset Management AUM and broadens the Group's fixed income offering.

On 1 February 2016, the Group took a controlling interest in Secquaero by increasing its holding from 30.0% to 50.1%. This transaction expanded the Group's existing relationship with Secquaero, a Swiss based insurance linked securities (ILS) business.

Net assets acquired
The fair values of the net assets acquired in the transactions together with the goodwill and intangible assets arising are as follows:

| Net assets acquired: | Benchmark Capital £m | Securitised Credit £m | Secquaero £m | Total £m |
|---|---|---|---|---|
| Cash | 7.1 | – | 1.7 | 8.8 |
| Trade and other receivables | 1.6 | – | 1.0 | 2.6 |
| Other assets | 0.5 | – | 0.1 | 0.6 |
| Trade and other payables | (0.9) | – | (1.0) | (1.9) |
| Other liabilities | (3.8) | – | (0.9) | (4.7) |
| Tangible net assets | 4.5 | – | 0.9 | 5.4 |
| Goodwill | 65.0 | 11.6 | 6.0 | 82.6 |
| Intangible assets | 33.5 | 6.2 | 4.3 | 44.0 |
| Deferred tax arising on intangible assets | (6.3) | – | (0.8) | (7.1) |
| Non-controlling interest | (11.1) | – | (2.2) | (13.3) |
| Total | 85.6 | 17.8 | 8.2 | 111.6 |

| Satisfied by: | Benchmark Capital £m | Securitised Credit £m | Secquaero £m | Total £m |
|---|---|---|---|---|
| Cash | 80.6 | 6.2 | 3.3 | 90.1 |
| Fair value of the Group's pre-existing 30% interest | – | – | 4.9 | 4.9 |
| Issuance of 233,623 Schroders plc – non-voting ordinary shares | 5.0 | – | – | 5.0 |
| Contingent consideration[1] | – | 11.6 | – | 11.6 |
| Total | 85.6 | 17.8 | 8.2 | 111.6 |

[1]  At the acquisition date, £11.6 million was recognised as contingent consideration. Payment of this amount is contingent upon certain levels of revenue and performance fees being generated during the three years post-acquisition. An estimate of the range of outcomes is that a cash payment of between £12.0 million and £16.4 million will be payable across 2017, 2018 and 2019.

Benchmark Capital
Goodwill arising on the acquisition of Benchmark Capital represents the value of the acquired business arising from:

– A broader platform for business growth;
– A talented owner along with a talented management and employee pool; and
– Opportunities for synergies from combining certain Wealth Management operations.

Goodwill arising on the acquisition of Benchmark Capital will not be deductible for tax purposes.

The measurement of the £11.1 million of NCI was determined as the proportion of identifiable net assets at acquisition attributable to third parties.

Financial report

# Notes to the accounts

29. Business combinations continued
Securitised Credit
The goodwill arising from the acquisition is attributable to the anticipated profitability of the business acquired arising from increased investment capabilities in the future.

Secquaero
The goodwill arising from the acquisition is attributable to the anticipated profitability of the business acquired arising from increased investment capabilities in the future. The measurement of the £2.2 million of NCI recognised at the acquisition date was determined as the proportion of identifiable net assets at acquisition attributable to third parties.

At 1 February 2016 the fair value of the 30.0% equity interest held in Secquaero was £4.9 million. As a result of remeasuring the equity interest to fair value at the acquisition date, a gain of £2.7 million was recognised through net gains on financial instruments and other income in the Group's income statement.

On acquisition, the Group recognised an obligation to purchase the remaining 49.9% shareholding in Secquaero. This obligation amounted to £9.1 million and was recorded as a financial liability in the Consolidated statement of financial position, with a corresponding debit recorded within Other movements in the Consolidated statement of changes in equity.

Impact of the business combinations on the Group's income statement
In the period between the acquisition dates and 31 December 2016, the three acquired businesses contributed £10.4 million to the Group's net income. The contribution to profit before tax and exceptional items was £2.1 million and exceptional operating and other expenses of £3.6 million were incurred. If the transactions had been completed on 1 January 2016, the Group's net income for the year before exceptional items would have been £1,828.9 million and profit before tax and exceptional items would have been £652.2 million (profit before tax and after exceptional items: £617.3 million).

Estimates and judgements
The Group has determined the fair value of the intangible assets acquired as part of its business combinations based on estimated profits, taking account of synergies, derived from contractual relationships that existed at the acquisition dates. This assessment involves judgement and assumptions relating to potential future revenues, appropriate discount rates and the expected duration of client relationships. The Benchmark Capital and the Securitised Credit acquisitions also involved an assessment of the fair value of acquired technology and software which has been determined using appropriate valuation techniques. The difference between the fair value of the consideration and the value of the identifiable assets and liabilities acquired, including intangible assets, has been accounted for as goodwill.

30. Events after the reporting period
On 17 February 2017, the Group acquired the wealth management business of C. Hoare & Co. The acquisition contributed approximately £2.3 billion of discretionary Wealth Management AUM and increases the Group's scale and capability for its UK private clients.

The initial consideration was satisfied by means of a £70.0 million cash payment, of which approximately 63% is represented by goodwill and approximately 37% is represented by intangible assets. The goodwill is not expected to be deductible for tax purposes. Due to the structure of the acquisition, the determination of the final amount is subject to review.