## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SHAUN R. LEVESQUE,      ) | |
|     ) | |
|     Plaintiff,     ) | |
|     ) | Civil Action No. 1:17-CV-12380 |
| v.     ) | |
|     ) | |
| SCHRODER INVESTMENT MANAGEMENT     ) | |
| NORTH AMERICA INC., and KARL DASHER,     ) | |
|     ) | |
|     Defendants.     ) | |

## <u>AMENDED COMPLAINT</u>

By this Complaint, Plaintiff Shaun R. Levesque seeks damages against his former employer, Schroder Investment Management North America, Inc. ("SIMNA") and his former manager, Karl Dasher, for breach of contract; violation of the Massachusetts Wage Act, Mass. Gen. L. ch. 149, §148; retaliation in violation of the Massachusetts Wage Act; promissory estoppel; *quantum meruit;* and age discrimination in violation of both Massachusetts and Federal law.

As set forth more fully below, Mr. Levesque was employed by SIMNA for more than nine years, selling investment services and products to institutional investors. Mr. Levesque earned, and was entitled to be paid, compensation in accordance with certain contractual agreements and promises. Notwithstanding these contractual agreements, Defendants have refused and failed to pay commissions due and owing to Mr. Levesque, in violation of these contracts and the Massachusetts Wage Act. Moreover, at the time of his termination, Mr. Levesque was a high performer but was, nevertheless, the sole employee impacted by a "reorganization" pursuant to which other, younger and less able employees were retained.

## **PARTIES, JURISDICTION AND VENUE**

1.      Plaintiff Shaun Levesque is an individual resident of Wrentham, Massachusetts. Plaintiff Levesque was employed by Defendant Schroder Investment Management North America Inc. ("SIMNA") from June 2, 2008 through his termination on September 22, 2017.

2.      Defendant SIMNA is a corporation organized and existing under the laws of Delaware that employees more than six employees.  SIMNA's principal place of business is located at 7 Bryant Park, New York, New York, 10018.

3.      Defendant Karl Dasher ("Dasher") is an individual who, on information and belief, has homes in New York, New York and Atlanta, Georgia, and who works in New York. Since approximately 2013, Dasher has been employed as the Chief Executive Officer of SIMNA, Co-Head of Fixed Income, and has served as a member of the Group Management Committee.

4.      This Court has subject matter jurisdiction over the Defendants pursuant to Mass. Gen. L. ch. 212, §3, because this is a civil action seeking relief in excess of $25,000 in damages.

5.      This Court has personal jurisdiction over the Defendants pursuant to Mass. Gen. L. ch. 223A, §3 because the contract at issue was executed and delivered in the Commonwealth of Massachusetts, the Defendants' actions caused harm to Plaintiff Levesque in the Commonwealth of Massachusetts, and each transacts business in the Commonwealth of Massachusetts.

6.      Venue in this Court is proper pursuant to Mass. Gen. L. ch. 223, §1, because Plaintiff Levesque resides in Wrentham, Norfolk County, Massachusetts.

## **FACTS**

7.      Schroders plc is a private limited company, with a principal place of business at 31 Gresham Street, London, England, EC2V 7QA.  On information and believe, Schroders plc is organized and existing under the laws of England and Wales.

8.      Schroder plc, together with its subsidiary undertakings, form the Schroders plc Group (the "Group"). See Schroders Annual Report and Accounts 2016, attached hereto as Exhibit A.   The Group is managed as a whole. See Schroder Investment Management Limited Annual Report and Accounts 2016, at 4, attached hereto as Exhibit B.

9.      As set forth in the Financial Report, incorporated by reference into Schroders Annual Report and Accounts 2016, the Group has three business segments: Asset Management, Wealth Management and the Group segment. Asset Management principally comprises investment management including advisory services, equity products, fixed income securities, multi-asset investments, real estate and other alternative asset classes such as commodities. SIMNA is part of the Asset Management business segment.

10.      The Group segment principally comprises the Group's investment capital and treasury management activities, business strategy and corporate development activities and the management costs associated with governance and corporate management.

11.      The Group is managed by a committee, comprised of the Group Chief Executive, the Group's Chief Financial Officer, Global Head of Human Resources, Global Head of Strategy, Global General Counsel, and the Chief Executive Officers and Heads of various divisions within each segment.

12.      SIMNA is part of the Asset Management Segment of the Group.

13.     Mr. Levesque was hired by the Group to work within SIMNA as Institutional

Sales Director, U.S. East Coast ("Sales Director"), reporting to the Head of U.S. Institutional

Distribution.  His offer letter dated April 18, 2008 ("Offer Letter"), was signed by Jamie

Dorrien-Smith, Chief Executive Officer of SIMNA.  A copy of the Offer Letter is attached as

Exhibit C.

14.     In the investment management context, Institutional sales refer to the sale of

investment products and services to institutions, rather than to individual investors.  In other

words, in this context an institution is a client or potential client that maintains and manages

pension or other types of investment funds for multiple persons or business entities.  By way of

example, the California Public Employees Retirement System ("CalPERS") is an agency within

the California executive branch that manages retirement and health benefits for more than 1.6

million California public employees, retirees, and their families, would be an "institution."

15.     On information and belief, at the time he offered Mr. Levesque a position as Sales

Director for SIMNA, Mr. Dorrien-Smith was a member of Member of the Group Management

Committee, the Asset Management and Global Distribution Executive Committees.

16.     As Sales Director, Mr. Levesque was entitled to compensation as set forth in the

Offer Letter.  Specifically, Mr. Levesque was then entitled to a base salary of $225,000 per year.

In addition, he was eligible to earn Incentive Compensation based on Management Fee Revenues

(as defined in the applicable Incentive Compensation Plan).  Mr. Levesque's Incentive

Compensation was guaranteed to be at least $550,000 for the first twelve months of his

employment.

17.     The Incentive Compensation for which Mr. Levesque was eligible was comprised

of a quantitative component and a qualitative component.  The quantitative component equaled a

percentage of Management Fee Revenues accrued on any New Account (as defined in the Incentive Compensation Plan) over a three-year period.  The qualitative component of Mr. Levesque's Incentive Compensation, which was also calculated as a percentage of Management Fee Revenues accrued on any New Account, was paid over a three-year period based on his achievement of individual goals in the base year.

18.     Quantitative Incentive Compensation was earned when revenues were generated on accounts.  Qualitative Incentive Compensation was earned at the end of each fiscal year, when it was determined whether a participant met his or her stated goals in that year.  Although the amount paid was somewhat discretionary, it was based on a percentage of Management Fee Revenues accrued on a participant's sales production.

19.     Schroders' reserved the right to defer up to 50% of the qualitative component of Mr. Levesque's earned Incentive Compensation, subject to the rules of a referenced Equity Compensation Plan.

20.     Mr. Levesque was paid a total of $875,000 in salary, quantitative incentive compensation (i.e., commissions), and qualitative bonus during calendar year 2008.

21.     In mid-2009, Mr. Dorrien-Smith promoted Mr. Levesque to Head of Institutional Sales ("Sales Manager").  Together, they agreed that Mr. Levesque's management responsibilities would take approximately 25% of his time, meaning that he would have less time to make sales and to earn the Incentive Compensation that comprised the majority of his total compensation.  Accordingly, based on a targeted $1,000,000 in base earnings comprised of base salary and quantitative incentive bonus (commissions), Mr. Dorrien-Smith suggested paying Mr. Levesque a management bonus of $250,000, more if the team Mr. Levesque managed exceeded its goals.

22.     The management bonus referenced in paragraph 21, which ranged from $100,000 to $350,000 per year, was paid to Mr. Levesque for the years 2009, 2010, 2011, and 2012, in or about February of the year following the year relative in which it was earned.

23.     According to Mr. Dorrien-Smith, a memorandum memorializing the compensation arrangement described in paragraph 21 had been placed in Mr. Levesque's personnel file.

24.     In 2011, the Group implemented a new Equity Compensation Plan ("ECP"), which applied to SIMNA.  Under the ECP, participating employees were given either a Share Award (an amount of shares in Schroders plc) and/or a Fund Award (units in a range of the Group's investment products), equal to the value of their earned, deferred Incentive Compensation. A copy of the ECP, which superseded an earlier version of it, is attached as Exhibit D.

25.     In 2013, SIMNA implemented a new Incentive Compensation Plan applicable to Institutional Sales.

26.     On information and belief, the 2013 Incentive Compensation Plan (the "2013 Plan") was similar to the Incentive Compensation Plan in effect from the start of Mr. Levesque's employment through the effective date of the 2013 Plan.   One of the two primary differences between the two Plans was that both the quantitative component of incentive compensation was itself divided into two components –individual Quantitative Incentive Compensation and team Quantitative Incentive Compensation.  As with the earlier plan, the dollar value of both the quantitative and qualitative components of available incentive compensation was calculated based on Management Fee Revenue generated on sales production.

27.     The second primary difference between the superseded incentive compensation plan and the 2013 Plan was that after 2013, the team Quantitative Incentive Compensation was subject to deferral into the ECP, along with the Qualitative Incentive Compensation.

28.     As with the earlier Incentive Compensation Plan, quantitative Incentive Compensation was earned when revenues were generated on accounts.  Qualitative Incentive Compensation was earned at the end of each fiscal year, when it was determined whether a participant met his or her stated goals in that year.

29.     Mr. Levesque earned between approximately $1,160,000 and $1,412,500 each year in the years between 2010 and 2014.

30.     Between 2010 and 2013, in what became a recurring conversation, Mr. Dorrien-Smith and Massimo Tosato, Vice-Chairman of Schroders plc, repeatedly questioned Mr. Levesque about his retirement plans. For example,

    a.   On Wednesday, July 12, 2011, Mr. Dorrien-Smith asked Mr. Levesque when he planned to retire.   Mr. Levesque was then 53 years of age.

    b.   Jamie Macmillan was hired by SIMNA in 2011 as an Institutional Salesman. During the hiring process, Mr. Dorrien-Smith made a number of disparaging comments to Mr. Levesqe regarding Mr. Macmillan (who was 53 years old at the time), to the effect that SIMNA should not be hiring a "bunch of Kelly's Heros," meaning older workers and misfits.

    c.   Massimo Tosato, Vice-Chair of SIMNA's parent corporation, Schroders, plc, and Mr. Levesque had a conversation on May 29th, 2012.   Mr. Tosato grilled Mr. Levesque about his willingness to still get on planes at his age and stage of career.

Mr. Tosato said that people of their age often do not have the same push and said that he did not have the same push he had when he was younger.

d. On November 15th, 2012, Mr. Macmillan told Mr. Levesque that he had been concerned when Mr. Dorrien-Smith had told him that the hiring of Curtis Johnson, a new salesperson (then approximately 40 years of age), would bring fresh ideas because he was younger.

e. Mr. Dorrien-Smith retired in 2013.  Before that, on Thursday, Oct. 18th, 2013, Mr. Dorrien-Smith talked to Mr. Levesque about raising the floor on minimum sized prospects in his sales territory so that a younger mid-market salesperson could have more to cover.  In other words, Mr. Dorrien-Smith asked Mr. Levesque to give up prospects below a certain value in favor of a younger co-worker who was unable to generate sufficient business on his own.

31.      Repeatedly, Mr. Levesque refused to discuss either his age or his retirement plans.

32.      In mid-2013, Mr. Dorrien-Smith retired.  He was replaced as CEO of SIMNA by Defendant Karl Dasher, who also held the title of Co-Head of Fixed Income assets.  Defendant Dasher continued to serve on the Group Management Committee, to which he had been appointed in about 2010.

33.      In about February 2014, Mr. Levesque and Defendant Dasher had a discussion about Mr. Levesque's management bonus.  During that conversation, Mr. Dasher noted that Mr. Levesque earned approximately $1.4 million in 2013, which amount was based entirely on Mr. Levesque's base salary and his earned quantitative bonus (commissions).  Accordingly, Mr. Dasher told Mr. Levesque that he thought Mr. Levesque's compensation was "excellent" for

someone in his position and, therefore, he would not be getting a management bonus relative to his 2013 performance.

34.     Mr. Dasher assured Mr. Levesque that, going forward, if Mr. Levesque earned less in commissions than he earned in 2013, he would make up the difference so that he received a total compensation package equal to $1.4 million.

35.     Shortly thereafter, in 2014, Defendant Dasher hired Marc Mayer as head of Institutional Investments.  Mr. Levesque began reporting to Mr. Mayer, instead of Mr. Dasher.

36.     In a telephone call in about the summer of 2014, Mr. Mayer informed Mr. Levesque that he no longer needed an Institutional Sales Manager because he instead wanted the salespeople to report directly to him.

37.     Immediately thereafter, Mr. Levesque and Mr. Dasher spoke by telephone. During that call, Mr. Dasher reiterated his promise to keep Mr. Levesque's total compensation at no less than $1.4 million.  During that call, Mr. Dasher told Mr. Levesque that he only expected Mr. Levesque to remain employed for another approximately three years before retiring.  At that time, Mr. Levesque was 56 years old.

38.     Shortly thereafter, in about September 2014, Mr. Mayer called Mr. Levesque. During that telephone call, Mr. Mayer acknowledged the promise Defendant Dasher had made to Mr. Levesque, that Mr. Levesque would continue to receive at least $1.4 million dollars in earnings.

39.     Relieved that both Defendant Dasher and Mr. Mayer were in agreement that Mr. Levesque's compensation would remain at no less than $1.4 million, Mr. Levesque asked that the agreement be memorialized, in case there were further management changes.

40.     Mr. Mayer declined to put the agreement in writing, saying that both he and Defendant Dasher were "serious guys."  Mr. Mayer also stated Schroders "did not put such things in writing."

41.     Mr. Levesque earned less than $1.4 million in base salary and quantitative incentive compensation for 2013.

42.     Notwithstanding the promises made by both Defendant Dasher, and confirmed by Mr. Mayer, Mr. Levesque was not paid a qualitative bonus in an amount that brought his total compensation to $1.4 million dollars, which bonus should have been paid in February or March 2014.  Mr. Levesque was paid approximately $1,100,000 relative to 2013.  Mr. Levesque was not paid a bonus of approximately $300,000 in February or March 2014, to bring his total earnings relative to 2013 up to $1,400,000.

43.     Mr. Levesque continued his employment as Sales Director.  He was the top-producing Sales person for 2015, and was the first or second highest grossing salesperson for every year he worked for the Group.

44.     In about March 2015, Mr. Mayer spoke with Mr. Levesque about the Emerging Market Equities Product section of the Asset Management segment of the Group.  Specifically, Mr. Mayer described the difficulties the then-Manager of the Emerging Product section was having accomplishing his goals and objectives.  Mr. Levesque remarked that he would be interested in the position, but not for two or three more years.

45.     In or about spring 2015, Mr. Mayer contacted Allan Conway, the Head of Emerging Markets, to discuss the possibility of Mr. Levesque transferring into the position of Manager of Emerging Products.  Mr. Mayer made this contact without Mr. Levesque's knowledge.

46.     Mr. Levesque and Mr. Conway discussed the position over lunch in London, during the summer of 2015.  They agreed that Mr. Levesque would start as Manager of Emerging Products in early 2016.  They also agreed that Mr. Levesque targeted compensation would be between $750,000 and $1 million, and that Mr. Levesque and Mr. Mayer would come to an agreement about the Sales Director quantitative bonus (commissions) he would be due on already-made Institutional sales for the full three-year commission cycle.  Finally, they agreed that Mr. Levesque would report to Alan Ayers, Head of Client Portfolio Management, Emerging Equities.

47.     During the London meeting described above, Mr. Levesque expressed to Mr. Conway his intent to continue working for at least five more years, if not longer.

48.     Mr. Leveque became Client Portfolio Manager for Emerging Products on February 1, 2016.

49.     After much negotiation and back-and-forth, the terms of Mr. Levesque's compensation as Client Portfolio Manager for  Emerging Products were memorialized.   By an internal memorandum dated June 29, 2016 ("2016 Agreement"), Mr. Levesque would be compensated as follows:

    a.  Base salary, at his then-current level ($275,000);

    b.  Continued sales-related pay ("SRP") for three years, at specified levels, for named accounts that were in process at the time Mr. Levesque transferred;

    c.  Continued SRP at specific, agreed upon rates applicable to both the quantitative and qualitative components of his incentive compensation for the full three-year cycle, relative both to business sold prior to Mr. Levesque's transfer (institutional sales), as well as business sold relative to Emerging Product clients; and

     d.   Eligible to be considered for a qualitative bonus based on his work with the

Emerging Equity product team.

50.     A copy of the 2016 Agreement is attached hereto as <u>Exhibit E</u>.

51.     In accordance with the terms of the 2016 Agreement, the earned compensation

referenced in paragraph 49 was subject to deferral into the ECP.

52.     Mr. Conway retired in August 2016.  He was replaced by Tom Wilson, who

became Head of the Emerging Markets Equity Group.  Mr. Ayers, to whom Mr. Levesque

reported, reported to Mr. Wilson.

53.     In early 2016, Mr. Levesque and Mr. Wilson traveled across the country, so that

Mr. Levesque could introduce Mr. Wilson to his North American clients.  In the course of these

travels, in March 2016, a conversation took place at Los Angeles International airport wherein

Mr. Wilson (who was then approximately 38 years of age), asked Mr. Levesque whether he was

tired of traveling so much at his age (which was then 59), and how much longer did he think he

could work.

54.     During a conversation between Mr. Dasher and Mr. Levesque just prior to the

Group's holiday party in December 2016, Mr. Dasher confided in Mr. Levesque that racially

disparaging comments he had made about Hispanics had been used against him during

negotiations between the Group and an attorney for an employee who had been pushed out.  Mr.

Levesque attempted to coach Mr. Dasher, to help protect him and the Group.

55.     In early February, 2017, Mr. Levesque was told that Mr. Dasher would speak to

him about his 2016 Incentive Compensation.

56.     On or about February 10, 2017, Mr. Levesque met with Mr. Dasher.  During that

meeting, which took place in Atlanta where Mr. Dasher now lives, Mr. Dasher disclaimed the

terms of the 2016 Agreement (Exhibit E).  Instead, Mr. Dasher told Mr. Levesque that, despite the existence of the 2016 Agreement, it was his belief that the promised bonus relative to Mr. Levesque's work for in Emerging Markets Client Portfolio Management was intended to be in lieu of his quantitative bonus (commissions) earned relative to his previously-made Institutional Sales.

57.     In that conversation, Mr. Dasher also told Mr. Levesque that he was fortunate to be paid as much as he was because, he erroneously stated, the "going rate" for the job held by Mr. Levesque was between $400,000 and $600,000.  When Mr. Levesque responded that he never would have left a position in sales where he earned in excess of $1,000,000 per year for a position earning significantly less than that per year. Mr. Dasher responded to Mr. Levesque, saying he should not complain because he had earned a lot of money over the years.

58.     Mr. Levesque was paid a total of $950,000 for 2016.  This amount included his base salary and the sales-related pay ("SRP") relating to Emerging Equity Market sales he made, calculated in accordance with the 2016 Agreement.

59.     Had Mr. Levesque been paid the quantitative Incentive Compensation earned relative to Institutional sales for all of 2016, as promised, he would have been paid an additional amount of approximately $367,000 in 2017 relative to work performed in 2016.  In addition, had Mr. Levesque not been terminated in retaliation for submitting a complaint about his compensation, in 2018 he would likely have earned an additional amount of quantitative Incentive Compensation relative to these sales, in an amount of approximately $732,000.

60.     Had Mr. Levesque been paid the qualitative bonus earned relative to his 2016 performance, calculated as a percentage of management fee revenues accrued on sales made by Mr. Levesque, he would have been paid an additional amount of approximately $500,000.

61. Thereafter, Mr. Levesque had a discussion with Mr. Ayers and Mr. Wilson. Mr. Wilson, who ran the Emerging Equity group, told Mr. Levesque not to complain because "he did bloody well." Inexplicably, Mr. Wilson also told Mr. Levesque that he should be grateful he was paid in United States dollars, a strong currency.

62. Subsequently, Mr. Levesque spoke to Mr. Ayres, his direct manager. Mr. Ayres told Mr. Levesque that he should "leave it alone."

63. Thereafter, Mr. Levesque contacted Louise Hoskings, the Chief of Staff for the Asset Management segment of the Group. As Chief of Staff, Ms. Hoskings is responsible for managing personnel issues within the Asset Management segment. Mr. Levesque explained to Ms. Hoskings that Mr. Dasher was refusing to pay him compensation legally owed to him under the terms of his agreements with the Group. Because Mr. Levesque was concerned (rightfully) about retaliation, he asked for Whistleblower status under the Group Whistleblowing Policy. A copy of the Whistleblowing Policy is attached hereto as Exhibit F.

64. Mr. Levesque also contacted Emma Holden, head of Human Resources for the Group. As such, Ms. Holden is responsible for all personnel issues across the Group. After multiple attempts, Mr. Levesque finally managed to arrange a telephone conversation with Ms. Holden. During that conversation, Mr. Levesque protested the breach of his compensation agreement and the Group's failure to pay him the compensation as promised, both verbally and in writing. Mr. Levesque reiterated his request for Whistleblower status, along with his concern about retaliation. Ms. Holden rejected this out of hand, saying that this was simply a pay dispute between an employee and his manager. Ms. Holden refused to engage further, and directed Mr. Levesque to speak with Mr. Dasher.

65.     On September 8, 2017, Mr. Levesque met with Chris Lue, head of Human Resources for the Group in the United States.  Also present were Alan Ayres and Tom Wilson, who had flown to the United States from London for the meeting.

66.     During the meeting on September 8, Mr. Levesque was told that his position was being "upgraded" and moved to London.  Mr. Levesque, who is a British national, was not offered the position.

67.     At the end of the meeting on September 8, after Mr. Ayres and Mr. Wilson had left, Mr. Lue told Mr. Levesque that he should "take the weekend" and think about how he wanted to "manage the narrative."  Mr. Lue suggested that Mr. Levesque refrain from telling his co-workers what happened in the meeting, and that he should consider telling co-workers – falsely – that he intended to retire.

68.     Mr. Levesque, who is 60 years of age, has no interest in retiring in the near-or mid-future.  He told this to Mr. Lue, and told him that it would be a lie to tell his co-workers that he intended to retire.  Mr. Lue again suggested that he think about it over the weekend, and to consider telling his co-workers he had decided to retire.

69.     Over the course of his employment, Mr. Levesque SIMNA has discriminated against him on the basis of age by attempting to limit his earning potential and by "reorganizing" in a way that eliminated his position while retaining younger employees.

Mr. Levesque can identify at least two individuals who have recently left SIMNA under circumstances that strongly suggest that they, too, were subjected to age discrimination.

**COUNT I**
**Breach of Contract**
**(against SIMNA)**

70.     Mr. Levesque restates and incorporates by reference the allegations set forth above as though fully set forth herein.

71.     Mr. Levesque had an agreement pursuant to which Mr. Levesque performed services for SIMNA, in exchange for payments made in accordance with the 2013 Incentive Compensation Plan and the 2016 Agreement.

72.     Such agreements constituted valid and binding contracts between the parties.

73.     Mr. Levesque performed all of his obligations pursuant to the contracts between the parties.

74.     SIMNA's obligation to pay Mr. Levesque in accordance with the terms of the 2013 Incentive Compensation Plan and the 2016 Agreement constituted material obligations under the contracts between the parties.

75.     Defendants breached the contracts by failing to pay all compensation owed.

76.     As a result of Defendants' breach of their contractual obligations, Mr. Levesque has sustained damages.

**COUNT II**
**Breach of the Covenant of Good Faith and Fair Dealing**
**(against SIMNA)**

77.     Mr. Levesque restates and incorporates by reference the allegations set forth above as though fully set forth herein.

78.     Defendant SIMNA owed Mr. Levesque the duty of good faith and fair dealing which is implied in every contract under the laws of the Commonwealth o f Massachusetts and the State of New York.

79.     Mr. Levesque performed all duties and responsibilities under the 2013 Plan and the 2016 Agreement including, but not limited to, making significant sales to Institutional Sales and Emerging Equity Market clients.

80.     SIMNA's conduct in accepting Mr. Levesque's services, and subsequently terminating Mr. Levesque's employment in bad faith in order to deprive him of commissions and/or without good cause, resulting in the loss of commissions relating to past services, breached the covenant of good faith and fair dealing.

81.     As a result of Defendants' breach of their contractual obligations, Mr. Levesque has sustained damages.

**COUNT III**
**Violation of Mass. Gen. L. ch. 149, §148 (Massachusetts Wage Act)**
**(against SIMNA)**

82.     Mr. Levesque restates and incorporates by reference the allegations set forth above as though fully set forth herein.

83.     Mr. Levesque has exhausted all administrative remedies, submitting his claim to the Attorney General's Wage Claim Unit on October 5, 2017 and receiving a private right to sue letter on October 12, 2017.

84.     SIMNA is an employer under Chapter 149 of the Massachusetts General Laws. Mr. Levesque was an employee of SIMNA for the purposes of the statute.

85.     SIMNA's failure to timely pay Mr. Levesque wages as promised and required is a violation of the Massachusetts Wage Act, Mass. Gen. L. ch. 149 § 148.

86.     Due to SIMNA's actions, Mr. Levesque has suffered damages.

**COUNT IV**
**Violation of Mass. Gen. L. ch. 149, §148 (Massachusetts Wage Act)**
**(against Defendant Dasher)**

87.     Mr. Levesque restates and incorporates by reference the allegations set forth above as though fully set forth herein.

88.     Mr. Levesque has exhausted all administrative remedies, submitting his claim to the Attorney General's Wage Claim Unit on October 5, 2017 and receiving a private right to sue letter on October 12, 2017.

89.     Defendant Dasher is an employer under Chapter 149 of the Massachusetts General Laws.  Mr. Levesque was an employee of Defendant Dasher for the purposes of the statute.

90.     Defendant Dasher's failure to timely pay Mr. Levesque wages as promised and required is a violation of the Massachusetts Wage Act, Mass. Gen. L. ch. 149 § 148.

91.     Due to the Defendant Dasher's actions, Mr. Levesque has suffered damages.

## COUNT V
## Violation of Mass. Gen. L. ch. 149, §148A (Retaliation)
**(against both defendants)**

92.     Mr. Levesque restates and incorporates by reference the allegations set forth above as though fully set forth herein.

93.     Mr. Levesque has exhausted all administrative remedies, submitting his claim to the Attorney General's Wage Claim Unit on October 5, 2017 and receiving a private right to sue letter on October 12, 2017.

94.     Mr. Levesque was terminated because he demanded wages that were due and owing to him pursuant to the Massachusetts Payment of Wages statute, in violation of Mass. Gen. L. ch. 149 § 148.

95.     The decision by the Defendants to terminate Mr. Levesque was done in bad faith, with actual malice and in retaliation for Mr. Levesque seeking to enforce his rights to wages under Massachusetts law.

96.     Discharging Mr. Levesque for seeking to enforce his rights under G.L. c. 149, § 148 is a violation of Massachusetts law.

97.     As a result of the Defendants' actions, Mr. Levesque has suffered damages.

**COUNT VI**
**Promissory Estoppel**
**(against SIMNA)**

98.     Mr.  Levesque restates and incorporates by reference the allegations set forth above as though fully set forth herein.

99.     Representatives of SIMNA and the Group told Mr. Levesque that he would be entitled to earn a bonus relative to his work in Emerging Markets Client Portfolio Management and, in addition, a quantitative bonus (commissions) earned relative to his previously-made Institutional Sales.

100.    Representatives of SIMNA and the Group made this representation knowing that Mr. Levesque would not accept a transfer into a position at significantly lower compensation.

101.    In reasonable reliance on the promises made, Mr. Levesque accepted a transfer from his position as a top-producing Sales Director into a position within the Emerging Market Equities product group.

102.    As a result of the SIMNA's actions, Mr. Levesque has suffered damages.

**COUNT VII**
**Quantum Meruit**
**(against SIMNA)**

103.    Mr.  Levesque restates and incorporates by reference the allegations set forth above as though fully set forth herein.

104.    Mr. Levesque acted in good faith in providing services for SIMNA with the expectation of being properly paid for his services.

105.     SIMNA acted in bad faith and refused to compensate Mr. Levesque for all of the work he performed.

106.     As a result of SIMNA's actions, Mr. Levesque has suffered damages.

**COUNT VIII**
**Age Discrimination inViolation of the Age Discrimination in Employment Act, 29 U.S.C.**
**§621, *et seq.* and Mass. Gen. L. ch. 151B**
**Against SIMNA**

107.     Mr.  Levesque restates and incorporates by reference the allegations set forth above as though fully set forth herein.

108.     SIMNA is an "employer" under both Section 1(5) of the Massachusetts fair employment practices law, Mass. Gen. L. ch. 151B ("Chapter 151B") and Section 630(b) of the Age Discrimination in Employment Act, 29 U.S.C. §621, *et seq.* (the "ADEA").

109.     Mr. Levesque has timely satisfied all prerequisites to lawsuit based on the Chapter 151B and the ADEA, and has received a right to sue letter from the Equal Employment Opportunity Commission.

110.     At all relevant times, Mr. Levesque was over the age of forty.

111.     At the time of his termination, Mr. Levesque was qualified for the position he held, as well as other positions within SIMNA.

112.     At the time of his termination, Mr. Levesque performed better than or equal to other younger employees who were retained.

113.     The duties and responsibilities performed by Mr. Levesque prior to his termination are being performed by younger employees.

114.     SIMNA terminated Mr. Levesque's employment because of his age.

115.     By the conduct described above, SIMNA discriminated against Mr. Levesque based on his age, in violation of the ADEA and Chapter 151B

-20-

116.    SIMNA's actions were willful.

117.    As a result of SIMNA's actions, Mr. Levesque has suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Shaun R. Levesque respectfully requests that this Court:

1.    Enter judgment in Mr. Levesque's favor on all counts of this Complaint;

2.    Award Mr. Levesque all contractual damages to which he is entitled;

3.    Award Mr. Levesque treble damages, attorneys' fees and costs under the Massachusetts Wage Act, Mass. Gen. L. ch. 149, § 148;

4.    Award Mr. Levesque front pay;

5.    Award Mr. Levesque compensatory, punitive and liquidated damages, as well as attorneys' fees and costs, under the ADEA;

5.    Order any other such relief as this Court deems fair and just.

## DEMAND FOR JURY TRIAL

Plaintiff Shaun R. Levesque hereby demands a trial by jury on all Counts that are so triable.

Respectfully submitted,
SHAUN R. LEVESQUE,

By his attorneys,


/s/ Martha J. Zackin
John F. Welsh, BBO#522640
Martha J. Zackin, BBO #555733
Bello Welsh LLP
125 Summer Street, Suite 1200
Boston, Massachusetts 02110
Tel: (617) 247-4100
Fax: (617) 247-4125
mzackin@bellowelsh.com
jwelsh@bellowelsh.com

DATED: February 8, 2018

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on February 8, 2018, I electronically filed the foregoing using the CM/ECF system, which will send notification of such filing to counsel for Defendants at the email address(es) registered with the system.

*/s/ Martha J. Zackin*